**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
Austin P. Van
(*pro hac vice*)
Samantha Daniels
(*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
avan@pomlaw.com
sdaniels@pomlaw.com

[*Additional Counsel on Signature Page*]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE SUNPOWER CORPORATION SECURITIES LITIGATION | Case No.:  3:23-cv-05544-RFL <br><br> <u>CLASS ACTION</u> |
| This Document Relates to: <br><br> *ALL ACTIONS* | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

1

## TABLE OF CONTENTS

2

I.      INTRODUCTION ............................................................................................. 1

3

II.     JURISDICTION AND VENUE ...................................................................... 4

4

III.    PARTIES ........................................................................................................ 5

5

        A.      Plaintiffs ............................................................................................ 5

6

        B.      Defendants ......................................................................................... 5

7

IV.     BACKGROUND ............................................................................................ 6

8

        A.      SunPower and Its Businesses ........................................................... 6

9

        B.      SunPower's Challenges Entering 2023 ............................................ 8

10

        C.      SunPower's Dismal 2023 .................................................................. 9

11

V.      SUNPOWER MISELD INVESTORS ABOUT ITS BREACHES OF FINANCIAL
12      COVENANTS ................................................................................................ 10

13

VI.     SUNPOWER MISELD INVESTORS ABOUT ITS CASH POSITION ....................... 15

14

        A.      SunPower's Nonpayment of Maxeon .............................................. 19

15

VII.    MATERIALLY FALSE AND MISLEADING STATEMENTS ................................... 20

16

        A.      False and Misleading Statement in Q1 2023 Form 10-Q .................. 20

17

        B.      False and Misleading Statement in Q2 2023 Form 10-Q ................... 21

18

        C.      False and Misleading Statement on October 24, 2023, Form 8-K.................... 21

19

        D.      False and Misleading Statement on November 1, 2023, Earnings Call.............. 22

20

VIII.   ADDITIONAL ALLEGATIONS IN SUPPORT OF SCIENTER ................................. 23

21

IX.     LOSS CAUSATION........................................................................................ 24

22

        A.      November 15, 2023 ............................................................................ 25

23

        B.      December 11, 2023 ............................................................................ 25

24

        C.      December 18, 2023 ............................................................................ 26

25

        D.      February 15-23, 2023 ........................................................................ 27

26

X.      NO SAFE HARBOR ........................................................................................ 29

27

i

28

XI.    PLAINTIFFS' CLASS ACTION ALLEGATIONS ........................................................... 30

XII.   CLAIMS ................................................................................................................... 32

XIII.  PRAYER FOR RELIEF ........................................................................................... 36

XIV.   DEMAND FOR TRIAL BY JURY ........................................................................... 36

ii

1   Lead Plaintiff Bezeyem Lemou and additional Plaintiff Daniel Suarez (collectively

2 "Plaintiffs"), by and through their undersigned counsel, respectfully submit this First Amended

3 Consolidated Class Action Complaint ("Complaint") alleging claims pursuant to Sections 10(b)

4 and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and U.S. Securities and

5 Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, against Defendants

6 SunPower Corporation, Peter Faricy, and Elizabeth Eby. Plaintiffs bring these claims on behalf of

7 themselves and all persons and entities other than Defendants who purchased or otherwise

8 acquired the securities of SunPower Corporation ("SunPower" or the "Company") between

9 May 3, 2023, and February 14, 2024, both dates inclusive (the "Class Period"). This group is

10 referred to as the "Class." Excluded from the Class are Defendants, their families, and their

11 affiliates.

12   Plaintiffs allege the following information based on their personal knowledge. All other

13 allegations in this Complaint are based upon the ongoing investigation undertaken by Plaintiffs'

14 counsel, including their review and analysis of (i) the Company's public filings with the SEC;

15 (ii) research reports from securities and financial analysts; (iii) the Company's press releases and

16 reports; (iv) the Company's website and marketing materials; (v) media reports concerning the

17 Company and other facts related to this action; (vi) interviews with former SunPower employees;

18 (vii) price and volume data for Company securities; (viii) consultation with experts and

19 investigators; and (ix) additional data concerning the Company and industry.

20 **I.  INTRODUCTION**

21   1.  SunPower is a solar panel installer and provider that suffered a brutal 2023. With

22 each passing day, the Company came closer and closer to violating certain critical thresholds

23 contained in financial covenants with its lenders – which violations would give its lenders the right

24 to demand immediate repayment of all amounts owed.

25   2.  When SunPower announced on October 24, 2023, that it would need to restate its

26 financials for several preceding reporting periods because of an overstatement of the value of its

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

consignment inventory, investors immediately homed in on whether the restatement would push SunPower into a breach of those financial covenants.

3.    Yet in its October 24, 2023 statement, SunPower failed to provide clarity when it stated that it was "negotiating the terms and conditions of a consent and waiver to address the effects of the Restatement" SunPower was planning to issue on one of its credit agreements. This statement reasonably suggested that SunPower was not yet in breach of its financial covenants and was seeking waivers to avoid such breach and default when it issued its restatement.

4.    On November 1, 2023, a week after SunPower announced the need for a restatement and cryptically revealed that it was in discussions with its lenders regarding the effects of the restatement on its covenants, the Company held an earning call.  On that call, a Goldman Sachs market analyst pressed Defendants on whether the Company was currently in breach of any of its four financial covenants, or whether instead the Company would be in compliance with its covenants until the end of the year.  In response, SunPower's CFO Elizabeth Eby either blatantly lied, or spoke with severely reckless disregard for the truth, when she said that the Company was "fine" with respect to its covenants in Q3 2023.

5.    In fact, as of the end of Q3 2023 on October 1, 2023, and well before the November 1, 2023 call, the Company was already in breach of its financial covenants with its lenders.  Accordingly, when far from being "fine in Q3," the Company was facing immediate obligation to repay its loans in full, which would have forced the Company into bankruptcy.

6.    The Company itself revealed this fact, and attendant concealed risks materialized, in a series of disclosures and revelations in December 2023 and February 2024.

7.    *First*, on December 11, 2023, the Company announced that it had secured a temporary waiver of "existing and certain anticipated defaults and events of default . . . related to the breach of a financial covenant and a reporting covenant."  That is, Defendants admitted that SunPower had breached some covenants and was anticipating breaching others, without specifying

which were which. SunPower's share price dropped from $4.80 to $4.43, or 7.7%, in response to this news.

8.      *Second*, a week later, on December 18, 2023, SunPower disclosed that it was currently in breach of its financial covenants, and had been as of Q3 2023, permitting lenders to demand immediate repayment of loans that the Company could not possibly repay immediately. For this reason, the Company was forced to issue a "going concern" warning. These announcements shook the market and caused SunPower's share price to substantially depreciate, with the share price plunging from $6.14 to $4.22, or over 31%, on this news.

9.      Finally, the risks of financial upheaval from the breaches of financial covenants that SunPower had concealed with its misstatements fully materialized in a series of revelations on February 15-24, 2024.  SunPower revealed that it had obtained permanent waivers of the events of default, but the relief came at a steep cost: the Company was forced to issue warrants to its lenders that gave them the right to buy huge amounts of equity at below-market prices, thereby diluting existing shareholder value. Upon announcement of this expensive life raft and its consequences, SunPower's share price fell from $4.26 to $3.18, or 25.4%.

10.     Separately, there was a second fraud occurring at SunPower during the same period. As a former employee corroborated, the Company's collapsing finances led it to struggle with its cash position, yet Defendants insisted that it had sufficient cash to meet its obligations to its suppliers. But that was false: despite Defendants telling investors in May and August 2023 that the Company had sufficient cash to meet its obligations, SunPower had ceased paying a company called Maxeon, its key supplier of the solar panels at the core of its business, by months prior to July 2023, and Maxeon had ceased shipping solar panels to SunPower. Thus, Defendants also made false statements in claiming that SunPower had sufficient cash to meet its obligations.

11.     Investors remained unaware that SunPower had made false and misleading statements and omissions in its SEC filings until November 15, 2023, when Maxeon revealed that it had ceased shipments to SunPower in July because of nonpayment of approximately $29 million

of invoices – that is, at the same time that SunPower was telling investors that it had sufficient cash to meet all its obligations.

12.     Defendants had falsely claimed in their previous quarterly financial report that they had sufficient cash and cash equivalents to meet their obligations. When the truth emerged of the falsity of that claim, SunPower's share price dropped from $4.67 to $4.33, or 7.3% on November 16, 2023 in response to this news.

13.     Given the admissions in SunPower's corrective disclosures, it is apparent that SunPower's misstatements concerning its breaches of financial covenants and its cash on hand to meet its obligations (as set forth below and herein) were made knowingly or at a minimum with reckless disregard for their truth.

## II.     JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to the Securities Exchange Act of 1934 and certain rules promulgated by the U.S. Securities and Exchange Commission. Specifically, this Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a), and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §§ 240.10b-5, and 28 U.S.C. § 1331.

15.     The Court has jurisdiction over this action's subject matter under Section 27 of the Exchange Act, *see* 15 U.S.C. § 78aa (exclusive jurisdiction over Exchange Act violations) and 28 U.S.C. § 1331 (federal question jurisdiction).

16.     Venue is proper in this District under Section 27 of the Exchange Act, *see* 15 U.S.C. § 78v and 28 U.S.C. § 1391(b) & (d). At all relevant times, SunPower conducted business and maintained its principal executive office at 1414 Harbour Way South, Suite 1901, Richmond, California 94804, in this District. Additionally, many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

17.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## III.   PARTIES

### A.     Plaintiffs

18.     Lead Plaintiff Bezeyem Lemou, as set forth in his Certification (ECF No. 24-1), purchased SunPower common stock during the Class Period and suffered damages due to Defendants' violations of the federal securities laws alleged herein.

19.     Additional Plaintiff Daniel Suarez, as set forth in his Certification filed concurrently, purchased SunPower common stock during the Class Period and suffered damages due to Defendants' violations of the federal securities laws alleged herein.

### B.     Defendants

20.     Defendant SunPower is incorporated under the laws of Delaware with principal offices located in Richmond, California.  SunPower's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the symbol "SPWR."

21.     Defendant Peter Faricy was the Company's Chief Executive Officer ("CEO") at all relevant times.  Faricy signed internal control and SOX certifications attached to the misleading Forms 10-Q.

22.     Defendant Elizabeth Eby has served as the Company's Chief Financial Officer since May 30, 2023.  Eby signed the false and misleading Forms 10-Q and October 24, 2023, Form 8-K, and made false and misleading statements during the November 1, 2023, earnings call.

23.     Defendants Faricy and Eby are sometimes referred to herein as the "Individual Defendants."

24.     Each of the Individual Defendants:

(a)     directly participated in the management of SunPower;

5

(b)    was directly involved in the day-to-day operations of SunPower at the highest levels;

(c)    was privy to confidential proprietary information concerning SunPower and its business and operations;

(d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)    was directly or indirectly involved in the oversight or implementation of SunPower's internal controls;

(f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning SunPower; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

25.    SunPower is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all the wrongful acts complained of herein were carried out within the scope of their employment.

26.    The scienter of the Individual Defendants and other employees and agents of SunPower is similarly imputed to SunPower under *respondeat superior* and agency principles.

**IV.    BACKGROUND**

**A.    SunPower and Its Businesses**

27.    SunPower offers fully integrated solar, storage, and home energy solutions to customers primarily in the United States and Canada through an array of hardware, software, and financing options. It offers a "Smart Energy" platform designed to add layers of "intelligent control" to homes, buildings, and grids.

28.    SunPower has contracts with various other companies that supply it with the goods and services necessary to operate its business. To effectuate these relationships, SunPower enters contracts with its suppliers.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

29.     To pay these suppliers, SunPower relies on funds from a variety of debt and credit sources, two of which are relevant to this case: a revolver and term loan facility with Bank of America and Bank of the West (the "Credit Agreement"), and a loan and security agreement with Atlas Securitized Products Holdings, L.P. (the "Atlas Credit Agreement").

30.     Under both agreements, SunPower has certain financial and reporting covenants with which it must comply. If SunPower fails to comply with those covenants, its counterparties have the right to demand immediate repayment of all outstanding amounts.

31.     As relevant to this case, under Section 7.10 of the Credit Agreement, SunPower was obliged to satisfy four financial covenants.

32.     The first covenant concerned the "Total Net Leverage Ratio," requiring SunPower to "not permit the Total Net Leverage Ratio on the last date of any Test Period to exceed 4.50:1.00." The Total Net Leverage Ratio is defined as "the ratio of (a)(i) Total Funded Debt as of such date minus (ii) Unrestricted Cash as of such date to (b) Consolidated EBITDA for the most recently ended Test Period." A "Test Period" "means, as of any date of determination, the most recently completed four (4) fiscal quarters of the Borrower . . . in the case of any calculation pursuant to Section 7.10, ended on the last day of the fiscal quarter in question."

33.     The second covenant concerned the "Consolidated Interest Coverage Ratio," requiring SunPower to "not permit the Consolidated Interest Coverage Ratio on the last day of any Test Period to be less than 1.75:1.00." The Consolidated Interest Coverage Ratio is defined as "the ratio of (a) Consolidated EBITDA to (b) Consolidated Net Interest Charges, in each case, for the most recently completed Test Period."

34.     The third covenant concerned the "Consolidated Asset Coverage Ratio," which required SunPower to "not permit the Consolidated Asset Coverage Ratio on the last day of any Test Period to be less than 1.50:1.00." The "Consolidated Asset Coverage Ratio is defined as "the ratio of (a) Adjusted Consolidated Net Tangible Assets to (b) Total Funded Debt, in each case, as of such date of determination."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

35.    The fourth covenant was a requirement pertaining to "Minimum Liquidity," requiring SunPower to "not permit Liquidity on the last day of any Test Period to be less than $100,000,000."

36.    Companies and analysts are universally aware of how crucial it is for companies to comply with their lenders' financial covenants: failure to comply with them constitutes an event of default, allowing a lender to cease lending under an agreement and demand immediate repayment of all amounts owed. Companies thus work very diligently to avoid breaching these covenants, as even a single breach risks triggering a doom loop for a company that is cut off from credit and forced to immediately repay all amounts owed.

37.    Separately, under the Atlas Credit Agreement, SunPower is required to deliver its unaudited financial statements within 45 days following quarter end, subject to a 10-business-day cure period.

38.    Similar to breaches of financial covenants, breaches of reporting covenants are events of default. However, it is known within the industry that lenders are far more willing to waive events of default triggered by breaches of reporting covenants than those triggered by breaches of financial covenants because reporting obligations say less about a company's underlying health than its financial obligations.

39.    Market analysts were aware of these covenants in SunPower's lending agreements.

**B.    SunPower's Challenges Entering 2023**

40.    SunPower faced a perfect storm of challenges in 2023.

41.    *First*, ongoing supply chain constraints that began during the COVID-19 pandemic impeded SunPower's efforts to obtain both physical components and the necessary skilled labor at costs it could afford. SunPower's increased costs harmed its margins.

42.    *Second*, SunPower also struggled in the face of California's new net energy metering program ("NEM 3.0"), approved by the California Public Utilities Commission on

8

1    December 15, 2022. Net metering programs allow consumers to earn credits for any excess solar

2    electricity sent to the grid when their solar panel systems generate more power than they need.

3        43.    While the formulas underlying the new metering program are complex and depend

4    on the specific hour, day, and month, the overall effect of NEM 3.0 was to reduce net metering

5    compensation rates – that is, the compensation for excess power generated by new California solar

6    customers that is fed back into the grid – by approximately 75 percent.

7        44.    Because a solar panel system is expensive, compensation rates for excess electricity

8    returned to the grid are a substantial portion of the value proposition for residential solar customers.

9    When that compensation rate was slashed going into 2023, consumers became much less likely to

10   purchase residential solar energy solutions from SunPower or its competitors.

11       45.    *Third*, SunPower faced challenges related to higher interest rates. Many of

12   SunPower's customers finance their solar power purchases, either directly through SunPower's in-

13   house finance company, SunPower Financial, or through external sources. No matter the source of

14   the financing, however, economy-wide interest rate increases throughout 2022 and 2023 made

15   borrowing from any source less affordable. Accordingly, demand from consumers declined.

16       46.    SunPower thus faced a trifecta of challenges in 2023 that cast a pall over its entire

17   business: in addition to facing higher costs in procuring and supplying solar energy systems, its

18   customers confronted a higher bill for installing new systems and a diminished value proposition

19   for doing so.

20       **C.    SunPower's Dismal 2023**

21       47.    At the beginning of the year, SunPower issued 2023 full-year guidance of between

22   $125 million and $155 million of adjusted EBITDA based on 90,000 to 110,000 new customers,

23   and adjusted EBITDA per customer before platform investment of between $2,450 and $2,900.

24   According to Defendant Faricy, who introduced this guidance on SunPower's February 15, 2023,

25   Q4 and full-year 2022 earnings call, this EBITDA guidance was "meant to be conservative,"

26   reflecting "some uncertainty in the economy," and incorporating increased platform investment, a

27

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1  500-basis point reduction to SunPower's overall customer growth from new homes, and a 500-

2  basis point reduction in year-over-year customer growth from the transition to NEM 3.0 in

3  California.

4      48.    But 2023 got off to a far worse start than even this "conservative" guidance would

5  have suggested.  On July 26, 2023, the week before it issued its Q2 2023 financial metrics and just

6  five months after originally issuing 2023 guidance, SunPower issued an 8-K with reduced

7  guidance for 2023 and announced cost-cutting measures that included the departure of

8  approximately 140 employees. Its new 2023 guidance was a dramatic reduction compared to its

9  initial 2023 projections: the Company slashed its projected adjusted EBITDA by more than half,

10  to $55 million to $75 million; it cut its projected new customer count by around 20 percent, to only

11  70,000 to 90,000 new customers; and cut its projected adjusted EBITDA per customer by over

12  40%, to only $1,450 to $1,650. It also introduced a projected net GAAP *loss* of ($31) million to

13  ($1) million.

14      49.    In response to this dramatic reduction in its guidance, SunPower's share price fell

15  from $11.59 to $9.23, a drop of over 20%, from July 25, 2023, to July 27, 2023.

16      50.    SunPower's reduced guidance made it reasonably clear to investors that 2023 was

17  shaping up to be a challenging year for SunPower, and that the Company was in a precarious

18  position, necessitating greater scrutiny of its finances. With each reduction in its adjusted EBITDA

19  guidance, the Company came closer to risking a violation of one or multiple financial covenants.

20  But because of Defendants' actions during Q3 2023, the market would have no way to know that

21  the Company had in fact already crossed the line with its lenders in Q3 2023, breaching its financial

22  covenants and precipitating an event of default.

23  **V.    SUNPOWER MISELD INVESTORS ABOUT ITS BREACHES OF FINANCIAL**

24  **COVENANTS**

25      51.    After hours on October 24, 2023, SunPower filed a Form 8-K announcing that the

26  financial statements in the Company's FY 2022 Form 10-K and its Q1 2023 and Q2 2023 Form

27

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

10-Qs should no longer be relied upon, and that it planned to restate its financials for those periods in amended reports. The Company described an overstatement of consignment inventory of microinverter components at certain third-party locations, a material weakness in the Company's internal controls over financial reporting, and ineffective disclosure controls and procedures.

52.     SunPower added one more sentence at the end of its statement:

> The Company and Bank of America, N.A., the administrative agent and collateral agent for the lenders (the 'Agent') under the Credit Agreement dated as of September 12, 2022 (as amended by the First Amendment, dated as of January 26, 2023, the 'Credit Agreement'), among the Company, the lenders party thereto from time to time, and the Agent are currently negotiating the terms and conditions of a consent and waiver to address the effects of the Restatement under the Credit Agreement.

53.     Defendants did not explain what was meant by "the effects of the Restatement under the Credit Agreement."

54.     A week later, on November 1, 2023, SunPower reported its preliminary Q3 2023 financial results. Those preliminary results made clear that even the Company's reduced full-year 2023 guidance was no longer feasible, and SunPower revised it downward again. SunPower guided an adjusted EBITDA *loss* of ($35) million to ($25) million based on 70,000 to 80,000 new customers, and adjusted EBITDA per customer of only $600 to $700. It also projected a net GAAP *loss* of ($175) million to ($165) million.

55.     The Company held an earnings call that same day, where Peter Faricy, Elizabeth Eby, and Michael Weinstein spoke on the Company's behalf.

56.     Investors were understandably concerned about whether the Company's revised figures placed it in breach of its crucial financial covenants in its lending agreements. Accordingly, a Goldman Sachs analyst directly asked Eby about SunPower's present compliance with its financial covenants:

> Question – Brian Lee: I know, Beth, you're still working with your creditors on the waivers and what have you, but could you remind us what the actual covenants are? I believe there might be some

11

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   either minimum cash and/or EBITDA coverage covenants. Could
2   you remind us what those are, where you stand relative to those
    today?

3   Answer – Elizabeth Eby: So, the covenant – there is four covenants.
4   One is a net debt-to-EBITDA with all the adjustments of 4.5x, and
    that's all the non-recourse. If you take out the non-recourse groups,
5   there's a interest coverage and there's a minimum liquidity, not
6   minimum cash, and an asset covenant.

7   Question – Brian Lee: Okay. And...

8   Answer – Elizabeth Eby: And we reached on all of those.

9   Question – Brian Lee: Yes. And given the...

10  Answer – Elizabeth Eby: Well, pending final adjustments. But yes.

11  Question – Brian Lee: Understood. Sorry, I cut you off there. So it
12  sounds like even given the negative EBITDA outlook here that you
    updated the market on this morning, you still plan to be in
13  compliance with all those covenants through year-end?

14  Answer – Elizabeth Eby: We need to get to the final phase of they're
    always the backward looking and ***we're fine in Q3*** and we're talking
15  to the banks about waivers for the restatement and anything else we
16  need.

        1.      Question – Brian Lee: Okay. Understood. Helpful.
17
18      57.     As described below, and contrary to Eby's statement during the earnings call, the

Company was in fact already in violation of its financial covenants during Q3 2023, and so as of
19
the date of that call was already at risk of its lenders demanding immediate repayment, triggering
20
bankruptcy. Accordingly, Eby blatantly misled investors.
21
        58.     Eby was aware of SunPower's precarious financial position when she spoke on the
22
November 1, 2023, earnings call. She either knew for a fact that the Company was not "fine" with
23
its financial covenants in Q3 2023, or she was severely reckless in stating definitively that the
24
Company was "fine" in Q3 2023 if she did not have the numbers to answer the question one way
25
or another. Eby certainly understood that the Company's non-compliance with its financial
26
covenants, and its attendant risk of bankruptcy, was material to investors.
27

28                                              12

                    AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
                          VIOLATIONS OF THE FEDERAL SECURITIES LAWS

59.     SunPower was due to file its Q3 2023 Form 10-Q by no later than November 29, 2023, but on November 13, 2023, SunPower announced that it would not be able to timely file its Q3 2023 Form 10-Q. SunPower explained that it was "working diligently to complete the Restatement," but that to file its Q3 financials by the prescribed due date would require "unreasonable effort or expense."

60.     After trading hours on December 11, 2023, SunPower shocked investors when it filed a Form 8-K announcing that it had entered into an agreement with Bank of America related to breaches of covenants contained in the Credit Agreement. In this release, Defendants admitted that SunPower had breached some covenants and was anticipating breaching others, without specifying which were which. In pertinent part, in discussing the agreement reached with Bank of America, the Form 8-K stated:

> The Amendment provides for, among other things . . . a temporary waiver until January 19, 2024 . . . of existing and certain anticipated defaults and events of default under the Credit Agreement related to the breach of a financial covenant and a reporting covenant . . . ."

61.     On this news, share prices of SunPower dropped $.37 per share, or 7.7%, from the closing price of $4.80 per share on December 11, 2023, to the close price of $4.43 per share on December 12, 2023, damaging investors.

62.     Then, in the morning on December 18, 2023, SunPower filed its financials for Q3 2023, along with restated financials for fiscal year 2022 and the first two quarters of 2023.

63.     In its Q3 2023 Form 10-Q, in connection with its restated financials for prior reporting periods that same day, SunPower stated that it was currently in breach of its financial covenants, and had been as of October 1, 2023, the close of Q3 2023, permitting lenders to demand immediate repayment of loans.  That is, the Company disclosed that they were in violation of their financial covenants during Q3 2023, contrary to Eby's false statement on November 1, 2023 that the Company was "fine in Q3":

> [A]s of October 1, 2023, we breached a financial covenant and a reporting covenant of our Credit Agreement, dated as of September

13

12, 2022 (as amended, the "Credit Agreement") [. . .] The breaches created events of default thereunder (the "Existing Defaults"), which enables the requisite lenders under the Credit Agreement to demand immediate payment or exercise other remedies . . . .

On December 8, 2023 (the "Amendment Effective Date"), the Company obtained a waiver and amendment to the Credit Agreement . . . which provides for, among other things, a temporary waiver until January 19, 2024 of the breaches.

64.     SunPower also issued a "Going Concern" warning telling investors that the Company may not have enough funds to continue its business over the next year:

**Risks Related to Our Liquidity**

Substantial doubt exists about our ability to continue as a going concern and if we are unable to continue our business, our common stock might have little or no value. Although our financial statements have been prepared on a going concern basis, unless we obtain a full waiver or amendment of the covenant breaches under the Credit Agreement and Atlas Credit Agreement and we are able to raise additional capital, there is a material risk that we will continue to be in breach of our financial covenants under the Credit Agreement and Atlas Credit Agreement, which may cause future events of default under our other existing debt agreements.

65.     SEC S-K Item 2.04 ("Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement") required that Defendants disclose the breach of SunPower's financial covenant. As SunPower admitted, it breached its financial covenants as of October 1, 2023, which accelerated its credit obligations. Defendants violated S-K Item 2.04 by failing to disclose this breach until over two months after it happened. Defendants' misstatements were all the more misleading in this context.

66.     On the news of the Company's announcement of the breach of financial covenants, restatement, and a going concern warning, share prices of SunPower plummeted another $1.92 per share, or over 31%, from the closing price of $6.14 per share on December 15, 2023, to the close price of $4.22 per share on December 18, 2023, damaging investors.

67.     However, the financial risks that SunPower had concealed with its misstatements did not fully materialize until February 2024.  On February 15, 2024, SunPower filed a Form 8-K

14

announcing that it had obtained permanent waivers of its defaults under both the Credit Agreement and the Atlas Credit Agreement. The Company also announced amendments rendering the financial covenants under the Credit Agreement less onerous. The Company went on to state that it had obtained $175 million of capital and $25 million of additional revolving debt capacity from Sol Holding.

68.    Yet to obtain this additional financing, the Company was forced to issue penny warrants to Sol Holding to purchase up to approximately 41.8 million shares of the Company's common stock with an additional 33.4 million of warrants issued if the Company drew the full amount of available funding, significantly diluting existing shareholder value.

69.    The next week, on February 23, 2024, SunPower announced that it had secured over $300 million in project financing commitments for its residential solar and storage lease programs, enabling it to meet certain funding conditions in its loans from Sol Holding.

70.    On this news, share prices of SunPower fell $1.08 per share, or 25.4%, from the closing price of $4.26 per share on February 14, 2024, to the closing price of $3.18 per share on February 23, 2024.

## VI.    SUNPOWER MISELD INVESTORS ABOUT ITS CASH POSITION

71.    Separate from SunPower's breach of financial covenants, the Company committed a second fraud during the Class Period:  SunPower disguised a dire cash shortage by misrepresenting that it had sufficient cash to cover its obligations in the coming year, when in fact appears to have been unable even to pay its current debts to its suppliers.

72.    A former employee ("FE1") has described SunPower's chronic cash problems.

73.    FE1 worked for SunPower from January 2022 to January 2024 in the Company's financial planning and analysis team, with the title of Finance Manager.  In that role, FE1 worked with SunPower's Supply Chain team to "understand all of the inventory, the cost, [and] the P&L [profit and loss statements]." FE1 thus analyzed material costs, reconciled supply chain numbers with what suppliers were reporting, and examined "why costs were increasing or decreasing."

74.     FE1 reported to her finance manager, Anita Flores Deremick, who reported to Vice President and Business CFO Sam Lee, and Lee reported to CFO Elizabeth Eby.

75.     FE1 explained that the Company was hit hard by California's enactment of NEM 3.0, which resulted in "demand dropping," such that the Company had not performed well for "a couple of quarters" leading into the middle of 2023.

76.     FE1 stated that "[t]here were a lot of high expenses, so the leadership team, including [Defendant Faricy], they were really zoning in on all of these expenses and costs and trying to understand where we could cut all of the costs," but that such efforts were "hard to do, especially when working with inventory." FE1 elaborated that "[o]ne of the major issues that we as a whole company were trying to resolve was trying to liquidate material and supplies that we didn't need so we could get cash out of it." "Literally everything you could think of" to reduce costs, "they were trying to do." For example, SunPower ended one of its leases for an office in Richmond, California, and the company's leadership was no longer allowed to travel unless it was "absolutely necessary" and approved by Faricy.

77.     Another former employee ("FE2") told a similar story.  FE2 worked for SunPower from January 2019 to August 2023 as a Senior Risk Manager.  In that role, FE2 oversaw insurance on behalf of the company, and FE2 worked with insurers for all parts of the company, from equipment to operations.  FE2 reported to Treasurer and Vice President of Project Finance (and later Interim CFO) Guthrie Dundas.

78.     According to FE2, "[c]ash was always an issue" during FE2's entire tenure at SunPower.  As the Company was "crunched constantly" for cash, that "[n]othing just flowed." For instance, "[t]here was always delays in paying our suppliers and allocating cash to pay suppliers," such that SunPower "never just cut the check" — "[i]t was always, 'Who is most important?'" and needed to be paid now versus who could be paid later.  As a result, FE2 "was always having to escalate" bills owed to the Company's insurance providers, often resorting to "beg[ging] someone to pay" the outstanding bills.  Given these constant delays, according to FE2, a "handful" of

16

1  SunPower's insurance suppliers threatened to issue notices of cancellation, or "NOCs" because of

2  the Company's "nonpayment." FE2 communicated the insurers' threats verbally to then-Treasurer

3  and Vice President – Project Finance (and later Interim CFO) Guthrie Dundas.

4        79.    Yet another former employee ("FE3") had similar experiences. FE3 worked at

5  SunPower from January 2019 to January 2023 as a Logistics Data Analyst. This role involved

6  tasks related to the logistics and transportation operations of the company, such as managing the

7  payment process, conducting reporting for month-end transportation accruals, assisting with

8  accounting for support freight, and "data crunching and reports." FE3 reported to the Senior

9  Manager for North American Logistics, Matthew Kavanagh, who reported to the Director of Sales

10  and Operations Planning, Brian Ross.

11        80.    All throughout the three years of FE3's tenure, SunPower was continuously "tight

12  on cash." FE3, who helped manage SunPower's relationships with transportation suppliers,

13  received questions from the suppliers wanting to know when the company was going to make

14  payments. SunPower's transportation suppliers regularly "didn't really get paid on time," which

15  "was a pretty usual thing at the end of each quarter." Things got so bad that suppliers threatened

16  to halt services if SunPower failed to pay. One major supplier did in fact "shut service down," and

17  it took SunPower a "week or two" to tender payment and restart that critical pipeline.

18        81.    SunPower's lack of cash and issues with paying suppliers on time became a "bigger

19  and bigger and bigger" issue after surfacing in 2022, and SunPower's cash problem was well-

20  known throughout the Company.

21        82.    Indeed, another former employee ("FE4") confirms that SunPower's management

22  knew of these persistent cash problems. FE4 worked for SunPower from February 2022 to

23  February 2024 as the Vice President of Supply Chain operations, where FE4 lead the entire supply

24  chain department. FE4 reported to the Executive Vice President of Operations, Derek Kuzak, who

25  reported to CEO Peter Faricy. FE4 also reported to COO Jennifer Johnston.

26

27

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

83.     According to FE4, CEO Faricy and CFO Elizabeth Eby knew about the cash issues but were "very tight-lipped" amount the matter." They "continued to say" that they were "not able to tell you when we will have the ability to raise the equity" needed "in order to pay," whether it was Maxeon other suppliers. "Everything pertaining to cash was very, very tight-lipped" and kept among "a small group of people."

84.     After October 2023, Ernst & Young "took a really, really long time" to conduct a "deep dive" into the issues that led to the restatement. SunPower was finally able to restate its financials in December, by which point "we were delinquent on payments to everybody."

85.     FE4 also recalled being pulled into an "ad-hoc" meeting in August or September 2023 with CFO Elizabeth Eby and COO Johnston as SunPower was walking a "tightrope" to "piss the least amount of people off" given these cash issues. The message in the meeting was "basically, 'We've got a problem." Eby and Johnston asked FE4 if FE4 could help the company work with suppliers "to delay receipts."  FE4 said he was "certain there were a lot of meetings highlighting the gravity of our financial situation."  FE4 indeed was "regularly getting called" into meetings and being asked if Supply Chain "could do more" to "alleviate the cash crunch."

86.     FE4 said SunPower was having issues paying suppliers "across the entire company. Every aspect was overdue," and that "at the end of every week," FE4's team would have to ask SunPower's Treasury department, "'Did you make any payments to this account?'" If the answer was no, the next question was: "When will we be able to make a payment there?" Always, "There was radio silence," FE4 said. According to FE4, "There's no way that [CEO] Peter wasn't aware of the gravity of the payment situation that [CFO] Beth and [COO] Jen on his behalf were trying to navigate."

87.     These financial issues long plagued the Company.  Indeed, FE4 related how SunPower had failed an annual audit conducted by Ernst & Young in 2022.  That accounting firm told SunPower it needed to make a "bunch of corrections" and these corrections were all "going on" during the first nine months of 2023.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

88.     Struggling to cut costs, the Company saw its cash position continue to deteriorate and become a bigger issue "starting mid-way through" 2022, to the point that there was no longer "enough cash in the business to continue to pay some of the suppliers."

89.     "There is and was a lack of cash on hand at the company," FE1 explained. "We had almost monthly meetings from Peter [Faricy] trying to emphasize the importance of getting cash on hand and trying to liquidate some of our material and inventory we had in warehouses."  There was a "large emphasis on trying to reduce the amount of inventory" on hand and to "reduce expenses."

90.     The fact that the company was "in big trouble" surfaced around the "beginning of summer" 2023 and involved a meeting with Faricy. There were companywide "all-hands" meetings conducted via Zoom and attended by "pretty much everyone" during which SunPower's leadership discussed the need to cut costs and liquidate assets.

91.     Then, around Q2 or Q3 2023, FE1 recalled that SunPower "lost [its] contract" with Maxeon, one of SunPower's "major suppliers," after SunPower "missed payments" to the company. FE1 believes that the payments were "probably months" late. "It was noted that it was because of payment issues."

**A.    SunPower's Nonpayment of Maxeon**

92.     SunPower did not mention any of the issues described by FE1 when it filed its Q1 and Q2 2023 Forms 10-Q on May 3, 2023 and August 2, 2023, respectively.

93.     Instead, SunPower took the opportunity in its filings to reassure investors regarding its cash position, claiming, "We currently anticipate that our cash and cash equivalents will be sufficient to meet our obligations over the next 12 months from the date of issuance of our financial statements." Those statements were false when they were made.  SunPower's cash position became so strapped that it had *already* stopped paying Maxeon, one of its key suppliers.

94.     Then, on November 15, 2023, SunPower and Maxeon, the primary supplier of SunPower's photovoltaic modules, both released press releases announcing that they had entered

into an agreement to settle and resolve disputes related to their contract. Maxeon stated that it had suspended shipments to SunPower in July 2023 because SunPower had seriously fallen behind on payments—SunPower had failed to pay approximately $29 million of past due invoices. Accordingly, SunPower had been unable to pay its invoices to its key supplier for months prior to July 2023, and thus misled investors when it stated in its May and August 2023 quarterly reports that it anticipated that it had sufficient cash and cash equivalents to meet its obligations over the next 12 months.

95.    On this news, share prices of SunPower dropped $.34 per share, or 7.3%, from the closing price of $4.67 per share on November 15, 2023, to the close price of $4.33 per share on November 16, 2023, damaging investors.

## VII.    MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.    False and Misleading Statement in Q1 2023 Form 10-Q

96.    SunPower filed a Form 10-Q on May 3, 2023, announcing its financial results for the first quarter ended April 2, 2023. It was signed by Defendant Eby, and Defendants Faricy and Eby both signed attached internal control and SOX certifications.

97.    SunPower stated, "We currently anticipate that our cash and cash equivalents will be sufficient to meet our obligations over the next 12 months from the date of issuance of our financial statements."

98.    The preceding statement in the Form 10-Q was materially false and misleading and omitted material facts when made because at the time SunPower did not have cash and cash equivalents, and did not anticipate having cash and cash equivalents, sufficient to meet its obligations for the next 12 months.  SunPower already lacked sufficient cash to pay Maxeon, a key supplier of its photovoltaic modules.  In a November 15, 2023, press release, Maxeon explained that it had suspended shipments to SunPower starting in July 2023 because SunPower had fallen behind on payments, so SunPower could not reasonably have anticipated as of

1    May 2023 that its cash and cash equivalents would be sufficient to meet its obligations for the next

2    12 months.

3        **B.**     **False and Misleading Statement in Q2 2023 Form 10-Q**

4        99.     SunPower filed a Form 10-Q on August 2, 2023, announcing its financial results

5    for the second quarter ended July 2, 2023. It was signed by Defendant Eby, and Defendants Faricy

6    and Eby both signed attached internal control and SOX certifications.

7        100.     SunPower stated, "We currently anticipate that our cash and cash equivalents will

8    be sufficient to meet our obligations over the next 12 months from the date of issuance of our

9    financial statements."

10        101.     The preceding statement in the Form 10-Q was materially false and misleading and

11    omitted material facts when made because at the time SunPower did not have cash and cash

12    equivalents, and did not anticipate having cash and cash equivalents, sufficient to meet its

13    obligations for the next 12 months. SunPower already lacked sufficient cash to pay Maxeon, a

14    key supplier of its photovoltaic modules. As Maxeon CEO William P. Mulligan revealed on an

15    August 10, 2023 earnings call, Maxeon had "notified SunPower, in writing, that it ha[d] failed to

16    pay approximately $29 million of past due invoices."

17        **C.**     **False and Misleading Statement on October 24, 2023, Form 8-K**

18        102.     SunPower filed a Form 8-K after trading hours on October 24, 2023, stating that:

19
20
21
22
23
> "The Company and Bank of America, N.A., the administrative agent and collateral agent for the lenders (the 'Agent') under the Credit Agreement dated as of September 12, 2022 (as amended by the First Amendment, dated as of January 26, 2023, the 'Credit Agreement'), among the Company, the lenders party thereto from time to time, and the Agent ***are currently negotiating the terms and conditions of a consent and waiver to address the effects of the Restatement under the Credit Agreement.***"

24        103.     The preceding bolded statement in the Form 8-K relating to "the effects of the

25    Restatement under the Credit Agreement" was materially false and misleading and omitted

26    material facts because:

27

28

21

(a)    the statement reasonably suggested that SunPower was not yet in breach of its financial covenants, and was seeking waivers to avoid such breach and default when it issued its restatement, when in fact it was already in breach of its financial covenants;

(b)    SunPower's statement created the impression that the Company was only potentially in breach of reporting covenants, when in fact the Company was in breach of more serious financial covenants;

(c)    the statement reported certain facts required to be reported in a current report on Form 8-K, yet misleadingly omitted others, including that it was in breach of financial covenants, which the Company was required under S-K Item 2.04 to report in the 8-K.

**D.**    **False and Misleading Statement on November 1, 2023, Earnings Call**

104.    Beginning at 8:00 AM Eastern time on November 1, 2023, the Company hosted a Q3 2023 earnings call with securities analysts. Defendants Faricy and Eby spoke on the Company's behalf.

105.    During the question-and-answer portion of the call, a Goldman Sachs analyst asked Eby about SunPower's compliance with its financial covenants:

> Brian Lee [Goldman Sachs]: . . . it sounds like even given the negative EBITDA outlook here that you updated the market on this morning, you still plan to be in compliance with all those covenants through year-end?

> Answer – Elizabeth Eby [CFO]: We need to get to the final phase of they're always the backward looking and ***we're fine in Q3*** and we're talking to the banks about waivers for the restatement and anything else we need.

(a)    The preceding bolded statement in the November 1, 2023, earnings call relating to the Company's compliance with its covenants in Q3 2023 was materially false and misleading and omitted material facts. SunPower's third fiscal quarter ended on October 1, 2023, and as described above, SunPower admitted that it was in breach of its financial covenants as of October 1, 2023. The Company's compliance with its financial covenants was not "fine in Q3[.]"

106.    Following this November 1, 2023 call, highly sophisticated analysts were demonstrably misled to believe that the Company was fine on its debt covenants. For instance, on the same day, JP Morgan issued a report stating that "SPWR reported 3Q results" and "[e]ncouragingly, the company generated positive FCF [free cash flow] during 3Q and appears to be in compliance with debt covenants, though the company is in discussions with its lenders for a waiver owing to the pending restatement (non-cash) recently announced." (JP Morgan, SunPower Corporation, Nov. 1, 2023.)

## VIII.   ADDITIONAL ALLEGATIONS IN SUPPORT OF SCIENTER

107.    Additionally, Defendants Faricy and Eby held themselves out in their public statements as personally familiar with the Company's financial performance. Throughout the Class Period, including in press releases, SEC filings, and on earnings calls, Defendants Faricy and Eby regularly spoke to investors and securities analysts regarding, among other topics, the Company's financial metrics, cash position, lending agreements, and financial covenants. Having spoken on these subjects so many times, Faricy and Eby knew, or were deliberately reckless in not knowing, that the statements about SunPower's compliance with its financial covenants and cash position were false and misleading and omitted material information.

108.    As the Company's CFO, Eby knew that SunPower's compliance with its financial covenants was material to its ability to continue as a going concern and, therefore, was material to investors. She also understood how close the Company was to violating those covenants, especially as SunPower repeatedly reduced its guidance throughout 2023. Thus, Eby understood the importance of speaking accurately and truthfully when describing SunPower's compliance with its financial covenants. Her knowledge of the significance of SunPower's financial covenants creates an inference that she spoke intentionally and deliberately when she said that the Company was "fine" in Q3 2023. If she knew when she spoke that the Company was not "fine," then her misstatement was knowing. If Eby stated that the Company's compliance with its financial covenants was "fine" in Q3 2023 without actually knowing whether the Company was in fact fine

1   with its compliance with its financial covenants during that period, she acted at a minimum with

2   severe recklessness in making up an answer on a matter that she knew was highly material to

3   markets.

4       109.    With respect to SunPower's cash position, the Company admitted, in the Q1 and

5   Q2 2023 10-Q quarterly reports signed by Eby, that, "We continuously evaluate our liquidity and

6   capital resources, including our access to external capital, to ensure we can finance our future

7   capital requirements." As the Company's CEO and CFO, Faricy and Eby (respectively) understood

8   that Maxeon, as its key supplier of solar panels, would demand to be paid pursuant to the operative

9   master supply agreement. They similarly understood that its possession of cash sufficient to meet

10  its obligations, both to Maxeon and to its other suppliers, was a fact material to markets. Before

11  signing the Q2 2023 Form 10-Q, Faricy and Eby certainly would have known that the Company

12  was delinquent in its payments to its most important supplier.

13  **IX.    LOSS CAUSATION**

14      110.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline

15  in the market value of the Company's securities, Plaintiffs and other Class members have suffered

16  significant losses and damages.

17      111.    During the Class Period, as detailed herein, Defendants engaged in a scheme to

18  deceive the market and/or engaged in a course of conduct that artificially inflated the price of

19  SunPower's securities and deceived purchasers of SunPower's securities. By failing to disclose

20  the true state of the Company's financial performance, business and operations, Defendants

21  presented a misleading picture of SunPower's condition and value, which had the intended effect

22  and caused the Company's securities to trade at artificially inflated prices during the Class Period.

23  Investors purchased SunPower's securities based on these false premises. SunPower securities

24  could not have been issued, or would have been sold at dramatically lower prices, had investors

25  been aware of SunPower's true state of affairs.

26

27

28

112. Because Plaintiffs were unaware that Defendants' representations identified above were false and misleading (and that Defendants omitted and failed to disclose material information regarding SunPower's breach of its financial covenants), Plaintiffs paid an artificially inflated and unreasonable price for their purchases of SunPower securities.

113. As set forth herein, as Defendants' materially false, misleading, and incomplete statements were revealed through disclosure events occurring between November 15, 2023, and February 23, 2024, the price of SunPower's securities materially fell, as the prior inflation came out of the Company's share price.

### A. November 15, 2023

114. On November 15, 2023, SunPower issued a Form 8-K and a press release announcing it had entered into an agreement "to settle and resolve certain disputes" related to its supply agreement with Maxeon. As Maxeon's press release issued the same day related, Maxeon had suspended shipments to SunPower in July 2023 because SunPower had failed to pay approximately $29 million of past due invoices. The agreement required SunPower "to issue to Maxeon, in a private placement, warrants for 1,700,000 shares of the Company's common stock."

115. On this news, share prices of SunPower dropped $.34 per share, or 7.3%, from the closing price of $4.67 per share on November 15, 2023, to the close price of $4.33 per share on November 16, 2023, damaging investors.

### B. December 11, 2023

116. On December 11, 2023, SunPower filed a Form 8-K announcing that it had entered into an agreement with Bank of America related to breaches of covenants contained in the Credit Agreement. In this release, Defendants admitted that SunPower had breached some covenants and was anticipating breaching others, without specifying which were which. In pertinent part, in discussing the agreement reached with Bank of America, the Form 8-K stated: "The Amendment provides for, among other things . . . a temporary waiver until January 19, 2024 . . . of existing and

certain anticipated defaults and events of default under the Credit Agreement related to the breach of a financial covenant and a reporting covenant . . . ."

117.    On this news, share prices of SunPower dropped $.37 per share, or 7.7%, from the closing price of $4.80 per share on December 11, 2023, to the close price of $4.43 per share on December 12, 2023, damaging investors.

**C.    December 18, 2023**

118.    On December 18, 2023, SunPower filed its financials for Q3 2023, along with restated financials for fiscal year 2022 and the first two quarters of 2023. In SunPower's Q3 2023 Form 10-Q, in connection with its restated financials for prior reporting periods that same day, SunPower stated that it was currently in breach of its financial covenants, and had been as of October 1, 2023, the close of Q3 2023, permitting lenders to demand immediate repayment of loans.  It stated: "[A]s of October 1, 2023, we breached a financial covenant and a reporting covenant of our Credit Agreement, … (as amended, the "Credit Agreement") [. . .] The breaches created events of default thereunder (the "Existing Defaults"), which enables the requisite lenders under the Credit Agreement to demand immediate payment or exercise other remedies . . . ."

119.    In that Q3, SunPower also issued a "Going Concern" warning telling investors that the Company may not have enough funds to continue its business over the next year.  As stated: "Although our financial statements have been prepared on a going concern basis, unless we obtain a full waiver or amendment of the covenant breaches under the Credit Agreement and Atlas Credit Agreement and we are able to raise additional capital, there is a material risk that we will continue to be in breach of our financial covenants under the Credit Agreement and Atlas Credit Agreement, which may cause future events of default under our other existing debt agreements."

120.    On the news of the Company's announcement of the breach of financial covenants, restatement, and a going concern warning, share prices of SunPower plummeted another $1.92 per share, or over 31%, from the closing price of $6.14 per share on December 15, 2023, to the close price of $4.22 per share on December 18, 2023, damaging investors.

**D.    February 15-23, 2023**

121.    On February 15, 2024, SunPower filed a Form 8-K announcing that it had obtained permanent waivers of its defaults under both the Credit Agreement and the Atlas Credit Agreement and announced amendments rendering the financial covenants under the Credit Agreement less onerous.

122.    In that 8-K, the Company also stated that it had obtained $175 million of capital and $25 million of additional revolving debt capacity from Sol Holding—but to obtain this additional financing, SunPower was forced to issue penny warrants to Sol Holding to purchase up to approximately 41.8 million shares of the Company's common stock with an additional 33.4 million of warrants issued if the Company drew the full amount of available funding, significantly diluting existing shareholder value.

123.    On February 23, 2024, SunPower announced that it had secured over $300 million in project financing commitments for its residential solar and storage lease programs, enabling it to meet certain funding conditions in its loans from Sol Holding.

124.    On this news, share prices of SunPower fell $1.08 per share, or 25.4%, from the closing price of $4.26 per share on February 14, 2024, to the closing price of $3.18 per share on February 23, 2024.

125.    These material declines in the price of SunPower's securities was a direct result of the nature and extent of Defendants' deception (or results of its deception) being revealed to investors and the market, and the materialization of risks concealed by Defendants' misstatements. The timing and magnitude of SunPower's share price declines negates any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic, or industry factors, or other matters unrelated to Defendants' misconduct.

126.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Plaintiffs and

other Class members would not have purchased or otherwise acquired SunPower securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of SunPower securities and that the corrective disclosure of the Defendants' misrepresentations and omissions, and/or the materialization of the risks concealed by those misrepresentations and omissions, would cause the price of SunPower securities to decline.

127.    As detailed herein, Defendants engaged in a scheme and/or course of conduct to deceive Plaintiffs, which artificially inflated the price of SunPower stock and operated as a fraud or deceit on Plaintiffs and Class members by failing to disclose and misrepresenting the adverse facts detailed herein.

128.    SunPower's financial results and future business prospects were based upon false and misleading statements and omissions regarding its financial covenants and its possession of cash sufficient to meet its obligations.

129.    Throughout the period during which Plaintiffs and Class members purchased SunPower securities, the prices of these securities were artificially inflated because of Defendants' materially false and misleading statements and omissions as alleged herein.

130.    Defendants' false statements served to conceal the risks that their misconduct would be publicly exposed, as well as the risks related to Defendants' dissemination of false and misleading statements in investor materials, press releases, earnings calls, and industry conferences.

131.    It was foreseeable that public exposure of the scheme would lead to negative financial and legal consequences to Defendants, including: (i) the violation of its financial and reporting covenants to its lenders; (ii) the failure to satisfy its contractual obligations with its suppliers; (iii) the announcement of non-reliance of the Company's reported financial results for 2022, along with the first two quarters of 2023; (iv) the inability to timely file quarterly results for

28

Q3 2023; (v) analyst downgrades; (vi) the restatement of the Company's reported financial results for 2022, along with the first two quarters of 2023; (vii) the disclosure of material weaknesses in the Company's internal disclosure controls and processes; and (viii) the issuance of a going concern warning. The materialization of any one or more of these factors would lead to a significant decline in the price of SunPower's stock.

132.    The value of Plaintiffs' investments in SunPower securities was negatively impacted when the concealed risks noted above materialized.

133.    The declines in the price of the SunPower securities and resulting losses are directly attributable to the materialization of risks that were previously misrepresented or concealed by the Defendants.

134.    Had Plaintiffs known of the material adverse information not disclosed by the Defendants or been aware of the truth behind their material misstatements, they would not have purchased the SunPower securities at artificially inflated prices.

135.    As a result of their purchases of the SunPower securities, Plaintiffs suffered economic loss and damages, as contemplated by the federal securities laws.

**X.    NO SAFE HARBOR**

136.    Neither the federal statutory safe harbor applicable to forward-looking statements under certain circumstances nor the bespeaks caution doctrine applies to any of the allegedly false statements pled herein, as the statements alleged to be false and misleading herein all relate to then-existing facts and conditions. The statutory safe harbor or bespeaks caution doctrine do not apply to statements included in financial statements prepared in accordance with generally accepted accounting principles. Moreover, none of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about the Company's current and historical financial accounting practices, financial condition, and internal controls, among other topics.

137.    To the extent any of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward looking statements" when made, and/or were unaccompanied by meaningful cautionary statements that identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by the Company were insufficient to insulate Defendants from liability for their materially false and misleading statements.

138.    Alternatively, to the extent that the statutory safe harbor is found to apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for such statements because, at the time each such statement was made, the speaker had actual knowledge that it was materially false or misleading, and/or the statement was authorized or approved by an executive officer of SunPower who knew that the statement was materially false or misleading when made.

## XI.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

139.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of (a) all those who purchased or otherwise acquired the publicly traded securities of SunPower during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

140.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SunPower securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of

1   the pendency of this action by mail, using the form of notice similar to that customarily used in

2   securities class actions.

3       141.    Plaintiffs' claims are typical of the claims of the members of the Class as all

4   members of the Class are similarly affected by Defendants' wrongful conduct in violation of

5   federal law that is complained of herein.

6       142.    Plaintiffs will fairly and adequately protect the interests of the members of the Class

7   and has retained counsel competent and experienced in class and securities litigation. Plaintiffs

8   have no interests antagonistic to or in conflict with those of the Class.

9       143.    Common questions of law and fact exist as to all members of the Class and

10  predominate over any questions solely affecting individual members of the Class. Among the

11  questions of law and fact common to the Class are:

12          (a)     whether the Exchange Act was violated by Defendants as alleged herein;

13          (b)     whether statements made by Defendants misrepresented material facts

14  about the business, operations, and prospects of SunPower; and

15          (c)     to what extent the members of the Class have sustained damages and the

16  proper measure of damages.

17      144.    A class action is superior to all other available methods for the fair and efficient

18  adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

19  damages suffered by individual Class members may be relatively small, the expense and burden

20  of individual litigation make it impossible for members of the Class to individually redress the

21  wrongs done to them. There will be no difficulty in the management of this action as a class action.

22      145.    Plaintiffs will rely, in part, upon the presumption of reliance established by the

23  fraud-on-the-market doctrine in that:

24      •   Defendants made public misrepresentations or failed to disclose material facts

25          during the Class Period;

26      •   the omissions and misrepresentations were material;

27

28

31

- SunPower securities are traded in efficient markets;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on NASDAQ, and was covered by at least 12 analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased and/or sold SunPower securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

146.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

147.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**XII.    CLAIMS**

**COUNT I**

**VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND**

**RULE 10B-5 AGAINST ALL DEFENDANTS**

148.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

149.    This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

150.    During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

151.    The Company and the Individual Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes, and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of SunPower securities during the Class Period.

152.    The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

153.    The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

154.    As a result of the foregoing, the market price of SunPower securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of SunPower securities during the Class Period in purchasing SunPower securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

155.    Had Plaintiffs and the other members of the Class been aware that the market price of SunPower securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased SunPower securities at the artificially inflated prices that they did, or at all.

156.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

157.    By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of SunPower securities during the Class Period.

158.    This claim was brought within two years from when it reasonably could have been discovered and five years from when the violations alleged herein occurred.

34

1

2

3

**COUNT II**

**VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT**

**AGAINST DEFENDANTS FARICY AND EBY**

4      159.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing

5    paragraphs as if fully set forth herein.

6      160.    During the Class Period, the Individual Defendants participated in the operation

7    and management of the Company and conducted and participated, directly and indirectly, in the

8    conduct of the Company's business affairs. Because of their senior positions, they knew the

9    adverse non-public information regarding the Company's business practices.

10      161.    As officers and/or directors of a publicly owned company, the Individual

11    Defendants had a duty to disseminate accurate and truthful information with respect to the

12    Company's financial condition and results of operations, and to correct promptly any public

13    statements issued by the Company which had become materially false or misleading.

14      162.    Because of their positions of control and authority as senior officers, the Individual

15    Defendants were able to, and did, control the contents of the various reports, press releases, and

16    public filings which the Company disseminated in the marketplace during the Class Period.

17    Throughout the Class Period, the Individual Defendants exercised their power and authority to

18    cause the Company to engage in the wrongful acts complained of herein. The Individual

19    Defendants therefore were "controlling persons" of the Company within the meaning of Section

20    20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which

21    artificially inflated the market price of SunPower securities.

22      163.    Each of the Individual Defendants, therefore, acted as a controlling person of the

23    Company. By reason of their senior management positions and/or being directors of the Company,

24    each of the Individual Defendants had the power to direct the actions of, and exercised the same

25    to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of

26    the Individual Defendants exercised control over the general operations of the Company and

27

28

35

possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

164.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

165.    This claim was brought within two years from when it reasonably could have been discovered and five years from when the violations alleged herein occurred.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the members of the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## XIV.    DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury in this Action.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1  DATED: March 29, 2024                    Respectfully submitted,

2                                           **POMERANTZ LLP**

3                                           */s/ Austin P. Van*_____

4
                                            Jeremy A. Lieberman
5                                           (*pro hac vice* application forthcoming)
                                            Austin P. Van
6                                           (*pro hac vice*)
                                            Samantha Daniels
7                                           (*pro hac vice*)
                                            600 Third Avenue, 20th Floor
8                                           New York, New York 10016
                                            Telephone: (212) 661-1100
9                                           Facsimile: (917) 463-1044
                                            jalieberman@pomlaw.com
10                                          avan@pomlaw.com
                                            sdaniels@pomlaw.com
11

12
                                            Jennifer Pafiti (SBN 282790)
13                                          1100 Glendon Avenue, 15th Floor
                                            Los Angeles, California 90024
14                                          Telephone: (310) 405-7190
                                            jpafiti@pomlaw.com
15

16                                          *Counsel for Bezeyem Lemou and*
                                            *Co-Lead Counsel for the Class*
17
                                            PORTNOY LAW FIRM
18                                          Lesley F. Portnoy, Esq.
                                            1800 Century Park East, Suite 600
19                                          Los Angeles, California 90067
                                            Telephone: (310) 692-8883
20                                          lesley@portnoylaw.com
21
                                            *Additional Counsel for Bezeyem Lemou*
22

23

24

25

26

27
                                            37
28