# EXHIBIT A

No *Shepard's* Signal™
As of: July 23, 2024 6:23 PM Z

## *Jaszczyszyn v. Sunpower Corp.*

United States District Court for the Northern District of California

July 17, 2024, Decided; July 17, 2024, Filed

Case No. 22-cv-00956-AMO

**Reporter**
2024 U.S. Dist. LEXIS 126193 *

PIOTR JASZCZYSZYN, Plaintiff, v. SUNPOWER CORPORATION, et al., Defendants.

**Prior History:** *Jaszczyszyn v. Sunpower Corp., 2022 U.S. Dist. LEXIS 35274, 2022 WL 561932 (N.D. Cal., Feb. 24, 2022)*

## Core Terms

allegations, scienter, cracking, products, connectors, replace, announced, costs, fails, forward-looking, manufacturer, warranties, investors, customers, warnings, defects, incur, commercial business, defective product, repairing, judicial notice, segment, solar, press release, falsity, risks, motion to dismiss, residential, Earnings, puffery

**Counsel: [*1]** For Piotr Jaszczyszyn, Plaintiff: Pavithra Rajesh, Glancy Prongay & Murray LLP, Los Angeles, CA; Charles Henry Linehan, Glancy Prongay and Murray LLP, Los Angeles, CA.

For SunPower Corporation, Peter Faricy, Manavendra S. Sial, Defendants: Katherine Leigh Henderson, LEAD ATTORNEY, Wilson, Sonsini, Goodrich & Rosati, A Professional Corporation, San Francisco, CA; Ava K. Mehta, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA; Dylan Grace Savage, Wilson Sonsini Goodrich & Rosati, P.C., Spear Tower, San Francisco, CA; John Charles Roberts, Jr, Wilson Sonsini Goodrich & Rosati, Seattle, WA; Yana Pavlova, Wilson Sonsini Goodrich & Rosati LLP, San Francisco, CA.

For Deming Song, Movant: Laurence Matthew Rosen, LEAD ATTORNEY, The Rosen Law Firm, P.A., Los Angeles, CA; Phillip C Kim, The Rosen Law Firm, P.A., New York, NY.

For James Fillinger, Karla Fillinger, Movants: Charles Henry Linehan, Glancy Prongay and Murray LLP, Los Angeles, CA.

For Steamfitters Local 449 Pension & Retirement Security Funds, Movant: Danielle Suzanne Myers, Jennifer N. Caringal, Robbins Geller Rudman & Dowd LLP, San Diego, CA; Kenneth Joseph Black, Robbins Geller Rudman and Dowd LLP, San Francisco, CA; Michael Albert, Robbins **[*2]** Geller Rudman and Dowd LLP, San Diego, CA; Shawn A. Williams, Snehee Khandeshi, Willow E. Radcliffe, Robbins Geller Rudman & Dowd LLP, San Francisco, CA.

**Judges:** ARACELI MARTÍNEZ-OLGUÍN, United States District Judge.

**Opinion by:** ARACELI MARTÍNEZ-OLGUÍN

## Opinion

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

Re: Dkt. No. 63

This is a putative securities class action involving allegations that Defendant SunPower Corporation and its executives misled investors about the implications of failing components of the company's commercial line of products. Defendants' motion to dismiss was heard before this Court on October 26, 2023. Having read the papers filed by the parties and carefully considered their arguments therein and those made at the hearing, as well as the relevant legal authority, the Court hereby **GRANTS** the motion to dismiss, for the following reasons.

### I. BACKGROUND[1]

---

[1] The Court accepts Plaintiff's allegations in the complaint as true and construes the pleadings in the light most favorable to Plaintiff. *See Manzarek v. St. Paul Fire & Marine Ins. Co., 519*

SunPower Corporation ("SunPower" or the "Company") is a solar energy company that provides solar generation, storage, and other solutions to its customers. First Am. Compl. ¶¶ 4-5 ("FAC," ECF 55). Peter Faricy ("Faricy") was the Company's Chief Executive Officer ("CEO"), President, and Chairman of the Company's Board of Directors during the period **[\*3]** of August 3, 2021, through January 20, 2022, inclusive ("Class Period"). FAC ¶ 2. Manavendra S. Sial ("Sial") was the Company's former Chief Financial Officer ("CFO") and Executive Vice President during the class period. FAC ¶ 2.

In 2021, SunPower had a commercial business divided between two segments: (a) the Commercial and Industrial Solutions segment ("CIS" or "C&I," also referred to as "heavy") sold products to larger commercial clients; and (b) the "Light Commercial Value-Added Reseller" ("CVAR") business, a sub-segment of the Company's residential segment, sold products to smaller clients. FAC ¶ 6. In combination, the two segments contributed over 23% of SunPower's revenues. FAC ¶ 6. The warranties SunPower provided for the third-party products and components used in its solar power systems were considered to be a unique feature distinguishing the Company from its competitors. FAC ¶ 6.

In April 2021, SunPower hired Faricy as CEO with a mandate to review and restructure the business. Faricy told investors that his focus "over the next 100 days" was conducting a "deep [dive]" of the residential, commercial, and industrial businesses. FAC ¶ 8.

The Class Period in this putative class **[\*4]** action starts on August 3, 2021, when Defendants announced the Company's 2Q21 financial results. FAC ¶ 39. In the August 3, 2021 press release announcing those financial results, Defendants made three alleged false statements, including: [1] "'Our solid second quarter results reflect continued execution in both our residential and commercial businesses,'" and "'[2] we remain on track to achieve our 2021 financial outlook and [3] are well positioned to drive growth and profitability in 2022 and beyond.'" FAC ¶ 39. Faricy and Sial also hosted an earnings call, during which Sial said,

> I think the business is significantly better year-on-year, both from a top line perspective as well as a margin point of view. And then more importantly, we expect the CIS business to be profitable in the back half of the year, which you recall is a

significant turnaround from the last couple of years. FAC ¶ 40.

On August 4, 2021, SunPower filed its Form 10-Q for 2Q21. FAC ¶ 44. That report provided risk warnings cautioning investors that product defects may occur or harm SunPower's business, such as "potential future product or component failures could cause us to incur substantial expense to repair or replace **[\*5]** defective products or components." FAC ¶¶ 44-46; *see also* FAC ¶ 11.

On October 5, 2021, Defendants held an unscheduled investor call to announce a new acquisition and to announce that they were cutting financial guidance due to poor performance in the CIS segment and looking to sell the CIS business "by the end of the calendar year." FAC ¶ 52.

On November 3, 2021, Defendants hosted SunPower's 3Q21 earnings call. Steamfitters Local 449 Pension & Retirement Security Funds ("Plaintiff") alleges Faricy falsely reassured investors and omitted information, stating:

> Over the past few years, you've been with us through several major restructuring events and strategic changes. I'm pleased to report we have found our footing. With a streamlined company and our healthiest balance sheet in years, we are now going on offense to grow our business across a vast, mostly untapped residential TAM.

FAC ¶ 59. The next day, SunPower filed its quarterly report on Form 10-Q for 3Q21. That quarterly report repeated the same risk warning statements as those provided in August. FAC ¶¶ 62-64; *see also* FAC ¶ 14.

On December 7, 2021, SunPower published to its website the latest edition of its Safety and Installation **[\*6]** Instructions manual, including a new warning that cracking might occur in connectors. FAC ¶ 69.

On January 20, 2022, SunPower issued a press release on Form 8-K announcing that the Company would miss its financial guidance due to "cracking" problems with products across its commercial businesses. FAC ¶ 71. The press release announced SunPower was taking $31 million in charges to replace connectors experiencing the cracking problems across its commercial businesses. FAC ¶ 71. Following these disclosures, SunPower's stock price declined from a close of $19.02 per share on January 20, 2022, to $15.80 per share on January 21, 2022, a 16.9% drop,

*F.3d 1025, 1031 (9th Cir. 2008)* (citation omitted).

on more than 11.4 million shares trading volume, as compared to only 2.8 million shares traded on January 20, 2022. FAC ¶ 76. Prior to this point, the Company's stock price traded at prices as high as $34.61 per share. FAC ¶ 85. SunPower disclosed on February 16, 2022, that it would also "exit the light commercial business" at the cost of another $15 million to the Company. FAC ¶ 79. SunPower disclosed on August 31, 2022, that Sial was leaving the Company. FAC ¶ 81.

## II. REQUEST FOR JUDICIAL NOTICE

Defendants filed a request for judicial notice in **[\*7]** support of their motion to dismiss. ECF 64; *see also* Roberts Decl. (ECF 65). In general, review of a complaint under *Rule 12(b)(6)* is limited to the pleading, and the court may not consider extra-pleading materials without converting the motion into a motion for summary judgment. *See Fed. R. Civ. P. 12(b)(6)*; *12(d)*. There are two exceptions to this general rule: the court may consider materials that are judicially noticeable under *Federal Rule of Evidence 201*, and the court may consider materials that fall within the incorporation-by-reference doctrine. *Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 998 (9th Cir. 2018)*.

*Federal Rule of Evidence 201* permits judicial notice of "a fact that is not subject to reasonable dispute" because it is "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." A court may take notice of "undisputed matters of public record," but not of "disputed facts stated in public records." *Lee v. City of Los Angeles, 250 F.3d 668, 690 (9th Cir. 2001)* (emphasis in original).

The doctrine of incorporation by reference permits a court to treat an extrinsic document as if it were part of the complaint if the pleading "refers extensively to the document" or if "the document forms the basis" of a claim. *Khoja, 899 F.3d at 1002*. Incorporation can be proper "when assessing the sufficiency of a claim requires that the document at issue be reviewed," **[\*8]** but is not warranted when "the document merely creates a defense to the well-pled allegations." *Id.* Incorporation by reference "is designed to prevent artful pleading by plaintiffs" but should not be used as a "tool for defendants to short-circuit the resolution of a well-pleaded claim." *Id. at 1003*.

The first category of exhibits submitted in support of Defendants' Motion, numbers 1, 7-10, are SEC filings

that Defendants aver should be considered in their full context. The second category of exhibits, numbers 2-6, are other documents referenced in the complaint and which Defendants contend should be considered incorporated by reference.

Plaintiff's FAC incorporates by reference Exhibits 1-10 because Plaintiff explicitly refers to excerpts of these exhibits to support its claims. *See, e.g.*, FAC ¶ 39 (citing August 3, 2021 press release); Roberts Decl. Ex. 1 (reproducing same). Exhibits 1-10, further, are all publicly available documents representing information disclosed to the market and thus are subject to judicial notice. *See In re Restoration Robotics, Inc. Sec. Litig., 417 F. Supp. 3d 1242, 1253 (N.D. Cal. 2019)*. Plaintiff concedes that the Court may take judicial notice of the Exhibits. *See* RJN Opp. at 1-2 (ECF 68 at 2-3). Plaintiff argues, however, that pursuant to *Khoja*, Defendants **[\*9]** cannot use judicial notice or incorporation by reference on a motion to dismiss to create factual disputes with Plaintiffs' allegations. *Id.* at 4-5 (ECF 68 at 5-6). But nothing in *Khoja* prevents this Court from analyzing an alleged false statement in context. *See Khoja, 899 F.3d at 1002* ("[T]he policy concern underlying [incorporation by reference]" is to "[p]revent[ ] plaintiffs from surviving a *Rule 12(b)(6)* motion by deliberately omitting references to documents upon which their claims are based" (citation and quotation marks omitted)). The materials submitted for judicial notice by Defendants here provide additional context surrounding the statements made by Faricy and Sial. Such context matters in the Court's assessment of how a reasonable investor would consider the allegedly false statements. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 190-91, 194, 135 S. Ct. 1318, 191 L. Ed. 2d 253 (2015)* ("reasonable investor" interprets statements "fairly and in context"); *Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 323-24, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)* ("[t]he strength of an inference cannot be decided in a vacuum"). Thus, the Court declines Plaintiff's invitation to reject the materials submitted by Defendants in support of their motion to dismiss.

In support of their Reply Brief on the Motion to Dismiss, Defendants submitted an additional request seeking judicial notice of Exhibits 11-14, third-party **[\*10]** analyst reports extensively referenced and quoted in the Amended Complaint, but which Defendants omitted from their first request for judicial notice. ECF 77 at 2. Defendants request that the Court take notice of these analyst reports because Plaintiff's Opposition to Defendants' Motion to Dismiss (ECF 67) makes clear

that these documents form the basis of Plaintiff's securities fraud claims. Plaintiff cites repeatedly to the reports, quoting from them to allege falsity. *See, e.g.*, MTD Opp. at 6, 15, 17, 19, 20, 22, 24, 25 (multiple citations to the exhibits quoted in ¶¶ 72-75 of the Complaint). Plaintiff did not file a response to this second request for judicial notice. Although these materials are less helpful than those included in the initial request, the same reasoning applies to them — they will be considered by the Court because Plaintiff expressly relies on them in its pleading, and the portions cited by Plaintiff should be read in context.

In sum, the Court **GRANTS** Defendants' requests for judicial notice and incorporation by reference, and the Court will consider the materials in its assessment of the Motion to Dismiss for the limited purpose of determining what was disclosed **[*11]** to the market.

## III. LEGAL STANDARD

Under *Federal Rule of Civil Procedure 12(b)(6)*, a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a *Rule 12(b)(6)* motion, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly, 550 U.S. at 555, 570*.

A complaint alleging a violation of *Section 10(b) of the Securities Exchange Act* "must meet both the heightened pleading requirements for fraud" under *Federal Rule of Civil Procedure 9(b)* and the "exacting pleading requirements" of the PSLRA. *In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1140 (9th Cir. 2017)* (citations omitted). *Rule 9(b)* additionally requires that the circumstances constituting any alleged fraud be pled "specific[ally] enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009)* (citation omitted).

Claims **[*12]** of fraud must be accompanied by the "who, what, when, where, and how" of the misconduct alleged. *Id.* Under *Rule 9(b)* and the PSLRA, a complaint must "state with particularity the circumstances constituting fraud or mistake" and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" in making the false or misleading statements. *Fed. R. Civ. P. 9(b)*; *15 U.S.C. § 78u-4(b)(2)(A)*.

## IV. DISCUSSION

*Section 10(b) of the Securities Exchange Act* makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." *15 U.S.C. § 78j(b)*. To state a claim under *Section 10(b) of the Securities Exchange Act*, a plaintiff must plead: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37-38, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011)* (citation omitted).

Defendants challenge the sufficiency of Plaintiff's allegations with respect to only the first two elements of a **[*13]** *Section 10(b)* claim: (1) the falsity of SunPower's statements and (2) whether they were made with scienter. The "more exacting pleading requirements" of the PSLRA require that the complaint plead both falsity and scienter with particularity, and Defendants argue that the pleading here falls short of that standard. *See Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009)*; *see also 15 U.S.C. § 78u-4(b)(1)*. The Court takes up the two elements in turn.

### A. Material Misrepresentation or Omission

The first issue is whether Plaintiffs sufficiently allege a material misrepresentation or omission. The parties debate the sufficiency of the allegations on the three fronts discussed below: (1) whether Defendants' statements were made with knowledge of their falsity, (2) whether the challenged statements constitute

inactionable puffery, and (3) whether the challenged statements are forward-looking and protected by the PSLRA's safe harbor.

## 1. Knowledge of Falsity When Statements Made

"For a statement to be false or misleading, it must 'directly contradict what the defendant knew at that time' or 'omit[] material information.'" *Weston Fam. P'ship LLLP v. Twitter, Inc., 29 F.4th 611, 619 (9th Cir. 2022)* (quoting *Khoja, 899 F.3d at 1008-09*). For a true statement to be false by omission, it must "affirmatively create an impression of a state of affairs that differs in a material way from the **[*14]** one that actually exists." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051, 1061 (9th Cir. 2014)* (internal quotations omitted). An omission is material "when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available." *Matrixx, 563 U.S. at 38* (quotation marks and citation omitted). Statements that are "literally true" may still be misleading due to "their context and manner of presentation." *Miller v. Thane Int'l, Inc., 519 F.3d 879, 886 (9th Cir. 2008)*. Courts "apply the objective standard of a 'reasonable investor' to determine whether a statement is misleading." *Alphabet, 1 F.4th at 699*. While it is generally true that vague statements are not actionable, "even 'general statements of optimism, when taken in context, may form the basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys., 865 F.3d at 1143* (citation omitted).

Here, Plaintiff alleges that Defendants' statements regarding SunPower's then-current status in meeting its earlier guidance were false and misleading because each statement concealed dangerous product defects and the risk of related costs. Plaintiff charges that Defendants falsely misrepresented or omitted the prior existing, **[*15]** material facts that connectors across their commercial business had developed a "cracking" problem. Plaintiff's challenge relies on the following statements in the pleading:

- "The failure of a supplier to supply . . . components in a timely manner, or to supply raw materials or components that meet our quality, quantity, and cost requirements, *could* impair our ability to manufacture our products or could

increase our cost of production"; and "*If* we cannot obtain substitute materials or components on a timely basis or on acceptable terms, we could be prevented from delivering our products to our customers within required time frames." (FAC ¶ 44; August 4, 2021 2Q21 Form 10-Q, p. 55) (Statement 5);[2]

- "*If* we have quality issues with our solar and related products, our sales *could* decrease and our relationships with our customers and our reputation *may* be harmed"; and "[D]efects *could* cause us to incur significant warranty, non-warranty, and re-engineering costs, which may not be covered by manufacturer warranties, and could significantly affect our customer relations and business reputation. *If* we deliver products with errors or defects, or if there is a perception that such products contain **[*16]** errors or defects, our credibility and the market acceptance and sales of our products could be harmed. In addition, some of our arrangements with customers include termination or put rights for non-performance. In certain limited cases, we *could* incur liquidated damages or even be required to buy back a customer's system at fair value on specified future dates if certain minimum performance thresholds are not met." (FAC ¶ 45; August 4, 2021 2Q21 Form 10-Q) (Statement 6);

- "While we generally pass through to our customers the manufacturer warranties we receive from our suppliers, in some circumstances, we *may* be responsible for repairing or replacing defective parts during our warranty period, often including those covered by manufacturers' warranties, or incur other non-warranty costs. *If* a manufacturer disputes or otherwise fails to honor its warranty obligations, we may be required to incur substantial costs before we are compensated, if at all, by the manufacturer"; "Increases in the defect rate of SunPower or third-party products, including components, *could* cause us to increase the amount of warranty reserves and have a corresponding material, negative impact on our results of **[*17]** operations. Further, *potential future* product or component failures *could* cause us to incur substantial expense to repair or replace

---

[2] Plaintiff bolds and italicizes portions of Defendants' quoted statements in the FAC to highlight the purportedly false representations. The Court reproduces Plaintiff's formatting in this Order.

defective products or components, and we have agreed in some circumstances to indemnify our customers and our distributors against liability from some defects in our solar products. A successful indemnification claim against us could require us to make significant damage payments"; "Repair and replacement costs, as well as successful indemnification claims, **could** materially and negatively impact our financial condition, cash flows, and results of operations"; and "In addition, quality issues **can** have various other ramifications, including delays in the recognition of revenue, loss of revenue, loss of future sales opportunities, increased costs associated with repairing or replacing products, and a negative impact on our goodwill and reputation, any of which **could** adversely affect our business, results of operations, cash flows, and financial condition." (FAC ¶ 46; August 4, 2021 2Q21 Form 10-Q) (Statement 7);

• "The failure of a supplier to supply . . . components that meet our quality, quantity, and cost requirements, **could** impair our ability to manufacture **[*18]** our products or could increase our cost of production"; and "**If** we cannot obtain substitute materials or components on a timely basis or on acceptable terms, we **could** be prevented from delivering our products to our customers within required time frames." (FAC ¶ 62; November 4, 2021 3Q21 Form 10-Q, p. 56) (Statement 9);

• "**If** we have quality issues with our solar and related products, our sales **could** decrease and our relationships with our customers and our reputation **may** be harmed"; and "[D]efects **could** cause us to incur significant warranty, non-warranty, and re-engineering costs, which may not be covered by manufacturer warranties, and could significantly affect our customer relations and business reputation. If we deliver products with errors or defects, or if there is a perception that such products contain errors or defects, our credibility and the market acceptance and sales of our products could be harmed. In addition, some of our arrangements with customers include termination or put rights for non-performance. In certain limited cases, we could incur liquidated damages or even be required to buy back a customer's system at fair value on specified future dates if certain minimum **[*19]** performance thresholds are not met." (FAC ¶ 63; November 4, 2021 3Q21 Form 10-Q) (Statement 10); and

• "While we generally pass through to our customers the manufacturer warranties we receive from our suppliers, in some circumstances, we **may** be responsible for repairing or replacing defective parts during our warranty period, often including those covered by manufacturers' warranties, or incur other non-warranty costs. **If** a manufacturer disputes or otherwise fails to honor its warranty obligations, we may be required to incur substantial costs before we are compensated, if at all, by the manufacturer"; "Increases in the defect rate of SunPower or third-party products, including components, **could** cause us to increase the amount of warranty reserves and have a corresponding material, negative impact on our results of operations. Further, **potential future** product or component failures **could** cause us to incur substantial expense to repair or replace defective products or components, and we have agreed in some circumstances to indemnify our customers and our distributors against liability from some defects in our solar products. A successful indemnification claim against us could require **[*20]** us to make significant damage payments"; "Repair and replacement costs, as well as successful indemnification claims, **could** materially and negatively impact our financial condition, cash flows, and results of operations"; and "In addition, quality issues **can** have various other ramifications, including delays in the recognition of revenue, loss of revenue, loss of future sales opportunities, increased costs associated with repairing or replacing products, and a negative impact on our goodwill and reputation, any of which could adversely affect our business, results of operations, cash flows, and financial condition." (FAC ¶ 64; November 4, 2021 3Q21 Form 10-Q) (Statement 11).

Plaintiff charges that these statements omitted: the development of cracking in connectors in the Company's commercial systems; the need to spend $27 million replacing those connectors; and the related, negative financial impact on the Company. *See* FAC ¶¶ 50, 67.

Plaintiff submitted a statement of recent decision in which the Ninth Circuit found that corporate statements of hypothetical risks were actionably false where they contradicted contemporaneous knowledge that the risks had already materialized, but Plaintiff **[*21]** here fails to establish contemporaneous knowledge that the risks warned of had come to fruition. *Cf. In re Facebook, Inc.*

*Sec. Litig., 84 F.4th 844, 858-60 (9th Cir.)*, opinion amended and superseded on denial of reh'g, *87 F.4th 934 (9th Cir. 2023)* (as amended, at *87 F.4th at 948-51*). Plaintiff relies on the inference that Defendants knew of the cracking defects and associated impacts at the time they made the warnings, an inference that does not find support in the pleading. Plaintiff at no point alleges Defendants' knowledge of the defect — much less Defendants' understanding of how the defect would financially impact the company — at any time prior to the January 2022 announcement of the breadth of the cracking issue and the analyst reports discussing that announcement.

Nowhere does the FAC allege facts suggesting that the cracking issue had existed since 2019, that anyone at SunPower had knowledge of the cracking issue since 2019, or that the Company had proactively decided to replace all the potentially affected connectors — and thus knew that it would have to incur millions of dollars in costs — since 2019. Plaintiff asks the Court to infer that the reports of product defects were "found in 'nearly all [commercial] systems since 2019,'" but that appears to be a misreading of SunPower's **[*22]** press release as well as the financial analysts' reports. FAC ¶ 75. The Company's announcement regarding its proactive replacement of the failing third-party connectors does not represent that the "cracking issue" had been known by Defendants "since 2019"; rather, the statements and reports give the impression that Defendants only recently learned of the product defect and that the product defect existed in the products manufactured since 2019. FAC ¶ 71 ("the company has identified a cracking issue that developed over time" (emphasis omitted)).

Indeed, the analyst reports quoted and relied upon by Plaintiff in the FAC contradict Plaintiff's theory of Defendants' knowledge. For instance, Truist Securities wrote,

> SPWR has identified a cracking issue in certain connectors within third party commercial equipment supplied to the company. . . As the company is pursuing the sale of its CIS business, we wouldn't be surprised if such findings were revealed in a due diligence process, though we note SPWR specifically indicated the issue was identified in a product quality assessment.

FAC ¶ 72. Cowen Equity Research similarly wrote,

> The company noted that a third party connector that was installed **[*23]** at the factory has developed cracking issue. . . Our sense is this issue needs to

be resolved before the intended sale of the C&I division occurs and likely came up in due diligence. FAC ¶ 73. These analyst reports suggest Defendants discovered the cracking defect in the course of SunPower's due diligence review of the CIS segment for sale, sometime after the Company's October 5, 2021 announcement that it was considering such a sale. FAC ¶¶ 72-73. This suggests that SunPower did not know of the product defect until just before it announced its proactive replacement of all such connectors.

In addition to the analyst reports, Plaintiff avers that additional conduct demonstrated Defendants' knowledge earlier than represented. For example, because Defendants' October 5, 2021 conference call lowered guidance for 4Q21 due to poor performance in the CIS segment (FAC ¶ 52), Plaintiff avers that supports that Defendants knew something was wrong in the commercial segment by October 5, 2021, before the November 3, 2021 statements. But Defendants' announcements do not show knowledge of the product defect, and the factual allegations support a contrary narrative — that Defendants did not understand **[*24]** the problems with the commercial business until they completed their due diligence review in preparation of its sale. Plaintiff fails to allege knowledge that the Company was going to face a multi-million-dollar charge for defective connectors. Moreover, while not strictly necessary, Plaintiff fails to allege corroboration of contemporaneous knowledge. The Complaint alleges no confidential witness accounts, contradictory internal reports, red flags, or post-class-period admissions demonstrating Defendants' knowledge earlier than made public.

The failure to allege falsity infects all of the statements challenged by Plaintiff. Plaintiff claims Statements 5-7 and 9-11, risk factor statements that warned of potential costs related to product defects, were false or misleading because they disguised risks that had knowingly materialized as mere uncertainties. But that argument is again premised on the factually unsupported assertion that the cracking issue had already materialized and come to Defendants' attention by August 4 and November 4, 2021. That argument fails.

In sum, while Plaintiff argues that all of the statements were knowingly false when made, Plaintiff fails to identify how and **[*25]** when Defendants became aware of the connector defects or the gravity of those defects. *Cf. Facebook, Inc. Sec. Litig., 87 F.4th at 948-51*. Plaintiff's failure to allege falsity is fatal to its claims, and

they must be dismissed on this basis. Nonetheless, to provide Plaintiff with sufficient guidance in amending its pleading, the Court takes up Defendant's assertions that several of the challenged statements are inactionable as puffery and/or forward-looking, as well as the sufficiency of Plaintiff's scienter allegations.

### 2. Inactionable Puffery

Generalized statements of corporate optimism, such as business being "healthy," may be considered puffery and are not actionable. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, 759 F.3d 1051, 1060 (9th Cir. 2014)*; *see, e.g., In re Nimble Storage, Inc. Sec. Litig., 252 F. Supp. 3d 848, 854 n.8 (N.D. Cal. 2017)* ("[A]lleged optimistic statements indicating that a company is 'on track' to meet a certain goal are, without more, inactionable puffery."). "A statement is considered puffery if the claim is extremely unlikely to induce consumer reliance." *Newcal Indus., Inc. v. Ikon Off. Sol., 513 F.3d 1038, 1053 (9th Cir. 2008)*. The difference between puffery and a statement of fact "rests in the specificity or generality of the claim." *Id.* A statement that is "quantifiable" may be actionable, while a "general, subjective claim" is not. *Id.* However, "even general statements of optimism, when taken in context, may form a basis for a **[*26]** securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., 865 F.3d at 1143* (internal quotation marks omitted).

Defendants argue that these statements constitute feel-good corporate puffery:

> • "***Our solid second quarter results reflect continued execution in*** both our residential and ***commercial businesses*** . . ." (FAC ¶ 39; August 3, 2021 Press Release) (Statement 1);[3]

> • "[W]e ***remain on track to achieve our 2021 financial outlook and are well positioned to drive growth and profitability in 2022 and beyond***." (FAC ¶ 39; August 3, 2021 Press Release) (Statement 2);

> • "Yes. . . . On the CIS side of the house, while the business has tailwinds, the business has got a mix

of projects, and we are seeing some of those projects move into 2022"; and "So from a CIS perspective, I think the second quarter margins are reflective of the inherent lumpiness in the business. We knew that going into the second quarter. Having said that, ***I think the business is significantly better year-on-year, both from a top line perspective as well as a margin point of view. And then more importantly, we expect the CIS business to be profitable in the back [*27] half of the year, which you recall is a significant turnaround from the last couple of years***. So that's the CIS business." (FAC ¶ 40; August 3, 2021 2Q21 Earnings Call, p. 9) (Statement 4);

> • "Over the past few years, you've been with us through several major restructuring events and strategic changes. I'm pleased to report we have found our footing. ***With a streamlined company and our healthiest balance sheet in years, we are now going on offense*** to grow our business across a vast, mostly untapped residential TAM." (FAC ¶ 59; November 3, 2021 3Q21 Earnings Call, p. 6-7) (Statement 8).

Plaintiff counters that these challenged positive statements falsely represented then-existing negative conditions. Not so. These statements, particularly those including phrases such as "on track" and "well positioned," express the positive outlook of corporate optimism that is unlikely to induce consumer reliance. Though Plaintiff advances that these statements convey a false impression of the health of the CIS business, Plaintiff fails to show Defendants' then-present knowledge of falsity, i.e., that the CIS business would be hampered by component defects. *See* Section IV(A)(1), above.

Statement 8 is particularly **[*28]** difficult to recognize as false because, rather than ignoring or minimizing the difficulties arising from the CIS business, it expresses hopefulness. Plaintiff avers the statement "we have found our footing. With a streamlined company and our healthiest balance sheet in years, we are now going on offense" (FAC ¶ 59, Statement 8), was a false reassurance and/or material omission that SunPower's business was not then hamstrung by problems in its soon-to-be-sold CIS segment. "[S]treamlined company," read in context, refers to the anticipated sale of the CIS division that had been announced a month prior, and rather than providing false reassurances, SunPower earlier addressed numerous issues with CIS including delayed projects and the business's "inherent

---

[3] For ease of reference, the Court relies on the enumeration of the challenged statements presented in Defendants' chart at Roberts Declaration, Exhibit A. ECF 65-1.

lumpiness." FAC ¶¶ 40-41, 52, 57. Overall, Statements 1, 2, 4, and 8 constitute inactionable corporate puffery that cannot sustain Plaintiff's *Section 10(b)* claim.

### 3. Forward-Looking Statements and the Safe Harbor

Forward-looking statements are not actionable as a matter of law if they are identified as such and accompanied by "meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those **[*29]** in the forward[-]looking statement." *15 U.S.C. § 78u-5(c)(1)(A)(i)*. "A forward-looking statement is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues." *No. 84 Emp'r Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 936 (9th Cir. 2003)*. "[I]f a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." *In re Cutera Sec. Litig., 610 F.3d 1103, 1112 (9th Cir. 2010)*. However, "[t]he safe harbor cannot protect cautionary statements made with superior knowledge that some of the potential perils identified have in fact been realized." *Washtenaw Cnty. Emps. Ret. v. Celera Corp., 5:10-cv-02604 EJD, 2012 U.S. Dist. LEXIS 125314, 2012 WL 3835078, at *4 (N.D. Cal. Sept. 4, 2012)* (citing *In re Convergent Techs. Sec. Litig., 948 F.2d 507, 515 (9th Cir. 1991)*).

Moreover, "[r]isk disclosures that 'speak[ ] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[ ] the reader that some of these risks may already have come to fruition' can mislead reasonable investors." *In re Alphabet, Inc. Sec. Litig., 1 F.4th 687, 703 (9th Cir. 2021)*, cert. denied sub nom. *Alphabet Inc. v. Rhode Island, 142 S. Ct. 1227, 212 L. Ed. 2d 233 (2022)*; *see also Siracusano v. Matrixx Initiatives, Inc., 585 F.3d 1167, 1181 (9th Cir. 2009)* (statement that warned of "the risks of product liability claims in the abstract" was misleading in light of failure to disclose that the risk had already come to fruition).

Defendants argue that **[*30]** these statements are forward-looking statements protected by the PSLRA's safe harbor provision:

• "[W]e **remain on track to achieve our 2021 financial outlook and are well positioned to drive growth and profitability in 2022 and beyond**." (FAC ¶ 39; August 3, 2021 Press Release) (Statement 2);

• "For FY21, Defendants provided GAAP revenue guidance of $1.41 to $1.49 billion, net income guidance of $40 to $60 million, and reported 'Adjusted EBITDA guidance remains unchanged at $110 to $130 million inclusive.'" (FAC ¶ 39; August 3, 2021 Press Release) (Statement 3);

• "Yes. . . . On the CIS side of the house, while the business has tailwinds, the business has got a mix of projects, and we are seeing some of those projects move into 2022"; and "So from a CIS perspective, I think the second quarter margins are reflective of the inherent lumpiness in the business. We knew that going into the second quarter. Having said that, **I think the business is significantly better year-on-year, both from a top line perspective as well as a margin point of view. And then more importantly, we expect the CIS business to be profitable in the back half of the year, which you recall is a significant turnaround [*31] from the last couple of years**. So that's the CIS business." (FAC ¶ 40; August 3, 2021 2Q21 Earnings Call, p. 9) (Statement 4); and

• "Over the past few years, you've been with us through several major restructuring events and strategic changes. I'm pleased to report we have found our footing. **With a streamlined company and our healthiest balance sheet in years, we are now going on offense** to grow our business across a vast, mostly untapped residential TAM." (FAC ¶ 59; November 3, 2021 3Q21 Earnings Call, p. 6-7) (Statement 8).

The Court agrees. Statement 2, about the Company being "on track" and "well positioned" to meet financial guidance, FAC ¶ 39, is forward-looking, as "an unadorned statement that a company is 'on track' to achieve an announced objective, or a simple statement that a company knows of no issues that would make a goal impossible to achieve, are merely alternate ways of declaring or reaffirming the objective itself." *Wochos v. Tesla, Inc., 985 F.3d 1180, 1192 (9th Cir. 2021)*. Statement 3 is SunPower's actual financial guidance (FAC ¶ 39), and it is thus "classically" forward-looking. *Intuitive Surgical, 759 F.3d at 1058*. Statements 4 and 8, about "expect[ing] the CIS business to be profitable in the back half of the year" (FAC ¶¶ 10, 40 (Statement 4)), and "now **[*32]** going on offense to grow our business"

(FAC ¶¶ 13, 59 (Statement 8)), are also forward-looking because they refer to the future performance of the business. *See Intuitive Surgical, 759 F.3d at 1059* ("statements related to future expectations and performance" are generally forward-looking).

Defendants identified Statements 2, 3, 4, and 8 as forward-looking and provided cautionary language in support. At the beginning of each earnings call, SunPower cautioned investors that the call would contain "forward-looking" statements and encouraged investors to refer to the risks "described in the safe harbor slide of today's presentation, today's press release, our 2020 10-K and quarterly reports on Form 10-Q." Roberts Decl., Ex. 2 (Aug. 3, 2021 Earnings Call) at 4 (ECF 65-3 at 5); *see also* Ex. 5 (Aug. 3, 2021 Investor Slides) at 2 (ECF 65-6 at 3) (defining forward-looking statement to include "expectations regarding . . . future performance" and "strategic plans and expectations for the results thereof," including a list of risk factors, and referring investors to the Company's SEC filings for additional information); Ex. 4 (Nov. 3, 2021 Earnings Call) at 4 (ECF 65-5 at 6) (containing similar warnings); Ex. 6 (Nov. 3, 2021 Investor **[*33]** Slides) at 2 (ECF 65-7 at 3) (containing similar warnings).

The cautionary language provided by SunPower in its SEC filings was extensive and particularly addressed potential defect-related product issues akin to the issues that were realized and announced by SunPower in January 2022. SunPower cautioned, among other things, that "the failure of a supplier to supply . . . components that meet [its] quality, quantity and cost requirements, could impair [its] ability to manufacture [its] products or could increase [its] cost of production." FAC ¶¶ 11, 14 (recounting excerpts of cautionary language from the "risk factor" section of Company's SEC filings). SunPower further cautioned that it might "be responsible for repairing or replacing defective parts," that "defect[s] could cause [the Company] to incur significant . . . costs," that expenses could be "substantial," that the Company might not receive compensation from its suppliers despite manufacturers' warranties, that such costs "could materially and negatively impact our financial condition, cash flows, and results of operations" and that its "credibility and the market acceptance and sales of [its] products could be harmed." FAC **[*34]** ¶¶ 11, 14, 44-46, 62-64; *see also* Roberts Decl. Ex. 8 (Feb. 22, 2021 10-K) at 31-39 (ECF 65-9 at 23-31) (discussing important factors); Ex. 9 (Aug. 4, 2021 10-Q) at 54-55 (ECF 65-10 at 7-8) (incorporating 10-K risk factors and providing additional

factors); Ex. 10 (Nov. 4, 2021 10-Q) at 55-57 (ECF 65-11 at 7-9) (same). Statements 2, 3, 4, and 8 are therefore protected under the first prong of the safe harbor because they were accompanied by cautionary language.

Plaintiff argues that the safe harbor does apply to these statements because the cautionary language that accompanied the statements was not meaningful. The cautionary language here consists of risk warnings published shortly before and after Defendants' announcement that they were reviewing SunPower's commercial business for sale, and the warnings were phrased entirely as contingencies. *See* FAC ¶¶ 52-56. Plaintiff avers that the warnings were no longer hypotheticals but instead existing realities, rendering the risk statements falsehoods. Defendants purported to warn, for example: "defects could cause us to incur significant . . . costs"; "we may be responsible for repairing or replacing defective parts"; and "potential future **[*35]** product or component failures could cause us to incur substantial expense to repair or replace defective products or components." *See* FAC ¶¶ 11, 14, 44-46, 62-64. Plaintiff argues that these risk warnings are actionable because they warned of contingencies that Defendants knew had already come to fruition. That is, by August 4, 2021, and November 4, 2021, cracking in connectors in SunPower's commercial solar systems and the risk of related costs had materialized because defects "developed over time" in "nearly all" of SunPower's commercial solar systems "since 2019." *See* FAC ¶¶ 71, 75. But as discussed above (Section IV(A)(1)), Plaintiff's theory regarding Defendants' knowledge of the cracked connectors is not borne out through its allegations in the Amended Complaint, and Plaintiff fails to establish knowing falsity. In sum, Defendants' forward-looking statements are accompanied by meaningful cautionary statements and fall within the PSLRA's safe harbor. Statements 2, 3, 4, and 8 are forward-looking statements protected by the PSLRA's safe harbor provision, and they are not actionable.

## B. Strong Inference of Scienter

The PSLRA requires plaintiffs to "state with particularity facts giving **[*36]** rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)(A)*. This "is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Quality Sys., 865 F.3d at 1144* (citation and quotations omitted). "The inference

that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs, 551 U.S. at 324* (citation omitted). However, a strong inference of scienter "must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Tellabs, 551 U.S. at 314*.

The arguments regarding scienter fall into four categories, discussed below: (1) whether Plaintiff adequately alleges scienter based on Defendants' knowledge or access to material information concerning the risk of cracking in the commercial solar systems, (2) whether the core operations doctrine supports an inference of scienter based on Defendants' knowledge of their business, (3) whether the timing of the statements support an inference of scienter, and (4) whether a holistic view of the allegations supports an inference of scienter.

### 1. Knowledge or access to material [*37] information concerning the risk of cracking in SunPower's commercial solar systems

To plead scienter, a complaint may plead a "combination" of facts, none of which need to be from confidential witnesses, internal reports, or other specific sources. *See Alphabet, 1 F.4th at 707* (collecting authority for proposition "[a]llegations of suspicious stock sales or information from confidential witnesses are not needed"). However, the PSLRA demands "particular allegations which strongly imply Defendants' *contemporaneous* knowledge that the statement was false when made." *Berson, 527 F.3d at 989* (emphasis in original).

Here, Plaintiff fails to allege facts that suggest contemporaneous knowledge that contradicted Defendants' public statements. Plaintiff contends that because Faricy took a "deep dive" into the commercial business when hired as CEO (FAC ¶ 8), it is fair to reason that he knew of the cracking issues, how widespread the cracking issues were, or how they would impact the business. But general allegations of an internal review are insufficient where Plaintiff provides no detail about what Faricy's review revealed. *See In re Eargo, Inc. Sec. Litig., 656 F. Supp. 3d 928, 948 (N.D. Cal. 2023)* ("vague" allegations about "internal review" insufficient to establish scienter where plaintiff provided no details [*38] about what review showed). Plaintiff's general allegations implying that Faricy knew of the

widespread cracking defect based on his April 2019 review of the residential and commercial businesses do not even strongly imply that Faricy knew of the product defect before the Company's August and November statements regarding the scope of the component defect. Thus, Plaintiff's allegations are insufficient.

Plaintiff's allegations additionally fail for the misinterpretation discussed above. Plaintiff highlights that the cracking connectors impacted the products manufactured "since 2019," and it misattributes that date to also mean that Defendants knew of the cracking of the components "since 2019." That is not a fair reading of the statements.

Plaintiff has not sufficiently pleaded facts from which one can infer contemporaneous knowledge of the product defects and fails to establish a strong inference of scienter on this basis.

### 2. Core Operations

Plaintiff alleges that SunPower's commercial business — including both the CIS (the Company's second-largest business segment) and CVAR components — was a key component of the company's financial health as it generated more than 23% of the Company's **[*39]** revenue. FAC ¶¶ 6-7, 52. From this, Plaintiff reasons that Defendants knew of the risks related to widespread component failure. While the "core operations" doctrine allows the knowledge of certain facts that are critical to a business's "core operations" to be attributed to a company's key officers, *Webb v. Solarcity Corp., 884 F.3d 844, 854 (9th Cir. 2018)*, "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter — at least absent some additional allegation of specific information conveyed to management and related to the fraud." *Metzler Inv. GMBH, 540 F.3d at 1068*. On the other hand, when plaintiffs can advance "specific allegations that defendants actually did monitor the data that were the subject of the allegedly false statements . . . is sufficient under the PSLRA." *S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 785 (9th Cir. 2008)*. The Ninth Circuit established that

> allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement in three circumstances. First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is

cogent and compelling, thus strong in light of other explanations. . . Second, such allegations may independently satisfy **[\*40]** the PSLRA where they are particular and suggest that defendants had actual access to the disputed information. . . Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.

*Id. at 785-86* (citations omitted).

Defendants argue that none of the three forms of the core operations doctrine applies because Plaintiff fails to allege that Faricy or Sial had "actual access" to any information concerning the cracking problem. Plaintiff fails to advance specific allegations that Defendants monitored information or reports regarding the connector defects that were the subject of the allegedly false statements. Plaintiff's nearest approximation to showing Defendants' access to particular information about the CIS segment is the allegation regarding Faricy's April 2021 statement that he would conduct a "deep [dive]" of the residential, commercial, and industrial businesses in his first 100 days at the company. FAC ¶ 8. Such allegations do not amount to a "cogent or **[\*41]** compelling" inference of scienter, nor do they suffice to "suggest that defendants had actual access to the disputed information." *See S. Ferry, 542 F.3d at 785-86*. The allegations additionally fail for the same failure to allege knowledge of the component defect discussed above. *See* Section IV(B)(1). Thus, Plaintiff is not entitled to the core operations inference of scienter.

### 3. Temporal proximity of Defendants' statements and corrective disclosures and the scope of the cracked connectors

Plaintiff argues that the long-term and constant nature of component defects and Defendants' personal attention to the commercial business and the tight temporal proximity of the alleged statements and the revelations that the concealed risks had materialized, together, strongly bolsters the inference of scienter. Close temporal proximity between allegedly false statements and the disclosure of information contradicting those statements may bolster an inference of scienter. *Reese, 747 F.3d at 574-75*. However, timing alone, absent a

showing of knowing falsity, is insufficient to support scienter. *See Fecht v. Price Co., 70 F.3d 1078, 1083-84 (9th Cir. 1995); Roberti v. OSI Sys. Inc., No. CV 13-9174-MWF VBKX, 2015 U.S. Dist. LEXIS 24761, 2015 WL 1985562, at \*11 (C.D. Cal. Feb. 27, 2015)* (emphasizing that an inference of scienter was premised on holistic view, not merely on timing of statements).

It was only five and one-half months and **[\*42]** two and one-half months, respectively, after the statements that SunPower announced that: (a) it was missing its 4Q21 and FY21 guidance; (b) it was taking a $27 million charge in the already-ended 4Q21; and (c) cracking and the risk of cracking had developed in third-party connector components requiring SunPower to recall and replace those components. FAC ¶¶ 71, 86; *see also* FAC ¶¶ 72-75. Plaintiff does not allege when the Company made the proactive decision to take the $27 million charge to replace the cracking connectors, and in failing to establish that the decision was made prior to Defendants' challenged statements, Plaintiff fails to allege scienter based on the timing of the statements. For these reasons, the temporal proximity of the statements also fails to support a strong inference of scienter.

### 4. Holistic Picture of Scienter

Plaintiff advances that it is plausible to infer Defendants "conceal[ed] bad news in the hope that it w[ould] be overtaken by good news" or otherwise made a "reckless[] gamble." Opp. Br. at 24 (ECF 67 at 31) (quoting *Makor Issues & Rts., Ltd. v. Tellabs Inc., 513 F.3d 702, 710 (7th Cir. 2008)*). To evaluate scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." **[\*43]** *Tellabs, 551 U.S. at 326*. The court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id. at 324*. The inference of scienter "need not be irrefutable," but "must be more than merely reasonable or permissible — it must be cogent and compelling, thus strong in light of other explanations." *Id.* The question is: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id. at 326*.

An inference of scienter based on Defendants' withholding of bad news fundamentally fails for the same reason that Plaintiff's other theories fail: Plaintiff

fails to establish that Defendants knew of the "bad news," the component defect, at any point prior to their November 2021 statements. The FAC alleges, in essence, that Defendants should have disclosed the cracking issue sooner than they did, but the FAC does not provide any facts suggesting exactly when the issue arose or when Defendants had knowledge of it.

Further, Plaintiffs do not allege facts showing that any Defendants sold stocks during the Class Period, and the absence of such insider trading "supports an **[*44]** inference of no scienter." *See In re Rigel Pharm., Inc. Sec. Litig., 697 F.3d 869, 884 (9th Cir. 2012)* ("[B]ecause none of the defendants sold stock during the period between the allegedly fraudulent statements and the subsequent public disclosure . . . , the value of the stock and stock options does not support an inference of scienter. . . . In fact, it supports the opposite inference."); *accord, e.g., In re Solarcity Corp. Sec. Litig., 274 F. Supp. 3d 972, 1011 (N.D. Cal. 2017)*.

In conclusion, after reviewing the First Amended Complaint, Plaintiffs have not pleaded particularized facts showing a strong inference of scienter with respect to any of the challenged statements.

## C. Sufficiency of Pleading *Section 20(a)* Claim

Plaintiff also alleges a *Section 20(a)* claim against Faricy and Sial. FAC ¶¶ 108-109. *Section 20(a)* provides a right of action against any person "who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder." *15 U.S.C. § 78t(a)*. The *Section 20(a)* claim fails because it cannot stand absent a primary violation. *Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1035 n.15 (9th Cir. 2002)*. The Court therefore dismisses this cause of action as well.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion to dismiss with leave to amend. Any amended complaint must be filed by August 15, 2024. No additional parties or claims may be added without leave of Court or stipulation **[*45]** of Defendants.

**IT IS SO ORDERED**.

Dated: July 17, 2024

/s/ Araceli Martínez-Olguín

**ARACELI MARTÍNEZ-OLGUÍN**

**United States District Judge**

---

**End of Document**