POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
Austin P. Van
(*pro hac vice*)
Samantha Daniels
(*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
avan@pomlaw.com
sdaniels@pomlaw.com

[*Additional Counsel on Signature Page*]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SUNPOWER CORPORATION SECURITIES LITIGATION | Case No.:  3:23-cv-05544-RFL |
| This Document Relates to: | **CLASS ACTION** |
| *ALL ACTIONS* | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>Date: February 4, 2025<br>Time: 10:00 AM<br>Dept: Court Room 15, 18th Floor<br>Judge: Hon. Rita F. Lin |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 3

    A.    SunPower, A Cash-Strained Company Needing In Early 2023 To Substantially Increase Its Credit Facility, Issues Bullish Guidance And Then Retracts It. ......... 3

    B.    Throughout 2023, SunPower Suffered An Ongoing Liquidity Crisis And Breached The Financial And Reporting Covenants In Its Credit Agreement. ...... 4

    C.    Defendants Issue False Financials To Mask This Liquidity Crisis And Cover Up Accounting Issues To Induce Its Majority Shareholder To Provide A Credit Lifeline. ..................................................................................................................... 5

    D.    SunPower's Auditor Quits After Uncovering Misconduct In Management's Reporting. .................................................................................................................. 7

ARGUMENT ........................................................................................................................ 7

    A.    The CAC Pleads Actionable False Statements and Omissions About SunPower's Financial Health. ...................................................................................................... 7

        1.    Defendants' Misled Investors About SunPower's Cash Position in 2023. 8

        2.    Defendants Misled Investors About SunPower's Compliance With Its Financial Covenants. ................................................................................. 10

        3.    Defendants Misled Investors About the February 2024 Sol Holding Transaction. ........................................................................................... 13

        4.    Defendants Misled Investors About the Impact of Their Auditor's Resignation. ......................................................................................... 16

    B.    The CAC Pleads a Strong Inference of Scienter. ................................................ 17

        1.    Defendants Had Access To Information Falsifying Their Statements. ... 17

        2.    Defendants' CEOs And CFO Made Specific Assurances About Core Aspects Of The Company's Financial Health. ...................................... 19

        3.    Defendant Eby Spoke Directly About SunPower's Compliance With Its Financial Covenants. ................................................................................ 20

        4.    The Contemporaneous SEC Investigation Supports Scienter. ................. 21

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

        5.    That Defendants' Auditor Resigned Over Managements' Misconduct And Subterfuge Supports Scienter.........................................................21

        6.    Defendants' Motive Supports Scienter. ..................................................22

    C.    Plaintiffs Have Standing ......................................................................23

CONCLUSION.................................................................................................25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anschutz Corp. v. Merrill Lynch & Co. Inc.*,
  785 F.Supp.2d 799 (N.D. Cal. 2011) ..................................................................21

*Atlas v. Accredited Home Lenders Holding Co.*,
  556 F. Supp. 2d 1142 (S.D. Cal. 2008)................................................................17

*Berson v. Applied Signal Tech.*,
  527 F.3d 982 (9th Cir. 2008) ........................................................................ *passim*

*Brendon v. Allegiant Travel*,
  412 F.Supp.3d 1244 (D. Nev. 2019)....................................................................19

*Brown v. Papa Murphy's Holdings*,
  2021 WL 235865 (W.D. Wash. Jan. 12, 2021)......................................................9

*City of Birmingham Relief v. Acadia Pharms. Inc.*,
  2022 WL 4491093 (S.D. Cal. Sept. 27, 2022).......................................................8

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ..............................................................................18

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
  527 F. Supp. 3d 1151 (N.D. Cal. 2021) ...............................................................23

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
  70 F.4th 668 (3d Cir. 2023) .................................................................................17

*Cont'l Gen. Ins. Co. v. Olafsson*,
  2024 WL 4263211 (D.N.J. Sept. 23, 2024) .........................................................15

*De Vito v. Liquid Holdings Grp., Inc.*,
  2018 WL 6891832 (D.N.J. Dec. 31, 2018)......................................................15, 16

*Empl's Ret. Sys. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015)................................................................................22

*EnSource Invs. LLC v. Tatham*,
  2017 WL 10648061 (S.D. Cal. Mar. 9, 2017) ................................................14, 19

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*Fecht v. Price Co.*,
　　70 F.3d 1078 (9th Cir. 1995) ...........................................................................................21, 24

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
　　270 F.3d 645 (8th Cir. 2001) ...................................................................................................24

*Francisco v. Abengoa, S.A.*,
　　481 F. Supp. 3d 179 (S.D.N.Y. 2020)......................................................................................9

*Gammel v. Hewlett-Packard Co.*,
　　2013 WL 1947525 (C.D. Cal. May 8, 2013) ..........................................................................23

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
　　63 F.4th 747 (9th Cir. 2023) .............................................................................................10, 12

*Hacker v. Elec. Last Mile Sols. Inc.*,
　　687 F.Supp.3d 582 (D.N.J. 2023) ...........................................................................................20

*Hammer v. Frontier Fin. Corp.*,
　　2011 WL 13229260 (W.D. Wash. Sept. 7, 2011).............................................................9, 11, 12

*Hatamian v. Adv. Micro Devices, Inc.*,
　　87 F.Supp.3d 1149 (N.D. Cal. 2015) ...............................................................................7, 11, 20

*Hemmer Grp. v. SW Water Co.*,
　　527 Fed. App'x 623 (9th Cir. 2013) .........................................................................................9

*Herremans v. BMW of N. Am., LLC*,
　　2014 U.S. Dist. LEXIS 145957, 2014 WL 5017843 (C.D. Cal. Oct. 3, 2014)........................9

*Howard v. Everex Sys., Inc.*,
　　228 F.3d 1057 (9th Cir. 2000) .................................................................................................19

*In re Aceto Corp. Sec. Litig.*,
　　2021 WL 4350501 (E.D.N.Y. Mar. 16, 2021) .......................................................................12

*In re Advance Auto Parts, Inc., Sec. Litig.*,
　　2020 WL 599543 (D. Del. Feb. 7, 2020) ................................................................................15

*In re Am. Apparel, Inc. S'holder Litig.*,
　　855 F. Supp. 2d 1043 (C.D. Cal. 2012) ...................................................................................9

*In re Amgen Inc. Sec. Litig.*,
　　2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)........................................................................17

*In re Bare Escentuals, Inc. Sec. Litig.*,
　　745 F. Supp. 2d 1052 (N.D. Cal. 2010) ..................................................................................19

*In re Bear Stearns Comp., Inc..*,
    763 F.Supp.2d 423 (S.D.N.Y. 2011)............................................................................21

*In re: Bofi Holding, Inc. Sec. Litig.*,
    2016 WL 5390533 (S.D. Cal. Sept. 27, 2016)...........................................................18

*In re Countrywide Fin.*,
    273 F.R.D. 586 (C.D. Cal. 2009) ...............................................................................25

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F.Supp.2d 1132 (C.D. Cal. 2008) .......................................................................10

*In re Cylink Sec. Litig.*,
    178 F.Supp.2d 1077 (N.D. Cal. 2001) ....................................................................9, 21

*In re Diamond Foods, Inc., Sec. Litig.*,
    2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) ..........................................................19

*In re Emergent BioSolutions*,
    2023 WL 5671608 (D. Md. Sept. 1, 2023) ............................................................21, 23

*In re Eros Intl. PLC Sec. Litig.*,
    2021 WL 1560728 (D.N.J. Apr. 20, 2021) .................................................................16

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
    986 F.Supp 2d 428 (S.D.N.Y. 2013)..........................................................................15

*In re Grand Casinos, Sec. Litig.*,
    988 F. Supp. 1273 (D. Minn. 1997)............................................................................18

*In re Illumina, Inc. Sec. Litig.*,
    2018 WL 500990 (S.D. Cal. Jan. 22, 2018)...............................................................23

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005)........................................................................17

*In re Impax Lab'ys*,
    2008 WL 1766943 (N.D. Cal. Apr. 17, 2008) ......................................................12, 25

*In re Infineon Techs. AG*,
    2006 WL 1329887 (N.D. Cal. May 22, 2006) ...........................................................16

*In re LDK Solar*,
    584 F.Supp.2d 1230 (N.D. Cal. 2008) .......................................................................22

*In re LendingClub Sec. Litig.*,
    254 F. Supp. 3d 1107 (N.D. Cal. 2017) .....................................................................20

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*In re MF Global Holdings Ltd. Securities Litigation*,
  982 F.Supp.2d 277 (S.D.N.Y. 2013).................................................................9, 15, 16

*In re New Century*,
  588 F.Supp.2d 1206 (C.D. Cal. 2008) ........................................................................12

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) .....................................................................................19

*In re Pac. Gateway Exch., Inc., Sec. Litig.*,
  2002 WL 851066 (N.D. Cal. Apr. 30, 2002) ...........................................................15

*In re Pareteum Sec. Litig.*,
  2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) ..........................................................20

*In re Quality Sys.*,
  865 F.3d 1130 (9th Cir. 2017) ...........................................................................8, 9, 10

*In re QuantumScape Sec. Class Action Litig.*,
  580 F. Supp. 3d 714 (N.D. Cal. 2022) .......................................................................11

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)..........................................................................................18

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2018 WL 6167889 (S.D.N.Y. 2018).............................................................................15

*In re Silver Wheaton Corp. Sec. Litig.*,
  2019 U.S. Dist. LEXIS 59428 (C.D. Cal. Mar. 25, 2019) ........................................9

*In re Splunk Inc.*,
  592 F. Supp. 3d 919 (N.D. Cal. 2022) ..................................................................19, 23

*In re Stone & Webster, Inc., Sec. Litig.*,
  414 F.3d 187 (1st Cir. 2005)........................................................................................10

*In re SunPower Corp.*,
  No. 1:24-bk-11649 (Bankr. D. Del. Sept. 19, 2024)...................................6, 7, 14, 16

*In re Tesla, Inc. Sec. Litig.*,
  477 F.Supp.3d 903 (N.D. Cal. 2020) .....................................................................21, 22

*In re Thornburg Mortg., Inc. Sec. Litig.*,
  695 F.Supp.2d 1165 (D.N.M. 2010) ..........................................................................22

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F.Supp.2d 964 (N.D. Cal. 2009) .........................................................................22

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

vi

*In re VEON Ltd. Sec. Litig.*,
  2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017)........................................................................20

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
  2017 WL 3058563 (N.D. Cal. July 19, 2017)........................................................................17

*In re Williams Sec. Litig.*,
  339 F.Supp.2d 1206 (N.D. Okla. 2003) ................................................................................22

*In re Zoran Corp. Derivative* Litig.,
  511 F.Supp.2d 986 (N.D. Cal. 2007) ....................................................................................19

*Jaszczyszyn v. SunPower Corp.*,
  2024 WL 3463348 (N.D. Cal. July 17, 2024).............................................................15, 18, 23

*Johnson v. Costco Wholesale Corp.*,
  2019 WL 6327580 (W.D. Wash. Nov. 26, 2019) ..................................................................12

*Johnson v. Knapp*,
  2009 WL 764521 (C.D. Cal. Mar. 16, 2009)...........................................................................8

*Johnson v.* Manhattan *R. Co.*,
  289 U.S. 479 (1933)...............................................................................................................25

*Joyce v. Amazon.com, Inc.*,
  2023 WL 8370101 (W.D.Wash., 2023) .................................................................................20

*Jui-Yang Hong v. Extreme Networks*,
  2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) .......................................................................12

*Kaplan v. Rose*,
  49 F.3d 1363 (9th Cir. 1994) .................................................................................................24

*Karimi v. Deutsche Bank Aktiengesellschaft*,
  607 F.Supp.3d 381 (S.D.N.Y. 2022)......................................................................................21

*Karri v. Oclaro*,
  2020 WL 5982097 (N.D. Cal. Oct. 8, 2020)..........................................................................10

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ...................................................................................................7

*Knox v. Yingli Green Energy Holding*,
  242 F.Supp.3d 950 (C.D. Cal. 2017) .....................................................................................12

*Lierboe v. State Farm*,
  350 F.3d 1018 (9th Cir. 2003) ...............................................................................................25

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*M & M Hart Living Trust v. Global Eagle Entertainment, Inc.*,
  2017 WL 5635424 (C.D.Cal., 2017).................................................................................20

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)...............................................................................................................7

*Mehedi. Romano v. John Hancock Life Ins. Co. USA*,
  2024 U.S. App. LEXIS 27576 (11th Cir. Oct. 30, 2024)..................................................25

*Mehedi v. View, Inc.*,
  2023 WL 3592098 (N.D. Cal. May 22, 2023) ..................................................................21

*Mehedi v. View, Inc.*,
  2024 WL 2969982 (N.D. Cal. June 12, 2024) ..................................................................25

*Mulderrig v. Amyris, Inc.*,
  492 F.Supp.3d 999 (N.D. Cal. 2020) ................................................................................19

*Nash v. Qualtrics Int'l Inc.*,
  2024 WL 231870 (D. Del. 2024) .......................................................................................15

*Nguyen v. Radient Pharm. Corp.*
  2011 WL 5041959 (C.D. Cal. Oct. 20, 2011).....................................................................22

*Noto v. 22nd Century Grp., Inc.*,
  2023 WL 122305 (W.D.N.Y. Jan. 6, 2023) ......................................................................19

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
  780 F.App'x 480 (9th Cir. 2019) .........................................................................................8

*PAE Gov't Servs. Inc. v. MPRI, Inc.*,
  514 F.3d 856 (9th Cir. 2007) .............................................................................................23

*Resh v. China Agritech, Inc.*,
  2019 WL 1055240 (C.D. Cal. Jan. 8, 2019) .....................................................................22

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)...............................................................................................16

*S. Ferry LP # 2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009)..........................................................................19

*SBC Berlin 2012-2014, Ltd. v. Babywatch, Inc.*,
  2019 U.S. Dist. LEXIS 244309 (N.D. Cal. Oct. 10, 2019).................................................9

*Schueneman v. Arena Pharms*,
  840 F.3d 698 (9th Cir. 2016) .............................................................................................23

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992)..................................................................................................15

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ...........................................................................18, 20

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010)..................................................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..............................................................................................................17

*Todd v. STAAR Surgical Co.*,
    2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ...................................................................18, 23

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
    672 F.Supp.2d 596 (S.D.N.Y. 2009).......................................................................................9

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) .................................................................................................12

*Weston v. DocuSign, Inc.*,
    669 F.Supp.3d 849 (N.D. Cal. 2023) ...................................................................................12

*Zamir v. Bridgepoint Educ.*,
    2018 WL 1258108 (S.D. Cal. Mar. 12, 2018) .....................................................................21

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ................................................................................................20

**Statutes**

15 U.S.C. §78j(b) ..........................................................................................................................25

**Rules**

Fed. R. Civ. P. 12(b)6 ....................................................................................................................23

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

x

**PRELIMINARY STATEMENT**

Starting at least as early as the beginning of 2023, facing unprecedented challenges to its business, SunPower struggled with an undisclosed liquidity crisis that ravaged its financials and thus blocked its access to much-needed credit.  Defendants, including SunPower's management, attempted to stave off insolvency by misstating its financials long enough to fool its creditors, hiding those financials through a series of retractions, restatements, and delays.  SunPower concealed the truth about its dire financial health from the public and even from its own auditor, leading to that auditor's "noisy resignation" over management's misconduct and triggering SEC and AUSA investigations into its accounting.  Time has demonstrated that the fraud alleged in the original complaint in this Action was even more pervasive, and had even more devastating consequences, than originally imagined.  SunPower has now gone bankrupt.  Far from being a "case in search of facts," as Defendants' assert, (MTD 1), "time has proven" that the facts of this case constitute serious violations of the federal securities laws.

Defendants issued a series of false and misleading statements to hide the true state of SunPower's failing business amid an ongoing liquidity and financing crisis.  *First*, in May and August 2023, Defendants' quarterly reports proclaimed that the Company had "cash and cash equivalents . . . sufficient to meet [its] obligations over the next 12 months," when in reality, former employees confirmed that, throughout 2022 and 2023, the Company faced a "cash crunch" so severe that it could not pay its current bills.

*Second*, on October 1, 2023, SunPower's poor financial health triggered breaches of the financial and reporting covenants from its only source of credit, but when analysts asked directly about the Company's compliance, instead of disclosing these breaches, Defendants falsely assured investors that SunPower's was in compliance with its covenants in Q3 2023.

*Third*, in February 2024, Defendants used faulty restated financials to induce its majority shareholder (Sol Holding) to throw the Company a $175 million credit lifeline, only to retract those financials after this funding was secured.  While publicly, Defendants stated that the infusion of capital would assure that "cash flow" would be "positive in the second half of 2024 and beyond,"

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1

and would obviate the need for any "going concern" warning, the truth was that Defendants knew this credit was inadequate to keep the business afloat. As a Forbes analyst phrased it, "Sol Holding [was] induced to throw good money after bad based on fractured financials." Defendants knew those financials were tainted given that, while it was negotiating the transaction, SunPower's independent auditor had identified material misrepresentations in the Company's financials and the SEC had initiated an investigation into Defendants' accounting practices. Defendants then resorted to their modus operandi: they delayed the 10-K report and once again cited the need to restate all of SunPower's financials over the past two years without disclosing any improprieties.

*Finally*, when SunPower's auditor resigned before completing the restatement and audit, citing management's misconduct, in an 8-K filed after hours on July 3, 2024, Defendants maintained that the resignation "ha[d] no material impact on SunPower's current cash position." Again, this was false: unknown to investors, after Defendants exhausted the second tranche of the Sol Holding credit in June 2023, the Company (still in the midst of an undisclosed cash freefall) was out of financing options; the lack of an auditor—and thus the inability to file the necessary audited financial statements—blocked it from a much-needed influx of cash and credit. Indeed, only two weeks later, on July 17, 2024, analysts reported that SunPower told its customers and supply partners that the Company was ceasing operations. A few weeks later, on August 5, 2024, SunPower filed for bankruptcy, and that same day, the United States Attorney's Office for the Northern District of California (like the SEC) issued a federal grand jury subpoena to investigate SunPower's accounting.

Defendants' strategy is to balkanize these allegations, contending that each in isolation have "no demonstrable connection to" statements about the Company's cash position or credit compliance (MTD 1), a contention this Court rightly rejected in granting consolidation.[1] Defendants also argue that their statements about the Company's financial health are not false

---

[1] The Court did not grant (and Plaintiffs did not seek) "leave to amend," MTD 1, but only to consolidate the related actions; the Court's order makes clear the CAC "shall not add new claims or allegations not present in the operative complaints . . . absent further leave of court or a stipulation pursuant to Rule 15." Dkt. 78.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

2

(*e.g.*, MTD 7), but Defendants ignore statements by multiple FE's that establish that the Company was facing a liquidity crisis. Defendants try to argue that their statements are protected as forward-looking, but courts consistently find that representations clearly designed to reassure investors about a Company's *present* financial condition are actionable. Similarly, Defendants refuse to address the scienter allegations holistically, and in any event ignore some of the most damning scienter allegations at issue—that Defendants spoke directly to investors about these topics shows that Defendants either were knowledgeable about them, or were severely reckless in leading investors to believe they were knowledgeable about them when they were not.

The Court should deny Defendants motion to dismiss and permit discovery into these egregious violations of securities laws.

<u>**STATEMENT OF FACTS**</u>

**A.     SunPower, A Cash-Strained Company Needing In Early 2023 To Substantially Increase Its Credit Facility, Issues Bullish Guidance And Then Retracts It.**

At the beginning of 2023, SunPower faced unprecedented existential challenges to its business and liquidity including COVID-era supply chain constraints, a new net energy metering program ("NEM 3.0"), and drastic interest rate increases, all of which sharply decreased consumer demand. CAC¶¶40-48. SunPower installs solar panels on consumer homes, and it relies on funds from credit sources from agreements with financial and reporting covenants; SunPower's primary credit agreement with Bank of America (BOA) (the "Credit Agreement"), contained four financial covenants requiring SunPower to maintain certain levels or ratios of "net leverage," "interest," and "assets," and to maintain a "minimum liquidity," all of which depend on financial health metrics such as EBITDA, debt, or liquidity. CAC¶¶29-41.

The Company was burning through cash at an alarming rate. To get access to increased credit, Defendants created a surprisingly bullish 2023 forecast which appears to have been formulated to convince a BOA-led group on January 26, 2023 to extend an additional $100 million in loan availability. The projections were shared with the public just 20 days later, on February 15, 2023. After achieving its funding goal, the Company withdrew those projections. As the Class Period wore on, this pattern (bullish statements, obtaining funding, and rescinding those

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

statements) repeated itself with disturbing regularity.

**B.      Throughout 2023, SunPower Suffered An Ongoing Liquidity Crisis And Breached The Financial And Reporting Covenants In Its Credit Agreement.**

Given these challenges, SunPower faced an ongoing liquidity crisis. Publicly, however, the Company downplayed these issues.  In the Company's Q1 2023 Form 10-Q filed on May 3, 2023, and Q2 Form filed August 2, 2023, SunPower maintained that "[w]e currently anticipate that our cash and cash equivalents will be sufficient to meet our obligations over the next 12 months from the date of issuance of our financial statements."  Yet behind the scenes, former employees confirm an ongoing liquidity crisis:  One former employee confirmed that Defendants Faricy and Eby knew about the cash issues throughout this time, but "continued to say" that they were "not able to tell you when we will have the ability to raise the equity" needed "in order to pay" its obligations. Another former employee described SunPower scrambling to "try[] to liquidate material and supplies," and others conveyed  how SunPower was unable to pay suppliers, resulting in several of those players issuing "notices of cancelation," including how SunPower "lost [its] contract" with "major supplier[]" Maxeon due to SunPower's "missed payments."  CAC¶¶102-22. These tactics created a misimpression that the Company had sufficient cash on hand.

This crisis also implicated the Company's financial covenants.  While CFO Eby assured the market in November 2023 that SunPower had the financial strength to comply with those covenants, in reality the Company was scrambling to secure waivers of breaches that had occurred at least a month earlier on October 1, 2023—a fact not disclosed to the public.  CAC¶¶124-47. Indeed, on October 24, 2023, defendants only disclosed the need to "restate" the financial statements in the Company's FY 2022 Form 10-K and its Q1 2023 and Q2 2023 Form 10-Qs (2023 "Restatement"), due to issues only specified as "an overstatement of consignment inventory of microinverter components at certain third-party locations, a material weakness in the Company's internal controls over financial reporting, and ineffective disclosure controls and procedures." CAC¶55.  While it disclosed that management was "negotiating the terms and conditions of a consent and waiver to address the effects of the Restatement," it did not suggest the Company was in danger of (or in fact, already had) breached its financial covenants.  Nor did it disclose that

SunPower's liquidity or access to credit was in jeopardy.  CAC¶56.

Eby's assurances worked: analysts covering "SPWR reported 3Q results" reported that "[e]ncouragingly, the Company generated positive FCF [free cash flow] during 3Q and appears to be in compliance with debt covenants, though the Company is in discussions with its lenders for a waiver owing to the pending restatement (non-cash) recently announced."  CAC¶¶X.

**C.    Defendants Issue False Financials To Mask This Liquidity Crisis And Cover Up Accounting Issues To Induce Its Majority Shareholder To Provide A Credit Lifeline.**

The CAC asserts and details eight instances in which Class members suffered losses due to piecemeal revelations.  The truth emerged about the true state of SunPower's financial health in stages, beginning with the July 2023 guidance revisions. On July 26, 2023 misleading guidance was reversed.  CAC¶198.  Supplier problems with key partner Maxeon were disclosed on November 15, 2023. CAC¶200.  More disclosures were made on December 11 and 18, 2023.  For instance, the Company's Restatement and Q3 10-Q disclosed that the Company had "breached" an unspecified "financial covenant" as well as a "reporting covenant of our Credit Agreement" and had negotiated for waivers of those breaches, and that "[s]ubstantial doubt exists about our ability to continue as a going concern" due to those unspecified breaches (if they are not waived). CAC¶¶202-06.  The Restatement, however, did not disclose that the Company had been suffering a systemic liquidity crisis as its business failed amid new challenges.  Nor did it disclose that this would make raising capital from third parties (including an extension of more credit from BOA) substantially more difficult, if not impossible.  A serious stock drop occurred on December 18, 2023, accompanied by further revelations.  CAC¶206.

But this was still not the full picture, and instead of disclosing all the stark realities, the Company turned to its majority shareholder, Sol Holding, LLC to buoy the secretly failing business.  To get that financing, the Company presented a financial advisor, Houlihan, with its 2023 Restatement, which included the unaudited financial reports for Q1, Q2, and Q3 of 2023, to issue a fairness opinion—on the basis of those financials, Houlihan green-lit the transaction, enabling SunPower to obtain $175 million.  CAC¶¶158-81.  As Defendants touted, quite misleadingly: "[t]his transaction demonstrates the strong conviction of our financial partners in the

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

long-term value" of SunPower, setting the Company up with a "sure way[]" "to prevail in 2024 and then some." Defendants now "expect to be cash flow positive in the second half of 2024 and beyond" "do not expect at the moment to have a going concern provision in our 10-K [annual report] that's coming out" a few weeks later. CAC¶¶74. What these events truly signified was that the funding sources were temporarily fooled, and that the Company would only be able to obtain further crucial funding through subterfuge, a charade it ultimately could not keep up.[2]

At the time Defendants were negotiating and touting this agreement, Defendants and their auditor, Ernst & Young (EY), were working to prepare an audited 10-K annual financial report for 2023. Unknown at the time, during that audit preparation, EY detected and could not approve the gross accounting improprieties they encountered and was increasingly frustrated by Defendants' lack of candor in providing information to complete the audit, and that the Company was dealing with an undisclosed SEC investigation into the Company's "accounting practices." CAC¶¶89-90. Instead of filing that annual audited and vetted 10-K, on February 29, 2024, SunPower stated (without accurately explaining why) the 2023 annual report would be delayed for an undisclosed amount of time. Around the same time, Defendant CEO Faricy and the EVP left the Company. CAC¶¶75, 86. In truth, they were fired.

With still no 10-K filed, two months later on April 23, 2024, Defendants instead announced the need for yet another, even more massive restatement—covering all financial reports issued *for 2022 onward into the end of 2023*. CAC¶¶81. The disclosure only mentioned "misstatements" related to vague "capitalization of certain deferred costs," "the classification of certain sales commissions," and an identified an unspecified "new material weakness . . . in the Company's internal control over financial reporting," which the Company would "describe[] in more detail in the Company's" forthcoming amended financials. CAC¶177. But in a misleading manner, Defendants continued to sell SunPower as a Company in good current financial health, with the elements in place to achieve long-term success. CAC¶187.

---

[2] The public admissions in the bankruptcy file reveal that the Company still needed a "solution" to its liquidity crisis even after obtaining new funds. Bkt Dkt. No. 9, ¶¶12, 36, 44, 48.

**D.    SunPower's Auditor Quits After Uncovering Misconduct In Management's Reporting.**

SunPower would never issue any restated financials.  In what one analyst report referred to as a "horror show" 8-K filing (filed surreptitiously after-market hours on July 3, 2024, before the national holiday), SunPower revealed that its auditor EY resigned, stating it "believes that allegations of misconduct by senior members of management, who had significant roles in internal control over financial reporting and upon whose representations EY relied, were within the scope of EY's audit" but had been withheld, and that "information has come to its attention that has made [EY] unwilling to be associated with the financial statements prepared by management." CAC¶188.  Defendants, however, reiterated that this resignation prior to completing the new restatement would not impact its cash position.  CAC¶192.  However, a mere two weeks later, on July 17, 2024, analysts reported that the Company notified its customers and supply partners it was ceasing operations. CAC¶227.  Shortly after, on August 5, 2024, SunPower announced it was filing for bankruptcy.  CAC¶99.  That same day, the United States Attorney's Office for the Northern District of California issued the Company a federal grand jury subpoena seeking "documents similar to those sought by the SEC" to "investigat[e] . . . SunPower's accounting." Am. Disclosure St. at 32 n. 18, *In re SunPower Corp.*, No. 1:24-bk-11649 (Bankr. D. Del. Sept. 19, 2024) ("Bkt. Dkt."), ECF No. 515

## ARGUMENT

**A. The CAC Pleads Actionable False Statements and Omissions About SunPower's Financial Health.**

A statement is misleading if it creates an "'impression of a state of affairs that differs in a material way from the one that actually exists.'"  *Hatamian v. Adv. Micro Devices, Inc.*, 87 F.Supp.3d 1149, 1158-61 (N.D. Cal. 2015).  A statement "may be misleading if it omits material information," *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018), and "[d]isclosure is required" "to make statements made . . . not misleading," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). While there is no freestanding duty to disclose material facts, once companies *choose* to speak on a topic, they are "bound to do so in a manner that

wouldn't mislead." *Applied Signal*, 527 F.3d at 987.

    **1.**    **Defendants' Misled Investors About SunPower's Cash Position in 2023.**

Defendants' statements in Q1 and Q2 that "[w]e currently anticipate that our cash and cash equivalents will be sufficient to meet our obligations over the next 12 months" were false and omitted material information—at that time, SunPower did not have adequate "cash and cash equivalents," and did not have a basis to anticipate having cash "sufficient to meet [its] obligations over the next 12 months." The CAC amply alleges the falsity of these statements: Multiple FEs confirmed that SunPower disguised a dire cash shortage by misrepresenting that it had sufficient cash for the coming year, when in fact it was unable to pay its current obligations throughout 2022 and 2023. CAC¶¶102-22. FEs confirmed that SunPower was unable to pay its current bills to *many* service providers throughout 2022 and 2023, including its most important supplier Maxeon,[3] and stated that SunPower suffered chronic cash problems starting as early as 2022, getting more dire throughout 2023. *Id.*[4] The positive May and August 2023 statements were designed to hide SunPower's ongoing liquidity crisis from investors and even SunPower's own auditor; indeed, EY resigned over management's lack of candor in reporting financials for the 2023 10-K annual report, a time period squarely encompassing these statements, and the SEC and the AUSA are

---

[3] Defendants improperly claim "Maxeon's disclosures" "do not support" Plaintiffs' claim SunPower "lacked sufficient cash to pay." MTD 9. But Maxeon's press release and earnings call related that it suspended delivery due to nonpayment (¶¶69, 154), and a FE confirmed SunPower lacked the cash to pay Maxeon (¶¶110,117). Defendants cannot insert their own version of the facts in place of a complaint's particularized allegations. *See Johnson v. Knapp*, 2009 WL 764521, at *4 (C.D. Cal. Mar. 16, 2009). Instead, Defendants' alternative interpretations raise trial issues. Defendants' loss causation argument that the nonpayment was disclosed to the market (MTD 25) is a "truth on the market" defense premature on a motion to dismiss. *City of Birmingham Relief v. Acadia Pharms. Inc.*, 2022 WL 4491093, at *11 (S.D. Cal. Sept. 27, 2022).

[4] Defendants cannot reasonably dismiss these allegations as "common" "cash management and cost cutting initiatives," MTD 12, when FEs confirm that SunPower was in crisis (¶¶102-22). Unable to counter these statements credibly, Defendants instead challenge the sources. MTD 10-11. But the Ninth Circuit routinely "credit the allegations attributed to [CWs]" where they "form a plausible and coherent narrative" and are "in a position to be personally knowledgeable" of the facts alleged. *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F.App'x 480, 484 n.5 (9th Cir. 2019). Nothing more is required at the pleading stage. *Quality Sys.*, 865 F.3d at (crediting allegations where "the complaint includes each confidential witness's job description and responsibilities"). Given their day-to-day roles at the Company, they possess the requisite personal knowledge necessary to support their allegations about SunPower's cash position. CAC¶¶104, 111, 113, 116 (detailing roles and basis of knowledge).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

8

investigating Defendants' "accounting practices" used to create these metrics.

Ultimately, in April 2024, SunPower, in yet another financial about-face, effectively admitted that its cash statements (and many other statements) were false and "could no longer be relied upon" when it restated its financial results. *Id.* The restatement's scope was not limited to "recently identified historical accounting deficiencies" (MTD 12) but included *all* financial statements and related disclosures and claims *for the past two years.* CAC¶176. Such a massive restatement "[b]y definition . . . corrects financial data that was false when made."[5]

In *In re MF Global Holdings Ltd. Securities Litigation*, 982 F.Supp.2d 277, 299 (S.D.N.Y. 2013), defendants claimed to "have sufficient liquidity to satisfy all of [its] expected cash needs for at least one year." *Id.* In truth, however, MF Global had a "lack of sufficient internal controls to manage . . . liquidity and capital requirements," was "me[eting] . . . capital requirements only through intra-company transfers," and created a liquidity shortfall that led to bankruptcy and a shocking loss of shareholder wealth. *Id.* at 290, 299, 318. The same is true in this case. These "statements [were] inconsistent with [SunPower's] real-time financial information and were materially false or misleading."[6]

---

[5] *Hemmer Grp. v. SW Water Co.*, 527 Fed. App'x 623, 626 (9th Cir. 2013); *In re Cylink Sec. Litig.*, 178 F.Supp.2d 1077, 1084 (N.D. Cal. 2001); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F.Supp.2d 596, 606 (S.D.N.Y. 2009). It is no bar to a securities fraud case that the false financials were never formally restated. *In re Silver Wheaton Corp. Sec. Litig.*, 2019 U.S. Dist. LEXIS 59428, at *29-30 (C.D. Cal. Mar. 25, 2019) (collecting cases). In these circumstances: "Although Plaintiffs do not identify precisely when or where these facts were concealed, they do not need to." *SBC Berlin 2012-2014, Ltd. v. Babywatch, Inc.*, 2019 U.S. Dist. LEXIS 244309, at *27 (N.D. Cal. Oct. 10, 2019), *Herremans v. BMW of N. Am., LLC*, 2014 U.S. Dist. LEXIS 145957, 2014 WL 5017843, at *9 (C.D. Cal. Oct. 3, 2014) (Rule 9(b) is "somewhat relaxed [for concealment claims]").

[6] *In re Quality Sys.*, 865 F.3d 1130, 1144 (9th Cir. 2017); *Brown v. Papa Murphy's Holdings*, 2021 WL 235865, at *5 (W.D. Wash. Jan. 12, 2021) (statements painting a "rosier view" of "financial prospects"); *Hammer v. Frontier Fin. Corp.*, 2011 WL 13229260, at *5 (W.D. Wash. Sept. 7, 2011) (weak capitalization actionable). *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 210 (S.D.N.Y. 2020) (MTD 12) confirms that "the timing of" a revelation "is suggestive" of fraud, but concluded "Plaintiffs fail[ed] to plead any facts in support of the allegation that the Company's statements were false at the time they were made," whereas here, four former employees describe the contemporaneous cash freefall and the Company's main supplier ceased shipments due to nonpayment. For the same reason, "the complaint . . . describ[es] the problem[]" (lack of liquidity) and "stat[es] how . . . the aspirational statements defendants made [regarding SunPower's strong cash position] were false," unlike *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1074 (C.D. Cal. 2012) (cited at MTD 12).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

The PSLRA's safe harbor does not protect these misstatements (MTD 9), where, as here, management is expressing a *current* belief in the accuracy of forecasts, and plaintiffs allege that such belief was not genuinely held. *See Quality Systems*, 865 F.3d at 1142; *Karri v. Oclaro*, 2020 WL 5982097, at *5 (N.D. Cal. Oct. 8, 2020) (fairness opinion "declaration[s] of existing fact" about "present value"); *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005) (same). Defendants could not have "anticipated" that they would have sufficient cash "to meet our obligations over the next 12 months" because *at the time of their writing*, Defendants were *already unable to meet their obligations*. Moreover, "[c]autionary words about future risk cannot insulate . . . failure to disclose that the risk has transpired." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F.Supp.2d 1132, 1178 n.62 (C.D. Cal. 2008). Here, the statements omitted that SunPower did not, without depleting operating cash reserves, have the cash to pay key vendors and existing obligations. *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 780 (9th Cir. 2023).

**2.      Defendants Misled Investors About SunPower's Compliance With Its Financial Covenants.**

Compounding the liquidity crisis in 2023, SunPower also breached financial and reporting covenants embedded in its BOA credit line, foreclosing access from this critical source of funding. Yet like the undisclosed cash crunch, Defendants obscured the truth about the Company's breaches. On the Company's November 1, 2023 earnings call, when a Goldman Sachs analyst specifically asked, "even given the negative EBITDA outlook . . . you still plan to be in compliance with all those [financial] covenants through year-end?" Eby replied "*we're fine in Q3* and we're talking to the banks about waivers for the restatement and anything else we need," and reiterated "there [are] four [financial] covenants" "[a]nd we reached on all of those."

But the Company's compliance was *not* "fine in Q3," and SunPower had not "reached on all of those" financial covenants as of November 1, 2023. Rather, SunPower later admitted that it was in breach of its financial covenants as of October 1, 2023, the end of SunPower's Q3. CAC¶64. And, in stating that nevertheless SunPower was "talking to the banks about waivers for the restatement," Eby gave the false impression that SunPower was seeking waivers only to

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

address its *reporting* covenants, not the *financial* covenants related to financial health. Eby's assurances thus created an "impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Adv. Micro Devices*, 87 F.Supp.3d at 1158-61.

Defendants argue first that the CAC does not allege that the Company had determined one way or another whether it had been in breach of its covenants on November 1, 2023. MTD 13. But if the Company had *not* determined that it had been in breach as of that date, then Eby's statement that SunPower had been "fine in Q3" was equally misleading because it gave investors the impression that the Company *had in fact determined* by that date that it was not in breach.

Defendants also attempt to dodge these misleading statements by pointing to others they claim provide "context." MTD 13. This attempt fails because Eby's comments were specific and direct. Eby's statement that SunPower would "need to get to the final" (MTD 13) refers to her response to the analyst's question about "compliance with all those covenants through year-end," or Q4—which had not yet come to pass and thus was not yet "final"—but her statement assured investors that SunPower had been "fine in Q3," and so specifically and directly assured investors that she already had sufficient information as of that conference call to conclude that SunPower had not breached its covenants in Q3. The fact that Eby referred to these covenants as "backward looking" (MTD at 13) reinforces this misleading impression because it confirms Eby had all relevant "backward looking" information to make that assessment. Moreover, couching the broad category of "historical period financial information" as "preliminary" does not negate Eby's far more specific statements that SunPower was "fine," and had "reached" compliance. *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 734 (N.D. Cal. 2022) ("technical and narrow" disclosures do not render its "more categorical statements [. . .] non-misleading"). As a "present-tense statement[] of fact" "without qualification" about SunPower's status in Q3, "plaintiffs have sufficiently alleged falsity." *Adv. Micro Devices*, 87 F. Supp. 3d at 1159-60 ("yield is on expectations" and "[c]urrently we have no issues" for yield misleading).

Eby's statements thus are not "puffery" or too "vagu[e]" to be actionable. MTD 7, 13. "'[T]he difference between a statement of fact and mere puffery rests in the specificity or

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

11

generality of the claim,'" *Frontier*, 2011 WL 13229260, at *9, and "[p]uffing statements . . . 'are generally not capable of objective verification,'" *Knox v. Yingli Green Energy Holding*, 242 F.Supp.3d 950, 961 (C.D. Cal. 2017). Here, Eby's statements that SunPower was "fine in Q3" in compliance and had "reached on all of [its covenants]" are both specific and verifiable—and in fact, were later admitted false. *Jui-Yang Hong v. Extreme Networks*, 2017 WL 1508991, at *12 (N.D. Cal. Apr. 27, 2017) (integration "on track" and "ahead of plan"). Even if Eby's statements were mere optimism (they are not), such "'statements . . . when taken in context'" are actionable when "'address[ing] specific aspects of a company's operation the speaker knows to be performing poorly.'" *Weston v. DocuSign, Inc.*, 669 F.Supp.3d 849, 881 (N.D. Cal. 2023). That Eby spoke about the "specific aspect[] of" SunPower's compliance renders it actionable. *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) ("going fine"). Courts regularly conclude such verifiable statements about financial standing are not puffery. *In re New Century*, 588 F.Supp.2d 1206, 1226 (C.D. Cal. 2008) ("assurances of strong credit quality" not "puffery"); *Frontier*, 2011 WL 13229260, at *9 ("'capital ratios'" and "loan reserves" "remain strong'"). The same is true here.[7] This communication was all the more misleading given SunPower's prior statements that it had the strong liquidity position and financial health to maintain compliance with those covenants pending these supposedly routine reporting issues. Defendants' statement gave investors the impression that their investments had limited exposure to credit concerns, but failed to disclose the Company's true state of affairs. *Applied*, 527 F.3d at 987. It is therefore actionable.

---

[7] Defendants' claim that "no reasonable investor would have understood Ms. Eby to be guaranteeing that SunPower was . . . in compliance once the restatement was finalized" (MTD at 8) is belied by the sophisticated analysts that relied on Eby's statements in their same-day reports. CAC¶59; *Forescout*, 63 F.4th at 7711 (rejecting "puffery" argument where false information was provided in response to analyst questions); *Extreme Networks*, 2017 WL 1508991, at *11 ("investors do not rely on puffery when making investment decisions"). None of the Defendants' cases involved such a clear statement about financial compliance from the Company's CFO. In *Johnson v. Costco Wholesale Corp.*, 2019 WL 6327580, at *17 (W.D. Wash. Nov. 26, 2019), "Defendants' initial disclosure [filing] was couched in anticipatory language" but here, Eby spoke plainly that SunPower was "fine in Q3" on compliance. And in *In re Aceto Corp. Sec. Litig.*, 2021 WL 4350501, at *8 (E.D.N.Y. Mar. 16, 2021), Plaintiffs failed to even argue that disclosures about "historical compliance with its financial covenants" was misleading. In any event, whether statements are puffery "entail[s] fact-intensive assessments that are more properly left to the jury." *Impax Labs.*, 36 F.Supp.3d at 966. It is not appropriate here.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**3.    Defendants Misled Investors About the February 2024 Sol Holding Transaction.**

After issuing the first, unaudited "Restatement" in December 2023, Defendants negotiated a new $175 million credit line from majority shareholder, Sol Holding.  In a press release on February 15, 2024, Defendant CFO Eby stated, among other things, that "*we expect to be cash flow positive in the second half of 2024 and beyond*."  According to Eby, this infusion not only set up the Company for "long-term" success, but also purportedly solved the "going concern" issue recently disclosed in the December 2023 Restatement.  On a conference call held February 15, 2024, Eby explicitly stated, in response to an analyst question about the Company's crucial "going concern" status:  "[W]hile we are still in discussions with auditors and reviewing financial plans, *we do not expect at the moment to have a going concern provision in our 10-K [annual report] that's coming out*" a few weeks later.  CAC¶¶74, 77, 80, 84.  These statements were designed to reassure SunPower stockholders that sufficient funds had been obtained to put the Company on a steady, long-term financial footing and that serious financial problems were in the rearview mirror.

In reality, just the opposite was true.  Far from "expect[ing]" this influx of cash to render the Company "cash flow positive in the second half of 2024," in February 2024, the Company was in a liquidity crisis, as multiple FEs (including a finance manager) confirmed.[8]  That this $175 million wave was insufficient to support these statements is confirmed by SunPower's drawing on the second tranche of $50 million only a few months later.  CAC¶88.  And, undisclosed to investors, after this lifeline from Sol Holding, the Company would not have access to any more credit to support "positive cash flow" over the next 12 months given that the breaches of its

---

[8] Defendants wrongly claim that "none of the FEs even purport to speak about the state of SunPower after the financing transactions" announced on February 15, 2024 (MTD 18), but FE4 worked at SunPower from Feb 2022 to February 2024, and conveyed during the entire tenure that SunPower could not pay suppliers and that "every aspect" of SunPower's obligations were "overdue."  CAC¶¶116, 120.  And a former Finance Manager (FE1) worked at SunPower from Jan 2022 to Jan 2024, one month before the statements, explained the "monthly meetings" with CEO Faricy to resolve the ongoing liquidity crisis.  CAC¶¶102-04, 108.

financial and reporting covenants precluded new draws on existing or future credit.[9]  Defendants misrepresented both SunPower's current cash reserves and its access to more ready capital by failing to disclose that the restated financials it used to procure this lifeline were false and did not "fairly present the financial condition of the Borrower." CAC¶¶181, 179.[10]  While Defendants were "meeting on a near daily basis during January and February 2024 to close the financing transaction with Sol Holding," Defendants "simultaneously" were meeting with SunPower's auditor and preparing its 10-K annual report (due to be filed a mere two weeks after the transaction was announced) where (unknown to investors) Defendants had "identified misstatements and material deficiencies in the Company's disclosure controls and internal controls over financial reporting" that could not pass its auditor's scrutiny, and would delay the 10-K and force yet another restatement.  That Defendants were aware of this inevitable outcome is further confirmed by the "undisclosed SEC investigation" into the Company's "accounting practices" ongoing at the same time. CAC¶¶181.[11]  As Forbes wrote, given these red flags, "[t]he troubles at SunPower must be beyond the average accounting questions facing these companies," and raise an inference that "Sol Holdings [was] induced to throw good money after bad based on fractured financials." CAC¶¶98.  Simply put, "[i]f you put fresh capital into a company on the promise that its accounting issues were being ironed out, then six months later the auditor quits because management wouldn't cooperate, you might perhaps feel like a victim of securities fraud." *Id.*; *EnSource Invs. LLC v.*

[9] The Company's recent bankruptcy filings confirm this subterfuge.  In a sworn declaration from the Company's Chief Transformation Officer, "[w]hile this incremental financing allowed the Company to weather near-term challenges, the Company was also affected by delays in filing certain of its financial reports," which blocked access to any capital that could provide "a comprehensive long-term liquidity and business solution."  Bkt Dkt. No. 9, ¶¶ 10-12.

[10] CAC¶179 (detailing false financing-related statements defendants made by means of financial covenants with the funders); CAC¶172 (detailing the manner in which Houlihan was misled); CAC¶236 (describing actions were motivated by an undisclosed effort to deceive Houlihan).

[11] SunPower's executives would have known of an informal SEC investigation by late 2023 or early 2024, well before the February 28, 2024 formal subpoena.  Formal subpoenas follow, usually by a period of 60 days, an informal inquiry known as an MUI, or "Matter Under Investigation" during which companies work voluntarily with the SEC by responding to informal document requests and interviews.  *See* Baker Hostetler, An Offer You Can't Refuse: Best Practices for Responding to SEC 'Voluntary' Requests, June 25, 2021.  In any event, as late as June 3, 2024, Defendants were still touting the strength of this partnership and the strength of the Company's financials supporting a new $50 million second-tranche loan draw.  CAC¶88.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Tatham*, 2017 WL 10648061, at \*5 (S.D. Cal. Mar. 9, 2017) ("failed to disclose that Hopewell was on the verge of bankruptcy when soliciting . . . investment").[12]  These statements created the misimpression that the Company could remain viable by fulfilling Defendants' plans.  *De Vito v. Liquid Holdings Grp., Inc*., 2018 WL 6891832, at \*8 (D.N.J. Dec. 31, 2018) (defendants hid "the truth about [the company]'s questionable status as a going concern").

Contrary to Defendants' contention, MTD 15, these statements cannot be dismissed as generic optimism.[13]  Indeed, *MF Global* rejected puffery challenges to statements very similar to here, including claims that the Company had a "strong" liquidity position, in light of allegations that MF Global actually "faced substantial strain on its capital and liquidity and met its requirements only through daily intra-company transfers."  982 F.Supp.2d at 317-18.  Statements made repeatedly to reassure investors about matters of particular importance are not puffery, and nothing was more important than the Company's ability to remain solvent, given that it had just issued a going concern warning.  *In re Signet Jewelers Ltd. Sec. Litig*., 2018 WL 6167889, at \*12 (S.D.N.Y. 2018) (statements "to reassure the investing public"); *Cont'l Gen. Ins. Co. v. Olafsson*, 2024 WL 4263211, at \*3 (D.N.J. Sept. 23, 2024) ("clear path forward" "misleading . . . because Defendants had overstated [company's] financial strength").  Nor are these statements opinions, MTD 16, because they "involved the representation of existing facts" about the Company's current financial health and omitted the facts about the Company liquidity and credit.[14]

---

[12] Unlike in *In re Pac. Gateway Exch., Inc., Sec. Litig*., 2002 WL 851066 (N.D. Cal. Apr. 30, 2002) (cited at MTD 17-18) the extent of the Company's liquidity issues, the false financials, and the short runway of cash were not "public knowledge," nor did the executives (as here) issue public denials of those struggles.

[13] In addressing allegedly false statements about a particular product defect, the court concluded general statements about "driving growth and profitability" (*Jaszczyszyn v. SunPower Corp*., 2024 WL 3463348, at \*9 (N.D. Cal. July 17, 2024)) do not concern "specific aspects of a company's operation that the speaker knows to be performing poorly," *id*., such as the specific and verifiable statements here about SunPower's current cash reserves.  For the same reason, generic statements "expectat[ing]" future "profitability" were protected as forward-looking (MTD 16), whereas here, the statements about SunPower's cash position address present facts.

[14] *E.g.*, *In re Facebook, Inc., IPO Sec. & Derivative Litig*., 986 F.Supp 2d 428, 465 (S.D.N.Y. 2013); *In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at \*4-5 (D. Del. Feb. 7, 2020) ("we remain confident with the progress we're making" where executives ignored negative forecast); *Nash v. Qualtrics Int'l Inc*., 2024 WL 231870, at \*3 (D. Del. 2024); *Shapiro v. UJB Fin.*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Defendants argue that these statements are protected by the safe harbor. MTD 16. They are not. The statements are not forward looking, but state present facts, and they do not contain sufficient cautionary language because "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired," including the undisclosed liquidity crisis and inadequate financials. *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004); *Slayton v. Am. Express Co.*, 604 F.3d 758, 770 (2d Cir. 2010). "By superficially warning of possible risks while failing to disclose critical facts, [the Company] was akin 'to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'" *MF Global*, 982 F.Supp.2d at 318.

**4.      Defendants Misled Investors About the Impact of Their Auditor's Resignation.**

Unknown to investors, after Defendants exhausted the second tranche of the Sol Holding credit, the Company was out of financing options—the need to restate its financials for the past two years (as well as its many breaches of its financial and reporting covenants) cut off access to any additional credit. Yet on July 3, 2024, when the Company announced EY's "noisy" resignation, Defendants reassured the market that they were "working to secure a new independent registered public accounting firm" and that EY's refusal to complete the restatement "ha[d] *no material impact on SunPower's current cash position*." CAC¶192. Nowhere do Defendants even argue that this statement was not misleading or inactionable. MTD 15-18.

Rightly so. This statement was blatantly false and misleading when made because the Company omitted that the lack of an auditor—and thus the inability to file the audited financials—blocked it from much-needed cash and credit. Bkt Dkt. No. 9, ¶12; *In re Infineon Techs. AG*, 2006 WL 1329887, at *6 (N.D. Cal. May 22, 2006). Indeed, *only a month later*, the Company filed for bankruptcy. By the time of the Chapter 11 filing, SunPower had a scant $32.6 million in cash—roughly just enough to pay Chapter 11 administration costs. Bk. Dkt. 651 at 28. It was highly misleading to suggest that the auditor's resignation and the resultant inability to produce viable

---

*Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) (even general statements of financial facts such as "adequate" or "solid" are actionable); *De Vito*, 2018 WL 6891832, at *7, *45; *In re Eros Intl. PLC Sec. Litig.*, 2021 WL 1560728, at *2, *5-7 (D.N.J. Apr. 20, 2021) ("well-capitalized" not opinion).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

financial statements would not affect SunPower's "cash position." *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1150, 1155 (S.D. Cal. 2008) ("committed to a disciplined approach"); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2017 WL 3058563, at *7-8 (N.D. Cal. July 19, 2017) ("'top priority' and 'focal point' for R&D"). After Defendants misled SunPower's auditor, caused the auditor to resign, and misled its funders, insolvency was inevitable. *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 693 (3d Cir. 2023) ("later developments may allow a reasonable inference that prior statements were untrue or misleading when made" especially when "followed shortly by corrective disclosure of significant dimension").

## B. The CAC Pleads a Strong Inference of Scienter.

Plaintiff must "state with particularity facts giving rise to a strong inference that defendants acted . . . with deliberate recklessness as to the possibility of misleading investors." *Applied Signal*, 527 F.3d at 987. The relevant inquiry is whether all facts alleged, "taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). Any "tie" as to competing inferences "goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014).

### 1. Defendants Had Access To Information Falsifying Their Statements.

That "defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005). Defendants' argument that the CAC "relies on the disclosure of events that occurred weeks or months after the statements were made" (MTD 19) ignores the CAC's allegations and inferences of contemporaneous knowledge. For instance, former employees confirmed that SunPower's longstanding—and worsening— liquidity and inability to raise equity were well known to management.[15] While Defendants argue

---

[15] *E.g.*, CAC¶¶116-17 (VP of Supply Chain Operations recounting how "CEO Faricy and CFO Elizabeth Eby knew about the cash issues but were 'very tight-lipped' amount the matter"); ¶¶119-20 (describing regular meetings with CFO Eby and EVP/COO Johnson discussing "the gravity of [the company's] financial situation" and the "cash crunch"); ¶108 ("We had almost monthly meetings from Peter [Faricy] trying to emphasize the importance of getting cash on hand and trying

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

that statements from former employees solely relate to SunPower's "going concern" statements (MTD 20), in fact these statements reinforce an inference that Defendants knew or recklessly disregarded that SunPower could not fix the breaches of its financial covenants (as they are tied to liquidity), forbidding access to new credit, and that the new credit from its majority shareholder was not a long-term solution to this longstanding liquidity crisis—these FEs confirm that SunPower's dire liquidity crisis was ongoing in 2024, just as Defendants were negotiating (with false financials) a transaction to temporarily prop up the Company with new (and knowingly inadequate) credit.[16]  Defendants thus understood how close the Company was to insolvency and understood the importance of speaking truthfully about that reality.  Nevertheless, Defendants omitted this key information from the statements and instead reassured investors that this funding provided a "long-term" solution obviating the need for a "going concern" warning in the 10-K.[17]

Regarding the February 2024 statements and beyond, the CAC also alleges that Defendants knew that its auditor had identified misconduct and concealment in preparing the audit and that the SEC had initiated an investigation into those accounting issues.  In addition, the timing of the new restatement (announced shortly after securing the new financing) suggests Defendants knew those financials were false.  *In re Grand Casinos, Sec. Litig.*, 988 F. Supp. 1273, 1283 (D. Minn. 1997) ("given the short time frame" (three months) "it is reasonable to infer that management was

---

to liquidate some of our material and inventory we had in warehouses"); ¶109 (describing meeting with Faricy and leadership discussing cash crisis putting Company "in big trouble"); ¶112 (communicating threats of cancellation due to non-payment to leadership).

[16] Courts routinely credit allegations from witnesses that are not employed during the class period, in conjunction with other allegations.  *See, e.g.*, *In re: Bofi Holding, Inc. Sec. Litig.*, 2016 WL 5390533, at *10, n.5 (S.D. Cal. Sept. 27, 2016) (FE that worked at company before the class period corroborated pattern of misconduct); *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *7 (C.D. Cal. Apr. 12, 2016) ("[I]t simply does not follow that the Court must completely shut its eyes to such allegations [of pre-class period conduct] when examining the overall context in which such statements at issue were made."); *Twitter*, 282 F.Supp.3d at 1125 n.8; *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

[17] In *Jaszczyszyn*, 2024 WL 3463348 (MTD 19), the plaintiff "fail[ed] to allege facts that suggest contemporaneous knowledge that contradicted Defendants' public statements" where the only allegation concerned Defendant's statement that he took a "'deep dive' into the commercial business when hired as CEO."  *Id.* *12.  The CAC contains far more allegations of such knowledge. And, in *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017), there were "no allegations that the confidential informants personally disclosed" issues to Defendants, which is not the case here.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

on notice of these problems during the class period").[18]  "Defendants were aware of the adverse facts that cut against the positive information conveyed in the challenged statements" that made them "misleading."  *In re Splunk Inc.*, 592 F. Supp. 3d 919, 948 (N.D. Cal. 2022); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000).  At minimum, defendants "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts.'"  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010); *Howard*, 228 F.3d at 1064; *Mulderrig v. Amyris, Inc.*, 492 F.Supp.3d 999, 1026 (N.D. Cal. 2020).

### 2. Defendants' CEOs And CFO Made Specific Assurances About Core Aspects Of The Company's Financial Health.

That Defendants had access to information falsifying their statements is confirmed by their own representations that they were intimately involved with, and personally familiar with, the Company's credit and liquidity.[19]  *See In re Zoran Corp. Derivative* Litig., 511 F.Supp.2d 986, 1013 (N.D. Cal. 2007); *S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1257 (W.D. Wash. 2009).  That inference is particularly strong where, as here, Defendants made specific assurances to investors by responding favorably to analyst questions, assuaging market fears about any looming long-term financial crisis.  *E.g.*, CAC¶¶74, 131; *Brendon v. Allegiant Travel*, 412 F.Supp.3d 1244, 1261 (D. Nev. 2019).[20]  Indeed, given the paramount importance of the

---

[18] Both the EY resignation and the SEC subpoena are "documents" conflicting with managements' positive statements about the company's financial reporting and thus health (*contra* MTD 19, citing *City of Roseville v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1142 (E.D. Wash. 2013)). Confidential witnesses did speak directly about this liquidity crisis (unlike in *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1079 (N.D. Cal. 2010)).

[19] *E.g.*, CAC¶74  (Eby stating "we are in discussions with auditors and reviewing financial plans" to reassure market about going concern status); ¶133 (Eby "talking to banks" about credit agreement and covenants); ¶131 (Eby discussing status of compliance with financial covenants); ¶74 (Eby discussing knowledge of Company's cash reserves and going concern status); ¶163 (Faricy discussing Company's "working cash-flow" and "monetary record"); ¶187 (Werner discussing Company's steps taken to "operat[e] a financially sound business"); ¶192 (Werner discussing SunPower's "current cash position").

[20] *EnSource*, 2017 WL 10648061, at *5; *In re Diamond Foods, Inc., Sec. Litig.*, 2012 WL 6000923, at *11-12 (N.D. Cal. Nov. 30, 2012) (CEO and CFO were "acutely aware" of relevant parts of the business based on their roles, the scope of the accounting violations, and "defendants' own statements to analysts and investors"); *Noto v. 22nd Century Grp., Inc.*, 2023 WL 122305, at *9 (W.D.N.Y. Jan. 6, 2023) ("statements *were made to placate the market in response to* inquiries about [the relevant issue]") (collecting cases).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Company's financial survival, a "logical "infer[ence is] that . . . high-level managers must have known" of these systemic issues in SunPower's health. *Berson v. Applied Signal Tech.*, 527 F.3d 982, 987 (9th Cir. 2008); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1146 (N.D. Cal. 2017); *LendingClub*, 254 F. Supp. 3d 1107, 1122 (N.D. Cal. 2017).[21]  That is particularly true given the frequency and scope of the necessary retractions of prior guidance and restatements. *See Hacker v. Elec. Last Mile Sols. Inc.*, 687 F.Supp.3d 582, 600 n.38 (D.N.J. 2023) ("size of . . . errors"); *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *15-17 (S.D.N.Y. Aug. 11, 2021) (size of restatement).  Rather than "disprov[ing] scienter because no company would purposefully split up the accounting deficiencies into two separate restatements" (MTD 22-23), they support it here because Defendants were using them to hide an ongoing liquidity crisis, and the impact of one restatement on fundraising efforts is less serious than two or more. *See In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at *10 (S.D.N.Y. Sept. 19, 2017) ("steps to obscure" facts indicated scienter).

**3.    Defendant Eby Spoke Directly About SunPower's Compliance With Its Financial Covenants.**

Plaintiffs have pleaded a strong inference of Eby's scienter.  Defendants argue that the fact that "SunPower's compliance was assessed 'as of October 1, 2023' does not establish that Defendants **knew** of or were reckless as to the breach **on** that date."  MTD 21.  Yet *if Eby did not know* whether SunPower was in compliance as of October 1, 2023, then Eby was at minimum *severely reckless* and informing investors directly that SunPower was indeed in compliance, that the Company was "fine in Q3."  That Eby did not know whether the Company was in compliance and fabricated a position on the fly is *inculpatory*, not exculpatory.  *Adv. Micro Devices*, 87 F.Supp.3d at 1163-64 (issues were "behind" the company when they were not). In any event, Eby's statements suggest she *did* know, as they go beyond generic descriptions of the business and show personal familiarity with its status in direct response to an analyst question.[22]  That "SunPower's investigation into the effects of the restatement" allegedly was ongoing (MTD 21) does not change

---

[21] *Zucco*, 552 F.3d at 1001 (MTD 24), is not on point because the alleged misrepresentations depended on "definitional" issues that "d[id] not concern especially prominent facts."

[22] Neither of Defendants' authorities involved such specific statements from a CFO regarding a particular financial issue.  *Amazon*, 2023 WL 8370101, at *13; *M & M*, 2017 WL 5635424, at *14.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

this; if anything, "that argument, rather than weaken the inference of scienter, only strengthens it: to try to correct an issue, one must first be aware that it exists." *In re Emergent BioSolutions*, 2023 WL 5671608, at \*24 (D. Md. Sept. 1, 2023).  And the short time (seven weeks) between Eby's statements and the revelation is "circumstantial evidence" that the statements "were false when made." *Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995) (eleven weeks).

### 4.     The Contemporaneous SEC Investigation Supports Scienter.

"That the CEOs and CFOs knew information suggesting that the Challenged Statements were not accurate" is further confirmed by the "red flags" the ongoing SEC investigation would raise at least as soon as early 2024.  *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F.Supp.3d 381, 397 (S.D.N.Y. 2022) ("government investigations . . . provided red flags"); *In re Bear Stearns Comp., Inc..*, 763 F.Supp.2d 423 (S.D.N.Y. 2011) (same).   In addition, these accounting investigations are "circumstantial evidence that [defendants] w[ere] deliberately reckless or acted with conscious misconduct" in conveying a falsely rosy picture to the market about the Company's financial strength when the SEC had been investigating the Company's "accounting practices." *In re Cyclink Sec. Litig.*, 178 F.Supp.2d 1077, 1083 (N.D. Cal. 2001); *Anschutz Corp. v. Merrill Lynch & Co. Inc.*, 785 F.Supp.2d 799, 821 (N.D. Cal. 2011); *In re Tesla, Inc. Sec. Litig.*, 477 F.Supp.3d 903, 930 (N.D. Cal. 2020).  Of course, contrary to Defendants' claim, these "accounting matters" are "alleged to be part of the fraud at issue here" (MTD 22) given allegations that Defendants were misstating those financials to secure credit and then citing the need to "restate" them after the needed funding was secured.[23]

### 5.     That Defendants' Auditor Resigned Over Managements' Misconduct And Subterfuge Supports Scienter.

That Defendants attempted to mislead their own auditor by withholding financial

---

[23] Unlike here, the DOJ/DOE investigation in *Zamir v. Bridgepoint Educ.*, 2018 WL 1258108, (S.D. Cal. Mar. 12, 2018) (MTD 22) involved "compliance with the higher education act" and not the "accounting issue at the core of the Restatements."  In *Mehedi v. View, Inc.*, 2023 WL 3592098, at \*19 (N.D. Cal. May 22, 2023), the court said only that an investigation "standing alone, do[es] not give rise to a strong inference of scienter," whereas here, the CAC pleads that this investigation into the Company's accounting would put Defendants on notice of the improprieties in its financials fraudulently used to procure more credit to delay inevitable bankruptcy.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

information, leading to EY's resignation, supports scienter. *Empl's Ret. Sys. v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015).[24] Defendants try to cast EY's "noisy resignation" as *unrelated* to Defendants' misrepresentations about SunPower's finances, but EY expressly stated that Defendants withheld facts about management's "misconduct" regarding "reporting financials," such that EY would no longer be "associated" with former or current management. Defendants' characterization also is belied by analysts' understanding following this 8-K, noting "[s]ometimes when a company needs to restate prior financial statements, the Company in question may merely have counted certain revenue or costs in different periods," "[h]owever, EY's statement today appears to indicate outright misconduct. That is, needless to say, a pretty ominous note." Motley Fool, "Why SunPower Plunged Today." In any event, even this disagreement itself about the "scope of the audit" supports scienter. *See Resh v. China Agritech, Inc.*, 2019 WL 1055240, at *5-6 (C.D. Cal. Jan. 8, 2019). And the inference of misconduct is heightened given that Defendant CEO Faricy and the Company's COO/EVP were fired amidst the audit. *See In re UTStarcom, Inc. Sec. Litig.*, 617 F.Supp.2d 964, 975-76 (N.D. Cal. 2009).

### 6. Defendants' Motive Supports Scienter.

Defendants were motivated to misstate their financials to secure short-term credit solutions to buttress the failing business amid a liquidity crisis obscured by non-payment of obligations; once secured, they then hid and distorted their financials repeatedly citing the need for multiple, never-issued restatements.[25] That is particularly so where Defendants continuously touted the

---

[24] In *Zucco*, the court acknowledged that the auditor's resignation *can* support an inference of scienter if there are facts pled which refute the assumption that the resignation was simply a consequence of the need for the restatement. *Id.* at 1002. The complaint there failed to do so given that the accounting firm oversaw (and approved) *six quarters* of accounting improprieties, so it was, in some sense, "partially responsible for the corporation's failure to adequately control its accounting procedures." *Id.* Here, in contrast, the three Form 10-Q filings that were subject to the Restatements were *unaudited*, and the accounting errors were *detected* by EY.

[25] *See Nguyen v. Radient Pharm. Corp.* 2011 WL 5041959, at *8 (C.D. Cal. Oct. 20, 2011) (scienter demonstrated where "ability to continue operating was dependent upon raising additional capital"); *In re LDK Solar*, 584 F.Supp.2d 1230, 1247 (N.D. Cal. 2008) (motive to misstate financials to attract investors). Prolonging the "survival" of an enterprise the Defendants manage can supply a proper motive. *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F.Supp.2d 1165, 1195 (D.N.M. 2010); *see also In re Williams Sec. Litig.*, 339 F.Supp.2d 1206, 1234 (N.D. Okla. 2003) (fact that "WCG's continued viability was dependent upon certain measures of WCG's financial performance . . .

long-term strength of SunPower's business. *Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at \*21 (C.D. Cal. May 8, 2013) (executive could "recklessly misrepresent the inability to deliver on those promises"); *Splunk Inc. Sec. Litig.*, 592 F.Supp.3d 919, 949 & n.9 (N.D. Cal. 2022) ("incentive" to deceive investors to boost career). Defendants claim that SunPower's abrupt bankruptcy fails to show scienter given that the CAC "does not contain facts showing that Defendants knew bankruptcy was inevitable or even likely when the challenged statements were made." MTD 23. If there is no further source to euchre into providing funds, of course bankruptcy is imminent or likely. In addition, "Defendants attempt to raise the standard for scienter far beyond what is required by the PSLRA" as "the PSLRA does not require that Plaintiffs show that Defendants were capable of predicting the future." *STAAR II*, 2016 WL 6699284, at \*14. Were it otherwise, "then it would be virtually impossible to establish scienter at the pleading stage" in cases where deeply flawed financial issues undercut defendants' upbeat public commentary. *Id.*[26]

**C.    Plaintiffs Have Standing**

The CAC straightforwardly alleges that Lemou suffered injury by buying shares after Defendants' misleading statements inflated the share price, and by selling those shares after the "truth" of those misstatements was partly revealed causing the share price to drop.[27] The CAC

---

[under] WCG's debt and bank covenants" is a "strong motive" to misstate financials); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 527 F. Supp. 3d 1151, 1185 (N.D. Cal. 2021) (motive to buy time for disclosed strategy to succeed).

[26] *Schueneman v. Arena Pharms*, 840 F.3d 698, 709 (9th Cir. 2016) (what matters is "the failure to disclose 'issues' and 'concerns'" undermining defendants' positive statements "not who was ultimately right about the underlying [issue]"); *Emergent*, 2023 WL 5671608, at \*21 (plaintiff's theory is not that facility "doomed to fail" but that "ongoing, serious" flaws . . . made defendants' public assessments more risky than they led investors to believe"); *In re Illumina, Inc. Sec. Litig.*, 2018 WL 500990, at \*5 (S.D. Cal. Jan. 22, 2018) ("[i]t is possible that Defendants believed they could hit their earnings forecast notwithstanding lower [] sales. However, to survive this Fed. R. Civ. P. 12(b)6 motion, Plaintiff need not prove anything."). *Jaszczyszyn*, 2024 WL 3463348, at \*13 confirms that "[c]lose temporal proximity between allegedly false statements and the disclosure of information contradicting those statements may bolster an inference of scienter," but there the plaintiff "d[id] not allege when the Company made the proactive decision" showcasing scienter; here, the CAC alleges that Defendants knew of the liquidity crisis as early as 2022.

[27] Plaintiffs have not improperly contradicted any earlier pleading by citing July 26 as a loss causation date. This has always been Lemou's theory as to his own situation, even though it admittedly could have been stated more explicitly. In any event, Plaintiffs are expected to (and permitted to) refine their theories as the case proceeds, so long as no prejudice has resulted. *See PAE Gov't Servs. Inc. v. MPRI, Inc.*, 514 F.3d 856, 859 & n.2 (9th Cir. 2007).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

alleges that Lemou purchased over $1 million of SunPower shares after SunPower made misleading statements on May 3, 2023 about SunPower's cash position and that Lemou lost $360,000 by selling them on July 28, 2023—two days after the truth about SunPower's financial health was partially revealed on July 26, 2023 when the Company reduced its yearly guidance.[28]

Defendants argue that "the July disclosure did not correct prior supposed misstatements." MTD 6. As an initial matter, the CAC's recent events instead leave no doubt that the July 26, 2023 revelation-related financial losses are related to Defendants' scheme to hide the true state of SunPower's financials. As noted, on April 23, 2024—nearly a month after the FAC was filed on March 29, 2024—Defendants revealed that all financial statements from 2023 could "no longer be relied upon" due to "material weakness" over "financial reporting," forcing further restatement of those faulty reports. Projections flow from and are inextricably tied to the existence of accurate financial statements. If the financial statements are false, the projections may be inferred to lack a sufficient basis. Indeed, the projections are among the statements that concededly do not merit confidence and trust—they should not have been "relied upon." It follows that they should never have been issued. And, on July 3, 2024, Defendants admitted that EY resigned because "information has come to its attention that has made EY unwilling to be associated with the financial statements prepared by management," for 2023, citing possible management "misconduct" in reporting---more evidence that that the projections on which Lemou relied when

---

[28] The CAC makes clear that the Company's original guidance issued in February and May 3, 2023 was yet another actionable misleading statement, providing yet another representation on which LP relied that also confer standing when the Company later reduced that guidance on July 26, 2023. In April 2024, Defendants conceded these statements were false and could not be relied upon. The CAC alleges that the projections were unreasonable given supply chain disruptions, NEW 3.0 implementation, and higher interest rates—rendering them actionable. *See Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994). In addition, that the Company withdrew this guidance mere months after securing its first credit increase is also evidence of falsity and scienter. *Fecht*, 70 F.3d at 1083. Those inferences are given "more weight" because there was no "intervening catastrophic event" that might suggest that the executives' earlier statements may not have been false. *Id.* at 1084; *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001). While Defendants take issue that the February guidance falls "outside the [CAC] class period," which starts on May 3, 2023, Plaintiffs were bound by the Court's order not to expand the period without a formal grant to amend (rather than consolidate). An amendment would make clear this guidance falls in the class period. But, more importantly, the May 3, 2023 reiteration of the February 2023 guidance falls squarely within the Class Period, making this a non-issue.

purchasing in July 2023 were tainted by reporting "misconduct" of SunPower's management.

Yet even if the July 26, 2023 disclosure somehow were not a proper basis for pleading *loss causation* under Section 10(b) (it is), the CAC nevertheless clearly pleads that the July 26 disclosure caused Lemou an injury that confers Lemou with *Article III standing*. *Mehedi v. View, Inc.*, 2024 WL 2969982, at \*4 (N.D. Cal. June 12, 2024) ("loss causation and the Article III standing analysis" are "distinc[t]" such that where the complaint contains "factual allegations that may establish an injury that is fairly traceable to Defendants' conduct for Article III purposes but are not sufficient to plead loss causation," the lead plaintiff has standing). Indeed, the Eleventh Circuit just recently issued an opinion on Article III standing that is exactly in accord with the reasoning and result in *Mehedi*. *Romano v. John Hancock Life Ins. Co. USA*, 2024 U.S. App. LEXIS 27576, at \*14-16 (11th Cir. Oct. 30, 2024).

*Finally*, even if Lemou lacked Article III standing (he does not), Defendants' cases stand for the unremarkable proposition that where "the *sole* named plaintiff 'never had standing' . . . the district court must dismiss the action." *Lierboe v. State Farm*, 350 F.3d 1018, 1023 (9th Cir. 2003). Lemou is not the "sole" named plaintiff. Here, there are four named plaintiffs, and Defendants do not challenge the standing of anyone other than Lemou. Even crediting that authority, Lemou did not "add" Plaintiffs Rodrigues and Orr; they each filed independent cases and then appeared as plaintiffs when all cases were consolidated. Under Supreme Court authority each consolidated plaintiff retains the standing he had before consolidation.[29] Thus, "Defendants ignore the fact that [these named parties] remain[] a named Plaintiff and since there has been no challenge to his standing to sue, the Court currently has subject matter jurisdiction." *In re Impax Lab'ys*, 2008 WL 1766943, at \*8 (N.D. Cal. Apr. 17, 2008).

## CONCLUSION

The Court should deny Defendants' motion to dismiss.

---

[29] *Johnson v. Manhattan R. Co.*, 289 U.S. 479, 496-97 (1933) ("[C]onsolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another.").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

25

Dated: November 25, 2024                    Respectfully submitted,

POMERANTZ LLP

*/s/ Austin P. Van*

Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
Austin P. Van
(*pro hac vice*)
Samantha Daniels
(*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
avan@pomlaw.com
sdaniels@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Plaintiffs*

PORTNOY LAW FIRM
Lesley F. Portnoy, Esq.
1800 Century Park East, Suite 600
Los Angeles, California 90067
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Additional Counsel for Bezeyem Lemou*

David N. Lake
LAW OFFICES OF DAVID N. LAKE, APC
16130 Ventura Boulevard, Suite 650
Encino, California 91436
Tel: (818) 788-5100
Fax: (818) 479-9990
Email: david@lakelawpc.com

PASKOWITZ LAW FIRM PC

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Laurence D. Paskowitz
(*pro hac vice*)
97-45 Queens Blvd., Ste. 1202
Rego Park, New York 11374
Telephone: (212) 685-0969
Facsimile: (718) 275-1338
lpaskowitz@pasklaw.com

*Additional Counsel for Gabriel Rodrigues
and Charles Orr*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

27