Pages 1 - 60

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RITA F. LIN

IN RE SUNPOWER CORPORATION      )
SECURITIES LITIGATION           )
                                )   No. C 23-5544 RFL
                                )
                                )   San Francisco, California
                                )   Tuesday
                                )   February 4, 2025
_____ )   11:00 a.m.


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**          POMERANTZ, LLP
                             600 Third Avenue
                             20th Floor
                             New York, New York 10016
                        BY:  **SAMANTHA A. DANIELS, ESQ.**


**For Defendants:**          Wilson, Sonsini, Goodrich & Rosati
                             One Market Plaza
                             Spear Tower, Suite 3300
                             San Francisco, California 94105
                        BY:  **KATHERINE L. HENDERSON, ESQ.**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

*Debra L. Pas, CSR, RPR, RMR, CRR*
*Official Reporter - U.S. District Court - San Francisco, California*

**Tuesday - February 4, 2025**                           **11:18 a.m..m.**

                         **P R O C E E D I N G S**

                              **---0O0---**

THE CLERK:  Calling civil case 23-5544, In Re SunPower Corporation Securities Litigation.

Counsel please state your appearances for the record, beginning with the plaintiffs.

MS. DANIELS:  Samantha Daniels of Pomerantz LLP for plaintiffs.

MS. HENDERSON:  Good morning, Your Honor.  Katherine Henderson, Wilson Sonsini for defendants.

THE COURT:  Good morning to both of you.

I put out a notice of questions for the hearing.  Let's just go through the questions in order and then when we get to the end if there's anything else you'd like to tell me about your motion, I'm open to hearing it.

So let's just start with question one, which is really a question for the Defendants.  I won't read the whole question, but really the question is about the Q2 2023 Form 10-Q where there is a statement about the anticipation that cash and cash equivalents will be sufficient to meet the company's obligations for the next 12 months.

What's defendant's response to that?

MS. HENDERSON:  Sure.  Thank you, Your Honor.

I wanted to just start off by saying the statement is

forward looking.  It's a going concern prediction.  So it should be subject to the safe harbor, which means the standard for scienter is actual knowledge.

You don't even get there unless you find that the warnings that SunPower gave were not sufficient.  I think they were for the reasons we stated in our brief.  And we cited a number of cases which I think are right on point, including the Ninth Circuit's opinion in *Tesla*.

But I can focus on the scienter question that Your Honor has laid out for me.

**THE COURT:**  One question I have about that is it requires actuality knowledge that the forward-looking statement is wrong, which I had understood to mean knowledge that the -- the statement that we anticipate we will be able to meet our obligations, that is -- you actually know that that's wrong if you don't, in fact, anticipate that you'll meet your obligations.  It doesn't mean that you have to have a crystal ball where you would know for sure.

I absolutely know for sure there's no way we can make any of our obligations.  As long as the defendants did not, in fact, anticipate being able to meet their obligations that would satisfy scienter.

Am I understanding that accurately?

**MS. HENDERSON:**  I mean, I think that's right, Your Honor.  They have to show that what the information was before

them showed that wasn't true, right, and that they knowingly made a false prediction about cash for the next 12 months.

Now, every company has to do a going concern analysis each quarter. There is a lot of different factors that go into it. I think the key here is the Complaint doesn't allege anything about any you have those factors. You know, what was the current cash? What was the prediction for cash flow? What factors were they looking at? Did they think they were going to do an equity raise or a debt raise? There is so much that goes into that analysis.

I think to get to Your Honor's point, the actual analysis requirement is you need to allege facts showing what they knew at the time and that that analysis showed the opposite of what they said; right? That they didn't, in fact, anticipate it.

So I think that's the key here because none of the confidential witnesses were involved in that analysis. They concede they weren't. There is no internal documents about that analysis, and there is just nothing showing that anyone involved thought that, to suggest that Mr. Faricy and Ms. Eby didn't believe their predictions as well. You know, I think that's the key here.

There is also the matter of the company had quite a bit of cash, and plaintiffs don't challenge that. They had $114 million as of July. Still had about $103 million as of October. That's a lot of money; right?

So to show that you knowingly made a false prediction about the next 12 months, you'd have to undermine something about what was before the defendants to show that.

I think what you have here is just some information about cost cutting and cash crunch, and I just don't think that's enough to undermine that whole analysis showing -- you know, based on all those different factors.  And none of the FEs were involved in that analysis.  And I think that's the key.

**THE COURT:**  What about the inability to pay Maxeon because that is alleged to have occurred right before the statement.

So there is an argument that if, in fact, they didn't pay Maxeon -- not because of a contract dispute, but because they just didn't have the money to pay Maxeon -- that would be an instance of which they don't have the money to meet their current obligations.

And I understand that there is a dispute about, you know, maybe they were just not paying Maxeon because of a contract dispute.

But then later on, a few months later, there's a resolution of that dispute in which Maxeon is taking a lot of stock in exchange for forgiving the payment obligation, which sure looks like this wasn't a contract dispute.  It was an inability to pay situation when you combine that with all of the internal back-and-forth with the confidential witnesses.

So help me understand why that doesn't establish a strong inference of scienter.

**MS. HENDERSON:**  Sure.  I don't think the Complaint alleges it, Your Honor.  They would have to allege -- someone would have to say inside the company:  I knew that SunPower didn't have the money to pay.  And, in fact, those public disclosures show SunPower paying as of October.  Maxeon itself was using its guidance as if SunPower is going to pay.

So it's all amorphous for Your Honor to say:  Well, you could assume maybe they that didn't have the money and that's why.  But there is no facts to support that whatsoever.  None of the FE's say that.  The disclosures say the opposite of that.

**THE COURT:**  Would you point me to where it is in the Complaint that it has that information about October that you were mentioning?

**MS. HENDERSON:**  Which information about October?  The cash or about Maxeon?

**THE COURT:**  I thought you were saying that Maxeon said that SunPower is going to pay?  Did I get the time frame wrong?  Maybe I got the time frame wrong.

**MS. HENDERSON:**  Sure.  The October 10th statement -- it's actually Exhibit 12 at Page 5 -- that's where they are in their earnings call discussing the nonpayment.  And the analyst asked them the very question, right, because they were

concerned from Maxeon's point of view:  Hey, does this mean you're going to go out of business if your major customer is all of a sudden not going to pay you.  And they say:  No, no.  We actually -- we are assuming that payments are going to continue and we're going to resolve our dispute.  And, again, no one says anything differently in the Complaint.

I also wanted to make the point that the CWs are actually entirely consistent with what SunPower did disclose.  And most importantly in July, SunPower disclosed that it was reducing its guidance by a significant amount, and that was because of declining demand.  So the business was going down, and they had to put some cost-cutting measures.

So it's all in the public disclosures, including the termination of 140 people.  So that would have been part of the analysis that went into the August 2nd statement.

And I -- I want to just parse what each former employee actually says because I think it's entirely consistent with that.  So if you look at the allegations, she actually says:  SunPower had not performed well for a couple quarters leading into the middle of 2023.  And that's Paragraph 106.

I think your question may have conflated some of the paragraphs there, but I think that's an important timeline.  It wasn't that she was saying there wasn't enough cash in that earlier period.

She then says:  The leadership team were zoning in on

expenses and costs. Which, again makes sense if the business was beyond declining and they had to figure out what to do about that.

She says: In the beginning of the summer there was -- it surfaced they were this big trouble, but she says that's -- they need to cut costs.

And then she says that they -- they had monthly meetings. Don't specify when, but essentially it was all the same thing about reducing expenses and focusing on cash.

That's all leading into the July announcement were they announced cost cutting. And that, of course, then leads into the August 2nd announcement, which would have been part of that; right? Your all of a sudden reducing your costs so you have more leeway for the future. So I think that's important.

FE4, which Your Honor also references, is very similar; right? Just references unspecified cash issues, just like FE1.

And it says it wasn't until December that SunPower was delinquent on its payments. And that's when actually Sunpower issued a going concern warning. And that was after, in October, announcing another reduction in guidance and a restructuring plan again, again to cut costs; right?

And they specifically disclosed what the FEs say; that we're focused on cost cutting. We're facing stormy seas. You know, things weren't going particularly well.

It's all consistent with what SunPower disclosed. And if

you look at the timeline, a lot of it's unspecified, but the specific timelines, where they give you specific details, is all consistent with that.

So I think that's important when you're just looking at the FEs because it's really the only contemporaneous facts that's alleged in the Complaint.

And there just really isn't anything saying that when Mr. Faricy and Ms. Eby sat down to look at the next 12 months, you know, as of the beginning of August, that they had any contrary information.  I think that's what's needed to show actual knowledge.

That one meeting that FE4 references says it was either in August or September.  This was August 2nd.  So it doesn't say it happened before, which is there is only one day before; right?

And it's also very consistent with if it was September, again, maybe we didn't cut enough costs, so we're going to cut them again.  You know, declining.  Things are changing.  It's a very dynamic situation.

I think the allegations suggest that this was all one thing, but you can see a decline over time and SunPower disclosed all of that.

So the other point I'll make is just the prediction came true.  They actually didn't run out of cash for that 12 months. Even though they eventually filed for bankruptcy, it was

outside of that 12-month period.

So it's hard to find any strong inference of scienter in light of all of that, Your Honor.

The other point I'll just make quickly on Maxeon is none of the FEs say they didn't pay because they didn't have cash; right?

FE1 says lost the contract, which is inconsistent with the public disclosures.  She says because of payment issues, but doesn't say it was because they didn't have the cash; right?  So that's an important distinction.  Because there was -- the public statements say "because we have a dispute;" right?  Like, that's why we're not paying you.

So unless you have contrary facts in the Complaint to dispute that, I don't think you can find a strong inference of scienter that not paying Maxeon meant all that.

**THE COURT:**  Help me understand that last point.

**MS. HENDERSON:**  Sure.

**THE COURT:**  Because as I understand the record, it's that Maxeon was owed $29 million in payments.  Maxeon came out and announced:  SunPower hasn't paid us $21 million.

SunPower says:  Well, that's because you didn't give us what you promised us and we're having a contract dispute with you.

But then internally FE -- I think it's FE1 is saying, no, it really is because of payment issues.

Why does FE1 need to say something more specifically -- more specific than that?  I mean, obviously, circumstantial evidence can provide scienter.  So why doesn't FE1's statement create a strong inference that the reason for failing to pay that 29 million was, in fact, inability to meet their obligations as opposed to a genuine contract dispute?

**MS. HENDERSON:**  Well, I think when you say "payment issues," you're putting quotation marks around it.  But that's actually what the product disclosures say, right, is that there was a payment issued.  They didn't pay.  And that was because they said that Maxeon was in breach.  And there was a whole process to resolve that dispute and it's all in the public statements.

And that's, again, another issue.  It's all public; right?  As of August, Maxeon is disclosing that SunPower didn't pay.  This was not hidden from anyone.

And they disclosed the reasons for that; right?  And that they were working through and they had confidence they were going to work through it.  And they included ongoing payments in their forward-looking guidance.

So I don't think you can take one, in quotation marks, statement about lost payment, which is actually consistent with what the public disclosures say, and say that's a strong inference of scienter.

I did want to point Your Honor to the *Pacific Gateway*

case, because I think it's actually very similar to what we're dealing with here in terms of the allegations.  Similarly challenged a going concern statement with allegations they were delinquent in payments to vendors.

Very similar, you know, kind of nebulous allegations about, you know, we were trying to conserve cash, and vendors were complaining, and there were disconnect notices.

And the Court first held safe harbor was applicable; right?  So sufficient warnings.  That should get rid of the case; right?  But also on the knowledge front.

I thought this was a helpful quote, Your Honor.  The Court said:

> "At most, allegations suggest that at unspecified times defendants knew that unspecified number of unspecified trade creditors were demanding to be paid."

The allegations do not state for any of the alleged debts the time that payment became due, whether the obligation was discussed, whether any debts were subject to lengthy payment schedules, the length of time any debt had been outstanding beyond any grace period.

And I will note for Your Honor on Maxeon, if you look at the contract, they actually had a grace period.  You didn't have to pay unless if you paid interest.  And we pointed Your Honor to that, that contract in our briefing.

So they are basically in the same position here, where all they have said is there were payment issues.  The public disclosures say they didn't pay, and if you look at the contract, they didn't actually to pay as long as they were willing to pay the interest on it.

So it's very similar.  The Court rejected the same arguments plaintiffs make here about the "presently" language putting this outside of the safe harbor.  And the fact that that company eventually filed bankruptcy as well wasn't enough to put it outside of the safe harbor.

*Tower*, *OfficeMax*, also similar cases.  Even plaintiff's *Rombach* case, when you're just having, you know, these kind of general allegations about cash and being late to payments to folks is not enough to suggest the company is going to be insolvent.

And I would say even plaintiff's *Stone* case, if you look at the allegations there, they are very specific; right?  It's a construction company.  The allegations were involving subs who weren't paid, and there was a list that was allegedly reviewed by defendants that talked about payments being overdue by 600 to 700 days.  That's two years; right?  And if you're a construction company, that's your whole business, is getting your subs to do the work.

So essentially it was alleging the business had been shut down because of these payment issues.  And they specifically --

the Court specifically contrasted that to the allegations from an earlier period where they just sort of talked about nebulous being strapped for cash.

So I think that's also a helpful case just to see what type of specific allegations you have to show to show actual knowledge that the company was kind of on the brink of insolvency.

Those are my remarks on question one.  Should I stop there?

**THE COURT:**  Yes.  Let me give plaintiffs an opportunity to respond.

**MS. DANIELS:**  Yes.  Thank you, Your Honor.

Just to frame the statement for the Court.  You know, since at least 2023 defendants hid the company's financial information and the true state of the company's financial distress from investors and, as we've later found out, even from their own auditor here.

But publicly defendants continued to represent that SunPower was a company with solid financial health and had the metrics to be positioned for a longer term proposition.

And the truth was, though, that the company was suffering from liquidity and financial crisis that management masked with faulty or completely withheld financials until the truth finally came out.  But we still don't have those financials, as they issued two restatements claiming to first reissue,

claiming one restatement would suffice, and then retracting that several months later after they secured some additional credit from their majority shareholder, Sol Holding, which we claim was fraudulently procured as well.

Defendants were forced to admit their gamesmanship was coming to an end when their own auditor, Ernst and Young, noisily quit because of management's misconduct in reporting financials and because management was withholding financial information from Ernst and Young repeatedly.  This was not an honest mistake.

Their response letter to the disclosure that SunPower -- or defendants issued on July 3rd, after hours before the July 4th holiday, their response to that resignation was that: You've been hiding financial information from us.

They make this very clear, not just once but several times.  They said:  We had conversations with you.  You said you would provide this information.  You still are withholding it.  So we no longer can be associated with your financial statements, and we -- there are allegations that misconduct is involved.

The market took this to mean that this is way beyond average accounting issues at SunPower.  As Forbes said, they called it an accounting scandal.

"The troubles at Sunpower must be beyond the average accounting questions facing these companies.

And naturally there will be implications, as Forbes said.

"Was majority shareholder induced to throw good money after bad based on fractured financials?  If you put fresh capital into a company on the promise that its accounting issues were being ironed out, then six months later the auditor quits because management wouldn't cooperate, you might perhaps feel like a victim of securities fraud."

Here we have even more that.  We have two restatements.  Never issued financials.  An SEC investigation into these very statements that we're talking about, all of these statements for the last two years.  The SEC is investigating.  We now know the AUSA is also investigating.  They issued a Grand Jury subpoena after we filed the Complaint.

And, of course, Defendant Faricy has been fired after the -- after they received the SEC subpoena, but that was unknown to the market.  They didn't reveal that until July, that they were even under investigation.

So that August statement fits into this chain of events that we allege that, yes, defendants knew that SunPower was already cash-strapped at the time they made this statement.  And if they couldn't pay their current obligations, as we allege, or any bills, then they could not anticipate that their cash would suffice for the next year.

As you know, by the time SunPower made the statements --

or defendants made the statement, they were already delinquent on bills to suppliers and all their obligations.

These formers confirmed that the company was in a liquidity and equity crisis starting in 2022, that got worse throughout 2023. This was not common cash-crunching issues. They said they did not have the funds to pay obligations across the entire company.

Defendants misrepresent FE4's statement about that they were only delinquent by December. That's not true. FE4 states they were delinquent throughout his tenure really, but it got worse in 2023. They were delinquent on bills and, in fact, he was weekly asking his Treasury Department: When can we pay these bills? That was -- it was a weekly inquiry that was constantly being met with ready calls radio silence. This was not common cash issues here.

And he said by December we were delinquent to everybody, but they were delinquent, you know, across the board, at least in his department, before that.

He says that management told him -- he would constantly ask: When will we have the equity to pay the bills? But they could not -- they would not say. They kept it very tight-lipped.

They said that there was a constant need to liquidate materials for cash. Constant notices of cancellation from suppliers. Other than Maxeon, too. I know we focused a lot on

Maxeon, but, of course, these formers corroborate that SunPower was delinquent across so many channel of their business. We have people from, a finance manager, you know, insurance and supply chain.

So Maxeon, of course, is part and parcel of this broader, you know, pattern that SunPower is basically not paying its bills, so it kind of -- of course, the fact that they weren't paying Maxeon falls squarely within that. And we have two formers saying that Maxeon was not paid. So the contract dispute was due to nonpayment.

We have evidence that Eby was shifting obligations to, as FE4 says, to piss off the least amount of people. He was asked to delay receipts. And this was not just one meeting in the summer of 2023. He said -- he describes regular meetings with Eby discussing this with him. That's at Paragraph 119.

As you note, we have a former -- a finance manager that describes monthly meetings with Faricy and leadership discussing the cash crisis. These monthly meetings are, obviously, evidence that Faricy knew about this issue and she describes these monthly meetings as happening quarters into 2023, or a couple quarters into 2023. So Q1 2023 they were at least having regular meetings at that point.

The Former Employee 4, as I said, talks about regular check-ins with Eby and Faricy. He says:

"CEO Faricy and CFO Eby knew about the cash

issues, but were very tight-lipped.  They continued to say they were not able to tell you when we will have the ability to raise equity needed in order to pay, whether it was Maxeon or other suppliers."

Everything pertaining to cash was very tight-lipped and kept among a small group of people.

However, we do also allege, in addition to these meetings, these conversations, these -- you know, these -- basically FE4 saying "When can I pay my bills?" and getting no answer, or getting -- saying, "We can't tell you when we will."

We have evidence that CEO Faricy and leadership were tracking these expenses.  The finance manager says that throughout her tenure, the leadership team were zoning in on expenses, and it got to the point that Faricy had to approve all expenses, like travel.  So he is monitoring their cash position throughout her entire tenure, which includes, you know, starting at 2023.

We also allege that these issues were reported up to management.  It's not just about we do allege actual conversations, including with the V.P. of the pie chain, who is a very high-up -- he has a very high-up position.  He had regular contact with Eby and with Faricy, as he says.

But, also, these issues were reported up.  FE4 says that he reported these issues to Faricy, Eby and Johnson.

He says:

"SunPower was having issues paying suppliers across the entire company.  Every aspect was overdue.  And at the end of the week, FE4's team would have to ask SunPower's Treasury Department:  Did you make any payments to this account?  If the answer was no, the next question was:  When can we make the payment there?  Always there was radio silence."

And he said there's no way that Faricy was not aware of this given these conversations he's had with him and with Eby about this constant cash crisis that the company was in.

We have financing managers who did report to Eby in the reporting structure.  We allege that.

And Former Employee 2 also relates that they communicated threats of cancellation due to nonpayment to leadership, and this went to at the time the interim CFO.

We also have that these cash -- we have allegations that these cash issues were well known throughout the company in addition to these -- these very specific actually allegations about their knowledge.

They say -- FE3:

"Cash problems are very well known throughout the company.  There is no way that they did not know that Peter Faricy was not aware of the gravity of the payment situation."

And we have allegations of these systemic payment failures

from late 2022 onwards.

So to characterize this as -- they have a balkanized approach to nitpick every statement, but, really, this is about a holistic analysis about what these four formers are saying. They have no reason to lie and they corroborate one another.

**THE COURT:**  What's your response to their point that it's -- it's one thing to have trouble paying a couple of suppliers, but that doesn't mean that there is an anticipation the company will not continue as a going concern and that, really, the statement "we anticipate will be able to meet our obligations" is a going concern statement.

So it -- it's not enough to point to issues of cash being short or having difficulty paying because there could be an equity transaction that comes along and saves the day.  And if they know that that's coming, it's fair for them to anticipate that the company will continue as a going concern.

**MS. DANIELS:**  These are systemic issues.  It's not just -- they cite to cases where they couldn't pay, you know, maybe one supplier or have -- you know, there might be a reasonable basis for that.

This is a systemic company-wide issue, and that's the picture that these formers paint.

So to kind of balkanize these approach, I mean, that's a good way to avoid what they are saying, which is that this was a huge issue that we all knew about.  We were all baffled by

the fact we couldn't pay our bills and, yet, we see these statements from, you know, defendants saying for the next 12 months.

They like to say, well, that didn't happen. Oh, well, we actually made it 12 months. Well, they made it three days past 12 months.

But, also, we allege that they needed that Sol Holding majority shareholder infusion of cash to do that, which their financials are fractured based on that, as Forbes said.

So this -- this whole thing about, you know, basically paying Peter or to -- you know, robbing Peter to pay Paul, this is what they were doing. And we cite to cases where that is enough?

The *MF Global* case involved exactly these kind of allegations about how they were using intercompany transfers to kind of represent that they had sufficient cash, but when in reality that was not the case. It has the same going concern statement that we allege here.

And we also have defendant's own statements. We have these formers that really paint a clear picture about financial crisis. And we even have defendant's own statements. They hold themselves out as personally familiar with financial health.

Obviously, there's plenty of case law that says that their role is to know -- especially Eby, who is the CFO -- to know

what the can cash position is.

And we cite to -- you know, Paragraph 74 has Eby discussing the company's cash reserves.

163 is Faricy discussing the company's working cash flow.

So all of this reporting, tracking, contemporaneous knowledge shows that they did have access to, you know, contrary information, which shows that they did have knowledge. This isn't even just recklessness, which we think it is, but it's clearly knowledge about what was actually happening on the ground.

But in addition to that, we also have -- again, scienter is a holistic analysis. So we have plenty of other evidence that says this was not as defendants would paint: Oh, just a couple of missed payments, or there's nothing going on here.

For one, Defendant Faricy was fired after the SEC started investigating the statement -- this statement, the statements that they made, the financial statements that they made at issue here. And we cite cases that show that the timing of this, right after the SEC investigation, definitely supports scienter.

Of course, now we know there's an AUSA investigation, which is pretty radical. It's pretty extraordinary. It's one thing to have the SEC coming after you. It's another to also have the AUSA investigating the same practices.

Of course, hugely, Ernst and Young quit and cites

management's own misconduct in reporting this financial information at issue:  These statements can no longer be relied on.  Information has come to Ernst and Young's attention that has made it unwilling to be associated with these financial statements.

So, clearly, these statements are false.  They intentionally withheld information from Ernst and Young, as Ernst and Young says in their response letter.  So this is no common mistake.  This was continuously withholding information, which does -- and we cite cases that say intentional withholding of relevant information from your own auditor supports an inference of scienter.

Of course, we have the massive restatements that call -- you know, that they're hiding their true cash position.  They issued a restatement just long enough to get the Sol Holding transaction credit, line of credit that they needed, and then they immediately, you know, withdrew it and said two years can no longer be relied upon.  That is a huge restatement of these -- these finances at issue, which relates to something I wanted to address.

**THE COURT:**  Let me just make sure I understand the record correctly.  I had understood the record as -- or the allegations as that they have withdrawn the statements and said that they will restate them, but that they have not yet actually restated them.

Am I understanding that right?

**MS. DANIELS:**  They restated -- it's confusing because there's two restatements or notices of restatement.

In October they said we're going to need to restate these financials.  December 18th they did restate those financials, just long enough to get that Sol Holding infusion of cash that they desperately needed because they were running on fumes at this point, as our formers made clear.

In then April of 2024 they say:  Oh, never mind.  You know, we are going to restate it all of these.

And, in fact, Eby in February, when they announced the Sol Holding, transaction they touted as this big, you know, show of support from the majority shareholder, of course.

And Eby talks about when we have our forthcoming -- our annual report coming out for 2023, we don't expect to have a going concern statement in that.

And then ten days later, when that report is due, they file a notice saying our annual report will be delayed.

Then we know that there's a restatement for the last two earliest.

So it's delay, deny and hide.  This has been their blueprint to -- to get away with, you know, reassuring investors that things are fine, but not actually to give their financials.

Which leads me to say a common refrain from defendants,

and again today, they fault us for not citing exactly what the cash balance was or what the metrics were. They say that we need to do that to plead with particularity.

This case is unique because we don't have financials. They have said that you can't rely on them. So even if we did cite to the cash balance and -- that's false now. We know that that's false. We know that these cannot be relied upon. We know the SEC is investigating this.

So you can't fault us for not, you know, producing these numbers and exactly figuring out what's wrong when they tell us they're wrong.

So in these kind of cases Courts do say when such information is in there peer knowledge and control, we don't have to allege that with such -- in that -- to that degree of particularity because it would be impossible to do so and then we'd never bring securities fraud cases.

So given that -- we do cite though to formers that have, you know, contemporaneous knowledge. They all say the same thing. Again, no reason to lie.

And defendants have been on enough notice of what we're alleging here based on the case law. We don't need to plead evidence at this point.

And of course scienter, you know, goes to motive. And, of course, the motive is to, you know, present things are okay enough to get that new line of credit, to prolong the business.

You know, of course, we -- and we cite to many cases in our opposition that this is -- this is a motive that is, you know, a tale as old as time.

Often insiders are not forthcoming about the status of companies that they manage and run.  And maybe they believe that their strategy would work out; that they could get the Sol Holding and that would be enough to sustain them, which it wasn't in the end.  But, again, that's not good enough.

Defendants also cite to what they claim as partial, I guess, disclosures.  They claim:  Oh, well, they issued a going concern warning in December.  But actually -- well, first of all, some accurate information does not negate the false information that they are putting out there to the market.  And there are cases about that.

Defendants will, of course, release some truthful information as well.  It doesn't change the fact that they have released these false statements that investors relied on, but --

**THE COURT:**  Let me just -- in the interests of time, I think we need to move on to question two, but -- let me just move on to question two.

I know at the end if defendant wants to respond to some of what was said about question one, we can do that, but let's just stay on track for a minute.

So let me just ask defendant to let me know what your

response is on question two, which is about the November 1st, 2023 statement by Eby.

**MS. HENDERSON:**  Sure.  Thank you, Your Honor.

I wanted to start by what Your Honor frames the question as that we're arguing; that we're seeing that the allegations do not establish she had any information about whether SunPower was in breach.  That's not what we're saying at all.

I know that's what the opposition says, but if you look at our brief and what the arguments we're making, we're saying they have a pleading obligation; right?  They need to show facts, contemporaneous facts, that was inconsistent with what Ms. Eby said, right, that shows she was reckless or knowingly gave false statements; right?  It's facts that have to be pled by them.

And there's no facts showing that the information she said at the time, which was the preliminary Q3 financials, showed a breach or even showed that a breach would be likely.  I think that's the key of what you would need to show to show that those statements were made with scienter.

I would like to just focus on what she actually said, because I think plaintiffs conflate it and they are pretending it's some sort of guarantee or assurance that they would be in compliance after the restatement, and that's just not at all what was said.

She answered two questions; right?  One was:  Where do you

stand with respect to the covenants as of today?  That was on November 1st.  And that's where she said:  We were in compliance.  But she said:  Pending adjustments from the restatement, which Your Honor put in a question.

She's then asked:  Where do you expect to be by the end of the year?  So basically saying, you know, what's going to happen with the restatement.  And she said -- that's where she said:  We're fine, but we need to get to the final phase because you look backwards at the covenants and we're talking to the banks about waivers.

So a ton of caveat language in there suggesting that we need to get to the end of the restatement to say what the final answer is going to be.

THE COURT:  Isn't the statement "we're fine" meaningless if it doesn't -- to have any meaning that statement, it would seem to me, would be conveying that the information I have now, the preliminary information that I have about the Q3 results indicates that we will be in compliance when we get to year end.

Of course, there could be information I don't know about that will change the situation, but based on what I know now, the preliminary information is that we will meet Q3.

But then what I wonder about is given that, you know, shortly after it was very clear that they were not going to be fine at all in December, which is very soon after this, the

case law seems to say that if you make a statement that is reckless, that there's -- you don't have any basis for saying: Oh, we're going to be fine based on what I know so far. Then -- then you've committed securities fraud.

So help me understand why it is that if Eby's response is: I didn't have the information yet. I was waiting to hear what the information would be at year end, so I just said we're fine. Why isn't that reckless if she didn't have any information at all?

**MS. HENDERSON:** We're not saying she didn't have information. She had the preliminary Q3s; right? That showed they were fine.

Plaintiffs haven't alleged any facts showing that's not true, and that's the key, Your Honor. They would have to allege facts. You would need a CW saying: I gave her this analysis and it showed that we were in breach, or we were going to be in breach, and she knew that at the time and, thus, was reckless in saying "we're fine."

They don't allege that. That's the key. You need very specific particular allegations about that. Contemporaneous knowledge.

All they've alleged here is they point to the final statement, right, saying that they were in broach as of that, you know, end of date, because it's backwards-looking, and then saying: Well, it must have been reckless because she didn't

have information.

But the Complaint says she has information.  She had the preliminary Q3s.  And no one is suggesting that those preliminary Q3s put the company into breach.

And if you look at what the company announced, right, the original announcement in October had this inventory issue and that was the original issue that triggered it.

When you look at the December, which is 45 days later, so that's not an insignificant amount of time when you're doing a deep dive, as the CWs say.  You know, this is all being done in less than a quarter.  So 45 days would be half of that, Your Honor.  So that's an insignificant amount of time.  And they found additional issues, right, that had to do with expenses.

So the inference there is those additional issues put them over in the breach.  And there's nothing in the Complaint that's compelling to suggest the opposite of that.

So I think that's really the key.  And, I mean, there's countless Ninth Circuit cases which say you've got to plead facts.  You need detailed and specific allegations about management's exposure to that contrary information; right?  That's a line.  You need to allege in great detail facts that constitute the circumstantial evidence of deliberately reckless behavior, and that's *Silicon*.

*Prodanova*, it describes recklessness, Your Honor, as an extreme departure from the standards of ordinary care, which --

(Court reporter clarification.)

It's an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to defendant or so obvious that the actor must have been aware of it.

**THE COURT:**  What about the other information that we were talking about for question one, which there is an argument that knowing all of that information, the difficulty meeting payment obligations across the board allegedly coming from different former employees, meetings in August or September on a weekly basis about how there is difficulty meeting the payment obligations, why doesn't that, in combination with the December revelation, show that it couldn't be that the preliminary Q3 reports were fine.

**MS. HENDERSON:**  I mean, that's all speculation, Your Honor.  You need facts to allege what she knew and showing that it was so extreme, what she said, based on what she knew.  And that's not there.

I walked Your Honor through the disclosures.  There was an October disclosure about a restructuring plan that's just before this statement.  So, again, they are reducing costs; right?  So that's all going into the analysis.

If plaintiffs don't allege what was in that analysis, how can Your Honor determine that Ms. Eby was reckless in making that statement?  They need to show that what information she

had made it so extreme for her to say that, and they just don't.

I don't see how you can possibly come to an inference of reckless that's even as compelling as the one that's the opposite of that, which is:  Oh, they found different issues. The preliminary Q3 financials changed, so that's probably why the later determination of breach.

**THE COURT:**  Let me give plaintiffs an opportunity to respond.

What is the evidence that the preliminary Q3 results were not fine?

**MS. DANIELS:**  Well, their argument largely depends on an analyst not taking that fine to mean what it means.

They're saying -- the whole point is if we were actually waiting for the restatement to come out and these were just preliminary results, then saying that they are fine in Q3 was, at minimum, reckless when she didn't know one way or another if she had that information.

She intended for the market to rely on it, and they did rely on it.  JPMorgan issued a --

**THE COURT:**  I can see the reliance information, but what I want to understand is how -- how do I infer from the allegations that's the preliminary Q3 results were not fine.

**MS. DANIELS:**  We have -- well, she was talking about whether they were fine on compliance.

We have the timing of these waivers. She signed an 8-K issued one week prior, as we're talking about that October disclosure, which confirmed that the company was negotiating waivers of breaches of covenants, which defendants say they meant financial covenants. And we later learned that SunPower had secured temporary waivers of financial covenants on December 11th.

So if Eby was currently negotiating waivers for those financial covenants at the time of her statements, then it's -- how could she say they were fine on compliance. They are negotiating waivers for breaches, which they disclosed a few weeks later, but they're fine. So that was, at minimum, reckless.

But we do actually have information that she had contemporaneous knowledge that this was false. And, again, defendants pick apart our formers, but they do -- you have to take our allegations as true at this point and give all inferences in favor to us.

We have formers saying Eby knew on a regular basis how deeply the company was in financial crisis. Up until, especially, December. They say it was getting worse throughout 2023.

So we do allege contemporaneous knowledge. We're saying given this knowledge, given that she had these contrary facts, the fact that she would represent that the company was fine and

be -- financial compliance with financial covenants is a huge deal.  This shows the company's financial strength.

I mean, there's -- the metrics are minimum liquidity requirements.  You know, how much cash?  How much liquid assets do they have?  How many debt do they have?  You know, EBIDA. All these key metrics are tied to financial compliance.

So this is basically her saying:  Hey, you know, we're good.  You know, we're fine.  When she knew that the company was not based on all of our formers that, you know, spoke to her regularly that said:  Well, I can't pay -- when can I pay my bills?  When can I pay my bills?  And she can't tell them that.

So at minimum, again, if you -- there's -- you know, there's a duty to disclose; right?  So once --

**THE COURT:**  I have a question about that.  If -- if the financials are all wrong, as you're saying, and no one can rely on anything they say, why isn't it a fair inference that her look at the preliminary Q3 financials for EBIDA, minimum liquidity, a debt, that she got bad information which would obviously negate scienter?

**MS. DANIELS:**  Because we allege that she had -- that she knew the truth; that the truth was the company was in crisis.

And so these key metrics, which should actually put her on alert all the more to say -- she didn't have to say "we're

fine."  I mean, if you read the full exchange, I know defendants say there's hedging language, but, really, the best evidence is just reading the full exchange that we provide.

It clearly relays, as JPMorgan thought, that -- a Goldman Sachs analyst, that we're good.  You know, the company is good. She wanted people to rely on that statement.  She didn't have to say that.  She could have said, "Oh, I don't know."  I mean, that would have not been misleading.

The thing about securities law is there is no duty, free-standing duty to disclose information; but once you do say something, you have a duty to fully and fairly disclose that. And if she was going to talk about compliance, she should have just said "I don't know."  I mean, if she really didn't know.

But to give the impression and the clear, unmistakable impression, it was specific, from the company's CFO.  And we cite plenty of cases saying that investors will rely on that kind of information, especially in response to an analyst question.

So this was, at minimum, severely reckless for her to do that, especially given all the contemporaneous knowledge she had.

We also allege she knew it was false.  Like, they weren't fine.

They were also negotiating waivers at the time based on their later disclosure and the disclosure a week prior.

THE COURT:  So let me just make sure I understand the waiver point.

So they -- a week prior to the statement they are negotiating waivers of unspecified covenants.  And then in December it comes out that there was a waiver of financial covenants.

MS. DANIELS:  Yes.

THE COURT:  But we don't know whether those financial covenant waivers were negotiated a week before the November statement or in some subsequent period between the November statement and the December announcement.  Am I understanding that accurately?

MS. DANIELS:  Yes.  But we do know that Eby knew the company was in financial crisis.  And we allege that when they actually issued that October statement, they knew they were in breach of financial covenants and they did not disclose that information, which was a misleading omission.

They wanted to give the impression all along that this is really just impacting our reporting requirements, which require us to timely file financials, which we cannot do.

But now that's why this analyst asked about financial covenants, because it was unclear.  And so this is -- this is the kind of scenario where it is all the more important to be clear and to disclose the truth, which she didn't have to say -- well, she should have said "we're in crisis," as we

allege, but she could have just said, "I don't know." And here she did not do that. She wanted investors to rely on that.

And under *Oracle*, even a reckless disregard can be shown even when -- basically an officer has a duty to investigate facts and could have done so in a reasonable manner, you know, gotten the facts together and just didn't do any investigation.

So this is a fairly, I have to say, lenient standard, but we definitely plead enough at this stage, given the formers information about: Hey, we can't pay our bills. It's getting worse. By December we're delinquent to everybody. And her, you know, saying: Well, we're fine on financial compliance with our financial covenants that are key to our business.

THE COURT: Let me move to question three.

MS. HENDERSON: Your Honor, could I please just briefly respond?

THE COURT: Will you respond at the end?

MS. HENDERSON: Okay.

THE COURT: You'll have an opportunity to respond at the end. Tell me anything else you want me to know. But I just want to stay on track in terms of getting through the questions.

So question three is really about the June 27, 2024 statement from defendant Werner, who is now CEO at this point, and is saying that Ernst and Young, refusing to stand behind the statements, has no material impact on SunPower's current

cash position.

What's defendant's response on that?

**MS. HENDERSON:**  Sure.  So first of all, it's a July 3rd statement.

**THE COURT:**  Oh, right, yes.

**MS. HENDERSON:**  It was a press release which was issued, which was actually talking about getting a new auditor and said that that process has no material impact on current cash or continued focus on delivering.

A number of issues here, Your Honor.

First of all, I urge you to look at Paragraph 192 of the Complaint, which is where this is supposedly alleged that it was false.  There is nothing there.  There is no, you know, typical:  This statement was misleading because.  And their chart was blank for that reason.  There's just no allegations saying that the statement was false.  And they are obviously required to do that under Ninth Circuit case law to avoid the sort of, you know, I think issue where we're trying to put together facts that may be kind of try to show they're false.

The second is the Complaint also doesn't allege that Werner made this statement.  If you read again Paragraph 192, it just says the company issued a press release.  And that's all it is.  It's two lines.  It wasn't filed with the SEC.  The entire line is in the Complaint.  It doesn't actually even mention Werner at all.  And, obviously, you can't be held

liable for a statement that you didn't make.

But I want to focus on the substance of it. Again, you need particular facts showing that that wasn't true, right, as of July 3rd. They don't have any. There is no allegations about what cash was at that time, right, much like the earlier period, what the current cash was, what they were anticipating at that time. And there's nothing about any sort of material effects that the auditors could have on current cash whatsoever.

You know, I want to stress that the representations that are cited to Your Honor in the Complaint at 179 are actually historical reps. So if you read Exhibit 18, you'll see what SunPower was doing was representing as of the date of that agreement that the fiscal '22 financials were, you know, in compliance and accurately reflected the financial statement as of that date.

No facts showing why those reps would be relevant to July current cash statement. There is just nothing --

**THE COURT:** I saw that argument in the briefing. I have to confess I didn't understand it. Maybe you can help me understand it.

I understood that representation as saying as of today, we represent our financial statements that we submitted to get this loan are accurate, and -- but if it turns out now they are saying in 2024, oh, the auditor is saying these financial

statements are not accurate and we are going to have to restate that. Doesn't that breach the representation that, in fact, as of 2022, those statements were in compliance with GAAP and were a fair representation of the financial condition of the company?

MS. HENDERSON: So they don't allege anything about that. So I don't think Your Honor can infer a material breach of that representation, which, by the way, there's no allegation Sol ever claimed that it was -- SunPower was in breach and there's certainly no allegations tying that to E&Y.

I want to make one point upfront, is that SunPower actually had all of the cash that was owed under that agreement. That's in the Complaint. They pulled the last tranche of financing in June. So as of July 3rd, they had all the money.

THE COURT: So isn't the point that they might have to give it back, if it turns out that they misrepresented their current financial position, and then that there are allegations that Ernst and Young is saying that the statements that describe their current financial situation were not reliable.

MS. HENDERSON: So that's not in the Complaint, Your Honor, at all; right? That you could tie what E&Y said to a breach of the financing agreement from as of February.

THE COURT: Why can't I infer that from the factual allegations? I'm supposed to look at the factual allegations

and draw inferences in plaintiff's favor and then see if a strong inference of scienter can be made.  So why don't those facts support that inference?

MS. HENDERSON:  So I think there's a few reasons.

So, first of all, E&Y, all they said was that they don't want to be -- they are unwilling to be associated with financial statements from management.  They don't actually tie it to fiscal year '22.  And E&Y was actually also working on fiscal year '23 at the time.

So there's no particular facts even alleging that statement was because of the financials from '22.

THE COURT:  I thought they had to restate the '22 and '23 financials.

MS. HENDERSON:  So they didn't actually file '23.  They were working on that.  And that's what the plaintiff alleges were the delay in filing the final '23 fiscal year.  So they were working on both.

So the statement isn't attributed to either one.  So to make that connection, I don't think you have any particular facts to make that connection.

There's also nothing --

THE COURT:  Am I misunderstanding that the company said its financials from '22 and '23 could no longer be relied upon?

MS. HENDERSON:  So '22, and then quarters of in '23.

But they never filed for annual fiscal year '23.

**THE COURT:** Yes, but the 2022 financial statements could not be relied upon, that admission was made by the company after Ernst and Young withdrew.

Am I understanding that right?

**MS. HENDERSON:** So April was when the company said we're going to need to restate fiscal year '22.

In then June E&Y says: We're resigning and we no longer wish to be associated with the financial statements. They don't say one way or the other which ones they were referring to, and plaintiffs don't allege it.

So you would have to infer, right, that it's the fiscal '22 that they are even talking about.

So let's even assume that that's what they were talking about, even though there's no facts to suggest that. And when you look at what was alleged about the restatement, it's, again, sort of categorization of expenses. It's not fraud. It's not making up revenue. It's not hiding inventory from auditors. It's not, you know, that type of behavior that's directly attributed to misconduct by defendants.

And I urge Your Honor to read very carefully what E&Y does say, because that language was very carefully chosen. And it doesn't actually say they are withdrawing because there was misconduct related to the financials. It actually says the opposite. It was a disagreement about audit scope and whether

they would be informed of allegations of misconduct, right, not having even proven misconduct, that even if they didn't impact the financial statements.

So you would have to take from that statement where they specifically say it wasn't because of financials that, oh, it really was and that it was a GAAP violation that was then a material breach of the agreement.

And even if you could infer that, you then have to make the leap that SunPower should have known that Sol was going to claim a material breach -- again, has to be material -- based on E&Y's statement, which isn't connected to the financial statements.

And, remember, Sol is the majority shareholder, has the majority of the board, so they are in the know on all this stuff.  No allegation that it ever happened or why would it happen.

If they knew since April that the -- that those fiscal year '22 financials were going to be restated, why wouldn't they have claimed breach then?  In fact, they allowed SunPower to pull the second tranche in June after that date.

So any inference that Sol was taking the position that those reps had been breached just isn't supported by the facts and isn't supported by what E&Y actually said.

And then you have to see that there's an impact on current cash.  How does that work if you allege a breach?  Does it go

poof all of a sudden and the money gets given back?  No.  You allege a breach.

Then you have to go through a process where you're, like, litigating that issue.  You know, there is an event of default that can be declared under that financing agreement.  It's in Section 8.  But, again, you have to show material breach.  And then you're going to litigate that about whether you're getting the money back.

So that's, if anything, a future cash effect.  As of today, what he was saying was our -- you know, working towards getting another auditor isn't impacting what cash we currently have.  And that was all of the cash already under the financing agreement.

**THE COURT:**  That's an odd interpretation of the statement though, because it is always true that nothing -- almost nothing -- almost nothing that could ever happen would affect the, quote, current cash position if it's interpreted in the way that you describe, which is:  Today I have X amount of cash in the company.  This thing happened and tomorrow I'll have none, but today I still have the cash.  So it's accurate for me to say:  My current cash position is unaffected by this event that just occurred.

It seems to me to be an absurd interpretation of the term "current cash position," but I'm -- I'm curious if there is something more I should know.

**MS. HENDERSON:** Well, I mean, I think it's the opposite of what we were talking about earlier; right? The going concern is future cash; right? I think we're going to be solvent.

To say it's going to effect my current cash, the access that I have to my current cash right now, in other words, I'm not going to declare bankruptcy tomorrow, right, that's what that statement says.

**THE COURT:** But if -- if -- let's say hypothetically he was going to declare bankruptcy the next day. Do you think that statement would then become false?

**MS. HENDERSON:** So they didn't; right? So they haven't alleged any sort of facts that way.

I think the case law is pretty clear that when you make a statement about the current historical issue, it doesn't imply that it's going to continue forever.

**THE COURT:** So in your view the law says he can come out and tell the financial press this has no effect on our current financial situation and the next day know that he's declaring bankruptcy. And it wouldn't be false because he's talking about his current financial position and tomorrow's declaration is, in effect, on the future cash position.

**MS. HENDERSON:** Well, he didn't say "our current financial situation;" right? That's a broader statement, Your Honor.

**THE COURT:** "Current cash position."

**MS. HENDERSON:** Right? You -- you don't know what else they expected at that point in time because there's no facts alleged whatsoever. There's no CWs from that --

**THE COURT:** I understand that's not a factual situation.

But is it your argument then that the term "current cash position" has such a narrow definition that somebody could come out to the financial press and say: This development will not affect our current cash position, knowing the company would declare bankruptcy tomorrow and say: It's okay because that was our future cash position.

**MS. HENDERSON:** In that situation, if they were going to declare bankruptcy tomorrow, the current cash position was probably much different than SunPower's was at the time; right? They didn't declare bankruptcy til, you know, over a month later. And there's no facts showing, you know, did we think we were getting more financing from Sol; right? That there wasn't going to be any sort of immediate solvency there.

So I don't think you can infer into that one statement a guarantee of solvency in a month. And I think that's what, you know, you would be doing.

And it's very different to say the next day, right, than a month later when you don't have a CW saying: You know what? That was super reckless. We had an analysis showing we were

going to file in two days, and Sol had told us we were not going to give you any more money, and we were going to call the other money back; right?  There's none of that.

THE COURT:  I think it is the "no effect on current cash position" that is troubling me.  It's a quiet broad statement to say something has no effect.

It's not -- no one is saying that it is a guarantee of future solvency, but to say that there is no effect on the current financial -- the current cash position is pretty -- is a pretty significant statement, it seems to me.

MS. HENDERSON:  No, I understand what you're saying, Your Honor.  I think you're reading a lot into, though, the connection that SunPower should have made; right?  Because you're basically asking:  Was it reckless?

What information did they have in their heads at the time they put that press release out?  Their auditor had quit.  They were already talking to another auditor because there were conflicts issues; right?  So they were already in the process of getting another one.  And they said this does not have any, basically, immediate effect on our access to cash.

Well, if Your Honor had -- if there were allegations in here suggesting you knew you were going to file tomorrow, yeah, maybe that's misleading; right?  If you knew Sol was not going to give you financing, yeah, maybe that's misleading.  But we don't have any of that.

And to say that SunPower should have said:  Oh, you know, those reps we made back in February -- which, by the way, Mr. Werner wasn't even at the company when that contract was entered into, right -- we think Sol is going to declare a breach, even though plaintiffs haven't even alleged what about GAAP was not complying with fiscal year '22.  And the case law does say you have to allege specific details on that.  So all that had changed; right?

As of July 3rd, was the auditor resigned.  To make the connection between auditor resigned and we know that Sol is going to declare a material breach for failure to comply with GAAP with fiscal year '22.  There's no facts to support those leaps.  That's required.  And it's not some sort of ongoing covenant.

I think Your Honor would have a better position if there was an ongoing covenant or they hadn't gotten all the money yet; right?  So you're counting on this $50 million.  It's more reasonable, you know, to say:  Well, you know what?  You should have known that maybe Sol wasn't going to give you that if you knew you weren't compliant with GAAP in a material way; right?  Haven't alleged that.

When you look at the description, doesn't seem like it's going to be a material impact.  And that's all we have to go on; right?  I'm bound by the facts as well, right, not actually what happened here, but when you look at --

THE COURT:  I think that's fair.  I didn't realize that they had drawn down the whole line of credit.

Will you give me the portions of the Complaint where I can look at it to understand that they have drawn down the whole amount of credit?  They got 175 million up front and then they drew down the first tranche.  That was 125.

MS. HENDERSON:  125 and then 50.

THE COURT:  And then 50 is the second tranche.  Okay.

MS. HENDERSON:  That's Paragraph 187 of the Complaint in Exhibit 29.

THE COURT:  Thank you.

Let me give plaintiff an opportunity to respond.

MS. DANIELS:  Yes.  If, as defendants say, they drew on the second tranche here of 50 million, we are saying that at the time Werner made this very specific statement saying it has no material impact, you know, Ernst and Young resigning on our cash position, they were out -- the company was out of options.  They had already maximized their Sol Holding financing and now Werner would -- he was reckless in making this statement, but he would have known that SunPower could not get access to more credit as their -- as the declaration in their bankruptcy docket by their chief compliance officer does say.  We don't allege that here because it happened afterwards, but we do allege facts to make that inference at this point.

Of course, when Werner made that statement, they had

already issued that restatement in April saying: Look, you can't rely on our, you know, financial statements for the last two years, which Ernst and Young was also referencing, you know, related to misconduct.

And, as well, he also knew that the company was facing delisting due to their delayed financials from NASDAQ. They had received repeated warnings saying you need to file their 2023 financials.

So without either their -- their 2022 or 2023 financials or any financials being filed regularly, he would have known that no auditor -- there is no credit agreement upon which he could actually get -- you know, to stave off, as he calls it, imminent insolvency.

This is from that March information statement which was filed after Werner took office. It describes the Sol Holding transaction as needed to "stave off imminent insolvency."

So this is their lifeline and now they have access to -- now -- actually, we do allege that they were bleeding cash because, yes, okay, they did draw the 175 million in February and then a few months later, start of June, they needed to withdraw the 50, another 50 million, that second tranche. This was their last resort.

And knowing what he knew, which is we don't have any financial statements for now going on three years, our auditor just resigned citing our own misconduct and, you know, is

another auditor going to come in and, you know, clean up this mess within a month? I mean, we make light of -- defendants acknowledge that if they filed for bankruptcy a day later, that would be misleading. But this was a month. I mean, a month and a day.

You know, Werner, if he didn't know, he was reckless in making this statement about their cash position, about how low it was. And to say now we need to find another auditor to do three years' worth of financial statements, which would -- is a prerequisite for any credit agreement. You know, no creditor is going to extend credit to someone that has no financial statements, you know, just based on what? Including their majority shareholder, who was their kind of, you know, person of last resort. That's what kind of even ferried them through to this point.

So, and we know that at the time of their bankruptcy, they had just 32 million left, so which is just enough to maybe cover, you know, winding-up costs.

So Werner both knew that they could not get more credit at that point when he made that statements based on, you know, fractured financials, and he also knew that this was -- the Sol Holding transaction was entered into to stave off imminent insolvency. So he knew how much cash they had at the time, and it is borne out.

Scienter is a timing issue, too. The fact that bankruptcy

occurred just a month later.

And actually even earlier than that, on July 17th, this is two weeks after he made the statement "no material impact on our cash position," or I think he says, like, "our continued focus on delivering for our customers," which we can say maybe that's puffery, but two weeks later they are sending out letters, undisclosed letters, which were later reported on, to dealers saying we're canceling our leases. We're canceling our contracts. Sorry for the inconvenience. That was two weeks after the statement.

And, again, not to beat this down, but he did not have to say anything. He could have said: We can imagine what -- a statement wouldn't -- would not be actionable. He can say: We're looking for a new auditor, and I have continued confidence in the team to weather this storm. You know, something generic, some puffery.

This is not puffery. This is a very specific statement about our current cash position. But saying that, knowing that you cannot get access to more credit, this was really your last lifeline, and actually then two weeks later starting to cancel, you know, your operations, and then, yeah, two weeks later you're filing for bankruptcy because you have been running on fumes, that -- this is materially misleading.

And we also have case law. Just given that the -- the formers we know -- because when we did our investigation we had

not consolidated the Complaints yet, but our formers, up until February when he took the helm, still are talking about how the company was in crisis. That state of affairs is still taken as an inference in our favor saying -- that's not like that changed per se. Other than the Sol Holding infusion, which as we're saying, they were out of it by this point. He knew that. He represented he knew that.

And, of course, this -- the timing of the statement is also pretty damning. He issued it on July 3rd, the same day that they had to disclose that Ernst and Young resigned and the same day they had to -- or they disclosed that the SEC was investigating them.

This is a moment where everyone is like, whoa. I mean, an analyst referred to it as a horror show. 8-K, this is the worst statement that a company could make. This is the last thing that investors want to hear. And this is the press release the company issues at the same time.

**THE COURT:** We've come to the end of my questions. I promised you each you would have an opportunity to address anything else you want the Court to know. I know we're going on more than an hour into the argument, so please be conscious of time; but I promised I would give you an opportunity, and I will.

So let me start with defendants.

**MS. HENDERSON:** Thank you, Your Honor.

So just a few things. I wanted to respond just more globally to the suggestion here that there was just so many bad things that happened, something must have been bad; right? There must have been fraud.

And I understand the appeal of that, but I think there is just -- the case law shows you can't just point to that stuff and say you must have known earlier and all this bad stuff.

So I particularly would -- I would refer Your Honor to the *American Apparel* case because I think that's very helpful. Had very similar types of allegations. The auditor resigned. And in that case the auditor resigned actually tying its resignation to the financials. Unlike here; right?

It said that the defendants had withheld information which was needed for the financial statements and that's why it was resigning. It said the defendants made misrepresentations.

That's very different than what we have here, where all they said was, you know, they don't want to be associated with the financials, and then they cite this audit scope disagreement. They don't connect it to the fraud. And I think that's important here.

Judge Breyer's decision in *Roch* is very similar. If you don't have that connection, where the plaintiffs have no facts saying, you know, you knew all of this stuff as of that time.

And, you know, I think the last statement -- you know, Your Honor, I know, is troubled by, you know, what you would

say there, but I think what it says is Sol didn't declare a breach. Sol didn't say: I'm taking that money back; right? Like, that's what they were conveying.

And that's like -- they also were -- didn't -- don't say that Sol wasn't going to give them more money like they had done a monthly earlier; right? They are the majority shareholder. To assume that a majority shareholder is going to let the company go into bankruptcy, you don't have any facts showing all of that. So I think that's really important. And just relying upon the auditor resignation, the bankruptcy.

You know, the Ninth Circuit's decisions in *Zucco* and *Metzler*, I think, are without particularized allegations tying it to the fraud that's acknowledged. You can't show recklessness or scienter in that situation.

And in *American Apparel* there are much more damning allegations. Like, the Government found that there was illegal misconduct. Unlike here, where they are just investigating.

I would urge Your Honor to also look carefully at the chronology here. I think plaintiffs mix up things. You know, saying Faricy was fired. No allegations about that. Saying he was fired because of the SEC investigation. SEC investigation subpoena came the next -- you know, came after he resigned from the company.

So a lot of things that plaintiff said to you are not supported by the Complaint and are not factually true. So, you

know, I think that's important.

And, you know, I just wanted to read Your Honor some of the quotes from Judge Breyer, where he specifically points out that the resignation did not reflect a finding by BDO that defendants made false statements in 2013, which were the ones that were at issue. And that's in really stark contrast to some of the cases where the defendants themselves are engaged in the misconduct and the auditor says that. And that's not what they have alleged here.

And there's nothing about just them resigning in June that changes anything about the financials. They got more -- more money from Sol a month earlier after they announced the restatement.

So I think when you put all those facts together, it just doesn't support fraud.

I'd also urge Your Honor to look specifically at the CW allegations and the timeline, or the lack thereof. So a lot of what counsel said when she read to you some of the CW allegations, they do not actually apply to a specific time frame. And if you look at them more broadly, they are very consistent with the deterioration over time.

I would also urge Your Honor to look at the *Aceto* case because what is key in *Aceto* is they actually allege particular facts that defendants knew at the time that they were likely to be in breach. And even with that specific allegation, which we

do not have here -- and that's what I was harping on earlier -- but even if you had that, the Court said that's not enough to show that a statement of historical compliance is false and misleading.

And, you know, I think we don't even have that here.  So I think that's an important point to look at on question two as well.

And with that, I'll rest.  Thank you very much Your Honor.

**THE COURT:**  Anything further from plaintiff?

**MS. DANIELS:**  Yes, Your Honor.

I know your questions start with the August 2023 statement, but everything I've said about the allegations from the formers that, you know, endorse that, that falsity of that statement and the scienter there, that the company was in a cash crisis, it also applies to the May 2023 statement that was exactly the same.

And we do cite cases that these -- I mean, again, defendants try to dismiss what our formers are saying here, but we cite to cases where they -- there were similar allegations that formers, you know, had monthly meetings with management, you know, discussed these issues.

And then we have a case that's *Brendan versus Allegiant Travel*, which the Court says:

"Taken together, the former accounts, the core operations doctrine and the defendant's CEO

resignation, supports a strong inference of scienter."

Here we have far more than that.  And we even cite to cases where Courts just simply rely on the fact that they signed statements, you know, and made representations based on their core operations.

These are the company's leading officers making statements that are directly contrary to what was going on behind the scenes.  This is a classic case of fraud, of hiding.

And, again, defendants cannot dismiss the very blatant -- you know, when the truth was starting to continually be revealed, Ernst and Young did cite misconduct.  They said there's allegations of misconduct you're not telling us.

Of course, we know that Ernst and Young's lawyers looked at that statement very carefully.  They were trying to be -- probably not to outright say:  You've been defrauding us.  You know, their lawyers probably told them not to say that exactly.

The fact that they singled out management was huge.  And we have analysts responding to that saying:  This is a scandal.  This is not normal.  This means like -- you'll feel like a victim of securities fraud.  I mean, this is how Forbes and others responded to this statement.  It's not us making something up here.

And, again, their response letter saying:  We met continuously trying to get this information.  These are smart people.  We discussed what you -- what we need from you and

then you still weren't giving it to us.  I mean, these -- you can put two and two together.

Again, you have to construe all inferences in favor of us, especially on scienter, where it's a holistic analysis.

And this is the kind of case where we cannot allege a specific -- we can't get an expert to specifically identify what cash statements were false exactly by numbers because they withheld the information.

And, again, if this were allowed, then this would basically provide a blueprint to any company about how to commit fraud and how to continuously reassure investors just enough that the company is doing fine when, in fact, behind the scenes it was not.  They had contrary information.  They were hiding things from their auditor.

And this noisy resignation is not common.  It's extraordinary.  And we cite to cases where there's far less that shows scienter.

**THE COURT:**  Thank you all for the argument.  It was very helpful.  The case was very well briefed.

I will take the matter under submission and issue a written order.

**MS. HENDERSON:**  Thank you, Your Honor.

**MS. DANIELS:**  Thank you.

**THE CLERK:**  Court is adjourned.

(Proceedings adjourned.)

**CERTIFICATE OF OFFICIAL REPORTER**


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Saturday, February 22, 2025