UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SUNPOWER CORPORATION SECURITIES LITIGATION | Case No. 23-cv-05544-RFL<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>Re: Dkt. No. 88 |

This putative class action alleges violations of federal securities laws. SunPower Corporation ("SunPower"), which filed for bankruptcy in August 2024, was a publicly-traded company offering fully-integrated solar, storage, and home energy solutions to customers primarily in the United States and Canada. Defendant Peter Faricy was Chief Executive Officer of SunPower until February 26, 2024, Defendant Thomas Werner was SunPower's Principal Executive Officer since February 19, 2024, and Defendant Elizabeth Eby was Chief Financial Officer of SunPower since May 30, 2023 (collectively, "Defendants").

Lead Plaintiff Bezeyem Lemou and Plaintiffs Daniel Suarez, Gabriel Rodrigues, and Charles Orr ("Plaintiffs") filed this action on behalf of themselves and all other persons who bought SunPower stock during the period from May 3, 2023 to July 19, 2024 (the proposed "Class Period"). (Dkt. No. 79 ("SAC")[1].) Plaintiffs allege that during the Class Period,

[1] Page numbers reflect the pagination applied by the court's electronic case filing system.

Defendants issued false and misleading statements regarding SunPower's financial health, its compliance with financial covenants, and its ability to meet financial obligations. Plaintiffs allege violations of Section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Defendants now move to dismiss the Second Amended Complaint on the grounds that Plaintiffs allege neither falsity nor scienter with the requisite particularity as to the alleged misstatements. (Dkt. No. 88.) Defendants also challenge Plaintiffs' loss causation and standing. (*Id.*)

For the reasons discussed below, Defendants' Motion to Dismiss is **DENIED** as to the August 2023 going concern statement and **GRANTED** as to Plaintiffs' other claimed misstatements. Defendants' Motion is further **GRANTED** as to Lemou's and Rodrigues's claims as they fail to plead loss causation.

## I. BACKGROUND

### A. Factual Allegations

SunPower, a Delaware corporation with offices in Richmond, California, offered photovoltaic solar energy generation systems and battery energy storage products to residential consumers. (SAC ¶ 29.) SunPower also provided solar and storage lease financing options to customers through its network of residential solar dealers across the United States. (SAC ¶ 146.) To acquire the goods and services needed to operate its business, SunPower entered into contracts with various third-party suppliers. (SAC ¶ 30.)

#### 1. May 2023 and August 2023 going concern statements

In May 2023 and August 2023, Defendants Eby and Faricy filed Form 10-Qs with the SEC, stating that "[w]e currently anticipate that our cash and cash equivalents will be sufficient to meet our obligations over the next 12 months from the date of issuance of our financial statements." (SAC ¶ 151.) Plaintiffs allege that this statement was misleading because Eby and Faricy were aware that SunPower would not be able to meet their cash obligations in the next year. (SAC ¶ 153.)

The Complaint paints a picture of SunPower as already being in a precarious cash

position going into 2023. Former Employee 2 ("FE2"), who worked as a Senior Risk Manager at SunPower from January 2019 to August 2023 (SAC ¶ 111), stated that "[c]ash was always an issue" during their tenure at SunPower, and that they were "always having to escalate" bills owed to SunPower's insurance providers, often resorting to "beg[g]ing someone to pay" the outstanding bills. (SAC ¶ 112.) FE2 also recalled that a "handful" of SunPower's insurance suppliers threatened to issue notices of cancellation due to SunPower's nonpayment, and that FE2 communicated these threats to his management chain. (*Id.*) Similarly, Former Employee 3 ("FE3"), who was a Logistics Data Analyst at SunPower from January 2019 to January 2023 (SAC ¶ 113), stated that throughout their tenure, SunPower was continuously "tight on cash" and regularly failed to pay suppliers on time. (SAC ¶ 114.) FE3 describes one supplier who "shut service down" until SunPower took "a week or two" to tender payment and restart the pipeline. (*Id.*) Former Employee 4 ("FE4"), who worked at SunPower from February 2022 to February 2024 as the Vice President of Supply Chain Operations (SAC ¶ 116), stated that SunPower was having issues paying suppliers "across the entire company" (SAC ¶ 120) and that, starting mid-way through 2022, SunPower's cash position deteriorated to the point that there was no longer "enough cash in the business to continue to pay some of the suppliers." (SAC ¶ 122.)

The Complaint alleges that as 2023 progressed, SunPower's financial troubles grew increasingly urgent. On July 26, 2023, SunPower issued an 8-K announcing various cost-cutting measures, reduced its projected adjusted EBIDTA by more than half, and cut its projected new customer count by around 20 percent. (SAC ¶ 52.) Former Employee 1 ("FE1"), who worked as a Finance Manager at SunPower from January 2022 to January 2024 (SAC ¶ 104), stated that in Q2 or Q3 of 2024, SunPower "lost [its] contract" with Maxeon, one of SunPower's "major suppliers," after SunPower "missed payments" that were allegedly months late. (SAC ¶ 110.) Maxeon later revealed that it had discontinued shipments to SunPower in July 2023 because of nonpayment of approximately $29 million in invoices. (SAC ¶ 69.)

FE1 further describes "all-hands" meetings involving Faricy in the "beginning of summer" 2023 that discussed the need to cut costs and liquidate assets. (SAC ¶ 109.) FE4

recalls a meeting in August or September 2023 during which Eby and SunPower COO Jennifer Johnston described the company as walking a "tightrope" to "piss the least amount of people off" given these cash issues, and that there was a "problem." (SAC ¶ 119.) Eby and Johnston asked FE4 to help SunPower work with suppliers "to delay receipts." (*Id.*) FE4 stated that they were "regularly getting called" into meetings to ask if the Supply Chain department "could do more" to "alleviate the cash crunch" and that such meetings "highlight[ed] the gravity of [SunPower's] financial situation." (*Id.*) On November 15, 2023, SunPower issued a Form 8-K and a press release announcing it had entered into an agreement "to settle and resolve certain disputes" related to its supply agreement with Maxeon, which required SunPower "to issue to Maxeon, in a private placement, warrants for 1,700,000 shares of the Company's common stock." (SAC ¶ 200.) SunPower's share price dropped about 7.3% the next day. (SAC ¶ 201.) By December 2023, FE4 stated that SunPower was "delinquent on payments to everybody." (SAC ¶ 118.)

### 2. October 2023 restatement announcement and November 2023 investor call

In general, to pay its suppliers, SunPower relied on funds from debt and credit sources, including a loan agreement with the Bank of America and Bank of the West (the "Credit Agreement"). (SAC ¶ 31.) These agreements contained numerous financial covenants that required SunPower to maintain certain financial ratios, *e.g.*, net leverage and minimum liquidity ratios, and reporting covenants that required SunPower to deliver unaudited financial statements by certain deadlines each quarter to the banks. (SAC ¶¶ 32–37, 39.) Failure to comply with these conditions constitutes an event of default, which would allow the lender to cease lending and demand immediate repayment of all amounts owed. (SAC ¶ 38.) Compliance with these covenants is "backward looking," meaning that it is assessed on the last date of the relevant time period. (SAC ¶¶ 34–37.)

On October 24, 2023, SunPower announced a restatement for its 2022 and first and second quarter 2023 financials. (SAC ¶ 55.) In the Form 8-K, SunPower announced that it was "currently negotiating the terms and conditions of a consent and waiver to address the effects of

the Restatement under the Credit Agreement." (SAC ¶ 56.) A week later, on November 1, 2023, Eby had the following exchange on an investor call discussing Q3 2023 financials:

> Q: I know, Beth, you're still working with your creditors on the waivers and what have you, but could you remind us what the actual covenants are? I believe there might be some either minimum cash and/or EBITDA coverage covenants. Could you remind us what those are, where you stand relative to those today?
>
> Eby: So, the covenant – there is four covenants. One is a net debt to-EBITDA with all the adjustments of 4.5x, and that's all the non-recourse. If you take out the nonrecourse groups, there's a interest coverage and there's a minimum liquidity, not minimum cash, and an asset covenant.
>
> Q: Okay. And . . .
>
> Eby: And we reached on all of those.
>
> Q: Yes. And given the . . .
>
> Eby: Well, pending final adjustments. But yes.
>
> Q: Understood. Sorry, I cut you off there. So it sounds like even given the negative EBITDA outlook here that you updated the market on this morning, you still plan to be in compliance with all those covenants through year-end?
>
> Eby: We need to get to the final phase of they're always the backward looking and we're fine in Q3 and we're talking to the banks about waivers for the restatement and anything else we need.
>
> Q: Okay. Understood. Helpful.

(SAC ¶¶ 130–31.) On December 18, 2023, however, SunPower announced the final results of the October restatement, which disclosed that SunPower had "breached a financial covenant" of the Credit Agreement "as of October 1, 2023" and that "[s]ubstantial doubt exists about [SunPower's] ability to continue as a going concern[.]" (SAC ¶¶ 139–40.) Plaintiffs allege that in light of the announcement, the October 24, 2023 statement that SunPower was negotiating the terms of a waiver and Eby's November 1, 2023 statements that SunPower had reached its covenants in Q3 were false and misleading at the time they were made. (SAC ¶¶ 128, 132.)

### 3. Post-February 2024 statements

On February 14, 2024, SunPower entered into a credit agreement with Sol Holding, which provided $175 million in capital comprising a $125 million tranche that was borrowed on February 14, 2024 and a second tranche of up to $50 million. (SAC ¶ 162.) To obtain this financing, the Company had presented a financial advisor, Houlihan, with its 2022 financials so that Houlihan could render a written opinion as to whether the Sol Holding transaction was fair to SunPower's stockholders from a financial point of view. (SAC ¶¶ 171–72.) SunPower later characterized this transaction as a lifeline to stave off "imminent insolvency." (SAC ¶ 171.)

Following this cash infusion, Plaintiffs allege that SunPower made a series of misleadingly optimistic statements in February and March, including that the company "expect[ed] to be cash flow positive in the second half of 2024 and beyond" (SAC ¶ 71), was "positioned to execute on maximizing the value proposition of solar and storage for [their] customers" (SAC ¶ 73), and was "finding sure ways to situate itself to prevail in 2024 and then some" (SAC ¶ 163). SunPower also hired an Executive Vice President and Chief Revenue Officer, stating in a press release that it believed "his leadership will help put SunPower in a strong position to . . . further [its] market leading position in New Homes, and dramatically improve the customer experience." (SAC ¶ 169.) Meanwhile, SunPower assured investors that its January 2023 balance sheet and July 2023 balance sheet were prepared in accordance with generally accepted accounting principles ("GAAP"). (SAC ¶ 179.)

By February 28, 2024, the SEC had initiated an investigation into SunPower's accounting practices. (SAC ¶ 189.) About a month later, SunPower filed a Form 8-K revealing that it had received a standard notice from Nasdaq indicating that SunPower was not in compliance with the exchange's listing rules due to its failure to timely file a Form 10-K with the SEC. (SAC ¶ 174.) The Form 8-K, which was signed by Eby, stated that "[w]hile the Company can provide no assurances as to timing, the Company is working diligently to finalize the Form 10-K and plans to file the Form 10-K as soon as practicable, including to regain compliance with the Listing Rule." (*Id.*)

In April 2024, SunPower issued a second restatement announcement cautioning that "any previously issued or filed reports, press releases, earnings releases, investor presentations or other communications of the Company describing the Company's financial results or other financial information relating to the periods covered by the Affected Financial Statements [*i.e.*, from January 2022 through October 2023] should no longer be relied upon." (SAC ¶ 150.) Plaintiffs allege that the ongoing SEC investigation and this further restatement undermined SunPower's stated commitment to providing updated financial reports.

On June 3, 2024, SunPower drew on the remaining $50 million tranche from Sol Holdings. (SAC ¶ 187.) Plaintiffs allege that on the same day, SunPower released a press statement announcing this development and misleadingly stating that the new infusion of cash "demonstrates the continued support of our majority shareholders in the longterm value proposition of residential solar and SunPower's commitment to operating a financially sound business." (*Id.*) The statement also detailed that "[i]n addition to this funding, in recent months, [SunPower has] worked to reduce overall costs and increase the proportion of our costs that vary with changes in volume as we aim to build a more resilient business that can deliver consistent positive free cash flow in the future." (*Id.*)

On June 27, 2024, Ernst & Young ("EY") resigned as SunPower's independent auditor. (SAC ¶ 188.) EY later disclosed in a July 10, 2024 SEC filing that:

> There was a disagreement between EY and the Company regarding audit scope, specifically regarding [EY's] expectation that we would be informed of allegations against current or former members of management who have or had significant roles in internal control over financial reporting and whose representations we rely upon, or previously had relied upon, in performing our audits, even if those allegations did not expressly assert that there were errors in the Company's financial statements, and that the evaluation of such allegations was within the scope of our audit procedures.

(SAC ¶ 191.) EY further stated that it "became aware that not all such matters had been disclosed to us," though it disclaimed knowledge of whether there have been allegations against current senior members of management. (*Id.*) Citing the nature of EY's resignation, the April 2024 restatement, and the February 2024 SEC investigation, Plaintiffs allege that SunPower's

repeated assurances in May 2024 that it was "working diligently" to restate its financials was false and misleading. (SAC ¶ 84–85.)

In a press release issued simultaneously with the announced resignation of EY on July 3, SunPower stated that it was "working to secure a new independent registered public accounting firm" and that the "development has no material impact on SunPower's current cash position or continued focus on delivering for its customers." (SAC ¶ 192.) Plaintiff alleges that Defendants knew or were reckless in not knowing that this statement was false, given SunPower's rapidly deteriorating financial status in the month following this press release. Two weeks later, on July 17, 2024, SunPower informed suppliers that it would no longer be supporting new leases or power purchase agreements, which meant that SunPower would no longer be acquiring any new customers. (SAC ¶ 227.) Plaintiffs further allege that SunPower informed dealers who sold its systems that it could not support installation of panels that had been delivered but not yet installed. (*Id.*) Following these developments, SunPower's stock plummeted nearly 75% to $0.68, and various news outlets began to weigh in. (SAC ¶ 228.) A July 19, 2024 article published by Forbes.com opined that EY's resignation signaled that "[t]he troubles at SunPower must be beyond the average accounting questions facing these companies." (SAC ¶ 98.) The article also speculated about the Sol Holdings financing deal, stating that "[i]f you put fresh capital into a company on the promise that its accounting issues were being ironed out, then six months later the auditor quits because management wouldn't cooperate, you might perhaps feel like a victim of securities fraud." (*Id.*) On July 22, 2024, a Guggenheim analyst stated that he believed "this effectively marks the end of [SunPower] as an operating business," and that "[c]onsidering the debt that the company has accumulated, we believe that [SunPower's] equity no longer has any value." (SAC ¶¶ 96–97.)

On August 5, 2024, SunPower filed for bankruptcy. (SAC ¶ 18.) By the time of the Chapter 11 filing, SunPower only had $32.6 million in cash—roughly just enough to pay Chapter 11 administration costs. Disclosure Statement at 35, *In re SunPower Corp.*, No. 1:24-bk-11649 (Bankr. D. Del. Sept. 19, 2024), ECF No. 651.

### B. Procedural History

This putative class action was initially filed on October 27, 2023. (Dkt. No. 1.) On January 29, 2024, the Court appointed Lemou and another individual as co-lead plaintiffs (Dkt. No. 38); the other lead plaintiff later withdrew (Dkt. No. 53). On March 29, 2024, Plaintiffs Lemou and Suarez filed the First Amended Complaint, which added new claims regarding SunPower's loan covenants and going concern statements. (Dkt. No. 51.) On August 8, 2024, Gabriel Rodrigues filed a new class action complaint, which mirrored this action but added an expanded class period and incorporated alleged misstatements made after February 2024. Complaint, *Rodrigues v. Faricy*, No. 3:24-cv-04896-RFL (N.D. Cal. Aug. 8, 2024), ECF No. 1. His complaint was later consolidated with this action. (Dkt. No. 78.) Plaintiffs Lemou, Suarez, Rodrigues, and Orr then filed the consolidated Second Amended Complaint on September 25, 2024 with a new Class Period of May 3, 2023 to July 19, 2024. (Dkt. No. 79.)

## II. LEGAL STANDARD

To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

In addition to these plausibility requirements, the allegations here must "satisfy both the pleading requirements of the PSLRA and the heightened pleading standard of Rule 9(b), which requires that the complaint 'state with particularity the circumstances constituting fraud.'" *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1057–58 (9th Cir. 2014). The elements of a Rule 10b-5(b) claim include, among other things, (1) a material misrepresentation or omission, (2) scienter, and (3) loss causation. *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022). To plead falsity, the allegations must "specify each statement

alleged to have been misleading, [and] the reason or reasons why the statement is misleading" and contain particularized allegations of contemporaneous facts showing statements were false when made. 15 U.S.C. § 78u-4(b)(1); *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993–94 (9th Cir. 1999)). To plead scienter, the allegations must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A), which is "an 'intent to deceive, manipulate, or defraud,' or . . . deliberate recklessness." *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1106 (9th Cir. 2021). Deliberate recklessness "is 'an extreme departure from the standards of ordinary care . . . which presents a danger of misleading . . . that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Id.* Lastly, to plead loss causation, "the complaint must allege that the defendant's 'share price fell significantly after the truth became known.'" *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) (internal citation omitted).

Forward-looking statements may be subject to the safe harbor, which exempts from liability a statement that (1) is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or (2) is not "made with actual knowledge . . . that the statement was false or misleading." *Intuitive Surgical*, 759 F.3d at 1058 (quoting 15 U.S.C. § 78u-5(c)(1)).

## III. DISCUSSION

### A. February 2023 statement

Plaintiffs do not adequately allege falsity as to Faricy's February 15, 2023 statement that SunPower's EBITDA guidance was "meant to be conservative" reflecting "some uncertainty in the economy." (Dkt. No. 85 at 1.) Though SunPower allegedly announced in April 2024 that it would have to restate its financials from January 2022 through October 2023, there is no allegation that the restatement was based on a determination that the February 2023 guidance was not in fact sufficiently conservative. Nor have Plaintiffs otherwise alleged facts to support

an inference that the February 2023 guidance was not, in fact, "conservative" based on the available information at the time. Scienter is also inadequately alleged for the same reason: There are insufficient allegations to support an inference that Faricy knew the statement to be false by that early date. [2]

**B. May and August 2023 going concern statements**

Plaintiffs fail to sufficiently allege a claim as to Eby and Faricy's May 2023 statement that "[w]e currently anticipate that our cash and cash equivalents will be sufficient to meet our obligations over the next 12 months from the date of issuance of our financial statements," but adequately allege a claim as to the identical statement made in August 2023.

Multiple FEs reflected that from around 2019 to 2024, SunPower was tight on cash and regularly failed to pay suppliers on time. But these allegations are not sufficient to support an inference that, as of May 2023, Eby and Faricy already anticipated that SunPower would not be able to meet its cash obligations over the next 12 months. The fact that SunPower was alleged to have operated in this cash-strapped state for multiple years without a major liquidation event undercuts both the falsity and scienter prongs of Plaintiffs' claim regarding the May 2023 going concern statement.

Plaintiffs, however, have sufficiently stated a claim as to the same going concern statement when it was made again in August 2023. The Complaint plausibly alleges that by August 2023, SunPower was in a dire cash crunch that went far beyond "spot episodes of illiquidity," and that both Eby and Faricy were well aware of the situation and could not have believed SunPower could continue to meet its cash obligations over the next year. *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

On July 26, 2023, SunPower issued an 8-K announcing various cost-cutting measures and reduced its projected adjusted EBIDTA by more than half. (SAC ¶ 52.) Critically, in July 2023,

---

[2] This claim does not appear in the operative complaints from the initial action or the Rodrigues action and is therefore dismissed on that basis as well. (Dkt. No. 78 (ordering that the SAC "shall not add new claims or allegations not present" in these complaints)).

"key supplier" Maxeon suspended shipments to SunPower after it had failed to pay $29 million in past-due invoices. (SAC ¶ 154.) FE1 confirms that SunPower had "lost [its] contract" with Maxeon after SunPower "missed payments" to the company and that those payments were "probably months" late. (SAC ¶ 110.) Defendants argue that the reason SunPower withheld payment was due to a dispute over whether Maxeon had breached the parties' agreement, not because SunPower lacked the cash to pay. But that does not appear to be the implication of FE1's statement, which observed that SunPower lost the contract after the missed payments. (SAC ¶ 110.) Moreover, SunPower resolved the dispute by issuing Maxeon warrants for 1.7 million shares of its common stock, rather than paying cash. (SAC ¶ 200.) Construing facts in favor of the nonmoving party, the size of the payment and the use of equity rather than cash is enough to infer at the pleadings stage that the loss of the contract was *because* of the missed payments to Maxeon.

The existence of a severe liquidity crisis is further bolstered by events occurring around the time of the August 2, 2023 statement or shortly thereafter: In August or September 2023, Eby and COO Johnston told FE4 to work with suppliers to "delay receipts," described the company as walking a "tightrope" to "piss the least amount of people off" given these cash issues, and stated that "[w]e've got a problem." (SAC ¶ 119.) FE4 described repeated meetings "highlighting the gravity of our financial situation." (*Id.*) In December 2023, SunPower disclosed "substantial doubt exists about [its] ability to continue as a going concern" (SAC ¶ 65), and by February 2024, had obtained a cash infusion from Sol Holdings that SunPower later admitted was a lifeline to stave off "imminent insolvency" (SAC ¶ 171).

Plaintiffs have also adequately alleged that Eby and Faricy were aware of SunPower's escalating liquidity woes. Faricy allegedly attended an "all hands" meeting in the "beginning of summer" 2023 that discussed the need to cut costs and liquidate assets. (SAC ¶ 109.) At or shortly after the time of the statements, which came immediately after losing the Maxeon contract allegedly for nonpayment, Eby was alleged to have been leading meetings describing the company as walking a financial "tightrope" and highlighting the gravity of the situation.

(SAC ¶ 119). That, along with the fact that Eby and Faricy were SunPower's CFO and CEO, respectively, is enough to plausibly allege scienter.

Contrary to Defendants' contention, the August 2023 going concern statement is not exempted under the PSLRA safe harbor provision as a forward-looking statement accompanied by the required risk disclosures. As an initial matter, the Court concurs with Defendants that the statement is forward-looking. Because the statement refers to SunPower's present view of its future ability to meet its financial obligations for the next twelve months, it could be regarded as conveying an "implicit assertion that the goal [of meeting those obligations] is achievable based on current circumstances." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021). But, as the Ninth Circuit has held, that element is "inherent in *any* forward-looking statement," and as such, is not legally sufficient to remove a challenged statement from the category of forward-looking statements. *Id.*

However, the statement fails the second requirement of the safe harbor: that it be "accompanied by meaningful cautionary language that identifies important factors that could cause actual results to differ." 15 U.S.C. § 78u-5(c)(1)(A)(i). Defendants point to language that "actual results" may "differ materially" based on the "'Risk Factors' included in this . . . Form 10Q and our . . . Form 10-K." (Dkt. No. 88-9 at 7; Dkt. No. 88-11 at 8.) Those Risk Factors explain, among other things: "We may be unable to generate sufficient cash flows . . . to fund our operations . . . due to the general economic environment, cost inflation, and/or the market pressure" (Dkt. No. 88-6 at 18); "We cannot assure you that our business will generate cash flows from operations . . . to enable us to meet our payment obligations under our debt and to fund other liquidity needs" (*id.* at 19); and "If our capital resources are insufficient to satisfy our liquidity requirements, . . . we may seek to sell additional equity investments or debt securities or obtain other debt financings" (*id.* at 18).

These disclosures do not constitute sufficiently "meaningful cautionary language," given defendants' allegedly specific knowledge about SunPower's existing inability to meet its financial obligations to Maxeon and the significant likelihood it would be unable to meet its

financial obligations in the near future. "[C]autionary language is not 'meaningful' if it discusses as a mere *possibility* a risk that has already materialized." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 781 (9th Cir. 2023) (emphasis original). In *Glazer,* the defendant Forescout told investors that it "expected the merger to close," after the counterparty Advent expressed concerns about whether closing conditions were satisfied and said it was considering not closing the transaction. *Id*. at 778. Forescout argued that the safe harbor applied because it had simultaneously disclosed "the risk that the conditions to the closing of the transaction are not satisfied or that the transaction is not consummated." *Id.* at 780. The Ninth Circuit, however, held that the disclosure was not "meaningful" because it "amounts to only a boilerplate listing of generic risks and does not mention the specific risk to which [the defendant] had been alerted—the risk that Advent would back out of the merger." *Id.* Though "the risk that Advent would terminate merger proceedings had not yet become an absolute certainty," "Forescout was aware of a significant likelihood that the risk would materialize and did not sufficiently apprise its investors of this development." *Id.* at 781.

The same logic applies here. As detailed above, Eby and Faricy were allegedly aware that SunPower was in a severe liquidity crisis that resulted in SunPower already defaulting on its payment obligations to Maxeon. In that context, the boilerplate risk disclosures did not meaningfully convey the significant risk that had already materialized. "By superficially warning of possible risks while failing to disclose critical facts," Eby and Faricy were allegedly like "someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 315, 318 (S.D.N.Y. 2013) (refusing to apply PSLRA safe harbor when the defendant failed to disclose the company's current liquidity crunch, while simultaneously forecasting a solid liquidity position, because the boilerplate risk disclosures were "insufficient 'in light of the undisclosed hard facts critical to appreciating the

magnitude of the risks described'"). The safe harbor does not immunize such conduct.[3]

**C. October 2023 statements**

Plaintiffs fail to show both falsity and scienter as to Eby and Faricy's October 24, 2023 statement that SunPower is "currently negotiating the terms and conditions of a consent and waiver to address the effects of the Restatement under the Credit Agreement" with the Bank of America. There is no evidence that negotiations were not occurring. Plaintiffs further argue that Eby and Faricy misleadingly omitted the fact that SunPower was already in breach of its financial covenants in the statement. But while later filings in December showed that SunPower had been in breach of its financial covenants as of October 1, 2023, Plaintiffs fail to provide sufficient evidence that Faricy and Eby *knew* about the breach at the time of the October statement, as discussed further below.

**D. Eby's November 2023 statements in investor call**

Plaintiffs have not sufficiently alleged that Eby's statements during the November 1, 2023 investor call were false. In response to an analyst's question about "where [SunPower] stands relative" to the various Credit Agreement loan covenants "today," Eby responded that "we reached on all of those . . . pending final adjustments." (SAC ¶ 131.) The analyst then asked about planned compliance with the covenants "through yearend," to which Eby noted that "[w]e need to get to the final phase" of the restatement because the covenants are "backward-looking." She reiterated that "we're fine in Q3," and "we're talking to the banks about waivers for the restatement and anything else we need." *Id.*

Given this context, Eby's statement that "we reached on all of those . . . pending final adjustments" appears to be a statement about the current status of the financial covenants based on preliminary Q3 reports, not a forward-looking prediction, with caveats, that SunPower will

---

[3] The PSLRA also provides a safe harbor from liability for forward-looking statements not made with actual knowledge that the statement was false or misleading. 15 U.S.C. § 78u-5(c)(1). But Plaintiffs have adequately alleged that the August 2023 going concern statement does not qualify for that safe harbor either because, as detailed above, Eby and Faricy were allegedly aware of the serious liquidity crisis at SunPower and the company's inability to pay millions of dollars owed to Maxeon by that point.

meet those covenants once the reports are finalized. But there is no allegation that the preliminary numbers Eby had prior to the investor call supported an inference that SunPower was already in breach of the covenants. Plaintiffs point to the December 18, 2023 report, which disclosed that SunPower had in fact been in breach since October 1, 2023. (SAC ¶ 133.) That SunPower was ultimately found to be in breach, however, does not demonstrate that the preliminary Q3 reports revealed the breach. *See Johnson v. Costco Wholesale Corp.*, No. C18-1611 TSZ, 2019 WL 6327580, at *17 (W.D. Wash. Nov. 26, 2019) (not misleading where disclosures indicated "the company was merely making a preliminary disclosure" and "was not done with its investigation").

Eby's statement "we're fine in Q3" seems to be a reiteration of her prior statement about reaching all of the covenants pending final adjustments. Thus, as a statement about present circumstances, Plaintiffs' allegations regarding this statement fail on the falsity prong for the same reasons as stated above. And, to the extent that a reasonable investor could understand the statement as a *prediction* that finalized Q3 report numbers will not show a violation of the financial covenants, Plaintiffs' claims are still not viable. There are no allegations demonstrating that Eby knew the adjusted Q3 numbers would reveal a breach. Nor is mere awareness of SunPower's overall financial distress (*i.e.*, the FE allegations, the restatement, the guidance reduction) a sufficient basis for the Court to draw such an inference. The allegations are likewise insufficient to support an inference that Eby was reckless as to the falsity of her statement, since there is no allegation that Eby was aware the preliminary reports she relied on were particularly unreliable or likely to differ materially from the final report.

### E. February to June 2024 statements

None of the allegedly false and misleading statements made between February and June 2024 are actionable. These statements can be grouped into a few distinct categories, which are addressed in turn below.

*First*, Plaintiffs allege that Defendants' statements of optimism about SunPower's

financial future were false and misleading.[4] Most of these statements, however, are vague expressions of optimism constituting inactionable puffery. *See, e.g.*, *In re Cisco Sys. Inc. Sec. Litig.*, No. C 11-1568 SBA, 2013 WL 1402788, at *13 (N.D. Cal. Mar. 29, 2013) (finding statements touting a "strong foundation" and "high probability of gaining market share" to be inactionable puffery). While the statement that SunPower "expect[s] to be cash flow positive in the second half of 2024 and beyond" goes beyond puffery, Plaintiffs fail to adequately allege that this statement is false. There are no allegations supporting the inference that the $125 million cash infusion would not have mitigated SunPower's existing cash flow issues. None of the FEs were tenured at the company at the time of this alleged misstatement, and thus none commented on the effect of the capital infusion on the company's cash position. Moreover, that SunPower eventually declared bankruptcy by August 2024, without further evidence, does not indicate that insolvency was apparent to Defendants in February.

*Second*, Plaintiffs allege that in March and May 2024 Eby and Werner misleadingly stated that SunPower was "working diligently" to finalize its Form 10-K. (SAC ¶¶ 149, 174, 185.) Plaintiffs contend that the ongoing SEC investigation, the second restatement announcement in April 2024, and the circumstances surrounding EY's eventual resignation demonstrate that Eby and Werner's statements were false when made and misled investors about the true state of SunPower's financials. But Plaintiffs fail to adequately allege that SunPower was not in fact "working diligently" to restate its financials and file its Form 10-K disclosures. Nor were Eby and Werner required to disclose disagreements with its auditor or the fact that

---

[4] These statements include Eby and Faricy's February 15, 2024 announcement that SunPower "expect[s] to be cash flow positive in the second half of 2024 and beyond," "SunPower is focused on driving positive free cash flow and profitability," "SunPower is finding sure ways to situate itself to prevail in 2024 and then some," and other statements to the same effect, following the $125 million Sol Holding cash infusion. (SAC ¶¶ 161, 163.) Plaintiffs also allege that the March 14, 2024 press release stating that "we believe [the new Chief Revenue Officer's] leadership will help put SunPower in a strong position to nurture the Dealer Network and expand its reach, further our market leading position in New Homes, and dramatically improve the customer experience" is actionable. (SAC ¶ 169.) Lastly, Plaintiffs point to statements accompanying the June 2024 announcement of the $50 million infusion, including "SunPower's commitment to operating a financially sound business," and "[SunPower's] aim to build a more resilient business that can deliver consistent positive free cash flow in the future." (SAC ¶ 187.)

SunPower was under investigation by the SEC. *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 798 (9th Cir. 2020) (no "obligation to mention" SEC investigation without "an independent duty to disclose").

*Third*, once again citing the second restatement announcement, EY's eventual resignation, and SEC investigation, Plaintiffs allege that on February 15, 2024, Eby and Faricy misleadingly stated that SunPower's 2022 financials were prepared in accordance with GAAP. (SAC ¶ 179.) Plaintiffs further allege Eby and Faricy failed to disclose to Houlihan, who was engaged for the purpose of providing a fairness opinion as to the Sol Holding financing transaction in January 2024, any concerns regarding the accuracy of the 2022 financials. (SAC ¶ 172.) There are no specific allegations, however, indicating that at the time of these statements—months before the April 2024 restatement was announced—Eby and Faricy knew that the 2022 financials were not prepared in accordance with GAAP or were otherwise unsound. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009), *as amended* (Feb. 10, 2009) ("[T]he mere publication of a restatement is not enough to create a strong inference of scienter[.]"); *Rok v. Identiv, Inc.*, No. 15-CV-5775-CRB, 2017 WL 35496, at *14 (N.D. Cal. Jan. 4, 2017), *aff'd sub nom. Cunningham v. Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018) (noisy auditor resignation, without more, was "insufficient to support an inference of scienter").

**F. July 2024 Statement**

Plaintiffs' claim as to the July 3, 2024 press release, which stated that SunPower was "working to secure a new independent registered public accounting firm" and that this "development has no material impact on SunPower's current cash position or continued focus on delivering for its customers," is dismissed because Plaintiffs fail to plead attribution. (SAC ¶ 192.) As the majority of courts in this Circuit have held, corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles. *See, e.g., In re New Century*, 588 F. Supp. 2d 1206, 1224 (C.D. Cal. 2008). Instead, plaintiffs must allege specific facts linking the individual to the statement at issue. *Id.* Here, as Defendants point out,

the July 3, 2024 press release is unsigned and there are no allegations linking any of the Defendants to the press release.

Barring this issue, however, Plaintiffs have sufficiently alleged a claim. The Complaint sufficiently alleges that Defendants knew that the resignation of EY—and the resulting inability to file audited financials—would block SunPower from obtaining additional cash and/or credit to remain solvent, thereby "impact[ing] SunPower's current cash position." Indeed, because SunPower allegedly informed suppliers that it could not fulfill its preexisting obligations two weeks later, and filed for bankruptcy a month later with just $32.6 million in cash left in the bank despite having drawn the $50 million secondary tranche from Sol Holdings, one could reasonably infer that SunPower's cash position *had* been impacted.[5]

The imminency of SunPower's bankruptcy filing and the speculation of various news outlets about the gravity of SunPower's troubles after EY's resignation support a plausible inference that Defendants knew EY's withdrawal would be detrimental to the company's cash position. An article on Forbes.com opined that EY's resignation signaled that "[t]he troubles at SunPower must be beyond the average accounting questions facing these companies." (SAC ¶ 98.) It also wrote that Sol Holdings "might perhaps feel like a victim of securities fraud" because it "put fresh capital into a company on the promise that its accounting issues were being ironed out," and yet "six months later the auditor quits because management wouldn't cooperate." (*Id.*) From these statements, it is reasonable to infer that Defendants knew it was unlikely SunPower would be able to find another willing auditor soon to stave off its increasingly severe cash flow issues, and at the very least, was reckless in stating otherwise.

Defendants argue that the statement was not false because it discussed SunPower's *current* cash position, not its cash position two weeks or a month later, and there is no allegation that SunPower's cash position on July 3, 2024 was impacted by EY's resignation. But a

[5] The fact that Plaintiffs failed to fill in the "Falsity" column in its chart of misstatements (Dkt. No. 85) does not defeat its claim, as they explained their theory as to falsity in the "Scienter" column.

reasonable investor would not construe the statement so narrowly; indeed, such a statement would have little meaning if it were read as such. Rather, seeking a new auditor—and in the interim, lacking an auditor and restated financials—is an ongoing situation, and the most natural reading of the statement is as a comment on the impact to SunPower's cash position in the near future.

### G. Loss Causation

Neither Lemou nor Rodrigues sufficiently plead loss causation. Lemou sold all of his SunPower stock by August 7, 2023 (Dkt. No. 55-1), before "the truth became known." *Corinthian*, 540 F.3d at 1062–65. Lemou asserts that the July 26, 2023 statement of reduced guidance served the required corrective function, but because there are no viable misstatements prior to that date, this argument fails.[6] Similarly, Rodrigues only purchased SunPower stock on February 29, 2024, and there are no viable misstatements after this date. Complaint at 56, *Rodrigues v. Faricy*, No. 3:24-cv-04896-RFL (N.D. Cal. Aug. 8, 2024), ECF No. 1.

Suarez and Orr, however, have adequately pled that SunPower's November 15, 2023 press release corrected the August 3, 2023 going concern statements, such that November 15, 2023 is the date on which "the truth became known." The press release stated that SunPower had entered into an agreement "to settle and resolve" approximately $29 million in past-due invoices, under which SunPower would issue to Maxeon 1,700,000 shares of common stock. (SAC ¶ 200.) This provides a strong indication that SunPower did not have sufficient cash or cash equivalents to meet its obligations as it was resorting to offering equity. Moreover,

---

[6] Defendants also argue that Lemou lacks Article III standing to bring these claims. That argument conflates standing with the merits. While Lemou ultimately fails to state a claim based on the May 2023 going concern statement, and thus fails to adequately allege loss causation, he does have Article III standing. *See Mehedi v. View, Inc.*, 2024 WL 2969982, at *4 (N.D. Cal. June 12, 2024) ("loss causation and the Article III standing analysis" are "distinc[t]" such that where the complaint contains "factual allegations that may establish an injury that is fairly traceable to Defendants' conduct for Article III purposes but are not sufficient to plead loss causation," the lead plaintiff has standing). The Complaint alleges that the July 26, 2023 statement injured Lemou, as SunPower's share price allegedly fell over 20% following the issuance of that statement which allegedly partially corrected the May 2023 going concern statement.

SunPower's share price dropped about 7.3% the next day. (SAC ¶ 201.)

Defendants counter that the November 2023 press release fails as a corrective disclosure because Maxeon disclosed the same facts months earlier. Specifically, Defendants cite an August 10, 2023 earnings call during which Maxeon's CEO revealed that Maxeon had "notified SunPower, in writing, that it ha[d] failed to pay approximately $29 million of past due invoices." (Dkt. No. 51 ¶ 101.) But this disclosure does not capture two critical facts that were later disclosed in the November 2023 press release: that SunPower had agreed to pay a significant amount to resolve the past-due invoices and that SunPower elected to pay in equity instead of cash.

### H. Rule 10b-5(a) and (c) Scheme Claims and Section 20(a) Claims

Defendants' motion to dismiss these claims is wholly derivative of their arguments to dismiss the Rule 10b-5(b) claim, and is granted in part and denied in part on the same grounds explained above.

## IV. CONCLUSION

Although Plaintiffs have had several opportunities to amend their complaint, this is their first opportunity to do so after the Court's analysis of the deficiencies identified above. Accordingly, leave to amend will be granted.

In sum, Defendants' Motion to Dismiss is **DENIED** as to the August 2023 going concern statement and **GRANTED WITH LEAVE TO AMEND** as to Plaintiffs' other claimed misstatements. Because Defendant Werner is not alleged to have participated in the August 2023 going concern statement, which is the sole surviving basis for Plaintiffs' claims, all claims against him are dismissed with leave to amend. Defendants' Motion is further **GRANTED WITH LEAVE TO AMEND** as to Lemou's and Rodrigues's claims as they fail to plead loss causation.

If Plaintiffs wish to file an amended complaint correcting the deficiencies identified above, counsel shall do so by March 27, 2025. The amended complaint may not add new claims or parties, or otherwise change the allegations except to correct the identified deficiencies, absent

leave of the Court or stipulation by the parties pursuant to Federal Rule of Civil Procedure 15.

**IT IS SO ORDERED.**

Dated: March 6, 2025

RITA F. LIN
United States District Judge