**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
Austin P. Van
(*pro hac vice*)
Samantha Daniels
(*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
avan@pomlaw.com
sdaniels@pomlaw.com

[*Additional Counsel on Signature Page*]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE SUNPOWER CORPORATION SECURITIES LITIGATION | Case No.:  3:23-cv-05544-RFL <br><br> <u>CLASS ACTION</u> |
| This Document Relates to: <br><br> *ALL ACTIONS* | **CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

[Additional counsel on signature page]

1

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................... 1

II.     PARTIES….................................................................................................................... 6
        A.      Plaintiffs ............................................................................................................ 6
        B.      Defendants and Relevant Non-Party, SunPower........................................... 6

III.    JURISDICTION AND VENUE ................................................................................. 10

IV.     SUBSTANTIVE ALLEGATIONS .......................................................................... 10
        A.      SunPower's Business ...................................................................................... 10
        B.      Defendants Mislead Investors About SunPower's Financial Health and Financial
                Reporting. ........................................................................................................ 14
                1.      Defendants Mislead Investors About the Company's Financial Health
                        in 2023. ................................................................................................. 15
                2.      Defendants Mislead Investors About Its Financial Health in 2024 and the Sol
                        Holding Transaction............................................................................. 23
                3.      Defendants Mislead Investors About the Impact of Their Auditor's "Noisy"
                        Resignation. ......................................................................................... 32
        C.      Confidential Witnesses Reveal The Truth About SunPower's Dire Financial Health
                In 2023 and 2024. ........................................................................................... 39

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS RELATED
        TO SUNPOWER'S FINANCIAL HEALTH ........................................................... 48
        A.      Assurances in 2023 About The Company's Financial Health and Cash Position ............. 49
        B.      Assurances Related To SunPower's Cash Position in 2024 and The February 2024
                Sol Holding Transaction ................................................................................. 51
        C.      Assurances That The Company's Auditor's Noisy Resignation Will Have No Material
                Impact On the Company's Cash Position ....................................................... 59

VI.     LOSS CAUSATION ................................................................................................... 62
        A.      July 26, 2023 .................................................................................................... 63
        B.      November 15, 2023 .......................................................................................... 63
        C.      December 11, 2023 ........................................................................................... 64
        D.      December 18, 2023 ........................................................................................... 64
        E.      February 15-23, 2024 ....................................................................................... 65
        F.      April 23, 2024 .................................................................................................. 68
        G.      July 3, 2024 ...................................................................................................... 68
        H.      July 17-19, 2024 .............................................................................................. 69

VII.    ADDITIONAL SCIENTER ALLEGATIONS ........................................................ 70

VIII.   CLASS ACTION ALLEGATIONS .......................................................................... 73

IX.     PRESUMPTION OF RELIANCE ............................................................................ 74

X.      NO SAFE HARBOR ................................................................................................. 75

CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ............................................... 76

PRAYER FOR RELIEF ......................................................................................................... 79

JURY DEMAND ...................................................................................................................... 79

i

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## I.    INTRODUCTION

1.    Lead Plaintiff Bezeyem Lemou and Plaintiffs Daniel Suarez and Charles Orr (collectively "Plaintiffs"), by and through their undersigned counsel, respectfully submit this Consolidated Third Amended Class Action Complaint ("Complaint") alleging claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, against Defendants Peter Faricy, Thomas Werner, and Elizabeth Eby ("Defendants").[1]

2.    Plaintiffs bring these claims on behalf of themselves and all persons and entities who purchased or traded SunPower Corporation ("SunPower" "SPWR" or the "Company") securities between May 3, 2023, and July 19, 2024, both dates inclusive, and were damaged thereby (the "Class Period"). This group is referred to as the "Class." Excluded from the Class are Defendants, their families, and their affiliates. Plaintiffs have not named SunPower as a defendant by reason of its bankruptcy filing under Chapter 11 of the United States Bankruptcy Code on August 5, 2024. Plaintiffs allege the following based upon information and belief, except as to those allegations concerning Plaintiffs which are alleged upon personal knowledge. Plaintiffs' information and belief are based upon, *inter alia*, counsel's investigation, which includes a review and analysis of: (1) SunPower's filings with the SEC and in the bankruptcy proceedings; (2) press releases and media reports issued and disseminated by the Company; (3) analyst and media reports concerning the Company; (4) interviews with former SunPower employees; and (5) other public information regarding the Company, including statements made by SunPower executives.

3.    During the Class Period, SunPower and its top executives omitted material information about the deterioration of its financial condition and performance while making affirmative misstatements about its current financial health and its future that artificially inflated the price of SunPower common stock. The risk of financial crisis that the Defendants concealed in failing to

---

[1] By Order dated September 11, 2024 (ECF No. 78), this Court permitted the filing of a Consolidated Second Amended Complaint containing the claims and allegations that are contained in the Initial Action and in the *Rodrigues* action (*Rodrigues v. Faricy et al*, No. 5:24-cv-04896).

1

disclose the truth materialized in falling stock prices as the market recognized, at least in part, the true nature of SunPower's financial health. These misstatements and omissions were motivated by a desire to raise large sums of money employing false pretenses, as drastic changes in the solar market that began in early 2023 resulted in a cash flow crisis. Large sums were indeed raised from investors, who soon thereafter were damaged by the revelation of negative news.

4.      The charade could not last forever. SunPower admitted in mid-2024 that prior statements were inaccurate and unreliable, but only did so after the surprise resignation of its auditor, Ernst & Young ("Ernst & Young," "E&Y," or "EY"). In an event rarely seen in connection with auditor resignations, E&Y made certain disturbing accusations in tandem with its resignation. It was disclosed, among other things, that various allegations against current and former members of management had been withheld from E&Y, leading first to a disagreement regarding audit scope and then later to E&Y's decision to resign. As to the reliability of large numbers of financial statements (and related pronouncements), a SunPower SEC filing dated July 3, 2024 revealed:

> As previously disclosed in the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission (the "SEC") on April 23, 2024, the Audit Committee has previously determined that the Company's (a) audited financial statements included in the Company's Annual Report on Form 10-K/A for the period ended January 1, 2023 (the "2022 Form 10-K/A"), and (b) unaudited financial statements included in the Company's Quarterly Report on Form 10-Q/A for the quarterly period ended April 2, 2023; Quarterly Report on Form 10-Q/A for the quarterly period ended July 2, 2023; and Quarterly Report on Form 10-Q for the quarterly period ended October 1, 2023 (collectively, and together with the 2022 Form 10-K/A, the "Affected Financial Statements"), **should no longer be relied upon** and should be restated due to accounting errors in each of the Affected Financial Statements. ***Similarly, any previously issued or filed reports, press releases, earnings releases, investor presentations or other communications of the Company describing the Company's financial results or other financial information relating to the periods covered by the Affected Financial Statements should no longer be relied upon***. In addition, the report of EY on the Company's financial statements and internal control over financial reporting included in the previously filed 2022 Form 10-K/A should no longer be relied upon.
> (Emphases added).

5.      From the start of the Class Period in May 2023, SunPower exalted its liquidity and financial strength, and bolstered these statements with reckless projections auguring a bright future.

2

But, given the above, it is no wonder that confidential witnesses confirmed that behind the scenes SunPower was in a cash and equity crisis. This cash crisis implicated SunPower's financial covenants that depended on the Company's financial health metrics of liquidity, EBIDTA, and unrestricted cash. While CFO Elizabeth Eby assured the market in November 2023 that SunPower had the financial strength to comply with those covenants, in reality the Company was scrambling to secure waivers of its financial breaches that had occurred on October 1, 2023.

6.    At the same time, while SunPower disclosed that it needed to restate its financials (meaning its report would be late), SunPower framed the problem as one about a non-cash reporting issue rather than about SunPower's true, dire financial health or cash position that would breach multiple financial covenants.

7.    When the truth was revealed about SunPower's lack of cash to pay key suppliers, its going concern warning, its breaches of several financial covenants, and the expensive life raft cast by its parent company vastly diluting SunPower's shares, investors suffered from having relied on SunPower's false and misleading assurances.

8.    On April 23, 2024, Defendants unexpectedly announced the need for yet another restatement, disclosing that the Company had identified misstatements in its fiscal year 2022 financial results—in other words, the Company would need to restate its financials for the ***past two years***— including the improper capitalization of certain costs and misclassification of certain expenses, resulting in an overstatement of the Company's income from continuing operations by \$15 to \$25 million. The Company also revealed that its independent auditor had determined that its previously issued audit reports could no longer be relied upon. Clearly, the Company's Board and executives had concealed major problems in the period leading up to this bombshell announcement.[2]

9.    Then, in what one analyst report referred to as a "horror show" 8-K filing (filed surreptitiously after-market hours on July 3, 2024, before the national holiday), SunPower revealed that its auditor (Ernst & Young) resigned, citing management misconduct in reporting the Company's

---

[2] In addition, on February 26, 2024 and May 24, 2024, SunPower fired its CEO and COO/EVP.

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

financials, and that "information has come to its attention that has made Ernst & Young unwilling to be associated with the financial statements prepared by management." A press release issued on that date falsely reassured investors that: "This development has no material impact on SunPower's current cash position or continued focus on delivering for its customers." In truth and in fact, this development ended SunPower's ability to stop its cash flow implosion, and to properly service customers.

10.     The 8-K issued that day also belatedly revealed that the SEC had issued a subpoena to the Company on February 28, 2024, and that the SEC had been investigating SunPower's accounting, implicating much the same fraudulent scheme, but also now including "aspects of the Company's *revenue recognition practices*, with a focus on the periods covered by the Affected Financial Statements (*i.e.*, the 2022 10-K through the October 31, 2023 10-Q)." Quite surprisingly, however the SEC probe extended to the "Company's fourth fiscal quarter of 2023." These fourth quarter of 2023 numbers, now cast into doubt, factored into the decision of the Company's lenders to provide rescue financing in early February 2024. This SEC investigation, and its broad scope, was concealed from the public by SunPower's executives for months. The SEC investigation should have been disclosed on February 28, 2024 and in every disclosure thereafter that discussed the Company's accounting weaknesses and its financial condition as: (a) the Company's major stockholder—its lender of "last resort"—required as a condition of funding in mid-February 2024 that the Company promise there were no pending or threatened government investigations; (b) the lending agreement containing this pledge was made public on February 13, 2024 but the pledge contained therein was not thereafter updated until July 3, 2024; (c) a February 29, 2024 notice of a delayed Form 10-K filing for 2023 should also have triggered disclosure, as it addressed only some of the reasons the filing was delayed, and did not include the very substantial delay expected to be caused by the SEC probe and its attendant extensive forensic inquiries, as well as the distraction and consternation it caused the outside auditor (who was also subpoenaed); (d) the lending agreement stressed the materiality to the lender of there being no SEC investigation, as it required notice of any such investigation to be delivered to the lender within 5 days of receipt (meaning that the lender would have known of the SEC investigation on or

4

about March 5, 2024);  (e) the existence of this new investigation which now extended to the most recent fiscal quarter threatened the Company's ability to obtain fresh funding; (f) the SEC probe into revenue recognition practices signaled that the Company's accounting problems were potentially wider in scope and more serious than what was otherwise being disclosed and revealed;  (g) the lender declined to supply fresh funds after the SEC probe was revealed; and (h) the SEC probe and the "extensive internal investigation" it triggered were identified by Chief Transformation Officer Henry in a bankruptcy filings as among the "extensive obstacles" facing SunPower in the spring of 2024. Finally, the Company's Form 8-K did not disclose that ***both*** the Company and its *auditor* had received SEC subpoenas.  It would have been important to the public to know that the probe had extended to the auditor's conduct as well, as this would affect the Company's effort to attract any new auditor—a prerequisite to obtaining the fresh funding needed to meaningfully conduct its business, and to avoid bankruptcy.

11.    On July 17, 2024, in what analysts called SunPower's final nail in the coffin, SunPower sent letters to its dealers announcing that it was canceling core operations, including new installations, leases, and shipments—a move one Guggenheim analyst declared "effectively marks the end for SPWR as an operating business. . . SPWR's equity no longer has any value, and our price target is now $0."

12.    These revelations are the product of a prolonged and concerted effort by Defendants to keep investors in the dark about the true state of the Company's business, including its cash position, breaches of financial covenants that powered its now worthless business, and the integrity and accuracy of its financial reporting.  Indeed, Defendants' strategy to avoid detection was to delay issuing financial information, then restating it, and even once restated, acknowledging the need to restate yet again. Like most fraudulent schemes, however, Defendants' gamesmanship finally caught up with it: on August 5, 2024, SunPower was forced to file for bankruptcy.

5

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## II.    PARTIES

### A.    PLAINTIFFS

13.    Lead Plaintiff Bezeyem Lemou, as set forth in his Certification (ECF No. 24-1), purchased SunPower common stock during the Class Period and suffered damages due to Defendants' violations of the federal securities laws alleged herein.

14.    Plaintiff Daniel Suarez purchased SunPower common stock and other securities during the Class Period as set forth in his Certification previously placed on file with the Court (ECF 55-2) and suffered damages due to Defendants' violations of the federal securities laws alleged herein.

15.    Plaintiff Charles Orr, as set forth in his Certification previously placed on file with the Court (Case No. 24-4896, ECF No. 18-1), purchased SunPower common stock and traded options during the Class Period and suffered damages due to Defendants' violations of the federal securities laws alleged herein.

16.    As further alleged herein, options traders were damaged along with common stock purchasers.  For example, buyers of call options and sellers of put options acquired securities at distorted prices, and would have revoked their contracts had they known of the fraud, and/or would have avoided any such transaction, and forced purchase.[3]

### B.    DEFENDANTS AND RELEVANT NON-PARTY, SUNPOWER

17.    Non-party SunPower is incorporated under the laws of Delaware with principal offices located in Richmond, California.  SunPower's common stock traded on the Nasdaq Global Select Market under the symbol "SPWR."  SunPower options also traded on the CBOE options markets during the relevant period.  On August 5, 2024, SunPower filed for protection under Chapter 11 of the United States Bankruptcy Code.  This action is not brought against SunPower.

18.    Defendant Peter Faricy was the Company's Chief Executive Officer during the Class Period until February 26, 2024.  Faricy made and authorized false, misleading and/or omissive

---

[3] *See In re Apple Secs. Lit.,* Case No. 4:19-cv-02033-YGR, Dkt. No. 239, at *4 (N.D. Cal. March 28, 2023) (certifying class in securities fraud case "including purchasers of Apple Inc. call options and sellers of Apple Inc. put options …").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

statements during the Class Period.   Among other things, Faricy signed internal control and SOX certifications attached to the misleading 2022 Form 10-K/A, Q1 2023 Form 10-Q/A, Q2 2023 Form 10-Q/A and Q3 2023 Form 10-Q.

19.     Defendant Thomas Werner has been the Company's Principal Executive Officer since February 19, 2024.  Werner previously served as SunPower's CEO and Chairman of the Board for nearly 18 years from June 2010 to April 2021.  After stepping down as CEO of SunPower, Werner served in board and investor roles at H2U Technologies, Inc., Mainspring Energy, Flo, Wolfspeed, VIA Sciences, and Kanin.  Upon rejoining SunPower, Defendant Faricy praised Werner's "unmatched experience in the solar business and his legacy institutional knowledge" which he characterized as "invaluable" to SunPower.  Werner made and authorized false, misleading and/or omissive statements during the Class Period.  During Werner's prior stint as CEO of SunPower, allegations of accounting manipulation and securities fraud were upheld against him in *In re Sunpower Sec. Litig.*, No. C 09-5473 RS, 2011 U.S. Dist. LEXIS 152920 (N.D. Cal. Dec. 19, 2011).

20.     (a)  Defendant Elizabeth Eby served as the Company's Chief Financial Officer since May 30, 2023.  Eby made and authorized false, misleading and/or omissive statements during the Class Period.  Among other things, Eby signed the misleading 2022 Form 10-K/A, Q1 2023 Form 10-Q/A, Q2 2023 Form 10-Q/A and Q3 2023 Form 10-Q as well as each of the Forms 8-K referenced herein concerning financial operations.[4]   According to the May 15, 2023 press release announcing the appointment of Eby as Chief Financial Officer: "Eby is a seasoned executive who brings more than thirty years of experience in financial strategy, execution and governance at Fortune 50 and publicly traded technology companies.  As CFO, Eby will play a critical role in developing and implementing the Company's strategic growth plan and in leading SunPower's finance organization and activities."  In the press release, CEO Faricy touted Eby's "deep experience in financial operations backed by a strong track record of driving profitability and delivering value creation at best-in-class organizations."

---

[4] Chief Legal Officer, Eileen Evans signed the May 24, 2024 Form 8-K regarding the termination of the Company's Chief Operating Officer.

7

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

He expressed "confiden[ce] that her leadership will be an asset as we continue to scale our business and increase SunPower's market share during this period of high growth for the solar industry."

(b)   Eby had the power and authority to control the contents of company presentations and announcements regarding its cash position, financial status and prospects.  For example:

- On the August 1, 2023 earnings call, it was Eby who addressed the balance sheet; inventory; reasons for a reduction in financial "guidance"; and concluded: "We plan to delay [certain key investments] as we prudently match our cash usage to market conditions." On that same call, CEO Faricy deferred to CFO Eby to analyze and address "cash from operations" in the second-half of the year, and CFO Eby did so.  CFO Eby also stressed, "We have levers to pull particularly as you highlight on working capital…"

- On the November 1, 2023 earnings call, it was CFO Eby who assured listeners that a restatement "does not affect our cash position"; addressed earnings guidance, and "[t]urning to the balance sheet," discussed cash and debt.  The CFO also asserted a purported "improved management of working capital" and a purported "positive cash from operations…"  It was Eby who fielded an analyst's questions about negotiations with lenders and concluded they are "ongoing and productive."  Eby was also called upon to address an analyst's question: "How much do you think you need to work down by year-end to avoid external capital?", and she did so in detail.

- On the February 15, 2024 earnings call, CFO Eby addressed financial results and the balance sheet in great detail, as well as "cost reductions that we put in place where we're going to be consistently free cash flow positive in the second half and beyond that."  She also asserted: "And I think with the restructuring that we announced a couple of weeks ago, we are in a position where most of the cost reduction for the year has been done. We still have some ongoing productivity

8

improvements that we'll be delivering through the year, but the cost reductions have been implemented. So we're looking forward to a much more cash flow positive year this year."  Finally, Eby claimed: "We announced pretty significant savings in OpEx, as well as some moves on our cost of goods sold. And so, the bulk of that work is pretty much done."

(c)  In sum, Eby was the spokesperson and "subject matter expert" on all aspects of costs and the Company's cash position, as affected by various factors, and had power and authority over the presentation of these issues.  When statements regarding such subjects were made in SEC Filings, it was Eby who was called upon to sign them, and verify their contents as true and accurate. As further detailed herein, Eby had power and authority over financial press releases as well, including specifically the press release issued in tandem with the July 3, 2024 Form 8-K.  It was her habit and custom to review and approve the dissemination of financial information.

21.    Defendants Faricy, Werner and Eby are sometimes collectively referred to herein as the "Defendants."

22.    Each of the Defendants:

(a)  Directly participated in the management of SunPower;

(b)  Was directly involved in the day-to-day operations of SunPower at the highest levels;

(c)  Was privy to confidential proprietary information concerning SunPower and its business and operations;

(d)  Was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)  Was directly or indirectly involved in the oversight or implementation of SunPower's internal controls;

(f)  Was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning SunPower; and/or

9

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(g)  Approved or ratified these statements in violation of the federal securities laws.

23.    The acts and statements imputed herein to "Defendants" shall be read to refer to those Defendants in office at the time of such acts or statements.

24.    The allegations below pertain to the potential liability of the non-debtor individual Defendants herein and are not asserted against SunPower in view of the automatic stay.

## III.    JURISDICTION AND VENUE

25.    The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b ) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

26.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Defendants conducted substantial business in this District, and a significant portion of the damages due to Defendants' misconduct were suffered within this District.

27.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.  SunPower's Business

28.    Prior to its bankruptcy, SunPower offered fully integrated solar, storage, and home energy solutions to customers primarily in the United States and Canada through an array of hardware, software, and financing options.  It offered a "Smart Energy" platform designed to add layers of "intelligent control" to homes, buildings, and grids.  The Company provided photovoltaic solar energy generation systems and battery energy storage products.  Its solar solutions were designed for residential customers, with photovoltaic systems that convert sunlight into electricity using semiconducting materials.

29.    SunPower had contracts with various other companies that supplied it with the goods and services necessary to operate its business.  To effectuate these relationships, SunPower entered contracts with its suppliers.

30.    To pay these suppliers, SunPower relied on funds from a variety of debt and credit sources, two of which were a revolver and term loan facility with Bank of America and Bank of the West (the "Credit Agreement") and a loan and security agreement with Atlas Securitized Products Holdings, L.P. (the "Atlas Credit Agreement").

31.    Under both agreements, SunPower had certain financial and reporting covenants with which it was required to comply.  If SunPower failed to comply with those covenants, its counterparties had the right to demand immediate repayment of all outstanding amounts.

32.    As relevant to this case, under Section 7.10 of the Credit Agreement, SunPower was obliged to satisfy four financial covenants.

33.    The first covenant concerned the "Total Net Leverage Ratio," requiring SunPower to "not permit the Total Net Leverage Ratio on the last date of any Test Period to exceed 4.50:1.00."  The Total Net Leverage Ratio is defined as "the ratio of (a)(i) Total Funded Debt as of such date minus (ii) Unrestricted Cash as of such date to (b) Consolidated EBITDA for the most recently ended Test Period." A "Test Period" "means, as of any date of determination, the most recently completed four (4) fiscal quarters of the Borrower . . . in the case of any calculation pursuant to Section 7.10, ended on the last day of the fiscal quarter in question."

34.    The second covenant concerned the "Consolidated Interest Coverage Ratio," requiring SunPower to "not permit the Consolidated Interest Coverage Ratio on the last day of any Test Period to be less than 1.75:1.00."  The Consolidated Interest Coverage Ratio is defined as "the ratio of (a) Consolidated EBITDA to (b) Consolidated Net Interest Charges, in each case, for the most recently completed Test Period."

35.    The third covenant concerned the "Consolidated Asset Coverage Ratio," which required SunPower to "not permit the Consolidated Asset Coverage Ratio on the last day of any

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Test Period to be less than 1.50:1.00." The "Consolidated Asset Coverage Ratio is defined as "the ratio of (a) Adjusted Consolidated Net Tangible Assets to (b) Total Funded Debt, in each case, as of such date of determination."

36.    The fourth covenant was a requirement pertaining to "Minimum Liquidity," requiring SunPower to "not permit Liquidity on the last day of any Test Period to be less than $100,000,000."

37.    Companies and analysts are universally aware of how crucial it is for companies to comply with their lenders' financial covenants: failure to comply with them constitutes an event of default, allowing a lender to cease lending under an agreement and demand immediate repayment of all amounts owed. Companies thus work very diligently to avoid breaching these covenants, as even a single breach risks triggering a doom loop for a company that is cut off from credit and forced to immediately repay all amounts owed.

38.    Separately, under the Atlas Credit Agreement, SunPower is required to deliver its unaudited financial statements within 45 days following quarter end, subject to a 10-business-day cure period.

39.    Like breaches of financial covenants, breaches of reporting covenants are events of default. However, it is known within the industry that lenders are far more willing to waive events of default triggered by breaches of reporting covenants than those triggered by breaches of financial covenants because reporting obligations say less about a company's underlying health than its financial obligations.

40.    Market analysts were aware of these covenants in SunPower's lending agreements.

41.    SunPower faced a perfect storm of challenges in 2023.

42.    *First*, ongoing supply chain constraints that began during the COVID-19 pandemic impeded SunPower's efforts to obtain both physical components and the necessary skilled labor at costs it could afford. SunPower's increased costs harmed its margins.

43.    *Second*, SunPower also struggled in the face of California's new net energy metering program ("NEM 3.0"), approved by the California Public Utilities Commission on December 15, 2022,

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and effective April 15, 2023. Net metering programs allow consumers to earn credits for any excess solar electricity sent to the grid when their solar panel systems generate more power than they need.

44.    While the formulas underlying the new metering program are complex and depend on the specific hour, day, and month, the overall effect of NEM 3.0 was to reduce net metering compensation rates—that is, the compensation for excess power generated by new California solar customers that is fed back into the grid—by *approximately 75 %.*

45.    Because a solar panel system is expensive, compensation rates for excess electricity returned to the grid are a substantial portion of the value proposition for residential solar customers. When that compensation rate was slashed going into 2023, consumers became much less likely to purchase residential solar energy solutions from SunPower or its competitors. Indeed, the adoption of NEM 3.0 threw the solar industry into chaos and rendered the business difficult and highly unpredictable. This was because:

    (a) Customers panicked, rushing to make their solar purchases before April 2023, so that their NEM 2.0 solar benefits could be "grandfathered" prior to the implementation of NEM 3.0;

    (b) NEM 3.0 was specifically enacted to radically scale back the benefits of solar usage to satisfy critics of NEM 1.0 and 2.0 who argued that these arrangements overcompensated solar owners, contributing to concerns about cost-shifting to non-solar customers;

    (c) As a result of NEM 3.0 changes, homeowners expected to experience much higher energy bills and additional years before their investment in solar power was "paid back":

    (d) As one industry executive stated: "There is no way to launch an industry forward by making its products more expensive for consumers. The overwhelming reason customers go solar is to save money. When you take away the ability for consumers to save money it puts a brick wall in front of our whole industry.";[5]

---

[5] Carlos Beccar of Energy Concepts quoted in California Solar Storage assn., "Massive Layoffs, Business Closures, and Loss of Clean Energy Progress Since CPUC Slashed Rooftop Solar Incentives, New Analysis Shows," Nov. 30, 2023, available at: https://calssa.org/press-releases/2023/11/30/massive-layoffs-business-closures-and-loss-of-clean-energy-progress-since-cpuc-slashed-rooftop-solar-incentives-new-analysis-shows.

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(e) Before the implementation of NEM 3.0, business advisory company VECKTA warned: "In a recent unanimous decision, the California Public Utilities Commission (CPUC) voted to eliminate the current net metering regime, known as NEM 2.0. The new rule, NEM **3.0**, eliminates over 75% of the financial incentive.  Gareth Evans, Founder, and CEO of VECKTA says, "Energy provided by our utilities is only going to get more expensive and less reliable. Through a well-designed and contracted onsite energy system you can create a more profitable and sustainable business now and for the long term. The new net metering rule and tariffs will limit your financial upside and you should act now to be legacied in and maximize your financial benefits."[6]

(f) In light of these "NEM 3.0 Headwinds", it would be reckless of any company like SunPower to forecast strong, positive results in 2023.  But, as recounted herein, SunPower did so, with an eye toward raising money to address its cash crisis.

46.    *Third*, SunPower faced challenges related to higher interest rates.  Many of SunPower's customers finance their solar power purchases, either directly through SunPower's in-house finance company, SunPower Financial, or through external sources. No matter the source of the financing, however, economy-wide interest rate increases throughout 2022 and 2023 made borrowing from any source less affordable.  Accordingly, demand from consumers declined.

47.    SunPower thus faced a trifecta of challenges in 2023 that cast a pall over its entire business: in addition to facing higher costs in procuring and supplying solar energy systems, its customers confronted a higher bill for installing new systems and a diminished value proposition for doing so.

**B.    DEFENDANTS MISLEAD INVESTORS ABOUT SUNPOWER'S FINANCIAL HEALTH AND FINANCIAL REPORTING.**

48.    The Class Period begins on May 3, 2023, in the midst of a challenging year for the Company.  During that time, the Company failed to disclose that its financial metrics like liquidity

___

[6] Press release, Jan. 17, 2023, available at:  https://veckta.com/2023/01/17/changes-are-coming-to-californias-net-metering-tariffs-businesses-must-act-before-april-2023-to-take-advantage/

14

were in freefall and edged closer to violating certain critical thresholds contained in financial covenants with its lenders, which violations would give its lenders the right to demand immediate repayment of all amounts owed. It also was plagued by accounting errors and misrepresentations of its financial statements, leaving investors in the dark about the true state of the Company's financial health. As alleged herein, SunPower subsequently admitted in April 2024 that "any previously issued or filed reports, press releases, earnings releases, investor presentations or other communications of the Company describing the Company's financial results or other financial information relating to the periods covered by the Affected Financial Statements [*i.e.*, from January 2022 through October 2023] should no longer be relied upon."

### 1. Defendants Mislead Investors About the Company's Financial Health in 2023.

49. In early 2023, the Company was burning through cash at an alarming rate. To get access to increased credit, Defendants created a remarkably bullish 2023 forecast which appears to have been formulated with one goal in mind: to convince a BOA-led group on January 26, 2023 to extend an additional $100 million in loan availability. The projections were shared with the public just 20 days later, on February 15, 2023. The 2023 full-year guidance included between $125 million and $155 million of adjusted EBITDA based on 90,000 to 110,000 new customers, and adjusted EBITDA per customer before platform investment of between $2,450 and $2,900. According to Defendant Faricy, who introduced this guidance on SunPower's February 15, 2023, Q4 and full-year 2022 earnings call, this EBITDA guidance was "meant to be conservative," reflecting "some uncertainty in the economy…"

50. Unable to back off these projections and conform them to reality, SunPower doubled down on May 3, 2023, and reiterated them during a conference call that day. CEO Faricy stated: "Importantly, we remain confident in our plans to achieve our full year 2023 guidance of between $125 million and $155 million of adjusted EBITDA based on 90,000 to 110,000 new customers and adjusted EBITDA per customer before platform investment of between $2,450 and $2,900." Having achieved its funding goal, and with the Company now facing the "NEM 3.0

Headwinds", the Company withdrew those projections by July 2023. Given the vast impact of the NEM 3.0 Headwinds, the projections were at the outset at least reckless. Nonetheless the market would have placed credence in them, assuming SunPower had special insider knowledge of the market and its customers. But it became clear SunPower had no special immunity to this cataclysmic change, and no basis in fact for it bullish forecasts. As the Class Period wore on, this pattern (bullish statements, obtaining funding, and rescinding those statements) repeated itself with disturbing regularity.

51.    In SunPower's Q1 2023 Form 10-Q issued on May 3, 2023, SunPower again took the opportunity to reassure investors regarding its liquidity and financial strength, claiming, "We currently anticipate that our cash and cash equivalents will be sufficient to meet our obligations over the next 12 months from the date of issuance of our financial statements." Under the circumstances, with the extraordinary NEM 3.0 changes having gone into effect on April 15, 2023, SunPower's projections regarding its liquidity and financial strength could not have been solid, and statements to the contrary were reckless. In truth, the impacts of NEM 3.0 on the solar industry were "devastating [and] far-reaching" in 2023, according to Bernadette Del Chiaro, executive director of the California Solar and Storage Association ("CSSA")—the self-proclaimed largest and oldest clean energy business group. Ms. Del Chiaro described it as "an unfolding downturn and crisis in the California solar industry as opposed to a flash in the pan."[7] In a late November 2023 survey by the CSSA, "70% of residential solar and storage contractors expressed concern about their business outlook" and "nearly 43%—around 300 companies—said it would be difficult to stay in business over the winter." *Id.* According to another publication, *Cal Matters*, "[t]he state's decision has caused consumer demand for residential solar to plummet since the new rate took effect [in April 2023]. Solar companies say they've been shoved to the edge of a cliff, forcing

---

[7] Cited in *Utility Dive*, "California rooftop solar had a tough year following NEM 3.0. Can the industry bounce back?", Jan. 2, 2024, https://www.utilitydive.com/news/california-rooftop-solar-nem-30-outlook/702498/ (last viewed April 14, 2025).

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

them to lay off workers or even shut down."[8]  "The imminent change in payments to customers drove a three-month surge in homeowners applying for solar connections leading up to the [April] deadline.  ***But then came a 90% decline last May [of 2023] compared to May of 2022***, according to state data for areas served by Pacific Gas and Electric, Southern California Edison and San Diego Gas & Electric."  *Id.*  Nonetheless, SunPower allowed its forecasts, which were never realistic, to stay "alive" in the marketplace until the end of July, reassuring investors, and inflating its stock.

52.     On July 26, 2023, the week before it issued its Q2 2023 financial metrics and just five months after originally issuing 2023 guidance, SunPower issued an 8-K with reduced guidance for 2023 and announced cost-cutting measures that included the departure of approximately 140 employees.  Its new 2023 guidance was a dramatic reduction compared to its initial 2023 projections: the Company slashed its projected adjusted EBITDA ***by more than half***, to $55 million to $75 million; it cut its projected new customer count by around 20 percent, to only 70,000 to 90,000 new customers; and cut its projected adjusted EBITDA per customer by over 40%, to only $1,450 to $1,650. It also introduced a projected net GAAP loss of ($31) million to ($1) million.  The approximate impact of NEM 3.0, as reflected in these revisions, would have been known to top SunPower executive son May 3, 2023.  The refusal to withdraw the February 2023 projections and reiterate them in May 2023 was in reckless disregard of the situation at hand.

53.     In response to this news, SunPower's share price fell from $11.59 to $9.23, a drop of over 20%, from July 25, 2023, to July 27, 2023.

54.     Yet again on August 2, 2023, SunPower's Q2 2023 Forms 10-Q again reassured investors that "We currently anticipate that our cash and cash equivalents will be sufficient to meet our obligations over the next 12 months from the date of issuance of our financial statements." But at the time, SunPower even lacked sufficient cash to meet its obligations to its suppliers.  While

---

[8] Cited in *Cal Matters*, "What's happened since California cut home solar payments? Demand has plunged 80%", Jan. 26, 2024, https://calmatters.org/environment/climate-change/2024/01/california-solar-demand-plummets/ (last viewed April 14, 2025).

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Defendants were telling investors in May and August 2023 that the Company had sufficient cash to meet its obligations, SunPower had ceased paying its key supplier of solar panels—Maxeon—months prior to July 2023, and Maxeon, in turn, had stopped shipping solar panels to SunPower.

55.    The tumult with Maxeon was hidden from investors until November 15, 2023, when Maxeon revealed that it had discontinued shipments to SunPower in July because of nonpayment of approximately $29 million of invoices—at the same time SunPower had been telling the public that it had enough cash to meet all of its obligations.  When the falsity of that claim was exposed, SunPower's share price dropped from $4.67 to $4.33, or 7.3% on November 16, 2023.

56.    While Defendants were hiding a liquidity crisis, they also were obfuscating how this financial crisis impacted its financial covenants in its critical credit agreements.  After hours on October 24, 2023, SunPower filed a Form 8-K announcing that the financial statements in the Company's FY 2022 Form 10-K and its Q1 2023 and Q2 2023 Form 10-Qs should no longer be relied upon, and that it planned to restate its financials for those periods in amended reports. The Company described an "overstatement of consignment inventory of microinverter components at certain third-party locations, a material weakness in the Company's internal controls over financial reporting, and ineffective disclosure controls and procedures."

57.    There was one more sentence at the end of that statement:

The Company and Bank of America, N.A., the administrative agent and collateral agent for the lenders (the 'Agent') under the Credit Agreement dated as of September 12, 2022 (as amended by the First Amendment, dated as of January 26, 2023, the 'Credit Agreement'), among the Company, the lenders party thereto from time to time, and the Agent are currently negotiating the terms and conditions of consent and waiver to address the effects of the Restatement under the Credit Agreement.

58.    The October 24, 2023 statement, however, blithely assured investors that SunPower was "negotiating the terms and conditions of a consent and waiver to address the

18

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

effects of the Restatement" on one of its credit agreements.   Defendants did not offer an explanation as to what was meant by "the effects of the Restatement under the Credit Agreement."

59.    On November 1, 2023, a week after SunPower announced the need for a restatement and disclosed that it was in discussions with its lenders regarding the effects of the restatement on its covenants, SunPower reported its preliminary Q3 2023 financial results.  Those preliminary results made clear that even the Company's reduced full-year 2023 guidance was no longer feasible, and SunPower revised it downward again.  SunPower guided an adjusted EBITDA loss of ($35) million to ($25) million based on 70,000 to 80,000 new customers, and adjusted EBITDA per customer of only $600 to $700.  It also projected a net GAAP loss of ($175) million to ($165) million.

60.    On November 1,  2023, the same day, there was an earnings-related conference call.  Peter Faricy, Elizabeth Eby, and investor relations Vice President Michael Weinstein spoke on the Company's behalf.

61.    On that call, investors were understandably concerned about whether revised financial figures resulted in a breach of crucial financial covenants in lending agreements.  A Goldman Sachs market analyst pressed Defendants on whether the Company was currently in breach of any of its four financial covenants, and whether instead the Company would be in compliance with its covenants until the end of the year.  In response, SunPower's CFO Elizabeth Eby misleadingly stated that the Company was "fine" with respect to its covenants in Q3 2023.

> Question – Brian Lee: I know, Beth, you're still working with your creditors on the waivers and what have you, but could you remind us what the actual covenants are? I believe there might be some either minimum cash and/or EBITDA coverage covenants. Could you remind us what those are, where you stand relative to those today?
>
> Answer – Elizabeth Eby: So, the covenant – there is four covenants. One is a net debt-to-EBITDA with all the adjustments of 4.5x, and that's all the non-recourse. If you take out the non-recourse groups, there's a interest coverage and there's a minimum liquidity, not minimum cash, and an asset covenant.
>
> Question – Brian Lee: Okay. And...

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Answer – Elizabeth Eby: And we reached on all of those.

Question – Brian Lee: Yes. And given the...

Answer – Elizabeth Eby: Well, pending final adjustments. But yes.

Question – Brian Lee: Understood. Sorry, I cut you off there. So it sounds like even given the negative EBITDA outlook here that you updated the market on this morning, you still plan to be in compliance with all those covenants through year-end?

Answer – Elizabeth Eby: We need to get to the final phase of they're always the backward looking and we're fine in Q3 and we're talking to the banks about waivers for the restatement and anything else we need.

Question – Brian Lee: Okay.  Understood.  Helpful.

62.    In fact, as of the end of Q3 2023 on October 1, 2023, and well before the November 1, 2023 call, the Company was already in breach of its financial covenants with its lenders.  Accordingly, far from being "fine in Q3," the Company was facing an immediate obligation to repay its loans in full, which would have forced the Company into bankruptcy.

63.    The Company's compliance was not "fine in Q3," and SunPower had not "reached on all of those" financial covenants as of November 1, 2023.  Rather, SunPower later admitted that it was in breach of its financial covenants as of October 1, 2023, the end of SunPower's Q3.  And, in stating that SunPower had "reached on all of those" financial covenants but that nevertheless SunPower was "talking to the banks about waivers for the restatement," Eby gave the false impression that SunPower was seeking waivers only to address its reporting covenants, not the financial covenants related to financial health such as EBITDA or cash that it had purportedly "reached."  On December 18, 2023, SunPower admitted it had been in breach of its financial covenants as of October 1, 2023.  This impression was all the more misleading given SunPower's prior statements touting its sufficient cash position.

64.    Eby was aware of SunPower's precarious financial position when she spoke on the November 1, 2023, earnings call.  She either knew for a fact that the Company was not "fine" with its financial covenants in Q3 2023, or she was severely reckless in stating definitively that the

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Company was "fine" in Q3 2023 if she did not have the numbers to answer the question one way or another. Eby certainly understood that the Company's non-compliance with its financial covenants, and its attendant risk of bankruptcy or other material negative consequences, was material to investors.

65.    Following this November 1, 2023 call, highly sophisticated analysts were also demonstrably misled to believe that the Company was fine on its debt covenants. For instance, on the same day, JP Morgan issued a report stating that "SPWR reported 3Q results" and "[e]ncouragingly, the Company generated positive FCF [free cash flow] during 3Q and appears to be in compliance with debt covenants, though the Company is in discussions with its lenders for a waiver owing to the pending restatement (non-cash) recently announced." (JP Morgan, SunPower Corporation, Nov. 1, 2023.)

66.    SunPower was due to file its Q3 2023 Form 10-Q by no later than November 29, 2023, but on November 13, 2023, SunPower announced that it would not be able to timely file its Q3 2023 Form 10-Q. SunPower explained that it was "working diligently to complete the Restatement," but that to file its Q3 financials by the prescribed due date would require "unreasonable effort or expense."

67.    After trading hours on December 11, 2023, SunPower shocked investors when it filed a Form 8-K announcing that it had entered into an agreement with Bank of America related to breaches of financial covenants contained in the Credit Agreement. In this release, Defendants admitted that SunPower had breached some financial covenants and was anticipating breaching others, without specifying which were which. In pertinent part, in discussing the agreement reached with Bank of America, the Form 8-K stated:

> The Amendment provides for, among other things . . . a temporary waiver until January 19, 2024 . . . of existing and certain anticipated defaults and events of default under the Credit Agreement related to the breach of a financial covenant and a reporting covenant….

68.    On this news, share prices of SunPower dropped $.37 per share, or 7.7%, from the closing price of $4.80 per share on December 11, 2023, to the close price of $4.43 per share on December 12, 2023.

69.    Then, in the morning on December 18, 2023, SunPower filed its financials for Q3 2023, along with restated financials for fiscal year 2022 and the first two quarters of 2023.

70.    In its Q3 2023 Form 10-Q, in connection with its restated financials for prior reporting periods that same day, SunPower stated that it was currently in breach of its financial covenants, and had been as of October 1, 2023, the close of Q3 2023, permitting lenders to demand immediate repayment of loans.  That is, a violation of financial covenants during Q3 2023 was disclosed, contrary to Eby's false statement on November 1, 2023 that the Company was "fine in Q3":

> [A]s of October 1, 2023, we breached a financial covenant and a reporting covenant of our Credit Agreement, dated as of September 12, 2022 (as amended, the "Credit Agreement") [. . .] The breaches created events of default thereunder (the "Existing Defaults"), which enables the requisite lenders under the Credit Agreement to demand immediate payment or exercise other remedies . . . .

> On December 8, 2023 (the "Amendment Effective Date"), the Company obtained a waiver and amendment to the Credit Agreement . . . which provides for, among other things, a temporary waiver until January 19, 2024 of the breaches.

71.    Defendants also issued a "Going Concern" warning telling investors that "unless we [the Company] obtain[s] a full waiver or amendment of the covenant breaches under the Credit Agreement and Atlas Credit Agreement and we are able to raise additional capital," the Company may not have enough funds to continue its business over the next year:

> **Risks Related to Our Liquidity**

> Substantial doubt exists about our ability to continue as a going concern and if we are unable to continue our business, our common stock might have little or no value. Although our financial statements have been prepared on a going concern basis, unless we obtain a full waiver or amendment of the covenant breaches under the Credit Agreement and Atlas Credit Agreement and we are able to raise additional capital, there is a material risk that we will continue to be in breach of our financial

covenants under the Credit Agreement and Atlas Credit Agreement, which may cause future events of default under our other existing debt agreements.

72.    On the news of the Company's announcement of the breach of financial covenants, restatement, and a going concern warning, share prices of SunPower plummeted another $1.92 per share, or over 31%, from the closing price of $6.14 per share on December 15, 2023, to the close price of $4.22 per share on December 18, 2023, damaging investors.

### 2. Defendants Mislead Investors About Its Financial Health in 2024 and the Sol Holding Transaction.

73.    Even still, investors only were now aware of part of the truth, and Defendants continued to mislead investors regarding the true nature of the Company's decline. As investors would learn later, public statements concealed that SunPower was desperate for a lifeline and were intended to foster the impression that the Company was recovering from these setbacks.

74.    In February 2024, Defendants obfuscated SunPower's truly dire financial situation, maintaining a tone of optimism and reassuring investors that the problems it had faced since the restatement were behind it, and SunPower was poised for a strong recovery.

75.    On February 15, 2024, SunPower announced encouraging and optimistic fourth quarter and full year 2023 financial results and an infusion of additional capital. The press release touted:

**SunPower Reports Fourth Quarter and Full Year 2023 Results**

- *Added 16,000 customers in Q4, 75,900 new customers in FY 2023*
- *Reported Q4 revenue of $357 million; FY 2023 revenue of $1.7 billion*
- *Reported Q4 GAAP Net Loss of ($124) million and Adjusted EBITDA of ($68) million; FY 2023 GAAP Net Loss of ($247) million and Adjusted EBITDA of ($84) million*
- *Announced $175 million of additional capital and $25 million of additional revolving debt capacity*

76.    The FY 2024 Guidance also bespoke optimism and did not hint at any further accounting issues:

23

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| FY 2024 GUIDANCE | |
|---|---|
| Net Loss (GAAP) | ($160) million - ($80) million |
| Gross Margin (Non-GAAP) | 17% - 19% |
| Free Cash Flow[1] | Positive in second half 2024 |

77.     "For 2024, we are focused on profitability and free cash flow, and we expect to be cash flow positive in the second half of 2024 and beyond," stated Defendant CFO Eby, regarding the results.

78.     Defendants also announced a recent capital raise came from SunPower's largest stockholder, Sol Holding, LLC ("Sol Holding"):

> On February 14, 2024, the Issuer entered into a second lien credit agreement (the "Second Lien Credit Agreement") with Sol Holding, LLC ("Sol Holding"), pursuant to which Sol Holding provided an approximately $175 million term loan facility comprised of a $125 million tranche that was borrowed on February 14, 2024 (including the cashless roll of $45 million of outstanding revolving loans plus accrued unpaid interest on such loans into Tranche 1 Loans) (the "Tranche 1 Loans"), and a second tranche of up to $50 million of loans (the "Tranche 2 Loans") available to be borrowed upon the satisfaction of certain conditions, including the delivery of a business plan with respect to the use of proceeds of such loans that is satisfactory to the lenders under the Second Lien Credit Agreement.

79.     In the February 15, 2024 press release attached as Exhibit 99.1 to the Form 8-K filed that day, Defendant Faricy lauded the recent capital raise: "With the recent infusion of capital, SunPower is focused on driving positive free cash flow and profitability," said Defendant Faricy, then SunPower's CEO.  "This is a new opportunity for SunPower to reinforce our strong foundation as we continue to navigate an uncertain market in early 2024.  With this funding and industry tailwinds of extended tax credits and lower equipment costs, we believe SunPower is positioned to execute on maximizing the value proposition of solar and storage for our customers."

80.     Then-CEO Faricy emphasized: "With this infusion of extra liquidity and working cash-flow to our monetary record, combined with significant expense decreases, SunPower is finding sure ways to situate itself to prevail in 2024 and then some."  Soon, major brokerages raised their prices targets for SunPower stock, including Susquehanna and UBS.

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

81.    On a conference call held February 15, 2024, Defendants Faricy and Eby also made bullish comments about the Company's business.  Defendant Eby explicitly stated, in response to a question by an analyst, about the Company's crucial "going concern" status: "[W]hile we are still in discussions with auditors and reviewing financial plans, we do not expect at the moment to have a going concern provision in our 10-K that's coming out."

82.    In addition, on the February 15, 2024 earnings call, CFO Eby addressed financial results and the balance sheet in great detail, and "cost reductions that we put in place where we're going to be consistently free cash flow positive in the second half and beyond that."  She also asserted: "And I think with the restructuring that we announced a couple of weeks ago, we are in a position where most of the cost reduction for the year has been done.  We still have some ongoing productivity improvements that we'll be delivering through the year, but the cost reductions have been implemented.  So we're looking forward to a much more cash flow positive year this year."  Finally, Eby claimed: "We announced pretty significant savings in OpEx, as well as some moves on our cost of goods sold. And so, the bulk of that work is pretty much done."

83.    (a) But Defendants Faricy and Eby knew these statements to be false as the additional infusion of capital from Sol Holding was not so transformative so as to give SunPower sufficient runway "to be cash flow positive in the second half of 2024 and beyond."  Nor had sufficient cost reductions "been implemented", as was stated on the call.  Layoffs and a major reorientation of the Company's business were undertaken only a few weeks later, on April 24, 2024, with CEO Faricy asserting: "we need to achieve financial viability, which includes simplifying our business structure, transitioning away from areas where we have been unable to sustain profitable operations, and improving financial controls.  As such, we are moving to a low fixed-cost model that we believe we will be able to better flex when the market is up or down.  Specifically, we are winding down our SunPower Residential Installation (SPRI) locations and closing SunPower Direct sales.  We are also reducing our workforce to better align our business

with our new focus.  With this shift, we will reduce our workforce by approximately 1,000 people in the coming days and weeks."

(b)    In truth, the financing was merely a short-term respite while the Company and its advisors continued to explore new ways of addressing the Company's liquidity crisis.  The Declaration of Matthew Henry, Chief Transformation Officer of SunPower Corporation, In Support of Debtors' Chapter 11 Petitions and First Day Motions (the "Henry Declaration")[9] even describes the Sol Holding financing as "***incremental financing*** [which] allowed the Company to weather near-term challenges" but plainly not enough to provide long-term liquidity or make SunPower cash flow positive in the second half of 2024 and beyond.  Henry Decl. at ¶ 11 (emphasis added).  Rather, CTO Henry observed that "[t]his new money infusion provided the Company with critical liquidity support ***amid ongoing discussions*** with stakeholders regarding a ***potential comprehensive solution***."  Henry Decl. at ¶ 10 (emphasis added); *see also* Henry Decl. at ¶ 45 (emphasizing that the Second Lien Credit Agreement with Sol Holding provided "additional runway to find a more comprehensive solution.").

84.    On February 27, 2024, the Company announced the departure of Peter Faricy as CEO, Principle Executive Officer and Director, and the simultaneous appointment of Thomas H. Werner, the Company's Executive Chairman, as Principle Executive Officer—seemingly closing and then opening a new chapter for SunPower in which more stability and growth would follow.  A press release issue that day quoted Mr. Werner as stating, in relevant part:

> We remain committed to putting safety and our employees first, so that we can continue delivering the highest levels of service to our customers and partners. Importantly, we will also continue to build an even stronger operating discipline as we focus on profitability and achieving positive free cash flow. Now, following the Company's recent capital raise, we look forward to getting back to doing what SunPower does best and building an even more sustainable, resilient, and agile business.

85.    The markets responded favorably, and major brokerages raised their prices targets for SPWR stock, including Susquehanna and UBS.

---

[9] Dkt. No. 9 filed August 5, 2024, in *In re SunPower Corporation, et al.*, No. 24-11649 (D. Del. Bankr.).

86.    On February 29, 2024, shortly after Werner's February 27 elevation, SPWR announced that it filed a Form 12b-25 with the Securities and Exchange Commission to provide notice of the delayed filing of its Annual Report on Form 10-K for the fiscal year ended December 31, 2023.  It stated:

> On February 29, 2024, the Company determined that it was unable, without unreasonable effort or expense, to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2023 (the "Form 10-K") by the prescribed due date. ….
> As a result of the time and effort that was required to complete these [December 18] restatements, the Company required additional time to complete its financial statements preparation and review process for the fiscal year ended December 31, 2023, and was unable to file the Form 10-K by the prescribed due date.

87.    SunPower required additional time to complete its financial statements included in the Company's Form 10-K.  This was purportedly due to the time and effort that was required to complete restatements of the Company's prior period financial statements, which were filed with the SEC on December 18, 2023.  Filing a Form 12b-25 would provide the Company with an automatic extension of fifteen additional calendar days to file the Form 10-K, which was due on February 29, 2024.  SunPower asserted it expected to file the Form 10-K as soon as practicable.  There was no public sign of further accounting trouble at this time.  In truth and in fact, the extension was needed to address the SEC investigation, and to assess the results of an extensive internal SunPower investigation involving forensic accountants.

88.    More positive news followed on March 14, 2024, as SPWR announced:

> SunPower Corp. (NASDAQ:SPWR) a leading residential solar technology and energy services provider, today announced the appointment of residential solar and home energy veteran, Tony Garzolini, as Executive Vice President and Chief Revenue Officer (CRO). In this role, Tony will oversee sales, including the Direct, Dealer and New Homes channels, along with pricing and demand generation.

> "SunPower made great strides to improve our financial footing and we remain laser focused on achieving profitability and cash flow generation. As a part of this imperative, we're pleased to welcome Tony back to SunPower as our first Chief Revenue Officer," said Tom Werner, Executive Chairman of the Board and Principal Executive Officer of SunPower. "With Tony's deep expertise in residential renewable energy and exceptional track record working with our valued network of independent solar dealers, we believe his leadership will help put SunPower in a strong position to nurture the Dealer Network and expand its reach, further our market leading position in New Homes, and dramatically improve the customer experience.

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

89.    Notably, there was no indication that any negative financial news was forthcoming, even though, as Defendants withheld from the market, the SEC had initiated an investigation into Defendants' accounting practices at least as early as January 2024 and had issued subpoenas to **both** the Company and its auditor on or about February 28, 2024.  And, as later revealed in April 2024 and July 2024, all the Company's financial statements and accounting disclosures for the past two years had been compromised by accounting errors, including those supposedly hidden by management, forcing the Company's own auditor to resign given the lack of transparency and alleged gamesmanship and misconduct.  The Company's imminent ceasing of operations and eventual bankruptcy, revealed only months later in July and August 2024, further confirms that SunPower was not poised for a long-term leading market position.  In addition, former employees have confirmed that SunPower was in dire financial health in 2023.

90.    Additionally, on March 19, 2024, The Company filed its definitive Information Statement on Schedule 14C (the "Information Statement") for purposes of Nasdaq Rule 5635(d), approving by written consent the warrant issuance in connection with the Sol Holding financing, and explaining the circumstances of the transaction in detail.  The Information Statement described the transaction as a lifeline to stave off "imminent insolvency."  Information Statement at pp. 12-13.  The Schedule 14C also created the impression that sufficiently reliable financial information had been provided to the Company's financial advisor and its major investors to inspire confidence in its future sound operation, and the veracity of its executives.  However, by the time this document was filed, the SEC subpoena had been received.  The Schedule 14C never mentions it—its disclosure, however, would have placed the Schedule 14C's statements in a very different light.  Disclosure was thus required.

91.    On March 21, 2024, the Company filed a Form 8-K revealing that it had received a standard notice from Nasdaq indicating that as a result of the Company not having timely filed the Form 10-K with the SEC, SunPower was not in compliance with the exchange's listing rules and must submit a plan to regain compliance with the listing rules.  The, Form 8-K, signed by

Defendant Eby, stated that "[w]hile the Company can provide no assurances as to timing, the Company is working diligently to finalize the Form 10-K and plans to file the Form 10-K as soon as practicable, including to regain compliance with the Listing Rule."

92.    Having obtained much-needed financing through the use of false metrics, on April 23, 2024, Defendants unexpectedly announced the need for another restatement, disclosing that the Company had identified misstatements in its fiscal year 2022 financial results—in other words, the Company would need to restate its financials for the *past two years*—including the improper capitalization of certain costs and misclassification of certain expenses, resulting in an overstatement of the Company's income from continuing operations by $15 to $25 million. The Company also revealed that its independent auditor had determined that its previously issued audit reports could no longer be relied upon. Clearly, the Company's Board and executives had concealed major problems in the weeks leading up to this bombshell announcement, including as revealed in July 2024, accounting errors hidden by management, forcing the Company's own auditor to resign given the lack of transparency and alleged gamesmanship and misconduct, and at the time, the SEC had initiated an investigation into Defendants' accounting practices months earlier.

93.    In connection with the April 23, 2024, news, SPWR stated in an SEC filing:

On April 17, 2024, the Audit Committee (the "Audit Committee") of the Board of Directors of SunPower Corporation (the "Company") determined, based on the recommendation of management, that the Company's (i) audited financial statements included in the Company's Annual Report on Form 10-K/A for the period ended *January 1, 2023* filed with the U.S. Securities and Exchange Commission (the "SEC") on December 18, 2023 (the "2022 Form 10-K/A") and (b) unaudited financial statements included in the Company's Quarterly Report on Form 10-Q/A for the quarterly period ended April 2, 2023 (the "Q1 2023 Form 10-Q/A"); Quarterly Report on Form 10-Q/A for the quarterly period ended *July 2, 2023* (the "Q2 2023 Form 10-Q/A"); *and Quarterly Report on Form 10-Q for the quarterly period ended October 1, 2023* (the "Q3 2023 Form 10-Q"), all subsequently filed with the SEC on December 18, 2023 (collectively, the "Affected Prior Period Financial Statements"), *as well as the relevant portions of any communication which describe or are based on such financial statements, should no longer be relied upon. The Company plans to restate, as soon as practicable, the Affected Prior Period Financial Statements.*

In connection with the preparation of its financial statements for the fiscal year ended December 31, 2023, the Company identified misstatements in the audited financial statements for the fiscal year ended January 1, 2023, included in the 2022

29

Form 10-K/A. These misstatements primarily relate to (i) *the capitalization of certain deferred costs that did not qualify for capitalization,* (ii) *the classification of certain sales commissions as cost of revenue rather than sales, general and administrative expense,* and (iii) certain other individually immaterial adjustments. The Company estimates that the impact of the aforementioned adjustments is a decrease to income (loss) from continuing operations before income taxes and equity in earnings (losses) of unconsolidated investees for the fiscal year ended January 1, 2023, in the range of approximately $15 million to $25 million.

At this time, the Company has not fully completed its review, and the expected financial impact of the errors described above is preliminary and subject to change. The Company cannot provide assurance that other errors will not be identified. (Emphases added).
…..
In light of the matters described above, the Company's management has concluded that *a new material weakness* exists in the Company's internal control over financial reporting. The Company's remediation plan with respect to such material weakness will be described in more detail in the Company's amended 2022 Form 10-K/A. (Emphasis added).

94.    Not surprisingly, SunPower shares meaningfully declined after the disclosure of the restatement from $2.14 the day before the announcement to $1.96.

95.    The full extent of SunPower's troubles was still being concealed by Defendants, however.

96.    On May 13, 2024, Defendants issued a Form 12b-25 regarding its inability to file the Company's Q1 2-24 Form 10-Q for the quarterly period ended March 31, 2024 due to the restatement, but reassured investors that the Company was "working diligently and plans to restate the Affected Prior Period Financial Statements and file the 2023 Form 10-K and Q1 2024 Form 10-Q as soon as practicable."  Investors responded favorably to this optimism, driving the stock nearly 60% from the previous close, to $4.39 the following day.  Defendants did not, once again, mention a major impediment to filing the Form 10-K; the ongoing SEC probe, and the attendant forensic investigations.

97.    Likewise, on May 20, 2024, Defendants filed a Form 8-K disclosing SunPower's delisting from Nasdaq due to the Company's inability to file the 2023 Form 10-K and Q1 2024 Form 10-Q by the prescribed date, but repeated its reassurance that "[w]hile the Company can provide no assurances as to timing, the Company is working diligently and plans to restate the Affected Prior

Period Financial Statements and file the 2023 Form 10-K and Q1 2024 Form 10-Q as soon as possible" to regain compliance with Nasdaq listing rules.

98.    Also, on May 24, 2024 Defendants filed a Form 8-K disclosing departure of SunPower's Executive Vice President and Chief Operating Officer Jennifer Johnson.

99.    What Defendants did not reveal is that SunPower's situation was much worse than Defendants were letting on: that the Company had been the subject of a concealed SEC investigation *for nearly four months—since approximately January 2024* and that both the Company *and* its auditor had received SEC subpoenas on or about *February 28, 2024*; that Management and the Audit Committee had withheld disclosure of allegations of wrongdoing by certain current or former members of Management from the Company's outside auditor, E&Y; that E&Y was on the verge of resigning as auditor as a result paralyzing the Company's efforts to complete the restatement and jeopardizing further financings, and finally; that the Company was on the verge of collapse.

100.    As described by CTO Henry, "[d]espite the additional capital secured by the Second Lien Credit Agreement, the Company continued to face extensive obstacles to growth throughout the spring of 2024." Henry Decl. at ¶ 48. For example, CTO Henry noted that in "early 2024, the Company commenced an extensive internal investigation in response to a SEC subpoena issued to the Company and its auditor." *Id.* Then, according to CTO Henry, the Company began winding down its SPRI businesses, conducting extensive layoffs, all while continuing to mitigate concerns and negotiate with its Silo Lenders:

> In an effort to reduce liquidity burn, in April 2024, the Company began winding down its SunPower Residential (SPRI) locations and announced layoffs of approximately 1,000 employees. After announcing the layoffs, SunPower's publicly traded common stock dropped to their lowest recorded price since the Company went public in 2005. In response, a key Silo Lender stopped funding certain Non-Debtor Credit Facilities, as it believed that the conditions precedent to drawing were not satisfied. That same Silo Lender also declined to extend the availability period under one Non-Debtor Credit Facility, while another Silo Lender limited the availability for drawdowns under the same Non-Debtor Credit Facility as a condition to a waiver in connection with the delay in audited financial statements.

Henry Decl. at ¶ 49.

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

101.    Nevertheless, on June 3, 2024, Defendants portrayed a $50 million draw on the Company's term loan as a very positive development.    A press release recounted: "Today's announcement demonstrates the continued support of our majority shareholders in the long-term value proposition of residential solar and SunPower's commitment to operating a financially sound business," said Defendant CEO Werner.    "In addition to this funding, in recent months, we have worked to reduce overall costs and increase the proportion of our costs that vary with changes in volume as we aim to build a more resilient business that can deliver consistent positive free cash flow in the future."

### 3.    Defendants Mislead Investors About the Impact of Their Auditor's "Noisy" Resignation.

102.    On July 3, 2024, however, Defendants' efforts to cast SunPower as a Company poised for recovery substantially crumbled.    On that day, in a filing timed after the markets closed and right before the July 4 holiday, the Company revealed that it had been notified by E&Y on June 27, 2024, of its decision to resign as the independent registered public accounting firm of the Company, effective as of that date.    It was disclosed, among other things, that various allegations against current and former members of management had been withheld from E&Y, leading to a disagreement regarding audit scope and E&Y's decision to resign:

> As a result of EY's resignation, the Company and the Audit Committee have initiated discussions with independent registered public accounting firms to also audit the Company's financial statements for the fiscal year ended December 31, 2023, as well as the Company's restated financial statements included in the 2022 Form 10-K/A (as defined below). EY resigned prior to the completion of the audits for the fiscal year ended December 31, 2023 and the restatement of the fiscal years included in the 2022 Form 10-K/A.

> As previously disclosed in the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission (the "SEC") on April 23, 2024, the Audit Committee has previously determined that the Company's (a) audited financial statements included in the Company's Annual Report on Form 10-K/A for the period ended January 1, 2023 (the "2022 Form 10-K/A"), and (b) unaudited financial statements included in the Company's Quarterly Report on Form 10-Q/A for the quarterly period ended April 2, 2023; Quarterly Report on Form 10-Q/A for the quarterly period ended July 2, 2023; and Quarterly Report on Form 10-Q for the quarterly period ended October 1, 2023 (collectively, and together with the 2022 Form 10-K/A, the "Affected Financial Statements"), should no longer be relied upon and should be restated due to accounting errors in each of the Affected

Financial Statements. Similarly, any previously issued or filed reports, press releases, earnings releases, investor presentations or other communications of the Company describing the Company's financial results or other financial information relating to the periods covered by the Affected Financial Statements should no longer be relied upon. In addition, the report of EY on the Company's financial statements and internal control over financial reporting included in the previously filed 2022 Form 10-K/A should no longer be relied upon.

EY's most recent reports on the Company's consolidated financial statements, for the fiscal years ended January 1, 2023 and January 2, 2022, did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope, or accounting principles, except that EY's audit report on the Company's consolidated financial statements included in the 2022 Form 10-K/A included explanatory paragraphs regarding (i) the Company's ability to continue as a going concern, (ii) the restatement of the Company's consolidated financial statements included in the 2022 Form 10-K/A and (iii) EY's report dated December 18, 2023 noted that they audited the Company's internal control over financial reporting as of January 1, 2023, upon which EY expressed an adverse opinion. During the two most recent fiscal years ended December 31, 2023 and January 1, 2023 and the subsequent interim period preceding EY's resignation, there were no reportable events (as described in Item 304(a)(1)(v) of Regulation S-K under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), except as follows:

1. On April 8, 2024, EY advised the Audit Committee that internal controls necessary to develop reliable financial statements do not exist due to an ineffective control environment.

2. On June 27, 2024, EY advised the Audit Committee that information has come to its attention that has made EY unwilling to be associated with the financial statements prepared by management.

3. In connection with EY and the Company's discussions regarding EY's audits and reviews of the Affected Financial Statements during April 2024 through June 2024, EY advised the Company and Audit Committee of the need to expand significantly the scope of its audit procedures, and that information has come to EY's attention that, if further investigated, may materially impact the fairness or reliability of the Company's financial statements, or cause EY to be unwilling to rely on management's representations or be associated with the Company's financial statements. Given that the Company's process for addressing the restatements of the Affected Financial Statements and preparing its financial statements for the year ended December 31, 2023, remains open, the expansion of the scope of its audit was not completed prior to EY's resignation.

4. In connection with EY and the Company's discussions regarding EY's audits and reviews of the financial statements during April 2024 through June 2024, EY advised the Company and Audit Committee that information had come to its attention that materially impacts the fairness or reliability of the Company's financial statements. Given that the Company's process for addressing the restatements of the Affected Financial Statements and preparing its financial statements for the year

ended December 31, 2023, remains open, the issues raised were not resolved to EY's satisfaction prior to its resignation.

During the two most recent fiscal years ended December 31, 2023 and January 1, 2023 and the subsequent interim period preceding EY's resignation, there were no disagreements (as described in Item 304(a)(1)(iv) of Regulation S-K under the Exchange Act), except as follows:

**EY believes that allegations of misconduct by senior members of management, who had significant roles in internal control over financial reporting and upon whose representations EY relied, were within the scope of EY's audit. The Audit Committee previously had a good faith understanding that its obligations were limited to reporting to EY allegations of misconduct that bore on the accuracy of the Company's financial statements by senior members of management who had significant roles in internal control over financial reporting and upon whose representations EY relied.** The allegations that were the subject matter of discussion between EY and the Audit Committee regarding this reporting obligation do not relate to current senior members of management.

The Audit Committee was prepared to provide broader disclosure and was in discussions with EY concerning the scope of the disclosure obligation at the time of EY's resignation. Accordingly, there was a disagreement between the Company and EY regarding this aspect of EY's auditing scope or procedures at the time of EY's resignation. The Audit Committee has discussed the foregoing matters with EY. The Company has authorized EY to respond fully to the inquiries of any successor independent registered public accounting firm concerning the subject matter of the items described herein. The Company will describe any material weaknesses identified and related remedial measures to be taken as required in its Exchange Act filings. In accordance with Item 304(a)(3) of Regulation S-K under the Exchange Act, the Company provided EY with a copy of the statements set forth in this Item 4.01 prior to the filing of this Current Report on Form 8-K (the "Form 8-K") and requested that EY furnish a letter addressed to the SEC stating whether or not it agrees with the statements made herein and, if not, stating the respects in which it does not agree. EY has not provided its letter as of the time of the filing of the Form 8-K. Accordingly, the Company has requested that EY provide its letter as promptly as possible so that the Company can file the letter with the SEC within ten business days after the date of filing of this Form 8-K. The Company will file such letter by an amendment of this Form 8-K within two business days of receipt.
(Emphases added).

103.    Additionally, the July 3 Form 8-K revealed that the Company had been the subject of an SEC investigation for months, having received a document subpoena on February 28, 2024, relating to accounting matters, including aspects of the Company's revenue recognition practices. The SEC's inquiry extended through the fourth quarter of 2023. The disclosure revealed that "the SEC issued a document subpoena to the Company, which relates to certain accounting matters, including aspects of the Company's revenue recognition practices, with a focus on the periods covered by the Affected

34

Financial Statements and the Company's fourth fiscal quarter of 2023." In connection with the SEC's investigation, the Audit Committee had immediately authorized an internal review conducted by an outside law firm and had sought the assistance of forensic accountant advisors. Defendants had wrongfully concealed from the public for *months* the existence of the material SEC subpoena and the forensic accounting and legal investigation.

### Item 8.01.    Other Events

On February 28, 2024, the SEC issued a document subpoena to the Company, which relates to certain accounting matters, including aspects of the Company's revenue recognition practices, with a focus on periods covered by the Affected Financial Statements and the Company's fourth fiscal quarter of 2023. In response to the SEC investigation, the Audit Committee promptly authorized an internal review, which remains ongoing, conducted by an independent outside law firm, with the assistance of independent forensic accountant advisors. The Company has fully cooperated, and intends to continue to fully cooperate, with the SEC investigation.

104.    The Form 8-K did not disclose however, that the SEC had not just issued a subpoena to the Company, but that it had also taken the more unusual step of issuing a subpoena to SunPower's auditor, E&Y. *See* Henry Decl. at ¶ 48 ("In early 2024, the Company commenced an extensive internal investigation in response to a SEC subpoena *issued to the Company and its auditor*.") (Emphasis added).

105.    A press release issued on that same date, under the supervision of defendants Eby and Werner, and with their approval, falsely reassured investors that: "This development has no material impact on SunPower's current cash position or continued focus on delivering for its customers." In truth and in fact, this development ended SunPower's ability to stop its cash flow implosion, and to properly service customers.

106.    On the first trading day after the July 4 holiday, SunPower's stock sunk to $2.08 on this news.

107.    On July 12, 2024, the Company filed as an exhibit to a Form 8-K, E&Y's response, as directed by the SEC. Notably, E&Y shed further light on the disagreements relating to the failure by the Company and the Audit Committee to disclose certain allegations against *current* or former members of management (*i.e.*, not only former members, as the Company suggested in its July 3 filing)

35

who had significant roles in internal control over financial reporting and whose representations E&Y

relied upon and needed to rely upon:

July 10, 2024

Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549

Ladies and Gentlemen:

We have read Item 4.01 of Form 8-K dated July 3, 2024, of SunPower Corporation (the "Company") and are in agreement with the statements contained in the first through fourth paragraphs, first and second sentences of the seventh paragraph, and first through third sentences of the eighth paragraph therein, except that we have no basis to agree or disagree with the statements of the registrant regarding the Company's discussions with other independent registered public accounting firms contained in the first paragraph therein. We also have no basis to agree or disagree with the statements of the registrant contained in the third sentence of the seventh paragraph and fourth sentence of the eighth paragraph therein.

***We disagree with the characterization of the disagreement as described by the registrant in the fifth and sixth paragraphs therein. There is a disagreement between EY and the Company regarding audit scope, specifically regarding our expectation that we would be informed of allegations against current or former members of management who have or had significant roles in internal control over financial reporting and whose representations we rely upon, or previously had relied upon, in performing our audits, even if those allegations did not expressly assert that there were errors in the Company's financial statements, and that the evaluation of such allegations was within the scope of our audit procedures. After we became aware that not all such matters had been disclosed to us, we communicated the need for the Company and its Audit Committee to disclose them to EY, and we believed there was agreement on this point. However, the discovery of additional such allegations that had not been disclosed to EY indicated that a disagreement existed regarding our auditing scope or procedures.*** We have no basis to agree or disagree with the statements of the registrant regarding the Audit Committee's previous understanding of its reporting obligations to EY or what disclosure the Audit Committee may have been prepared to provide in the future. Finally, given that discussions regarding the completeness of the disclosures to EY were unresolved as of the date of EY's resignation, we disclaim knowledge of whether there have been allegations against current senior members of management.

/s/ Ernst & Young LLP (emphasis added).

108.    Even after this disastrous revelation, Defendants maintained the charade that these

events were not calamitous and endeavored to reassure investors.    A press release issued

simultaneously with the announced resignation of E&Y on July 3, stated that the Company was

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

"work[ing] to secure a new independent registered public accounting firm" and that the "development has no material impact on SunPower's current cash position or continued focus on delivering for its customers" and that "[a]dditional information is available in the Company's latest disclosure."

109.    Then, in an industry note shared by Roth Capital Partners, LLC on July 18, 2024, and other industry contacts, it was reported that on July 17, 2024, SunPower had sent a letter to dealers advising that it would no longer be supporting new leases or power purchase agreements, essentially conceding that SunPower would not be acquiring any new customers, and reflecting doubt as to the Company's ability to continue as a going concern.  A letter to dealers who sell SunPower systems stated it could not support installation of panels that had been delivered but not yet installed:

**SUNPOWER®**

Dear Dealer,

Beginning today, July 17, 2024, SunPower will no longer be supporting new Lease and PPA sales nor new project installations of these financing options.  This decision was not made lightly, and we continue to consider options to support our mutual customers and our collective pipeline of business.

As a result, we will deactivate Lease and PPA offerings from EDDiE, cease countersigning new agreements, and all active unsigned proposals will expire. Additionally, all new shipments and project installations will be halted.

We recognize the gravity of this morning's news and the difficult position you may find yourself in. We continue to explore alternative providers to help transfer sold projects and expect more details from SunPower as soon as possible.

We deeply regret any inconvenience or hardship that this news may cause.

Thank you,

110.    On this news, the Company's stock plummeted nearly 75% to $0.68, making it SunPower's stock's worst week on record according to Dow Jones Market Data.  Indeed, the stock fell 40% July 18, 2024 and 55% on July 19, 2024, the close of the Class Period.

111.    On July 22, 2024, it was reported by various news outlets that SunPower was on the cusp of failing and analysts downgraded the Company to underperform and cut their price targets.

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

112.    "*We think this effectively marks the end for SPWR as an operating business*," said an analyst note from Guggenheim analyst, Joseph Osha. "*Considering the debt that the Company has accumulated, we believe that SPWR's equity no longer has any value*."  Osha said this decision could mark a "winddown process" for the Company, which will likely sell remaining assets and delist its stock. Guggenheim Securities cut SPWR's price target from $1 to zero.  Osha called SunPower's downfall a "sad end for an industry pioneer."

113.    Forbes.com summarized SunPower's woes in a July 19, 2024 article entitled, "Dark Days for SunPower, as Shares Plunge Amid Accounting Scandal":

> According to a letter written by EY, filed with the SEC, the auditor quit in part because it felt internal controls and financial reporting disclosures were not to be relied upon in the past, and they're not sure they can be relied upon now.
>
> *The troubles at SunPower must be beyond the average accounting questions facing these companies*.
>
> There will naturally be implications. Was Sol Holdings induced to throw good money after bad based on fractured financials? *If you put fresh capital into a company on the promise that its accounting issues were being ironed out, then six months later the auditor quits because management wouldn't cooperate, you might perhaps feel like a victim of securities fraud.*

(Emphases added).

114.    Defendants' gamesmanship was forced to come to a screeching halt when, on August 5, 2024, the Company filed for Chapter 11 bankruptcy due to its liquidity crisis and accounting problems.

115.    SunPower's common stock has been delisted from the Nasdaq stock market due to the Company's bankruptcy and failure to comply with Nasdaq's listing rules.

116.    As first announced it in its August 5, 2024 bankruptcy filing: "On July 8, 2024, the Company was informed by the United States Attorney's Office for the Northern District of California (the "USAO") that the USAO had opened an investigation involving SunPower.  On August 5, 2024, the Company received a federal grand jury subpoena seeking documents in connection with the USAO's investigation.  The grand jury subpoena seeks documents similar to those sought by the SEC

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

subpoena, including documents previously disclosed to the SEC. The Company has fully cooperated, and intends to continue to fully cooperate, with the USAO investigation." Company's September 19, 2024 disclosure statement (Bankr. Dkt. # 515, p. 32, fn. 18).

117. As a result of Defendants' wrongful acts and omissions, and the resulting decline in the market value of SunPower's stock, Plaintiffs and the Class (as defined herein) suffered significant losses and damages under the federal securities laws.

### C. Confidential Witnesses Reveal The Truth About SunPower's Dire Financial Health In 2023 And 2024.

118. Former employees confirm that, throughout the Class Period and earlier in 2023, SunPower was in dire financial health.

119. One former employee ("FE1") FE1 worked for SunPower from January 2022 to January 2024 in the Company's financial planning and analysis team, with the title of Finance Manager. In that role, FE1 worked with SunPower's Supply Chain team to "understand all of the inventory, the cost, [and] the P&L [profit and loss statements]." FE1 thus analyzed material costs, reconciled supply chain numbers with what suppliers were reporting, and examined "why costs were increasing or decreasing." FE1 reported to her finance manager, Anita Flores Deremick, who reported to Vice President and Business CFO Sam Lee, and Lee reported to CFO Elizabeth Eby.

120. FE1 said the Company was performing "OK" when FE1 joined in January 2022. But like other solar companies, SunPower was "hit hard" by California's enactment of NEM 3.0, a new net billing tariff that decreased compensation for electricity customers and reduced the value of installing solar panels in the state. The new NEM 3.0 tariff resulted in "demand dropping," such that the Company had not performed well for "a couple of quarters" leading into the middle of 2023. "[CEO] Peter [Faricy] was under a lot of heat for that."

121. Indeed, during the first quarter of 2023 and after, "[t]here is and was a lack of cash on hand at the Company," FE1 explained, and "[w]e had almost monthly meetings from Peter [Faricy] trying to emphasize the importance of getting cash on hand and trying to liquidate some of our material and inventory we had in warehouses." There was a "large emphasis on trying to

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

reduce the amount of inventory" on hand and to "reduce expenses." FE1 stated that "[t]here were a lot of high expenses, so the leadership team, including [Defendant Faricy], they were really zoning in on all of these expenses and costs and trying to understand where we could cut all of the costs," but that such efforts were "hard to do, especially when working with inventory." FE1 elaborated that "[o]ne of the major issues that we as a whole Company were trying to resolve was trying to liquidate material and supplies that we didn't need so we could get cash out of it." "Literally everything you could think of" to reduce costs, "they were trying to do." For example, SunPower ended one of its leases for an office in Richmond, California, and the Company's leadership was no longer allowed to travel unless it was "absolutely necessary" and approved by Faricy.

122.    The fact that the Company was "in big trouble" was also clear around "beginning of summer" 2023 and involved a meeting with Faricy. There were companywide "all-hands" meetings conducted via Zoom and attended by "pretty much everyone" during which SunPower's leadership discussed the need to cut costs and liquidate assets. Then, around Q2 or Q3 2023, FE1 recalled that SunPower "lost [its] contract" with Maxeon, one of SunPower's "major suppliers," after SunPower "missed payments" to the Company. FE1 believes that the payments were "probably months" late—meaning that the nonpayment started many months *before* the official July 2023 cancellation. "It was noted that it [the cancellation] was because of payment issues."

123.    Another former employee ("FE2") told a similar story. FE2 worked for SunPower from January 2019 to August 2023 as a Senior Risk Manager. In that role, FE2 oversaw insurance on behalf of the Company, and FE2 worked with insurers for all parts of the Company, from equipment to operations. FE2 reported to Treasurer and Vice President of Project Finance (and later Interim CFO) Guthrie Dundas.

124.    According to FE2, "[c]ash was always an issue" in 2023. In Q1 2023, for instance, SunPower could not pay its suppliers or insurers on time. In the months leading up to the May Q1 2023 report, FE2 conveyed that the Company was "crunched constantly" for cash, that "[n]othing

just flowed," such that "[t]here was always delays in paying our suppliers and allocating cash to pay suppliers," such that SunPower "never just cut the check"—"[i]t was always, 'Who is most important?'" and needed to be paid now versus who could be paid later. As a result, FE2 "was always having to escalate" bills owed to the Company's insurance providers, often resorting to "beg[ging] someone to pay" the outstanding bills. Given these constant delays, according to FE2, a "handful" of SunPower's insurance suppliers threatened to issue notices of cancellation, or "NOCs" because of the Company's "nonpayment." FE2 communicated the insurers' threats verbally to Interim CFO Guthrie Dundas. For instance, FE2 was responsible for all forms of "business insurance" that SunPower had, including property, workers' compensation, casualty, and "D&O," or directors and officers. FE2 communicated with the brokers and recalled getting calls from them saying, "so and so is threatening to cut you off again"; "my vendors would call and threaten to cut off service because we weren't paying our bills." These payments were behind "hundreds of thousands of dollars." FE2 complained to then-CFO Dundas "about the fact that SunPower wasn't paying" and that insurance suppliers were repeatedly threatening to terminate their service. FE2 also sent emails to SunPower's Treasury department "trying to get them to pay the bills" and communicated that SunPower's insurance suppliers were "threatening a NOC," or notice of cancellation. FE2 would ask Treasury, "'Can you put this to the top of the queue?'" Yet these bills would remain outstanding "and drag on."

125.    Yet another former employee ("FE3") had similar experiences. FE3 worked at SunPower from January 2019 to January 2023 as a Logistics Data Analyst. This role involved tasks related to the logistics and transportation operations of the Company, such as managing the payment process, conducting reporting for month-end transportation accruals, assisting with accounting for support freight, and "data crunching and reports." FE3 reported to the Senior Manager for North American Logistics, Matthew Kavanagh, who reported to the Director of Sales and Operations Planning, Brian Ross.

41

126.    FE3 recounts how SunPower was "tight on cash," which became a "big" issue in 2023.  FE3, who helped manage SunPower's relationships with transportation suppliers, received questions from the suppliers in the months leading up to the May Q1 2023 quarterly report, wanting to know when the Company was going to make payments.  During this timeframe and after, SunPower's transportation suppliers regularly "didn't really get paid on time," which "was a pretty usual thing at the end of each quarter" in 2023, and things got so bad that suppliers "threatened to halt services" if SunPower "failed to pay."  One major supplier did in fact "shut service down," and it took SunPower a "week or two" to tender payment and restart that critical pipeline.

127.    Another former employee ("FE4") worked for SunPower from February 2022 to February 2024 as the Vice President of Supply Chain operations, where FE4 led the entire supply chain department.  FE4 reported to the Executive Vice President of Operations, Derek Kuzak, who reported to CEO Peter Faricy.  FE4 also reported to COO Jennifer Johnston.

128.    According to FE4, SunPower's lack of cash became "apparent" in Q1 2023 and was "caused" by CEO Peter Faricy's decision to "pay down a bunch of debt" in 2022 to "make sure we could get more favorable equity to fund" the "financial services business."  CEO Faricy placed a "big bet on business growth" in 2023.  But that was a risky move, given that solar is a "very volatile" industry.  "One of his shortcomings was—I don't think people grasped the risk profile of the Company and how the infrastructure was poor."  "If you don't have enough cash to sustain operations for several months, which we didn't, you get into dire straits really, really quickly."

129.    FE4 said in Q1 2023, there was no longer "enough cash in the business to continue to pay some of the suppliers."  In Q1 2023, for instance, SunPower hired consulting firm Alvarez & Marsal to "literally manage cash flow."  But still, starting in early 2023, SunPower was having issues paying suppliers "across the entire Company"; almost "every aspect was overdue," and that "at the end of every week," FE4's team would have to ask SunPower's Treasury department, "'Did you make any payments to this account?'"  If the answer was no, the next question was: "When

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

will we be able to make a payment there?" Always, "There was radio silence," FE4 said. And—by the end of 2023—FE4 recalls "we were delinquent on payments to everybody."

130.    According to FE4, "There's no way that [CEO] Peter wasn't aware of the gravity of the payment situation that [CFO] Beth and [COO] Jen on his behalf were trying to navigate." As conveyed by FE4, CEO Faricy and CFO Eby knew about the cash issues but were "very tight-lipped" amount the matter." Throughout these cash problems in 2023, they "continued to say" that they were "not able to tell you when we will have the ability to raise the equity" needed "in order to pay," outstanding bills to suppliers or otherwise. "Everything pertaining to cash was very, very tight-lipped" and kept among "a small group of people."

131.    FE4 was "certain there were a lot of meetings highlighting the gravity of our financial situation" throughout 2023. FE4 indeed was "regularly getting called" into meetings and being asked if Supply Chain "could do more" to "alleviate the cash crunch." FE4 also recalled being pulled into an "ad-hoc" meeting in August or September 2023 with CFO Elizabeth Eby and COO Johnston as SunPower was walking a "tightrope" to "piss the least amount of people off" given these cash issues. The message in the meeting was "basically, 'We've got a problem." CFO Eby and COO Johnston asked FE4 if FE4 could help the Company work with suppliers "to delay receipts."

132.    Former employees also confirmed that this cash crisis persisted (and got worse) throughout 2024.

133.    One former "FE5" worked for SunPower from April 2018 to September 2024, joining first as a Project Manager (until November 2020) and then was promoted to Regional Operations Manager. As a Regional Operations Manager, FE5 was responsible for overseeing all crews, project managers, field supervisors/superintendents, team supervisors and some office staff, akin to a "branch manager." FE5 reported to the Director and Senior Manager, Partner Operations Josh Splinter, who reported to Senior Director, Regional Operations Casey Roybal, who reported to Vice President, Residential Operations Jennifer Pearce. Pearce reported to Chief Operating

Officer Jennifer Johnston, who reported to CEO Peter Faricy and later to CEO Thomas Werner. FE5 left SunPower in September 2024, as the Company had filed for bankruptcy.

134.    FE5 recounted the many cash flow issues impacting the Company from February to July 2024.  In that timeframe, SunPower was still having issues paying subcontractors "for a long period of time," leading it to have to "pause" work sometimes.  In addition, FE5 recalls that SunPower had an "all-hands" meeting led by CEO Peter Faricy to discuss the credit agreement with Sol Holding that SunPower entered into on February 14, 2024.  While the message to employees was that the deal "bolstered" SunPower, FE5 "we knew we were still in trouble" with cash issues.

135.    Indeed, in February and March 2024, FE5 was aware of multiple examples indicating that SunPower was "still in trouble" financially and "still having cash flow issues." "Cash flow stuff was a big deal" that was "affecting literally everything."  For example, SunPower was "four or five months" behind in paying its $50,000-a-month rent on the large North Hollywood office and warehouse where FE5 worked.  FE5 knew this because FE5 remembered "seeing an email from the property manager that I was cc'ed on" stating that SunPower was "four months behind on rent."

136.    Also in the February/March 2024 timeframe, cleaning services at the facility were "paused" by the cleaning company because SunPower had "missed payments."  FE5 recalled that SunPower had a "PO" account that it "could pay against" for the cleaning company.  At some point, SunPower was "a few months behind" paying the cleaning company, at which point SunPower asked if it could pay the balance with a credit card.  But the cleaning company said no, explaining that SunPower was "multiple months" behind and that it was "not going to accept credit card payment."

137.    Additionally, FE5 recalled a specific instance in March 2024 "where the gas cards went down." FE5 recalled how the Company-issued "gas cards"—credit cards used by employees with Company vehicles to pay for gas—"stopped working nationwide" on various days because

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

SunPower "hadn't paid down" its credit card bills, adding that this left the Company "trying to figure out how to get 50-plus vehicles gas." "It was like a huge issue because there's hundreds of employees who had vehicles stuck without being able to put gas in the cars." "It was a huge outrage," FE5 said of the gas issue, adding that "people were emailing HR" to complain. "It was a huge mess," FE5 said, adding that FE5 remembered going to Home Depot to buy Visa gift cards for employees using "petty cash."

138. Regarding these cash issues persisting in February and March 2024, FE5 said the above issues were discussed during "daily meetings" with Senior Director, Regional Operations Casey Roybal. "He [Roybal] would have these daily meetings with us, all the ROMs, going over production estimates for the week," referring to regional operations managers. During the call, which took place on Mondays, participants would "go over install and inspection numbers," and FE5 and others would have to "explain to him" why they missed their numbers.

139. FE5 confirmed these issues were reported to CEO Werner. "He [Roybal] was talking with the CEO," referring to Roybal and CEO Thomas Werner. "My understanding was that he would get on meetings with him and stuff," FE5 said, again referring to Roybal and Werner, adding that Roybal would go over "each office's production numbers daily" with senior leadership. FE5 added that Roybal was a "very vocal" supervisor who "advocates for his team." "Knowing how Casey is, he would probably make a lot of noise about his fleet not having gas," FE5 said, adding that there was a "0% chance" that Werner and other executives "didn't know" about the above issues that were due to SunPower's lack of cash. Prior to CEO Werner's return, Roybal also "had a direct line of communication" with former CEO Peter Faricy, FE5 said.

140. According to FE5, the winding down of SunPower Residential Installation in April 2024 "absolutely" showed that the Company was still in crisis mode. Throughout this period in 2024, there was "definite uncertainty within the Company at the time about SunPower's future"; FE5 recalled one of his supervisors—Senior Manager, Partner Operations Josh Splinter—going on paternity leave at this time and saying, "'Hopefully when I come back, there's a Company.'"

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

141.    FE5 confirmed these cash issues persisted until the bankruptcy in August 2024. When asked if SunPower was having these cash problems at the time of the July 3, 2024, press release, FE5 said, "Yeah. Hell yeah."  FE5 also confirmed that in July 2024 SunPower's finance team notified them that outstanding lease projects "can't be fulfilled."

142.    FE5 conveyed that two weeks after the July 3, 2024, press release, SunPower told employees that "none of the lease projects can be worked on," referring to the large number of existing SunPower installs—some 4,500 out of 5,000—that were leases.  This was because SunPower could no longer fulfill the leases, and there was "no guarantee" that installation partners and dealers would be paid.  This meant that "these lease projects have to be moved to loan or cash."  "We told install partners, 'Don't work on these projects."  Their response was, "'What the hell? We spent money on these designs, permits.'"  FE5 added that the timing of this development aligned with the July 17, 2024, letter SunPower sent to dealers advising them it was no longer taking on certain new customers.

143.    Yet another former ("FE6") had a similar recollection of the cash crisis.  FE6 joined SunPower in December 2023 as a Vice President of Finance, Treasury and Project Finance, a role that involved forecasting and working on other finance projects and left in January 2025.  FE6 reported to CFO Elizabeth Eby.

144.    In that role, said SunPower's cash position was a "constant theme" throughout FE6's tenure with the Company.  "There was the need and the desire for more cash" from the time FE6 started there in December 2023 until the bankruptcy in August 2024.  "I believe everyone was aware that we needed some additional cash."  FE6 had "regular meetings" with CFO Eby "every week or two," during which they discussed issues such as, "'We need to execute some wires to fund payroll or vendors.'"

145.    FE6 also "helped work on" the February 14, 2024, Sol Holding transaction. SunPower's senior leadership—including CEO Peter Faricy, later CEO Thomas Werner and CFO Elizabeth Eby—were "definitely in conversations with Sol Holding on the need for capital," likely

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

during regular Board meetings.  FE6 said that "a big chunk" and "maybe the majority" of SunPower's business was through leases, which was "very dependent on external capital."  FE6 said that even after securing funding from Sol Holding in February 2024, "the big worry then is will we get the next tranche of lease financing?  And if we get the next one, will we get the one after that?"

146.    Another former employee ("FE7") of SunPower from September 2021 to September 2024, who worked as Vice President of Investor Relations, recalled the SEC investigation starting in January 2024, noting that "everybody was told that if they were contacted to give them everything they wanted."

147.    FE7 explained that the resignation of E&Y in June of 2024 made it "very difficult to raise money."  A new auditor would have to "reassess several years of financials to bring it up to speed."  "That's six to twelve months with no financials, which makes it very difficult to raise additional debt just to get through until the ship is righted."

148.    FE7 also noted that the July 3 announcement of EY's resignation via Form 8-K included disclosure of the SEC investigation which had begun months earlier in January 2024.  "With E&Y quitting they had four days to disclose it.  With the SEC they didn't tell people until a few months after the investigation started."  "We ended up disclosing it in the 8-K where we also announced E&Y's resignation."

149.    Another former ("FE8") was a Structured Finance Analyst at SunPower from May 2024 through the Company's bankruptcy in August 2024 was a member of the Capital Markets team charged with "raising capital for our projects."  In that role, FE8 observed the Company's inability to raise capital from "big banks and insurance companies" that had already invested in SunPower.  As FE8 explained, the goal of his Capital Markets team was not to raise capital for the "daily operations of the business," but to "raise debt and equity capital from banks and different investors" to finance loans for purchased solar systems.  FE8 noted that "a company like SunPower does need constant financing.  Every time you make a lease or a loan, you need somebody to

47

purchase it." But, as FE8 noted, "We had not issued financial statements for quite a few months." "It was certainly tough to raise new capital. In fact, we did not raise any new capital because we hadn't issued financial statements."

150. And another former ("FE10")—who worked for SunPower from November 2006 to August 2024 as a Senior Director of Sales Americas, New Homes and Vice President of Sales, New Homes—confirmed the cash crisis persisted in June through July 2024. In June 2024, and at the time of the July 3, 2024, press release, "it was clear that the Company was still having cash problems." Indeed, at the time, the Company "was not paying our vendors," and was "probably just barely making payroll." FE10 stated that SunPower was not paying a "number of different suppliers," including manufacturers and installers, causing SunPower to build up "substantial debt." FE10 knew about the Company's failure to pay vendors because FE10 worked with those companies and "was dealing directly with the issues" of non-payment. FE10 reported to a number of different supervisors, including Senior Vice President, Sales and Revenue Operations Patrick Bigatel; Executive Vice President of Sales June Sauvaget; and Vice President of Sales, Residential (and later, Chief Revenue Officer) Tony Garzolini.

151. FE10 also conveyed how the auditor's resignation would impact the Company's cash position. Before the public announcement on July 3, 2024, there had been "rumors" within SunPower "for months" that the Company was "struggling completing audits." FE10 was able to figure out that E&Y was not going to sign off on SunPower's financials because of "ongoing questions being asked of different divisions" within SunPower to which "EY had not secured responses." FE10 related how "without having audited financials, our ongoing liquidity was pretty suspect."

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS RELATED TO SUNPOWER'S FINANCIAL HEALTH

152. Throughout the Class Period, Defendants misrepresented the Company's key financial metrics critical to financial health, including the strength of the financial metrics on which

compliance with the Company's financial covenants rely, the Company's liquidity strength, and the accuracy and integrity of the Company's financial reporting.

**A. Assurances In 2023 About The Company's Financial Health and Cash Position**

153.    In SunPower's Q1 and Q2 2023 Form 10-Q filed on May 3, 2023 and August 2, 2023, Defendants took the opportunity to reassure investors regarding the Company's cash position, claiming: "*We currently anticipate that our cash and cash equivalents will be sufficient to meet our obligations over the next 12 months from the date of issuance of our financial statements.*"

154.    The Q1 and Q2 statements that "[w]e currently anticipate that our cash and cash equivalents will be sufficient to meet our obligations over the next 12 months" were false and omitted material information.

155.    At the time of both statements, SunPower did not have "cash and cash equivalents," and did not anticipate having such "sufficient to meet [its] obligations over the next 12 months." Rather, starting in Q1 2023, as reported by former employees, SunPower *already* lacked sufficient cash to pay many vendors and suppliers, forcing notices of cancellation and causing a scramble for cash felt throughout the Company by the employees faced with paying (and putting off) mounting bills and obligations.  Key supplier Maxeon had suspended shipments to SunPower starting in July 2023 because SunPower had fallen months behind on payments.   On November 15, 2023, SunPower and Maxeon, the primary supplier of SunPower's photovoltaic modules, both released press releases announcing that they had entered into an agreement to settle and resolve disputes related to their contract.  Maxeon stated that it had suspended shipments to SunPower in July 2023 because SunPower had seriously fallen behind on payments—SunPower had failed to pay approximately $29 million of past due invoices. Accordingly, SunPower had been unable to pay its invoices to its key supplier for *months prior* to July 2023, and thus misled investors when it stated in its May and August 2023 quarterly reports that it anticipated that it had sufficient cash and cash equivalents to meet its obligations over the next 12 months.  Former

employees confirm that by the time Maxeon had canceled the contract in July 2023, the Company had been delinquent for months before that time (and thus before the May 2023 statement).

156.    That these cash statements were false and misleading is further revealed by the closely followed "going concern" warning issued later in the year in December 2023 and the resort to several expensive life rafts to raise equity that significantly diluted shareholder value in early 2024—a series of events unable to stave off the Company's imminent bankruptcy.

157.    The statements were also false and misleading because, as alleged herein, SunPower subsequently admitted in April 2024 that "any previously issued or filed reports, press releases, earnings releases, investor presentations or other communications of the Company describing the Company's financial results or other financial information relating to the periods covered by the Affected Financial Statements [i.e., from January 2022 through October 2023] should no longer be relied upon."  As later revealed in April 2024 and July 2024, all the Company's financial statements and accounting disclosures for the past two years had been compromised by accounting errors, including those supposedly hidden by management, forcing the Company's own auditor to resign given the lack of transparency and alleged gamesmanship and misconduct.

158.    Similarly, on a conference call held on May 3, 2023, Defendant CEO Faricy stated: "***Importantly, we remain confident in our plans to achieve our full year 2023 guidance of between $125 million and $155 million of adjusted EBITDA based on 90,000 to 110,000 new customers and adjusted EBITDA per customer before platform investment of between $2,450 and $2,900***."

159.    This misleading and falsely bullish guidance was, at minimum, reckless.  At the time, as reported by former employees, NEM 3.0 Headwinds began in early 2023 and resulted in demand dropping and exacerbated the serious cash issues plaguing the Company.  Indeed, at the time, as those formers related, SunPower *already* lacked sufficient cash to pay many vendors and suppliers, forcing notices of cancellation and causing a scramble for cash felt throughout the Company by the employees faced with paying (and putting off) mounting bills and obligations.

That this guidance was at minimum reckless is further confirmed by the Company withdrawing those projections only two months later, in July 2023. Given the vast impact of the NEM 3.0 Headwinds, the projections were at the outset at least reckless.

## B. Assurances Related To SunPower's Cash Position in 2024 And The February 2024 Sol Holding Transaction

160. In February 2024, Defendants were withholding from investors SunPower's truly dire situation, maintaining a tone of optimism and reassuring investors that the problems it had faced since the restatement were well in hand and SunPower was poised for a strong recovery.

161. On February 15, 2024, SunPower announced encouraging and optimistic fourth quarter and full year 2023 financial results and an infusion of additional capital from its majority shareholder, Sol Holding.

162. "*For 2024, we are focused on profitability and free cash flow, and we expect to be cash flow positive in the second half of 2024 and beyond*," stated CFO Defendant Eby, regarding the results.

163. During a conference call held February 15, 2024, Defendants CEO Faricy and CFO Eby also made bullish comments about the Company's business.

164. In his opening remarks, Defendant Faricy stated: "*With respect to cash flow, we are guiding to be cash flow positive for the second half of the year as lower inventory, lower inventory costs, and reduced OpEx all kick in. We are also guiding to continue this trend to be cash flow positive for 2025 as well*."

165. In response to an analyst question as to the use of the "new capital" from Sol Holding, Defendant Faricy stated: "*And then on the capital piece, we really believe, as I mentioned earlier, that the capital provided puts us in a position to meet our 2024 business plan and get to a point that we're developing –we're delivering free cash flow and positive cash flow in the second half of the year*. Beth, do you want to add any comments to that as well?," to which Defendant Eby reiterated: "Sure. The objective, as Peter mentioned, is that we put in a conservative 2024 plan, and that does still

51

get us with the cost reductions that we put in place *where we're going to be consistently free cash flow positive in the second half and beyond that*."

166.    Indeed, in response to a question by an analyst about if "this [Sol Holding] funding that you announced this morning, will that definitively remove the going concern language in your financials and what's the path there?" Defendant Eby explicitly stated: "*[W]hile we are still in discussions with auditors and reviewing financial plans, we do not expect at the moment to have a going concern provision in our 10-K that's coming out*."

167.    On this conference call, Defendant CEO Faricy continued to mislead analysts about the impact of this Sol Holding capital raise and the state of the business's financial health.

Question – Evercore ISI Analyst James West:  Peter, I'm curious, wonder maybe if you could provide some context around the recent capital commitments that were made, particularly with [Sol Holding] … and kind of how that all came together. Just kind of thinking through their level of support because it's obviously pretty clear that there's a lot of support for SunPower and I just wanted to get a little more color.

Answer – CEO Peter Faricy:  Yes. Thanks, James.  So I think the number one question on the minds of shareholders and investors has been our liquidity, appropriately so. And so, most of the reports, I think, that I've read or that came out last year thought that SunPower needed something on the order of $100 million to get liquidity back in order.  So I guess the first thing I'd put in perspective is the $200 million capital commitment is we're pleased, I guess is the way to say it. *We're pleased at that level of capital commitment because I think that puts us in a position to have the liquidity we need to execute against our business plan this year.  And a big part of the business plan, as I mentioned in my opening remarks, is getting us to cash flow positive and getting us back on this positive trail*.

And then I think as you point out, the second part of this that is a very big deal is that, you're looking for signals from your majority shareholders.  [Majority shareholders] Total Energies and Global Infrastructure Partners [i.e., Sol Holding] are two of the most successful companies and investors in the energy space globally.  And when they put their capital behind something, it's after a lot of due diligence and a lot of homework and a strong belief in the future of the Company.  So I really believe the second message here, besides the fact that $200 million is a very big number, is just the fact that they're committed to the future of the Company.

52

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

168.    On the same earnings call, CFO Eby addressed financial results and the balance sheet in great detail, and "cost reductions that we put in place where *we're going to be consistently free cash flow positive in the second half and beyond that*."  She also asserted: "***And I think with the restructuring that we announced a couple of weeks ago, we are in a position where most of the cost reduction for the year has been done.  We still have some ongoing productivity improvements that we'll be delivering through the year, but the cost reductions have been implemented.  So we're looking forward to a much more cash flow positive year this year***."  Finally, CFO Eby claimed: "We announced pretty significant savings in OpEx, as well as some moves on our cost of goods sold.  And so, the bulk of that work is pretty much done."

169.    These statements were false and misleading.

170.    As confirmed by CTO Henry, Defendants knew this financing would merely provide a short-term respite while the Company and its advisors continued to explore new ways of addressing the Company's liquidity crisis.  As described by CTO Henry, the Sol Holding financing was "***incremental financing*** [which] allowed the Company to weather near-term challenges" but plainly not enough to provide long-term liquidity or make SunPower cash flow positive in the second half of 2024 and beyond.  Henry Decl. at ¶ 11 (emphasis added).  Rather, CTO Henry observed that "[t]his new money infusion provided the Company with critical liquidity support ***amid ongoing discussions*** with stakeholders regarding a ***potential comprehensive solution***."  Henry Decl. at ¶ 10 (emphasis added); *see also* Henry Decl. at ¶ 45 (emphasizing that the Second Lien Credit Agreement with Sol Holding provided "additional runway to find a more comprehensive solution.").

171.    In addition, far from "expect[ing]" this influx of cash to render the Company "cash flow positive in the second half of 2024," multiple former employees working at SunPower during this timeframe confirm the Company was in a dire liquidity crisis that this influx of capital would not (and could not) solve.

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

172.    And, undisclosed to investors, after this lifeline from Sol Holding, the Company would not have access to any more credit to support "positive cash flow" over the next 12 months given that the breaches of its financial and reporting covenants precluded new draws on existing or future credit.  In a sworn declaration from the Company's Chief Transformation Officer, "[w]hile this incremental financing allowed the Company to weather near-term challenges, the Company was also affected by delays in filing certain of its financial reports," which blocked access to any capital that could provide "a comprehensive long-term liquidity and business solution." Bkt Dkt. No. 9, ¶¶ 10-12.  Formers also convey how it was clear the Company was out of options for any further capital raises given the Company's frozen credit agreements from financial-covenant breaches and the lack of financial statements that would bar access to more credit.

173.    That these statements were false and misleading is further revealed by the Company's imminent ceasing of operations and eventual bankruptcy, revealed only months later in July and August 2024.  Indeed, at the time of the Company's August 5, 2024 Chapter 11 filing, SunPower had a scant $32.6 million in cash—roughly just enough to pay Chapter 11 administration costs.  Bk. Dkt. 651 at 28.  And by June 2024, Defendants already were pulling the second and final loan tranche of $50 million.

174.    But Defendants Faricy and Eby knew these statements to be false as the additional infusion of capital from Sol Holding was not so transformative so as to give SunPower sufficient runway "to be cash flow positive in the second half of 2024 and beyond."  Nor had sufficient cost reductions "been implemented", as was stated on the call.  Layoffs and a major reorientation of the Company's business were undertaken only a few weeks later, on April 24, 2024, with CEO Faricy asserting: "we need to achieve financial viability, which includes simplifying our business structure, transitioning away from areas where we have been unable to sustain profitable operations, and improving financial controls.  As such, we are moving to a low fixed-cost model that we believe we will be able to better flex when the market is up or down.  Specifically, we are

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

winding down our SunPower Residential Installation (SPRI) locations and closing SunPower Direct sales.  We are also reducing our workforce to better align our business with our new focus. With this shift, we will reduce our workforce by approximately 1,000 people in the coming days and weeks."

175.    Also, as later revealed in April 2024 and July 2024, all the Company's financial statements and accounting disclosures for the past two years had been compromised by accounting errors, including those supposedly hidden by management, forcing the Company's own auditor to resign given the lack of transparency and alleged gamesmanship and misconduct.

176.    While Defendants were meeting on a near daily basis during January and February 2024 to close the financing transaction with Sol Holding, Defendants simultaneously were meeting with SunPower's auditor and preparing its 10-K annual report—due to be filed a mere *two weeks* after the transaction was announced—where (unknown to investors) Defendants had identified misstatements and material deficiencies in the Company's disclosure controls and internal controls over financial reporting that could not pass its auditor's scrutiny, and would delay the 10-K and force yet another restatement.  That Defendants were aware of this inevitable outcome is further confirmed by the undisclosed SEC investigation into the Company's "accounting practices" ongoing at the same time.

177.    Indeed, one former employee confirmed that Defendants knew of the SEC investigation at least as early as January 2024.  SunPower's executives would have known of an informal SEC investigation by late 2023 or early 2024, well before the February 28, 2024 formal subpoena.  Formal subpoenas follow, usually by a period of 60 days, an informal inquiry known as an MUI, or "Matter Under Investigation" during which companies work voluntarily with the SEC by responding to informal document requests and interviews.  *See* Baker Hostetler, An Offer You Can't Refuse: Best Practices for Responding to SEC 'Voluntary' Requests, June 25, 2021.

178.    On March 19, 2024, the Company filed its definitive Information Statement on Schedule 14C for purposes of Nasdaq Rule 5635(d), approving by written consent the warrant

issuance in connection with the Sol Holding financing.  The Information Statement characterized the transaction as a lifeline to stave off "***imminent insolvency***."  Information Statement at pp. 12-13.  According to the Information Statement, on January 6, 2024, the Company engaged Houlihan for the purpose of rendering a written opinion as to whether the Sol Holding financing transaction was fair to SunPower's stockholders from a financial point of view.

179.    According to the Information Statement, "[n]othing came to Houlihan's attention in the course of this engagement which would lead it to believe that (i) any information provided to Houlihan or assumptions made by Houlihan were insufficient or inaccurate in any material respect or (ii) it was unreasonable for Houlihan to use and rely upon such information or make such assumptions."  In other words, neither Management, nor the unnamed members of the Special Committee[10] which surely included members of the Audit Committee, apprised Houlihan of any inquiries, investigations, or ongoing concerns regarding the accuracy of 2022 financials.

180.    In order to obtain the February 14, 2024 Sol Holding Financing agreement, covenanted as follows in Section 5.05 at pp. 64-65 (emphasis added):[11]

(a)    ***The audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries for the fiscal year ended January 1, 2023***, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year of the Borrower and its consolidated Subsidiaries, including the notes thereto, (i) ***were prepared in accordance with GAAP*** consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) ***fairly present the financial condition of the Borrower and its consolidated Subsidiaries as of the date thereof and their results of operations, cash flows and changes in shareholders' equity for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein***; and (iii) ***show all material indebtedness***

---

[10] The Information Statement references the formation of the Special Committee on January 12, 2024 to "among other things, review, investigate, consider, evaluate and negotiate and determine the terms of any financing proposal received by the Company."  Information Statement at p. 6.  It does not identify the members of the Special Committee, merely averring that it "consist[s] solely of independent and disinterested directors who are not affiliated with Sol Holding, LLC or its affiliates."  *Id.*

[11] https://www.sec.gov/ix?doc=/Archives/edgar/data/0000867773/000086777324000015/spwr-20240214.htm

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*and other liabilities, direct or contingent, of the Borrower and its consolidated Subsidiaries as of the date thereof, including liabilities for Taxes, material commitments and Indebtedness*.

(b) *The unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries dated July 2, 2023*, and the related consolidated statements of income or operations, shareholders' equity and cash flows for the fiscal quarter ended on that date (i) *were prepared in accordance with GAAP consistently applied throughout the period covered thereby*, except as otherwise expressly noted therein, and (ii) *fairly present the financial condition of the Borrower and its consolidated Subsidiaries as of the date thereof and their results of operations, cash flows and changes in shareholders' equity for the period covered thereby*, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c) The projected consolidated balance sheets, statements of operations and cash flows for the Borrower and its Restricted Subsidiaries and any other projections and budget that have been delivered to the Administrative Agent *were prepared by the Borrower in good faith and were based on assumptions that the Borrower believed were reasonable when made*, it being understood, that actual results during the periods covered thereby may differ from the projected results.

(d) Since *the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.*

(e) *Neither the Borrower nor any of its Restricted Subsidiaries has, on the Closing Date, any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments in each case that are material and would need to be disclosed on financial statements in accordance with GAAP*, except (i) as referred to or reflected or provided for in the financial statements described in this Section 5.05, (ii) as set forth in Schedule 5.05, or (iii) as otherwise permitted pursuant to this Agreement.
(Emphases added).

181.    Defendants misrepresented both SunPower's current cash reserves and its access to more ready capital by failing to disclose that the restated financials it used to procure this lifeline were false and did not "fairly present the financial condition of the Borrower."

182.    Contrary to the aforementioned covenants that SunPower's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), Defendants had

employed qualitative accounting practices inconsistent with GAAP, requiring the restatement. Indeed, adhering to GAAP ensures that financial information is consistently and accurately reported, and Defendants failed miserably in this regard.

183. Thus, Defendants issued assurances in connection with the huge Sol Holdings financing as to the January 1, 2023 financials and the July 2, 2023 financials that were simply untrue. To put a fine point on the matter, while Management and the Special Committee were meeting on a near daily basis during January and February 2024 to close the financing transaction with Sol Holding, the Company was simultaneously in the midst of preparing of its financial statements for the fiscal year ended December 31, 2023 during which time, unbeknownst to SunPower's investors, it had identified misstatements and material deficiencies in the Company's disclosure controls and internal controls over financial reporting. It was also dealing with an undisclosed SEC investigation.

184. As later revealed in April 2024 and July 2024, all the Company's financial statements and accounting disclosures for the past two years had been compromised by accounting errors, including those supposedly hidden by management, forcing the Company's own auditor to resign given the lack of transparency and alleged gamesmanship and misconduct, and at the time, the SEC had initiated an investigation into Defendants' accounting practices at least as early as January 2024 and had issued subpoenas to both the Company and its auditor on or about February 28, 2024.

185. These revelations came after repeated reassurances that all that was needed to file a valid and reliable Form 10-K and other filings was a bit more time, and that prior issues had been put to bed. And yet, Defendants were plainly aware of new issues, were working on these issues, and knew that they would very likely not be able to file the required reports, despite their indications otherwise. This knowledge could not have dawned on them suddenly but likely was known many weeks earlier than revealed.

186. The full extent of SunPower's troubles was still being concealed by Defendants, however.

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

### C.  Assurances That The Company's Auditor's Noisy Resignation Will Have No Material Impact On the Company's Cash Position

187.    On July 3, 2024, however, Defendants' efforts to cast SunPower as a Company poised for recovery was further revealed to be false.  On that day, in a Form 8-K filing signed by Defendant Eby, timed after the markets closed and right before the July 4 holiday, the Company revealed that it had been notified by E&Y on June 27, 2024, of its decision to resign as the independent registered public accounting firm of the Company.

188.    Even after this disastrous revelation, Defendants maintained the charade that these events were not calamitous and endeavored to reassure investors.  In a press release issued simultaneously with, and referring to, the announced resignation of E&Y on July 3, the Company stated that it was "***working to secure a new independent registered public accounting firm***" and that the "***development has no material impact on SunPower's current cash position or continued focus on delivering for its customers***.  *Additional information is available in the Company's latest disclosure.*"

189.    This was false and misleading because this resignation had a material and devastating impact on the Company's cash position.  Unknown to investors, after Defendants exhausted the second tranche of the Sol Holding credit, the Company was out of financing options—the need to restate its financials for the past two years (as well as its many breaches of its financial and reporting covenants) cut off access to any additional credit.  The statement omits that the lack of an auditor—and thus the inability to file the audited financials—blocked it from much-needed cash and credit.  Bkt Dkt. No. 9, ¶12.  FE7 explained that the resignation of E&Y in June of 2024 made it "very difficult to raise money."  A new auditor would have to reassess several years of financials to bring it up to speed.  "That's six to twelve months with no financials, which makes it very difficult to raise additional debt just to get through until the ship is righted."

190.    Indeed, only two weeks later, on July 17, 2024, the Company announced it was forced to wind down major aspects of its business.  And, *only a month later*, the Company filed for bankruptcy.  By the time of the Chapter 11 filing, SunPower had a scant $32.6 million in cash—roughly

just enough to pay Chapter 11 administration costs. Bk. Dkt. 651 at 28. It was highly misleading to suggest that the auditor's resignation and the resultant inability to produce viable financial statements would not affect SunPower's "cash position."

191. With SunPower on the brink of bankruptcy and the disastrous resignation of E&Y, it is plausible to infer that SunPower's stewards, CFO Eby and CEO Werner, were uniquely positioned to opine—and did opine—on the Company's efforts to secure a new auditor, SunPower's "cash position" and business "focus on delivering for its customers." These momentous corporate matters and any public discussion thereof, at this precarious time, were well-within the power and authority of CFO Eby and CEO Werner. Indeed, CFO Eby signed the July 3, 2024 Form 8-K incorporated by reference into the July 3, 2024 press release. Moreover, the July 3 press release accompanying the Form 8-K addresses cash management and liquidity which were core responsibilities of Defendant Eby as SunPower's CFO and the leader of SunPower's strategic growth plan, finance organization and activities. Defendant Werner, as CEO, was likewise exercising power and authority over statements regarding the Company's operations and financial outlook—indeed, he was hired as CEO in February 2024 for his "unmatched experience in the solar business and his legacy institutional knowledge." Press Release dated February 20, 2024. Moreover, CFO Eby addressed similar financial issues in SEC filings which she signed throughout 2023 and 2024, to the exclusion of anyone else officially opining on such matters in such filings. It was her central task in these extraordinary and dramatic circumstances to determine what effect the auditor resignation would have on the Company's cash position and finances, and to exercise control as to what was said about these topics, which spoke to the core issue of the Company's ability to continue in existence. *See also* ¶ 20(b-c) *supra*.

192. Another former employee ("FE9") confirmed that the CEO or CFO would have reviewed and approved this statement. FE9 joined SunPower in February 2009 as an Executive Assistant and Office Manager until August 2020, supporting a senior vice president, and then held the role of Executive Assistant to the CFO (from August 2020 to August 2022) and Executive Assistant to the CEO (from August 2022 to November 2024). In that role, working with both the CFO and CEO,

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

FE9 confirmed that "either the CFO or the CEO" would personally review and approve all such press releases related to the Company's financial condition. FE9 explained that the Company's communications team would email the drafted release to CEO Werner, and FE9 typically was on the chain of emails conveyed these releases to CEO Werner for approval and would ensure that CEO Werner approved them in a timely manner for release.

193.    Defendant CEO Werner—for whom FE9 served as Executive Assistant upon Werner's return to SunPower on February 27, 2024—"likely would have reviewed and approved a press release like the Company's July 3, 2024, release." While FE7 could not remember if Werner approved this particular release (and FE9 no longer has access to FE9's Company emails or communications), FE9 also confirmed that, given the importance of this press release, CEO Werner would have "definitely wanted to review it" before it was released to the public. Indeed, FE9 conveyed that CEO Werner "reviewed and approved of most of" the Company's releases related to financial health and, given the gravity of the announcement (contemporaneous to such bombshell news about E&Y's resignation and the SEC's investigation), it is extremely likely Werner would have reviewed this release.

194.    FE7 confirmed this was likely the case. This former conveyed that "I know they have a process" for reviewing press releases and public statements. Asked if one could expect that CEO Werner and/or CFO Eby reviewed and/or approved this statement, FE7 said, "That sounds like a reasonable assumption to me." Asked if FE7 believed that CFO Eby approved major financial statements and releases made by the Company, FE7 said, "Yes, that would be surprising if that was not true."

195.    Yet another, FE5, told a similar story. FE5 believes CEO Werner and CFO Elizabeth Eby "would have had to" have approved the July 3, 2024, press release stating that the resignation of Ernst & Young as its independent auditor had "no material impact on SunPower's current cash position." FE5 thought this because "similar" statements that went out to the public were sent to employees from "an employee communications email, and those were heavily controlled by the executive team."

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

196. And FE10 related that press release review process was coordinated by the Public Relations/Communications team and typically involved sending those releases to the CEO for approval. FE10 thinks CFO Elizabeth Eby would have been involved in approving press releases that were "finance-related"; "I would imagine if it was finance-related that they [CFO Eby] were involved."

197. On the first trading day after the July 4 holiday, SunPower's stock sunk to $2.08 on this news.

## VI. LOSS CAUSATION

198. During the Class Period, as detailed herein, the Defendants made false and misleading statements and omissions and engaged in a scheme to deceive the market. These false and misleading statements and omissions artificially inflated the price of SunPower common stock, affected and artificially inflated the trading price of options and operated as a fraud or deceit on the Class (as defined above). Later, as Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, SunPower's common stock price fell significantly. As a result of their purchases of SunPower common stock and/or trading in options during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

199. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

200. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and/or engaged in a course of conduct that artificially inflated the price of SunPower's securities and deceived purchasers of SunPower's securities. By failing to disclose the true state of the Company's financial performance, business and operations, Defendants presented a misleading picture of SunPower's condition and value, which had the intended effect and caused the Company's securities to trade at artificially inflated prices during the Class Period. Investors purchased SunPower's securities based on these false premises. SunPower securities could not have been issued, or would

have been sold at dramatically lower prices, had investors been aware of SunPower's true state of affairs.

201.    Because Plaintiffs were unaware that Defendants' representations identified above were false and misleading (and that Defendants omitted and failed to disclose material information regarding SunPower's breach of its financial covenants), Plaintiffs paid an artificially inflated and unreasonable price for their purchases of SunPower securities.

202.    As set forth herein, as Defendants' materially false, misleading, and incomplete statements were revealed through disclosure events occurring between July 26, 2023, and July 19, 2024, the price of SunPower's securities materially fell, as the prior inflation came out of the Company's share price.

### A. JULY 26, 2023

203.    On July 26, 2023, the truth about the Company's financial health began to emerge. SunPower issued an 8-K with reduced guidance for 2023 and announced cost-cutting measures that included the firing of approximately 140 employees. Its new 2023 guidance was a dramatic reduction compared to its initial 2023 projections: the Company slashed its projected adjusted EBITDA by more than half, to $55 million to $75 million; it cut its projected new customer count by around 20 percent, to only 70,000 to 90,000 new customers; and cut its projected adjusted EBITDA per customer by over 40%, to only $1,450 to $1,650. It also introduced a projected net GAAP loss of ($31) million to ($1) million.

204.    In response to this news, SunPower's share price fell from $11.59 to $9.23, a drop of over 20%, from July 25, 2023, to July 27, 2023.

### B. NOVEMBER 15, 2023

205.    On November 15, 2023, SunPower issued a Form 8-K and a press release announcing it had entered into an agreement "to settle and resolve certain disputes" related to its supply agreement with Maxeon. As Maxeon's press release issued the same day related, Maxeon had suspended shipments to SunPower in July 2023 because SunPower had failed to pay approximately $29 million

of past due invoices.  The agreement required SunPower "to issue to Maxeon, in a private placement, warrants for 1,700,000 shares of the Company's common stock."

206.    On this news, share prices of SunPower dropped $.34 per share, or 7.3%, from the closing price of $4.67 per share on November 15, 2023, to the close price of $4.33 per share on November 16, 2023, damaging investors.  But this disclosure was partial, as SunPower had other problems, not yet revealed, which greatly threatened even its near-term corporate existence, and threatened substantial stockholder dilution.

### C. DECEMBER 11, 2023

207.    On December 11, 2023, SunPower filed a Form 8-K announcing that it had entered into an agreement with Bank of America related to breaches of covenants contained in the Credit Agreement. In this release, Defendants admitted that SunPower had breached some covenants and was anticipating breaching others, without specifying which were which. In pertinent part, in discussing the agreement reached with Bank of America, the Form 8-K stated: "The Amendment provides for, among other things . . . a temporary waiver until January 19, 2024 . . . of existing and certain anticipated defaults and events of default under the Credit Agreement related to the breach of a financial covenant and a reporting covenant . . . ."

208.    On this news, share prices of SunPower dropped $.37 per share, or 7.7%, from the closing price of $4.80 per share on December 11, 2023, to the close price of $4.43 per share on December 12, 2023, damaging investors.

### D. DECEMBER 18, 2023

209.    On December 18, 2023, SunPower filed its financials for Q3 2023, along with restated financials for fiscal year 2022 and the first two quarters of 2023. In SunPower's Q3 2023 Form 10-Q, in connection with its restated financials for prior reporting periods that same day, SunPower stated that it was currently in breach of its financial covenants, and had been as of October 1, 2023, the close of Q3 2023, permitting lenders to demand immediate repayment of loans.  It stated: "[A]s of October 1, 2023, we breached a financial covenant and a reporting covenant of our Credit Agreement, … (as

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

amended, the "Credit Agreement") [. . .] The breaches created events of default thereunder (the "Existing Defaults"), which enables the requisite lenders under the Credit Agreement to demand immediate payment or exercise other remedies . . . ."

210.    In that Q3, SunPower also issued a "Going Concern" warning telling investors that the Company may not have enough funds to continue its business over the next year.  As stated: "Although our financial statements have been prepared on a going concern basis, unless we obtain a full waiver or amendment of the covenant breaches under the Credit Agreement and Atlas Credit Agreement and we are able to raise additional capital, there is a material risk that we will continue to be in breach of our financial covenants under the Credit Agreement and Atlas Credit Agreement, which may cause future events of default under our other existing debt agreements."

211.    On the news of the Company's announcement of the breach of financial covenants, restatement, and a going concern warning, share prices of SunPower plummeted another $1.92 per share, or over 31%, from the closing price of $6.14 per share on December 15, 2023, to the close price of $4.22 per share on December 18, 2023, damaging investors.

**E.  FEBRUARY 15-23, 2024**

212.    On February 15, 2024, SunPower filed a Form 8-K announcing that it had obtained permanent waivers of its defaults under both the Credit Agreement and the Atlas Credit Agreement and announced amendments rendering the financial covenants under the Credit Agreement less onerous.

213.    In that 8-K, the Company also stated that it had obtained $175 million of capital and $25 million of additional revolving debt capacity from Sol Holding—but to obtain this additional financing, SunPower was forced to issue penny warrants to Sol Holding to purchase up to approximately 41.8 million shares of the Company's common stock with an additional 33.4 million of warrants issued if the Company drew the full amount of available funding, significantly diluting existing shareholder value.

214.    On February 23, 2024, SunPower announced that it had secured over $300 million in project financing commitments for its residential solar and storage lease programs, enabling it to meet certain funding conditions in its loans from Sol Holding.

215.    On this news, share prices of SunPower fell $1.08 per share, or 25.4%, from the closing price of $4.26 per share on February 14, 2024, to the closing price of $3.18 per share on February 23, 2024.

216.    These material declines in the price of SunPower's securities was a direct result of the nature and extent of Defendants' deception (or results of its deception) being revealed to investors and the market, and the materialization of risks concealed by Defendants' misstatements. The timing and magnitude of SunPower's share price declines negates any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic, or industry factors, or other matters unrelated to Defendants' misconduct.

217.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Plaintiffs and other Class members would not have purchased or otherwise acquired SunPower securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of SunPower securities and that the corrective disclosure of the Defendants' misrepresentations and omissions, and/or the materialization of the risks concealed by those misrepresentations and omissions, would cause the price of SunPower securities to decline.

218.    As detailed herein, Defendants engaged in a scheme and/or course of conduct to deceive Plaintiffs, which artificially inflated the price of SunPower stock and operated as a fraud or deceit on Plaintiffs and Class members by failing to disclose and misrepresenting the adverse facts detailed herein.

219.     SunPower's financial results and future business prospects were based upon false and misleading statements and omissions regarding its financial covenants and its possession of cash sufficient to meet its obligations.

220.     Throughout the period during which Plaintiffs and Class members purchased SunPower securities, the prices of these securities were artificially inflated because of Defendants' materially false and misleading statements and omissions as alleged herein.

221.     Defendants' false statements served to conceal the risks that their misconduct would be publicly exposed, as well as the risks related to Defendants' dissemination of false and misleading statements in investor materials, press releases, earnings calls, and industry conferences.

222.     It was foreseeable that public exposure of the scheme would lead to negative financial and legal consequences to Defendants, including: (i) the violation of its financial and reporting covenants to its lenders; (ii) the failure to satisfy its contractual obligations with its suppliers; (iii) the announcement of non-reliance of the Company's reported financial results for 2022, along with the first two quarters of 2023; (iv) the inability to timely file quarterly results for Q3 2023; (v) analyst downgrades; (vi) the restatement of the Company's reported financial results for 2022, along with the first two quarters of 2023; (vii) the disclosure of material weaknesses in the Company's internal disclosure controls and processes; and (viii) the issuance of a going concern warning. The materialization of any one or more of these factors would lead to a significant decline in the price of SunPower's stock.

223.     The value of Plaintiffs' investments in SunPower securities was negatively impacted when the concealed risks noted above materialized.

224.     The declines in the price of the SunPower securities and resulting losses are directly attributable to the materialization of risks that were previously misrepresented or concealed by the Defendants.

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

225.    Had Plaintiffs known of the material adverse information not disclosed by the Defendants or been aware of the truth behind their material misstatements, they would not have purchased the SunPower securities at artificially inflated prices.

226.    As a result of their purchases of the SunPower securities, Plaintiffs suffered economic loss and damages, as contemplated by the federal securities laws.

**F.  APRIL 23, 2024**

227.    On April 23, 2024, Defendants announced another restatement, disclosing that the Company had identified misstatements in its fiscal year 2022 financial results, including the improper capitalization of certain costs and misclassification of certain expenses, resulting in an overstatement of the Company's income from continuing operations by $15 to $25 million.  The Company also revealed that its independent auditor had determined that its previously issued audit reports could no longer be relied upon.  Clearly, the Company's Board and executives had concealed major problems in the weeks leading up to this bombshell announcement.

228.    SunPower shares declined after the disclosure of the restatement from $2.14 the day before the announcement to $1.96.

**G.  JULY 3, 2024**

229.    On July 3, 2024, however, Defendants' efforts to cast SunPower as a Company poised for recovery began to crumble.  On that day, in a filing timed after the markets closed and right before the July 4 holiday, the Company revealed that it had been notified by E&Y on June 27, 2024, of its decision to resign as the independent registered public accounting firm of the Company, effective as of that date.  It was disclosed, among other things, that various allegations against current and former members of management had been withheld from E&Y, leading to a disagreement regarding audit scope and E&Y's decision to resign.

230.    Additionally, the July 3 Form 8-K revealed that the Company had been the subject of an SEC investigation for months, SunPower having received a document subpoena on February 28, 2024, relating to accounting matters, including aspects of the Company's revenue recognition

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

practices.  In connection with the SEC's investigation, the Audit Committee had immediately authorized an internal review conducted by an outside law firm and had sought the assistance of forensic accountant advisors.

231.    On the first trading day after the July 4 holiday, SunPower's stock sunk to $2.08 on this news.  However, the full truth was not yet revealed, and the stock's fall was cushioned by the July 3, 2024 reassuring press release comments that kept the stock price at a still-inflated level.

### H.  JULY 17-19, 2024

232.    The full truth was fully revealed on July 18, 2024.  In an industry note shared by Roth Capital Partners, LLC on July 18, 2024, and other industry contacts, Defendants' efforts to conceal the true extent of SunPower's deteriorating business unraveled, and it was reported that on July 17, 2024, SunPower had sent a letter to dealers advising that it would no longer be supporting new leases or power purchase agreements, essentially conceding that SunPower would not be acquiring any new customers.  The Company also said in a letter to dealers who sell its systems that it could not support installation of panels that had been delivered but not yet installed:

233.    On this news, the Company's stock plummeted nearly 75% to $0.68, making it SunPower's stock's worst week on record according to Dow Jones Market Data.  Indeed, the stock fell 40% July 18, 2024 and 55% on July 19, 2024, the close of the Class Period.

234.    On July 22, 2024, it was reported by various news outlets that SunPower was on the cusp of failing and analysts downgraded the Company to underperform and cut their price targets.  "We downgrade [SunPower] to Underperform after news that the company is stopping lease and PPA installations, the most favored financing options in the industry, likely due to balance sheet constraints," Mizuho Securities analyst Maheep Mandloi wrote.  "Recall that balance sheet constraints have been exacerbated due to [SunPower's] inability to raise capital without a 2023 10k filing, and a potential 6+ month further delay in 10k filing after its auditors resigned on June 27."  Mizuho previously had a neutral rating for SunPower.  Mizuho reduced its SunPower price target to 50 cents from $4.00.

235.    Similarly, Susquehanna Financial Group suspended its coverage of SunPower early Monday, citing the challenges faced by the maker of solar-energy technology.  In a note released Monday, Susquehanna said it is suspending its SunPower rating and price target following the Company's letter to dealers last week stating it will no longer support lease and PPA sales.  "Going forward, our prior estimates, price target, and recommendations should no longer be relied upon," Susquehanna analyst Biju Perincheril wrote.  Susquehanna previously had a neutral rating and price target of 68 cents for SunPower.  "The letter indicates a significant retrenching by SunPower driven by an environment where it has little access to capital without current financials and exacerbated by the industrywide demand weakness," Perincheril added.  "With its financial auditor resigning earlier this month, it is unclear when the Company can become current with its filings, which will include a restatement/re-audit of 2022 10K, and audited 2023 results and quarterly 2024 financials."

236.    "We think this effectively marks the end for SPWR as an operating business," said an analyst note from Guggenheim analyst, Joseph Osha.  "Considering the debt that the Company has accumulated, we believe that SPWR's equity no longer has any value."  Osha said this decision could mark a "winddown process" for the Company, which will likely sell remaining assets and delist its stock. Guggenheim Securities cut SPWR's price target from $1 to zero.  Osha called SunPower's downfall a "sad end for an industry pioneer."

237.    As a result of Defendants' wrongful acts and omissions, and the resulting decline in the market value of SunPower's stock, Plaintiffs and the rest of the Class have suffered significant losses and damages.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

238.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the documents and public statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary

70

violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding SunPower, and their control over and/or receipt and/or modification of SunPower's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

239.    Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complexity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Defendants.

240.    The Defendants, because of their positions with SunPower, controlled the contents of SunPower's public statements during the Class Period. The Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, the Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the investing public and that the positive representations that were being made were false and misleading. As a result, Defendants are responsible for the accuracy of SunPower's corporate statements and are therefore responsible and liable for the representations contained therein.

241.    Defendants and Company insiders had unusual motives and the opportunity to commit securities fraud: (i) Defendants Faricy and Eby knew, or were deliberately reckless in not knowing, that the statements about SunPower's financial health, including compliance with its financial covenants and cash position, were false and misleading and omitted material information; (ii) As the Company's CFO, Eby knew that SunPower's financial health, including compliance with its financial covenants, was material to its ability to continue as a going concern and, therefore, was material to investors.  She also understood how close the Company was to violating

71

those covenants, especially as SunPower repeatedly reduced its guidance throughout 2023 and was unable to pay current obligations to key vendors; (iii) as the Company's CFO and Principal Executive Officer, Eby, Faricy, and Werner, respectively, knew about the Company's ongoing accounting problems, issues with its internal controls and would have been made aware of the SEC investigation, yet concealed the true facts regarding from the public, and even from its own auditor. Each of the Defendants were motivated by the desire to buoy investor confidence through the class period and secure an enormous capital infusion from majority shareholder, Sol Holding. They also were motivated to deceive financial advisor Houlihan and conceal facts from Houlihan. They also desired to reassure customers with falsely bullish pronouncements for as long as possible.

242. That the timing of SunPower's dramatic and apparently sudden decline, culminating in bankruptcy, occurred so soon after these statements (some mere weeks) is further evidence of scienter.

243. Moreover, that SunPower faced turnover in key roles during the alleged misconduct supports an inference of misconduct at the executive level with respect to disclosure and dissemination of SunPower's financials.

244. Throughout the class period, the Defendants were working directly with its now-resigned auditor, E&Y, to restate, again and again, the Company's financials from the last two years. There is no way that the Defendants would not have understood and appreciated the importance of issuing those restatements and conveying this financial information accurately to its auditor and the public. That its auditor, E&Y, felt compelled to resign amid allegations of misconduct by management before completing the restatements raises more inferences that the Defendants misled their own auditor as well as the public when relaying information about the Company's financial health.

245. The SEC's ongoing investigation into the Company's accounting practices, initiated as early as February 28, 2024, further aids an inference that the Defendants recklessly, knowingly, or intentionally mislead its auditor and the public.

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VIII.    CLASS ACTION ALLEGATIONS

246.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired SunPower common stock and/or traded options during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, and directors and officers of SunPower and their families and affiliates.

247.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of March 6, 2024, SunPower had 175,477,267 shares of common stock outstanding, owned by hundreds or thousands of investors.  Common stock and options were actively traded.

248.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants' statements and/or actions mispresented material facts;

(c)    Whether Defendants' statements and/or actions omitted material necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements, actions, and/or omissions were false and misleading;

(e)    Whether Defendants' misconduct impacted the prices of SunPower common stock and impacted options;

(f)    Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)    The extent of damages sustained by Class members and the appropriate measure of damages.

249.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

250.    Plaintiffs will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

251.    A Class Action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX.    PRESUMPTION OF RELIANCE

252.    At all relevant times, the market for SunPower common stock (and, by extension, options) was an efficient market for, among other things, the following reasons:

(a)    SunPower common stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient market;

(b)    As a regulated issuer, SunPower filed periodic public reports with the SEC and the Nasdaq;

(c)    SunPower regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    SunPower was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s), and which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

253.    As a result of the foregoing, the market for SunPower common stock promptly digested current information regarding SunPower from publicly available sources and reflected such information in the price of SunPower common stock. Under these circumstances, all purchasers of SunPower common stock during the Class Period suffered similar injury through their purchase of SunPower common stock at artificially inflated prices and the presumption of reliance under the fraud-on-the-market doctrine applies.

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

254.    Further, at all relevant times, Plaintiffs and other Class members relied on Defendants to disclose material information as required by law. Plaintiffs and other Class members would not have purchased or otherwise acquired SunPower common stock at artificially inflated prices if Defendants had disclosed all material information as required by law. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its business, Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128, 153 (1972).[12]

## X.    NO SAFE HARBOR

255.    Neither the federal statutory safe harbor applicable to forward-looking statements under certain circumstances nor the bespeaks caution doctrine applies to any of the allegedly false statements pled herein, as the statements alleged to be false and misleading herein all relate to then-existing facts and conditions. The statutory safe harbor or bespeaks caution doctrine do not apply to statements included in financial statements prepared in accordance with generally accepted accounting principles. Moreover, none of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about the Company's current and historical financial accounting practices, financial condition, and internal controls, among other topics.

256.    To the extent any of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward looking statements" when made, and/or were unaccompanied by meaningful cautionary statements that identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Given the then-existing facts contradicting Defendants' statements, any generalized

---

[12]    As the presumption of reliance applies to SunPower common stock, it applies to its options as well. *See In re Fibrogen Sec. Litig.,* No. 21-cv-02623-EMC, 2023 U.S. Dist. LEXIS 236083, at *54 (N.D. Cal. Oct. 3, 2023) ("Plaintiffs assert, and Defendants do not contest, that if Plaintiffs carry their burden on the presumption of reliance with respect to FibroGen stock, the Court should presume reliance in the market for FibroGen options as well.").

risk disclosures made were insufficient to insulate Defendants from liability for their materially false and misleading statements.

257.    Alternatively, to the extent that the statutory safe harbor is found to apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for such statements because, at the time each such statement was made, the speaker had actual knowledge that it was materially false or misleading, and/or the statement was authorized or approved by an executive officer of SunPower who knew that the statement was materially false or misleading when made.

## CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

## COUNT I

### For violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5
### (Against All Defendants)

258.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This action is not brought against SunPower by reason of the automatic stay.

259.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

260.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

    (a)    Employed devices, schemes, and artifices to defraud;

    (b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases and trades of SunPower securities during the Class Period.

261.    The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and

76

misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

262. The Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

263. As a result of the foregoing, the market price of SunPower securities was artificially inflated or otherwise adversely affected during the Class Period. In ignorance of the falsity of the Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of SunPower securities during the Class Period in purchasing SunPower securities or trading options at prices that were artificially inflated as a result of the Defendants' false and misleading statements, or not revoking put options when they could have done so.

264. Had Plaintiffs and the other members of the Class been aware that the market price of SunPower securities had been artificially and falsely inflated and adversely affected by the Defendants' misleading statements and by the material adverse information which the Defendants did not disclose, they would not have purchased SunPower securities at the artificially inflated prices that they did, or at all, and would have taken measures to avoid their losses.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

265.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial. By reason of the foregoing, the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases and trades of SunPower securities during the Class Period.

266.    This claim was brought within two years from when it reasonably could have been discovered and within five years from when the violations alleged herein occurred.

## COUNT II

### For violation of Section 20(a) of the Exchange Act
### (Against All Defendants)

267.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

268.    During the Class Period, the Defendants participated in the operation and management of the Company and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

269.    As officers and/or directors of a publicly owned company, the Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

270.    Because of their positions of control and authority as senior officers, the Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which were disseminated in the marketplace during the Class Period. Throughout the Class Period, the Defendants exercised their power and authority to cause the wrongful acts complained of herein. The Defendants therefore were "controlling persons" of the Company within the meaning

of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of SunPower securities.

271.    Each of the Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Defendants had the power to direct the actions of, and exercised the same to cause the unlawful acts and conduct complained of herein. Each of the Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

272.    By reason of the above conduct, the Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations alleged herein.

273.    This claim was brought within two years from when it reasonably could have been discovered and five years from when the violations alleged herein occurred.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against the Defendants as follows:

A.  Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.  Awarding Plaintiffs and members of the Class damages with interest;

C.  Awarding Plaintiffs' reasonable costs, including attorneys' fees; and

D.  Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

DATED: April 17, 2025           Respectfully submitted,

                                **POMERANTZ LLP**

                                */s/ Austin P. Van*

                                Jeremy A. Lieberman
                                (*pro hac vice* application forthcoming)
                                Austin P. Van
                                (*pro hac vice*)
                                Samantha Daniels
                                (*pro hac vice*)
                                600 Third Avenue, 20th Floor
                                New York, New York 10016
                                Telephone: (212) 661-1100
                                Facsimile: (917) 463-1044
                                jalieberman@pomlaw.com
                                avan@pomlaw.com
                                sdaniels@pomlaw.com

                                Jennifer Pafiti (SBN 282790)
                                1100 Glendon Avenue, 15th Floor
                                Los Angeles, California 90024
                                Telephone: (310) 405-7190
                                jpafiti@pomlaw.com

                                *Counsel for Plaintiffs*

                                PORTNOY LAW FIRM
                                Lesley F. Portnoy, Esq.
                                1800 Century Park East, Suite 600
                                Los Angeles, California 90067
                                Telephone: (310) 692-8883
                                lesley@portnoylaw.com

                                *Additional Counsel for Daniel Suarez*

                                David N. Lake
                                LAW OFFICES OF DAVID N. LAKE, APC
                                16130 Ventura Boulevard, Suite 650
                                Encino, California 91436
                                Tel: (818) 788-5100
                                Fax: (818) 479-9990
                                Email: david@lakelawpc.com

                                PASKOWITZ LAW FIRM PC

80

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Laurence D. Paskowitz
(*pro hac vice*)
97-45 Queens Blvd., Ste. 1202
Rego Park, New York 11374
Telephone: (212) 685-0969
Facsimile: (718) 275-1338
lpaskowitz@pasklaw.com

LAW OFFICES OF BETH A. KELLER, P.C.
Beth A. Keller
118 N. Bedford Road, Ste. 100
Mount Kisco, New York 10549
Telephone: (914) 752-3040
Facsimile: (914) 752-3041
bkeller@keller-lawfirm.com

*Additional Counsel for Charles Orr*

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS