# EXHIBIT 37

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SUNPOWER CORPORATION, *et al.*,[1] | ) | Case No. 24-11649 (●) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF MATTHEW HENRY,
CHIEF TRANSFORMATION OFFICER OF SUNPOWER CORPORATION, IN
SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Matthew Henry, hereby declare under penalty of perjury:

1.      I am the Chief Transformation Officer of SunPower Corporation (collectively, with its Debtor affiliates, the "Debtors" and, together with their non-Debtor affiliates "SunPower" or the "Company").[2]  SunPower is a publicly-traded company based in Richmond, California, organized under the laws of Delaware, and a debtor and debtor in possession in the above-captioned cases along with nine of its direct and indirect subsidiaries.

2.      As a Managing Director at Alvarez & Marsal North America, LLC ("A&M"), I began working with SunPower in November 2023 and was appointed Chief Transformation Officer in August 2024.  I have spent over sixteen years at A&M advising distressed companies in their restructuring efforts.  I also spent nearly three years with a middle-market investment bank,

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  SunPower Corporation (8969); SunPower Corporation, Systems (8962); SunPower Capital, LLC (8450); SunPower Capital Services, LLC (9910); SunPower HoldCo, LLC (0454); SunPower North America, LLC (0194); Blue Raven Solar, LLC (3692); Blue Raven Solar Holdings, LLC (4577); BRS Field Ops, LLC (2370); and Falcon Acquisition HoldCo, Inc. (3335).  The location of the Debtors' service address for purposes of these chapter 11 cases is: 880 Harbour Way South, Suite 600, Richmond, CA 94804.

[2]     Capitalized terms used but not immediately defined herein have the meanings given to them in other sections herein.

where I advised on acquisitions by private equity groups and publicly-traded conglomerates. I hold a bachelor's degree in finance from the University of Nevada and an MBA from the W.P. Carey School of Business at Arizona State University.

3. Each of the Debtors filed a voluntary petition contemporaneously herewith for relief under chapter 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Court") on August 5, 2024 (the "Petition Date"). To minimize the adverse effects on their business, the Debtors filed motions and pleadings seeking various forms of relief (collectively, the "First Day Motions"). I submit this declaration (the "Declaration") to assist the Court and the parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions (the "Petitions") and the First Day Motions.

4. As Chief Transformation Officer of SunPower, I am familiar with the day-to-day operations, business and financial affairs, and books and records of SunPower. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information provided by other members of the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. I am over the age of 18 and am authorized to submit this Declaration on behalf of the Debtors. If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

2

RLF1 31316570v.1

**Introduction**

5.      SunPower has been a leader in the residential solar energy and storage market in North America for over 30 years, with over half a million homes in the United States having been retrofitted or constructed with a SunPower solar energy system.  In recent months, however, SunPower has faced a severe liquidity crisis caused by a sharp decline in demand in the solar market and SunPower's inability to obtain new capital.  While the Company, along with its advisors and stakeholders, worked diligently to address its liquidity crisis, SunPower has been left with no choice but to effectuate a value-maximizing sale process through chapter 11, followed by a winddown of its businesses, for the benefit of all parties in interest.  Despite the current downturn in the solar market, and the unique challenges facing the Company, SunPower, its advisors, and stakeholders believe in the value of the Company's business model and assets.

6.      SunPower offers complete solar energy solutions to its customers—from the sale and installation of solar and energy storage systems to existing or new homes, to the integration of easy-to-use interfaces, plug-and-play power stations, and cable management systems to allow customers to monitor their home energy system in real time, to financing programs and offerings to support customers.  As part of this solutions-based approach, SunPower offers its customers a true "one stop shop" for all of their home's solar panel system needs.

7.      While nearly eighty-five million homes in the United States are suitable for solar energy systems, only about four million homes have solar energy systems installed.[3]  As the cost of solar energy declines, this nascent market is expected to continue growing.[4]

---

[3]     *How Many Americans Have Solar Panels in 2024?*, SolarInsure, (July 2, 2024), https://www.solarinsure.com/how-many-americans-have-solar-panels#how-many-homes-in-the-usa-have-solar-panels.

[4]     Max Roser, *Why Did Renewables Become So Cheap So Fast?*, Our World in Data (December 1, 2022), https://ourworldindata.org/cheap-renewables-growth.

RLF1 31316570v.1

8.      The solar industry's potential was further invigorated by the passing of the Inflation Reduction Act ("IRA") in 2022, which provides for a 10-year extension of the tax credit for solar and battery storage and bonus tax credits for leasing arrangements.  Companies like SunPower are poised to monetize these benefits while making solar energy accessible to more Americans across socio-economic lines.

9.      Despite growth trends in the solar energy market, SunPower is facing various macroeconomic headwinds, as well as certain Company-specific challenges.  Recent increases in U.S. inflation and corresponding increases in interest rates have led to reduced demand across the entire solar power industry, which hindered the Company's financial performance.  The reduced demand has caused liquidity to deteriorate, further straining the Company's financial flexibility and limiting the Company's ability to access capital.

10.     Since October 2023, the Company has been grappling with constrained liquidity and corresponding business challenges, including potential defaults under its various financing arrangements.  The Company has taken a proactive approach to addressing these issues, including by retaining a team of restructuring advisors and engaging with its stakeholders on potential solutions.  Between October and December 2023, the Company retained A&M as financial advisor, Kirkland & Ellis LLP ("K&E") as counsel, and Moelis & Company ("Moelis") as investment banker.  In December 2023, the Company obtained $50 million of bridge financing under its First Lien Facilities, comprising $25 million provided by existing first lien lenders and $25 million provided by the Company's largest equity holder, Sol Holding, LLC ("Sol Holding"), as a new lender under the First Lien Credit Agreement.  This new money infusion allowed the Company to rework its go-forward business plan and further engage with its stakeholders on the terms of a comprehensive solution.  In January 2024, Sol Holding provided an additional

4

$20 million commitment to the Company under the First Lien Credit Agreement; and in February 2024, the Company and Sol Holding entered into a $175 million second lien term loan facility, with Sol Holding as the sole lender.  In connection with the February 2024 financing, Sol Holding converted its $45 million in first lien loans into an equal amount of second lien loans, funded $80 million of new money second lien loans to the Company at closing, and committed to extend an additional $50 million of new money second lien loans upon the satisfaction of certain conditions, which the Company accessed in May 2024.  This new money infusion provided the Company with critical liquidity support amid ongoing discussions with stakeholders regarding a potential comprehensive solution.

11.     While this incremental financing allowed the Company to weather near-term challenges, the Company was also affected by delays in filing certain of its financial reports with the Securities and Exchange Commission ("SEC"), caused in part by misstatements in previously filed reports.  As detailed below, these delays put the Company at risk of breaching various financial reporting covenants in their prepetition financing documents and corresponding events of default.

12.     Throughout spring 2024, the Company and its advisors actively pursued various alternatives to address the Company's liquidity challenges.  Given the issues with the Company's financial statements, however, the Company was unable to obtain any incremental new capital, resulting in an acute liquidity crisis for the Company.  Despite good faith discussions with the Company's prepetition secured lenders and significant equity holders, the parties were unable to reach agreement on a comprehensive long-term liquidity and business solution.

13.     While these discussions failed, the Company was successful in negotiating a going-concern sale transaction for certain of its core business lines to Complete Solaria, Inc.

5

(the "Stalking Horse"), setting the floor for other potential bids to acquire certain assets during these chapter 11 cases. Under the August 5, 2024 asset purchase agreement between the Debtors and the Stalking Horse (as modified from time to time, the "Stalking Horse APA"), the Stalking Horse has committed, subject to Court approval, to acquire the assets of the Company's Blue Raven and New Homes businesses and a portion of the Debtors' dealer network business in exchange for a purchase price of $45 million cash.[5]

14.     The Company filed these chapter 11 cases with the goal of completing the going-concern sale to the Stalking Horse (or a potential topping bidder) and monetizing any other assets. To that end, the Debtors plan to continue their prepetition marketing and sale process, which will include a market check of the sale transaction contemplated by the Stalking Horse APA. But time is of the essence. Given the Debtors' inability to obtain additional financing, the Debtors must rely on cash collateral (including asset sale proceeds) to fund these chapter 11 cases, and the limited liquidity available to the Debtors cannot support a protracted chapter 11 process. To preserve liquidity and thereby maximize the Company's value for the benefit of all stakeholders, the Company made the difficult, but necessary, decision to significantly reduce the size of its workforce. The Company's remaining workforce will support ongoing operations in key business lines—including the Blue Raven and New Homes businesses—and the Company's sale process more generally, with the goal of completing a value-maximizing sale (or sales) of the Company's assets.

---

[5]     The Stalking Horse APA is attached as Exhibit 2 to the *Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Complete Solaria Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* (the "Bidding Procedures Order") filed contemporaneously herewith. Any description of the Stalking Horse APA in this Declaration is qualified in its entirety by the provisions of the Stalking Horse APA.

15.     To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors seek in the First Day Motions, this Declaration is organized as follows:

- **Part I** provides an overview of the Debtors' corporate history, structure, and business operations;

- **Part II** describes the Debtors' prepetition capital structure;

- **Part III** describes the circumstances leading to the filing of these chapter 11 cases;

- **Part IV** describes the Debtors' proposed restructuring transaction;

- **Part V** describes the Debtors' proposed use of cash collateral; and

- **Part VI** and **Exhibit A** hereto provides the factual support for the Petitions and the First Day Motions.

**Discussion**

**I.     The Debtors' Corporate History, Structure, and Business Operations.**

16.     SunPower has been at the forefront of the drive to adapt to solar energy technology since its founding nearly forty years ago.  Beginning in the 1970s, SunPower co-founder Dr. Richard Swanson, a professor of electrical engineering at Stanford University, researched and experimented ways to make the solar cells used on satellites more cost-effective and accessible to residential consumers.  By 1985, Dr. Swanson was awarded grants from the Electric Power Research Institute and the U.S. Department of Energy to support his solar power research and development.  These grants, along with support from two venture capital firms, allowed Dr. Swanson to incorporate SunPower in April of 1985.

17.     In the years following its incorporation, the Company continued to obtain financing to research and develop innovative new uses for solar technology.  In the 1990s and early 2000s SunPower's solar cells powered race cars to victory and National Aeronautics and Space Administration airplanes to record breaking heights.  The Company's first manufacturing facility

7

opened in the Philippines in 2004, the same year that the Company's first utility-scale power plant commenced operations in Germany. Building upon its growth and technological breakthroughs, SunPower successfully went public in 2005 and has been listed on the NASDAQ ever since.

18. In the nearly two decades following its initial public offering, SunPower has worked towards its goal to make home solar energy attainable for all Americans. Since going public, SunPower-enabled solar projects have generated approximately 173 terawatt-hours (TWh), the equivalent of reducing 123 million metric tons of carbon dioxide equivalent. For perspective, this is equivalent to negating greenhouse gas emissions from roughly 26 million passenger vehicles driven for one year, 24 million homes' electricity use for one year, or 136 billion pounds of coal burned.

19. In August 2020, SunPower consummated a transaction to split off its solar manufacturing business, creating a new solar-panel manufacturer named Maxeon Solar Technologies, Ltd. ("Maxeon"). In October 2021, SunPower acquired Blue Raven Solar, which expanded the Company's geographic footprint, particularly outside of California, in the U.S. residential solar and battery storage space, including in the Northwest, Midwest, and Atlantic regions.[6] A few months later, in December 2021, SunPower debuted SunPower Financial, a financial services institution whose sole focus would be making solar power affordable for American homeowners. In May 2022, SunPower sold off its commercial and industrial businesses to become a residential-only solar energy business.

---

[6] *See generally SunPower Corp.*, Annual Report (Form 10-K) (Feb. 25, 2022) at 6.

8

20. As discussed above, SunPower provides all-in-one residential solar power solutions ("Home Energy Solutions") to its customers. The products offered generally fall into four categories:

- *Solar Panels*. SunPower offers high quality mainstream and premium solar panel products with reliable performance. The solar panels are equipped with microinverters to maximize the power production of each panel and best-in-class mounting hardware to balance aesthetics and flexibility.

- *PV Supervisor*. The photovoltaic supervisor is a critical component of a complete home solar energy system. This device collects data and generates reports about the customer's system and enables the Company to provide better customer support.

- *Storage Batteries*. SunPower's batteries enable the customer to store the energy collected by the solar panels giving the customer the ability to shift between energy sources if needed and become resilient to outages.

- *mySunPower Web & Mobile Apps*. mySunPower is an easy to use, intuitive application available both on desktop and mobile phone. This application offers customers real-time insights to manage their home energy system and view usage and savings, among other metrics, in one place.



Solar Panels — Microinverters — Mounting Hardware — PV Supervisor — Storage — mySunPower™ Web & Mobile Apps

21. SunPower provides and sells Home Energy Solutions through three main business segments: Blue Raven, New Homes, and the SunPower dealer network. Blue Raven is the Company's direct-to-consumer business segment. Through Blue Raven, SunPower acts as both dealer and installer: a customer can purchase Home Energy Solutions from Blue Raven, and Blue Raven will install the Home Energy Solution for the customer. Through New Homes, SunPower collaborates with homebuilders to serve as the exclusive solar provider for new home construction

9

projects.  The homebuilders contract with SunPower and offer customers the option to include SunPower's Home Energy Solutions as part of their new home construction.  If a customer chooses to include SunPower's Home Energy Solution, SunPower then contracts with the homebuilders, including roofers, to install SunPower's Home Energy Solutions on the customer's new home. Finally, as part of the SunPower dealer network, SunPower collaborates with solar product dealers to provide certain business products and services.  Specifically, through (and to) the dealers, SunPower sells solar panel equipment, offers marketing services, and provides financing services for customer leases and loans, which are used to purchase the Home Energy Solution.

22.    Where SunPower sells equipment to an individual consumer, SunPower offers a range of purchase options in addition to traditional cash sales.  Specifically, qualifying customers may choose loan sales, whereby the customer obtains financing from SunPower Financial and can choose payment plans best suited to them, or lease sales, whereby a customer leases a solar panel system from SunPower with the ability to renew the lease or purchase the equipment at the end of the lease.

23.    It is difficult to quote a standard price for solar panels or a full home solar energy system as pricing depends on a variety of factors, including the model of the solar panel system, household energy needs, local weather, available roof space, shading, and the financing option selected (cash, loan, or lease).  Very broadly, the national average price for owning a 5 kW home solar energy system ranges from $13,250 to $21,000 before considering the benefits of available tax credits and incentives.  SunPower is committed to making solar energy as accessible as possible.  The Company is one of the only solar energy providers on the market to offer both loans to purchase and leases of solar panel systems (as opposed to one or the other), in addition to outright cash purchases.  SunPower also offers the "SunPower Complete Confidence Warranty,"

10

which covers the entire solar panel system, removal of defective parts, installation of new parts, shipping, and peak system AC power for twenty-five years (ten years for monitoring hardware).

24.     As set forth on the corporate structure chart attached as **Exhibit B**, Debtor SunPower Corporation is the ultimate parent company of the nine other Debtors in these chapter 11 cases, along with a number of other non-Debtor affiliates.  Sol Holding, which is indirectly owned by TotalEnergies Renewables USA, LLC ("TotalEnergies") and GIP Sol Acquisition, LLC ("GIP"), owns approximately 65% of SunPower Corporation's outstanding common stock. SunPower Corporation is a publicly traded company, and its common stock is listed on NASDAQ under the ticker symbol "SPWR".

## II.     The Debtors' Prepetition Capital Structure.

25.     As of the Petition Date, the Company has approximately $2.01 billion in principal amount of total funded debt obligations, comprising $483 million of Debtor funded debt obligations and $1.53 billion of non-Debtor funded debt obligations, and approximately $32.6 million in cash in Debtor and non-Debtor bank accounts.

| Funded Debt | Approximate Principal Amount Outstanding |
|---|---|
| First Lien Credit Agreement:  Revolving Credit Facility | $200 million |
| First Lien Credit Agreement:  Term Loan Facility | $93 million |
| Standby Letter of Credit Facility | $5 million |
| Second Lien Credit Agreement:  Term Loan Facility | $185 million |
| **Total Debtor Funded Debt Obligations** | **$483 million** |
| Non-Debtor Funded Debt Obligations | $1.531 billion |
| **Total Company Funded Debt Obligations** | **$2.01 billion** |

11

RLF1 31316570v.1

**A.     First Lien Credit Agreement: Revolving Credit Facility and Term Loan Facility.**

26.     Debtor SunPower Corporation is party to that certain Credit Agreement, dated as of September 12, 2022 (as amended, the "First Lien Credit Agreement"),[7] by and among SunPower Corporation, as borrower; each of the other Debtors, as guarantors, the lenders and issuers of letters of credit party thereto from time to time, and Bank of America, N.A., as administrative agent and collateral agent (Bank of America, N.A., in such capacities, the "First Lien Agent," and together with the other secured parties under the First Lien Credit Agreement, the "First Lien Parties"). The First Lien Credit Agreement provides for a $200 million revolving credit facility (the "First Lien Revolving Credit Facility") and a $100 million term loan credit facility (the "First Lien Term Loan Facility," and together with the First Lien Revolving Credit Facility, the "First Lien Facilities").

27.     Under the documents governing the First Lien Facilities, the First Lien Facilities are secured on a first-priority basis by liens on substantially all of the assets of the Debtors (subject to customary exceptions).  The maturity date of the First Lien Facilities is February 13, 2029, subject to a springing maturity date if certain indebtedness has a maturity date prior to ninety-one days after such date.  As of the Petition Date, approximately $200 million and $93 million of principal remain outstanding under the First Lien Revolving Credit Facility and the First Lien Term Loan Facility, respectively.

---

[7]     As amended by the First Amendment, dated as of January 26, 2023, as amended by the Second Amendment and Waiver to Credit Agreement, dated as of December 8, 2023, as modified by the Extension Agreement, dated as of January 18, 2024, as modified by the Waiver Agreement, dated as of January 30, 2024, as modified by the Extension Agreement, dated as of January 31, 2024, as amended by the Third Amendment Agreement, dated as of January 31, 2024, as amended by the Fourth Amendment Agreement, dated as of February 14, 2024, as amended by the Fifth Amendment Agreement, dated as of February 21, 2024, as amended by the Sixth Amendment Agreement, dated June 30, 2024.

12

**B.      Standby Letter of Credit.**

28.      Bank of the West, as succeeded by BMO Bank N.A. (the "L/C Secured Party"), has issued several letters of credit for the Debtors pursuant to that certain Standby Letter of Credit Agreement, dated as of October 4, 2021, as amended, which provides for a letter of credit facility in favor of the Debtors in an aggregate amount not to exceed $5.0 million.  The Standby Letter of Credit Facility is fifty percent cash secured via a cash collateral account.  As of the Petition Date, letters of credit issued and outstanding under the Standby Letter of Credit Facility totaled approximately $5 million.

**C.      Second Lien Credit Agreement.**

29.      Debtor SunPower Corporation is party to that certain Credit Agreement, dated as of February 14, 2024 (the "Second Lien Credit Agreement"), by and among SunPower Corporation, as borrower; each of the other Debtors, as guarantors, the lenders party thereto from time to time and GLAS USA LLC, as administrative agent and collateral agent (GLAS USA LLC, in such capacities, the "Second Lien Agent," and together with the other secured parties under the Second Lien Credit Agreement, the "Second Lien Parties," and together with the First Lien Parties and the L/C Secured Party, the "Prepetition Lenders").  The Second Lien Credit Agreement provides for a $175 million second-lien term loan facility (the "Second Lien Facility," and together with the First Lien Facilities and the Standby Letter of Credit Facility, the "Prepetition Facilities").

30.      Under the documents governing the Second Lien Facility, the Second Lien Facility is secured on a second-priority basis (subject to customary exceptions) by liens on substantially all of the assets of the Debtors.  The maturity date of the Second Lien Facility is May 16, 2029.  As of the Petition Date, approximately $185 million of principal remains outstanding under the Second Lien Credit Agreement.

13

### D. Non-Debtor Structured Financings.

31. In addition to the Prepetition Facilities to which the Debtors are party, certain non-Debtor affiliates of SunPower—the majority of which are owned by SunStrong Capital Holdings, LLC, a joint venture owned by Debtor SunPower Corporation and Hannon Armstrong Sustainable Infrastructure Capital, Inc. ("Hannon") at 51% and 49%, respectively—are parties to a number of senior and mezzanine credit facilities with Hannon and other financial institutions, as lenders, and recipients of equity contributions used to finance the loan and lease financing solutions offered to SunPower's customers (the "Non-Debtor Credit Facilities," and the lenders thereunder, the "Silo Lenders").

32. Specifically, when a qualifying customer decides to purchase SunPower's equipment using a loan or lease, the Debtors in turn sell such leases and loans and the underlying solar projects (collectively, the "Solar Assets") to certain non-Debtor affiliates (the "Non-Debtor Owners") organized in specific "project silos." These Non-Debtor Owners then enter into senior and mezzanine credit facilities with the Silo Lenders and receive debt and equity financing secured by such Solar Assets. Over the life of the lease or loan, the Non-Debtor Owners receive the lease and loan payments from customers and use this stream of income to pay back the financing received over time.[8] Under these arrangements, the financings received by the Non-Debtor Owners are usually unlocked progressively as solar equipment is installed at customers' residences. As a result, the purchase price owed to the Debtors for the Solar Assets is transferred on the same timeline. Usually, approximately 70% of the financing is unlocked as ownership of the Solar Assets is received by the applicable Non-Debtor Owner, 20% is received

---

[8] For the avoidance of doubt, no Debtor entity is an obligor nor guarantor under any of these financing facilities.

upon installation of the Solar Assets, and the remaining balance is received once the Solar Assets are connected to the grid.[9]

###### E. SunPower's Equity.

33. Debtor SunPower Corporation is publicly traded and has 175,361,088 shares of common stock issued and outstanding as of December 15, 2023. Sol Holding is the largest shareholder, owning approximately 65% of SunPower Corporation's outstanding common stock.

### III. Events Leading to the Commencement of the Chapter 11 Cases.

34. Prior to commencing these chapter 11 cases, the Debtors, with the assistance of their advisors, explored various out-of-court restructuring alternatives, all with a view to maximizing value for all stakeholders. While the Debtors have faced continual headwinds throughout 2023 and 2024, the need to commence these chapter 11 cases can largely be attributed to two main factors: (a) a sharp decline in demand in the solar market due to volatile market conditions; and (b) the Company's inability to obtain additional financing.

35. While experts predict further growth in the solar market, customer demand has declined due to nationwide and global inflationary pressures in 2022 and 2023. Rising interest rates have made it more difficult for customers to borrow money to finance their home energy system. This predicament has hit home solar companies especially hard, as most customers do not pay for their home solar panel systems outright with cash. As a result, loan and lease sales have all slowed. The slowdown in sales, among other factors, has been reflected in the Company's stock price, which has tumbled approximately 82% since the start of 2024.

---

[9] The intercompany transactions involving the Debtors that are entered into in connection with such structured financings are described in further detail in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms*, (D) Continue to Perform Intercompany Transaction, and (II) Granting Related Relief filed contemporaneously herewith.

15

36. Due to this decreased demand, the Debtors confronted liquidity obstacles in 2023 and 2024. Confident that SunPower would once again become profitable, the Debtors' stakeholders worked diligently to overcome these unique obstacles by engaging with various funding sources. Given the challenges with completing the audit of the Debtors' financial statements, however, the Debtors were unable to obtain new capital.

37. Notwithstanding these and other business challenges, the Debtors, with the assistance of their advisors, have engaged with their stakeholders every step of the way on potential out-of-court solutions, and now come to this Court only at the conclusion of (a) an exhaustive review of available pathways, (b) a sharp decline in demand in the solar market due to volatile market conditions, and (c) the Debtors' inability to obtain new capital. The Debtors have now reached the end of their liquidity runway. Simply put, these chapter 11 cases are the Debtors' best opportunity to fully and fairly resolve their liabilities in a manner that maximizes value and allows significant components of the Company to continue as a going concern.

**A.     Events Leading to the Second Lien Credit Agreement.**

38. On October 24, 2023, the Company filed a form 8-K with the SEC reporting that the Company's 10-K for the period ended January 1, 2023, 10-Q for the period ended April 2, 2023, and 10-Q for the period ended July 2, 2023 (the "First Restatement Financials") had to be restated because the value of certain inventory had been overstated and, therefore, could no longer be relied upon (the "First Restatement").

39. In late 2023, the Company engaged Kirkland, Moelis, and A&M to assess its options with respect to a breach of a financial reporting covenant on its Revolving Credit Facility as a result of the First Restatement and to diligence its business plan. On December 8, 2023, following good-faith, arm's length negotiations with the First Lien Parties, the Company was able to secure an amendment to the Credit Agreement and waiver of the covenant breaches

16

(the "Revolver Amendment"), such that the covenant breaches were not considered an event of default. Among other key terms, the Revolver Amendment provided for a temporary waiver of existing and anticipated defaults related to financial and reporting covenants until January 19, 2024.

40. On December 8, 2023, pursuant to the Revolver Amendment, the Debtors received access to $50 million in total additional revolving commitments, with $25 million provided by existing first lien lenders and $25 million provided by Sol Holding, as a new lender under the First Lien Revolving Credit Facility.

41. On December 18, 2023, the Company filed a form 8-K with the SEC notifying the public of an event of default under the Loan and Security Agreement, dated June 30, 2022, by and among SPWR RIC Borrower 2022-1, the lenders party thereto from time to time, Atlas Securitized Products Holdings, L.P. ("Atlas"), as administrative agent and Computershare Trust Company, National Association, as paying agent (the "Atlas Credit Agreement"). A few days prior, the Company became aware of a breach of the covenant under the Atlas Credit Agreement requiring delivery of unaudited financial statements within forty-five days following the end of the third quarter of 2023 (the "Q3 Financials"). Due to the Company's delay in delivery of Q3 Financials, an event of default was triggered under the Atlas Credit Agreement.

42. On December 22, 2023, following extensive negotiations with existing lenders and equity sponsors, SunPower publicly announced that it entered a waiver and amendment with Atlas (the "Atlas Amendment"). The terms of the Atlas Amendment were intended to mirror the terms of the Revolver Amendment insofar as it too provided for a temporary waiver of the reporting default until January 19, 2024.

17

## B. The Second Lien Credit Agreement.

43. To weather the weakened market and cover working capital expenses as well as operating losses, the Company drew $85 million on its First Lien Revolving Credit Facility at the end of Q2 2023. While this allowed the Company to continue its operations uninterrupted, the Company entered Q3 2023 having drawn 90% of its First Lien Revolving Credit Facility. That same quarter, the Company announced that it expected FY2023 losses to be between $165 and $175 million, roughly double its prior projected losses of $70 - $90 million.

44. Throughout Q1 of 2024, the Company and its advisors engaged with GIP and TotalEnergies in the hopes of consummating a capital raise that would bridge SunPower into Q4 2024, when SunPower projected the Company would become profitable again. The Company also explored third-party capital raises through Moelis' marketing efforts. To give the Debtors additional time to close a capital raise with their sponsors and/or a third-party financing institution, the Debtors sought extensions of the January 19, 2024 waiver deadlines under the Atlas Amendment and the Revolver Amendment, which were agreed upon by the parties prior to that deadline. Additionally, at this time, Sol Holding provided an additional $20 million of commitments under the First Lien Credit Agreement.

45. In February 2024, the Debtors successfully negotiated and entered into the Second Lien Credit Agreement with Sol Holding, which provided the Debtors much-needed liquidity and additional runway to find a more comprehensive solution. Specifically, in connection with the Second Lien Credit Agreement, Sol Holding converted its $45 million in first lien loans into an equal amount of second lien loans, funded $80 million of second lien loans to the Company at closing, and committed to fund an additional $50 million of second lien loans upon the satisfaction of certain conditions. In May 2024, the Company accessed the additional $50 million of new money.

18

## C. The Second Restatement.

46. On December 18, 2023, the Company filed an Amended 10-K with the SEC, amending and restating the First Restatement Financials and resolving the First Restatement. However, on April 23, 2024, the Company filed a form 8-K with the SEC reporting that the First Restatement Financials and the Company's 10-Q for the period ended Oct 1, 2024 (the "Second Restatement Financials") had to be restated because of (a) the capitalization of certain deferred costs that did not qualify for capitalization, (b) the classification of certain sales commissions as cost of revenue rather than sales, general and administrative expense, and (c) certain other individually immaterial adjustments (the "Second Restatement"). Consequently, the Company's auditor determined that its reports on the Company's financial statements and internal control over financial reporting included in the Second Restatement Financials should no longer be relied upon.

47. On February 29, 2024, the Company filed a form NT 10-K with the SEC notifying that their form 10-K for the period ended December 31, 2023 would be submitted late (the "2023 10-K"). Additionally, on May 13, 2024, the Company filed a form NT 10-Q with the SEC notifying that their form 10-Q for Q1 would be submitted late (the "Q1 10-Q"). On May 17, 2024, SunPower received a notification of deficiency from the Nasdaq Stock Market LLC, indicating that the Company was not in compliance with Nasdaq listing rules. Following this, on May 20, 2024, the Company filed a form 8-K with the SEC detailing that the Second Restatement caused the late filing of the 2023 10-K and Q1 10-Q. The Company executed a series of amendments and waivers to the Credit Facilities in an effort to stay in compliance with its financial reporting obligations under the Credit Facilities.

19

**D.      Obstacles to Growth.**

48.      Despite the additional capital secured by the Second Lien Credit Agreement, the Company continued to face extensive obstacles to growth throughout the spring of 2024. In early 2024, the Company commenced an extensive internal investigation in response to a SEC subpoena issued to the Company and its auditor.

49.      In an effort to reduce liquidity burn, in April 2024, the Company began winding down its SunPower Residential Installation (SPRI) locations and announced layoffs of approximately 1,000 employees. After announcing the layoffs, SunPower's publicly traded common stock dropped to their lowest recorded price since the Company went public in 2005. In response, a key Silo Lender stopped funding certain Non-Debtor Credit Facilities, as it believed that the conditions precedent to drawing were not satisfied. That same Silo Lender also declined to extend the availability period under one Non-Debtor Credit Facility, while another Silo Lender limited the availability for drawdowns under the same Non-Debtor Credit Facility as a condition to a waiver in connection with the delay in audited financial statements.

50.      Additionally, during this time, consumer demand for solar energy products continued to lag. In response, the Company and its advisors worked to obtain further funding to bolster the Second Lien Credit Agreement and bridge the gap to liquidity stability and profitability.

**E.      The Auditor Resignation.**

51.      On June 27, 2024, the Company's auditor notified the Company of its decision to resign as independent registered public accounting firm. The auditor resigned prior to completion of the 2023 10-K, the Q1 Financials, and the Second Restatement (the "Financial Reports"). On July 3, 2024, the Company filed a form 8-K with the SEC reporting the auditor's resignation. To

20

RLF1 31316570v.1

avoid any further defaults, the Company obtained waivers in an effort to stay in compliance with financial reporting obligations under the Credit Facilities.

## IV. The Proposed Restructuring Transaction.

52. Despite the Company's efforts to raise additional capital throughout the spring of 2024, the Company reached an inflection point in summer 2024. Because of the delayed Financial Reports, investors were no longer willing to provide additional liquidity needed for the Company to continue its turnaround plan. Given the absence of a comprehensive long-term liquidity and business solution for the Company, it became clear to the Company that conducting a sale process through chapter 11 was the best option available to maximize the Company's value for the benefit of all stakeholders.

53. The Company filed these chapter 11 cases with the goal of timely completing a value-maximizing sale (or sales) of the Company's assets. The Stalking Horse APA provides a backstop for the sale of the Company's Blue Raven and New Homes businesses and a portion of its dealer network business, which will be subject to a market check. As to the Company's other assets, the Company will undertake to sell certain assets for the highest or otherwise best value available. Liquidity is limited, and time is of the essence. Accordingly, the Debtors' proposed chapter 11 timeline contemplates an expeditious process that is necessary under these circumstances to maximize value for the Debtors' estates.

## V. The Proposed Use of Cash Collateral.

54. Leading up to the Petition Date, the Debtors, their advisors, and the Prepetition Lenders worked diligently and negotiated in good faith regarding potential postpetition financing to extend the Debtors' liquidity runway and fund these chapter 11 cases. In parallel, the Debtors worked with Moelis to conduct a marketing process to identify other possible sources of postpetition financing. Despite the Debtors' best efforts, however, the Debtors did not obtain

actionable postpetition financing proposals. The Prepetition Lenders would not provide postpetition financing, nor consent to being primed by a third party. No third party presented a viable postpetition financing option with junior debt or otherwise.

55.     While the Debtors were not able to obtain postpetition financing, the Prepetition Lenders agreed to provide the Debtors access to prepetition cash collateral (the "Cash Collateral"). Access to Cash Collateral will provide the Debtors with the necessary liquidity to pursue the asset sale (or sales) and maximize the value of the estate for the benefit of all stakeholders.

56.     Specifically, pursuant to the Cash Collateral Motion,[10] the Debtors seek the continued use of the Prepetition Lenders' Cash Collateral to provide sufficient liquidity for their operations during these chapter 11 cases. Without access to Cash Collateral, the Debtors would be unable to operate their business and administer their estates, and their stakeholders would be immediately and irreparably harmed as a result. Authorization to use Cash Collateral during the duration of these chapter 11 cases will provide the Debtors with sufficient liquidity to continue operating as a going-concern and to maintain relationships with key vendors and personnel, continue to provide products and services to their customers, and pay wages to employees, all while working toward a value-maximizing sale of the Debtors' assets.

57.     In consideration for the consensual use of Cash Collateral, the Debtors have agreed to provide the Prepetition Lenders with adequate protection as set forth in the Cash Collateral Motion and the accompanying proposed interim order (the "Interim Order"). The Debtors' use of Cash Collateral will also be subject to the following milestones:

---

[10]   *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Lenders (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (filed contemporaneously herewith).

RLF1 31316570v.1

- One calendar day after Petition Date: File Bidding Procedures Motion;[11]

- Three calendar days after Petition Date:  Entry of interim cash collateral order;

- Twenty-eight calendar days after Petition Date: Entry of the Bidding Procedures Order;

- Twenty-eight calendar days after Petition Date: File chapter 11 plan, disclosure statement, and motion to approve disclosure statement;

- Thirty calendar days after Petition Date: Entry of final cash collateral order;

- September 6, 2024:  Bid deadline under the Bidding Procedures Order;

- September 10, 2024:  Auction (if necessary);

- September 10, 2024:  Notice of successful bidder;

- September 18, 2024: Entry of order approving sale under to winning bidder(s) ("Sale Order");

- September 18, 2024: Entry of order approving disclosure statement;

- By September 30, 2024:  Consummation of sale pursuant to entered Sale Order;

- October 18, 2024: Entry of order confirming chapter 11 plan; and

- October 31, 2024: Occurrence of chapter 11 plan effective date.

## VI.    Evidence in Support of First Day Motions.

58.    Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet.

---

[11]    *Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Complete Solaria Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* (filed contemporaneously herewith).

23

RLF1 31316570v.1

24

59.     The First Day Motions request authority to pay certain prepetition claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.

60.     I am familiar with the information contained in each First Day Motions and believe that the relief sought in each motion (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element for the Debtors to successfully implement a chapter 11 strategy, and (c) best serves the Debtors' estates and creditors' interests.  A description of the relief requested and the facts supporting each of the First Day Motions is detailed in **Exhibit A**.

[<em>Remainder of Page Intentionally Left Blank</em>]

RLF1 31316570v.1

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  August 5, 2024                                    /s/ Matthew Henry
          Richmond, California                           Name:  Matthew Henry
                                                         Title:   Chief Transformation Officer,
                                                                  SunPower Corporation

RLF1 31316570v.1