POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
Austin P. Van
(*pro hac vice*)
Samantha Daniels
(*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
avan@pomlaw.com
sdaniels@pomlaw.com

[*Additional Counsel on Signature Page*]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE SUNPOWER CORPORATION SECURITIES LITIGATION | Case No.: 3:23-cv-05544-RFL |
| This Document Relates to: | **CLASS ACTION** |
| *ALL ACTIONS* | **MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>Date: September 2, 2025<br>Time: 10:00 AM<br>Dept: Court Room 15, 18th Floor<br>Judge: Hon. Rita F. Lin |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 2

    A.    In 2023, Defendants Masked SunPower's Unprecedented Liquidity Crisis.......... 2

    B.    Defendants Continued to Hide SunPower's Financial Distress in 2024 By Issuing, And Then Retracting, False Financials To Induce Financing From Its Majority Shareholder. ................................................................................................................. 3

    C.    SunPower's Auditor, Ernst & Young, "Noisily" Resigns, Alleging Misconduct In Defendants' Financial Reporting, And SunPower Files For Bankruptcy.............. 4

ARGUMENT ........................................................................................................................ 5

    A.    The TAC Pleads Actionable False Statements and Omissions............................ 5

        1.    Defendants Misled Investors About SunPower's Financial Health in 2023............................................................................................................. 5

            a.    The Same Cash Concerns in August 2023 Were Apparent to Defendant Faricy in May 2023 (Statement 1). ............................... 5

            b.    Investors Were Misled About Full-Year 2023 Guidance (Statement 2)..................................................................................... 12

        2.    Defendants Misled Investors About SunPower's Financial Health in 2024 and The Impact of the Sol Holding Transaction (Statements 4-9) .......... 15

        3.    Defendants Misled Investors About the Impact of Their Auditor's "Noisy" Resignation (Statement 10). ................................................................... 20

            a.    New Allegations Bolster This Court's Ruling. ............................ 21

            b.    New Allegations Permit This Statement to be Attributed to Defendants. ................................................................................. 23

    B.    The TAC Adequately Pleads Section 20(a) Claims.......................................... 25

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Alger Dynamic Opportunities Fund v. Acadia Pharm. Inc.*,
    756 F.Supp.3d 852 (S.D. Cal. 2024)...............................................................................25

*Bar Mandalevy v. Bofi Hldg.*,
    2021 WL 794275 (S.D. Cal. Mar. 2, 2021) .....................................................................24

*Bartelt v. Affymax, Inc.*,
    2014 WL 231551 (N.D. Cal. Jan. 21, 2014) ...................................................................24

*Biao Wang v. Zymergen*,
    744 F.Supp.3d 995 (N.D. Cal. 2024) .............................................................................25

*Boba Inc. v. Blue Box OPCO*,
    2019 WL 3082021 (S.D. Cal. July 15, 2019) .................................................................11

*Bowles v. Reade*,
    198 F.3d 752 (9th Cir. 1999) .........................................................................................12

*Brendon v. Allegiant Travel Co.*,
    412 F.Supp.3d 1244 (D. Nev. 2019)................................................................................7

*Brown v. Papa Murphy's Holdings*,
    2021 WL 235865 (W.D. Wash. Jan. 12, 2021)................................................................7

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
    527 F.Supp.3d 1151 (N.D. Cal. 2021) ...........................................................................14

*Cont'l Gen. Ins. Co. v. Olafsson*,
    2024 WL 4263211 (D.N.J. Sept. 23, 2024) ..............................................................10, 17

*Costas v. Ormat Techs., Inc.*,
    2019 WL 6700199 (D. Nev. Dec. 6, 2019)....................................................................25

*De Vito v. Liquid Holdings Grp., Inc.*,
    2018 WL 6891832 (D.N.J. Dec. 31, 2018) ....................................................................18

*Empl's Ret. Sys. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)......................................................................................12, 20

*EnSource Invs. LLC v. Tatham*,
    2017 WL 10648061 (S.D. Cal. Mar. 9, 2017) ...........................................................18, 19

*Gammel v. Hewlett-Packard Co.*,
    2013 WL 1947525 (C.D. Cal. 2013)..........................................................................13, 18

*Hacker v. Elec. Last Mile Sols. Inc.*,
  687 F.Supp.3d 582 (D.N.J. 2023) ...................................................................................13

*Hammer v. Frontier Fin. Corp.*,
  2011 WL 13229260 (W.D. Wash. Sept. 7, 2011)..............................................................7

*Hemmer Grp. v. SW Water Co.*,
  527 Fed. App'x 623 (9th Cir. 2013) ...............................................................................11

*Herremans v. BMW of N. Am., LLC*,
  2014 WL 5017843 (C.D. Cal. Oct. 3, 2014)....................................................................11

*Hessefort v. Super Micro Comput., Inc.*,
  2021 WL 1169906 (N.D. Cal. Mar. 29, 2021)..................................................................23

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) .....................................................................................8, 25

*In re Alphabet Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ............................................................................................20

*In re Alstom SA Sec. Litig.*,
  406 F.Supp.2d 433 (S.D.N.Y. 2005)................................................................................17

*In re American Int'l Grp., Inc. 2008 Sec. Litig.*,
  741 F.Supp.2d 511 (S.D.N.Y.2010).................................................................................20

*In re Apple Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989) ........................................................................................15

*In re Apple Sec. Litig.*,
  2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ..................................................................13

*In re Arlan's Dep't Stores, Inc.*,
  615 F.2d 925 (2d Cir. 1979)............................................................................................22

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F.Supp.3d 600 (S.D.N.Y. 2017)................................................................................24

*In re Bear Stearns Comp., Inc.*,
  763 F.Supp.2d 423 (S.D.N.Y. 2011)................................................................................19

*In re Celera Corp. Sec. Litig.*,
  2013 WL 4726097 (N.D. Cal. Sept. 3, 2013) ..................................................................10

*In re Celgene Corp.*,
  741 F.Supp.3d 217 (D.N.J. 2024) ...................................................................................24

*In re City of Vallejo,*
  2008 WL 4180008 (Bankr. E.D. Cal. Sep. 5, 2008) ...............................................................22

*In re Countrywide Fin. Corp. Sec. Litig.,*
  588 F.Supp.2d 1132 (C.D. Cal. 2008) ...................................................................................9

*In re Cyclink Sec. Litig.,*
  178 F.Supp.2d 1077 (N.D. Cal. 2001) .................................................................................12

*In re Daou Sys., Inc.,*
  411 F.3d 1006 (9th Cir. 2005) ...............................................................................................9

*In re eHealth Sec. Litig.,*
  2021 WL 5855864 (N.D. Cal. Aug. 12, 2021) .......................................................................14

*In re Eros Int'l PLC Sec. Litig.,*
  2021 WL 1560728 (D.N.J. Apr. 20, 2021) ............................................................................14

*In re Grand Casinos, Sec. Litig.,*
  988 F.Supp.1273 (D. Minn. 1997)...................................................................................14, 20

*In re Illumina, Inc. Sec. Litig.,*
  2018 WL 500990 (S.D. Cal. Jan. 22, 2018)..........................................................................10

*In re InterMune, Inc. Sec. Litig.,*
  2004 WL 1737264 (N.D. Cal. July 30, 2004)........................................................................24

*In re LDK Solar,*
  584 F.Supp.2d 1230 (N.D. Cal. 2008) ..................................................................................19

*In re MF Global Holdings Ltd. Securities Litigation,*
  982 F.Supp.2d 277 (S.D.N.Y. 2013)............................................................................. *passim*

*In re Mullen Auto. SEC Litig.,*
  2023 WL 8125447 (C.D. Cal. Sep. 28, 2023)........................................................................15

*In re Pac. Gateway Exch., Inc., Sec. Litig.,*
  2002 WL 851066 (N.D. Cal. Apr. 30, 2002) ...........................................................................9

*In re Quality Sys., Inc. Sec. Litig.,*
  865 F.3d 1130 (9th Cir. 2017) .........................................................................................7, 10

*In re QuantumScape Sec. Class Action Litig.,*
  580 F.Supp.3d 714 (N.D. Cal. 2022) ....................................................................................20

*In re Rocket Fuel, Inc. Sec. Litig.,*
  2015 WL 9311921 (N.D. Cal. Dec. 23, 2015)........................................................................24

*In re Sipex Corp. Sec. Litig.*,
   2005 WL 3096178 (N.D. Cal. Nov. 17, 2005) ...................................................................11

*In re Splunk Inc.*,
   592 F.Supp.3d 919 (N.D. Cal. 2022) ...........................................................................8, 14

*In re Thornburg Mortg., Inc. Sec. Litig.*,
   695 F.Supp.2d 1165 (D.N.M. 2010) .................................................................................9

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) .........................................................................................9

*In re VEON Ltd. Sec. Litig.*,
   2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017)...............................................................14

*In re Williams Sec. Litig.*,
   339 F.Supp.2d 1206 (N.D. Okla. 2003) .........................................................................14

*Janus Capital Group, Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011)..........................................................................................23, 24, 25

*Karimi v. Deutsche Bank Aktiengesellschaft*,
   607 F.Supp.3d 381 (S.D.N.Y. 2022).............................................................................19

*Kipling v. Flex Ltd.*,
   2020 WL 7261314 (N.D. Cal. Dec. 10, 2020)..................................................................5

*Lama v. Fred Meyer, Inc.*,
   2006 WL 581084 (W.D. Wash. Mar. 8, 2006) ..............................................................13

*Nguyen v. Radient Pharm. Corp.*,
   2011 WL 5041959 (C.D. Cal. Oct. 20, 2011)................................................................19

*Oaktree Principal Fund V, LP v. Warburg Pincus LLC*,
   2017 WL 3187688 (C.D. Cal. Jan. 17, 2017) ..........................................................24, 25

*Ohio Pub. Empls. Ret. Sys. v. Meta Platforms, Inc.*,
   2024 WL 4353049 (N.D. Cal. Sep. 30, 2024) ...............................................................25

*Pino v. Cardone Capital, LLC*,
   2025 U.S. App. LEXIS 14214, 139 F.4th 1102 (9th Cir. June 10, 2025)......................19

*Roberti v. OSI Sys., Inc.*,
   2015 WL 1985562 (C.D. Cal. Feb. 27, 2015).................................................................10

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) .............................................................................................9

*SBC Berlin 2012-2014, Ltd. v. Babywatch, Inc.*,
   2019 WL 13203776 (N.D. Cal. Oct. 10, 2019)..............................................................................11

*Schueneman v. Arena Pharms*,
   840 F.3d 698 (9th Cir. 2016) ......................................................................................................10

*Shapiro v. UJB Fin. Corp.*,
   964 F.2d 272 (3d Cir. 1992)........................................................................................................12

*Sneed v. AcelRx Pharm., Inc.*,
   2023 WL 4412164 (N.D. Cal. July 7, 2023)................................................................................23

*Todd v. STARR Surgical Co.*,
   2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) .............................................................................10

*Vanleeuwen v. Keyuan Petrochemicals, Inc.*,
   2013 WL 2247394 (C.D. Cal. May 9, 2013) .................................................................................5

**Statutes**

Private Securities Litigation Reform Act ("PSLRA").....................................................................9, 12

**Rules**

Fed. R. Civ. P. 12(b)6 ....................................................................................................................10

Rule 9(b)  ................................................................................................................................11, 12

**PRELIMINARY STATEMENT**

Throughout 2023 and 2024, Defendants hid the true state of SunPower's failing business and financial health amid an ongoing liquidity and financing crisis. This fraud ultimately resulted in the auditor's resignation over management's misconduct for failing to provide accurate financials, multiple government investigations into management's accounting practices, and SunPower's bankruptcy. This Court held that Defendants' August 2023 quarterly report—which assured investors that the Company had "cash and cash equivalents" to remain solvent for the next year—was actionably misleading given allegations that, by August 2023, Defendants were aware the Company was in a "dire cash crunch." Op. 11. The TAC adds new allegations confirming that this acute, unprecedented cash crisis was occurring, and known, when CEO Faricy made the same assurance a few months earlier, in May 2023. Faricy also falsely doubled-down on his continued "confidence" about the Company's ability to meet its bullish full-year guidance.

In February 2024, Defendants used faulty restated financials to induce SunPower's majority shareholder, Sol Holding, to throw the Company a $125 million credit lifeline, only to retract those financials after funding was secured. Defendants falsely claimed at the time that this infusion solved the Company's long-term liquidity issues. This short-term measure could not (and did not) solve the ongoing cash crisis. Rather than face this reality, Defendants hid an ongoing SEC investigation into their accounting practices, claimed the need to restate all of SunPower's financial information for the past two years, and never issued further financial reports. When SunPower's auditor (Ernst & Young, or "EY") resigned before completing the restatement and audit, citing management's misconduct, Defendants, in a press release filed after hours on July 3, 2024, maintained that the resignation "ha[d] no material impact on SunPower's current cash position," and new TAC allegations attribute this press release to Defendants. Op. 19.

This was false: As this Court held, "[t]he [prior] Complaint sufficiently alleges that Defendants knew that the resignation of EY—and the resulting inability to file audited financials— would block SunPower from obtaining additional cash and/or credit to remain solvent, thereby 'impact[ing] SunPower's current cash position.'" Op. 19. As this Court reasoned, "[a]n article on

Opposition To Motion To Dismiss                    1                    3:23-cv-05544-RFL

Forbes.com opin[ed] that EY's resignation signaled that *'[t]he troubles at SunPower must be beyond the average accounting questions facing these companies'*" and "that Sol Holdings '*might perhaps feel like a victim of securities fraud*' because it 'put fresh capital into a company on the promise that its accounting issues were being ironed out,' and yet "six months later the auditor quits because management wouldn't cooperate.'" Op. 19. Indeed, only two weeks later, on July 17, 2024, analysts reported that SunPower told its customers and supply partners that the Company was ceasing operations. On August 5, 2024, SunPower filed for bankruptcy. That same day, a federal grand jury subpoena was issued to investigate SunPower's accounting.

Defendants cannot insert their own version of the facts in place of a complaint's particularized allegations. Rather than address the allegations as pled in the TAC, Defendants ignore them, creating their own dubious narratives through a litany of extraneous documents the Ninth Circuit has made clear this Court cannot, and should not, consider at this stage. Defendants' attempt to paint an alternative reality is faulty for another reason: while Defendants try (improperly) to use the Company's extraneous financial information for the truth of the matter asserted, they ignore that Defendants later **admitted** (**twice**, through two notices of restatement) that the key financials were **false and could no longer be relied upon**. In fact, EY resigned *because* management was withholding the financial information needed to complete its audit. As a result, Defendants' narrative, even if improperly credited, rests upon a discredited foundation.

## STATEMENT OF FACTS

**A. In 2023, Defendants Masked SunPower's Unprecedented Liquidity Crisis.**

SunPower offered solar energy solutions through an array of hardware, software, and financing options. ¶28. Its credit agreements contained financial and reporting covenants. The main credit agreement with Bank of America (BOA) contained four financial covenants requiring SunPower to maintain certain ratios of "net leverage," "interest," and "assets," and to maintain a "minimum liquidity," all of which depended on financial health metrics such as EBITDA, debt, or liquidity. ¶¶30-47. Going into 2023, SunPower faced unprecedented existential challenges to its business and liquidity including a new net energy metering program ("NEM 3.0") and drastic

interest rate increases, which sharply decreased consumer demand. NEM 3.0 (passed in December 2022 and effective April 2023) had a "devastating" impact on the solar industry, immediately causing a 90% decline in consumer demand compared to the previous year. ¶¶44-45, 51.

As a result, in Q1 2023, the Company suffered an acute liquidity crisis. ¶¶49-55, 119-131. Unknown to investors, the Company was burning through cash at an alarming rate and could not meet its existing obligations, including to its key supplier, Maxeon. Yet publicly, Defendants masked this cash crisis. Then-CEO Faricy projected an unreasonably bullish 2023 full-year guidance (including EBITDA and sales) to convince a BOA-led group on January 26, 2023 to extend an additional $100 million loan facility. (The guidance was shared with the public in both February and May 2023.) In the Q1 May 2023 report, Faricy assured investors that the Company's "cash and cash equivalents will be sufficient to meet our obligations over the next 12 months" (*i.e.*, that the Company could continue as a "going concern" for the next year). ¶¶49-51. On the May Q1 conference call, Faricy reiterated that he "remained confident" in achieving that guidance. Two months later, on July 26, Faricy retracted it, slashing it by more than half. ¶52. Despite the ongoing liquidity crisis, Faricy and CFO Eby repeated the same going-concern assurance in the August 2023 Q2 report. ¶52. On October 1, 2023, Defendants admitted the need to "restate" financial reports from 2022 and 2023 (citing unspecified issues) and revealed that the Company had breached (unspecified) financial and reporting covenants. ¶56. This pattern of bullish statements, obtaining funding, and rescinding those statements, repeated itself with disturbing regularity.

**B. Defendants Continued to Hide SunPower's Financial Distress in 2024 By Issuing, And Then Retracting, False Financials To Induce Financing From Its Majority Shareholder.**

In December 2023, Defendants issued the unaudited "restatement," with a "going concern" warning, but did not disclose the seriousness of the ongoing liquidity crisis. Instead, Defendants turned to majority shareholder, Sol Holding, to buoy the secretly failing business with a $125 loan facility, announced February 15, 2024. To get that financing, Defendants presented a financial advisor, Houlihan, with SunPower's unaudited December 2023 "restatement" (the unaudited financial reports for Q1, Q2, and Q3 of 2023) for a fairness opinion—and, on the basis of those financials, Houlihan green-lit the transaction. This cash infusion was misleadingly portrayed as a "long-term" solution to the Company's liquidity challenges. Defendants asserted that they

"expect[ed] to be cash flow positive in the second half of 2024 and beyond" and "d[id] not expect . . . to have a going concern provision in our 10-K [the audited 2023 annual report]" supposedly to be released just 14 days later (meaning the Company could remain solvent for at least a year), and that all significant "cost reductions" were complete.  In truth, the Company's financial crisis had only become more dire, and the infusion could not (and did not) keep the Company above water for long.  ¶¶82-83, 132-49, 160-86.  Soon after, on February 27, Faricy was fired, with Defendant Werner named as his replacement.  ¶84.  And, contrary to Eby's assurance, Defendants did not issue the Company's audited 10-K annual report 14 days later—or any financial statements—ever again.  Unknown at the time, during audit preparation, EY detected accounting improprieties and was increasingly frustrated by Defendants' lack of candor in providing crucial information.  ¶102.  Also unknown at the time, Defendants were dealing with an SEC investigation into "accounting practices."  ¶89, 177.  Thus, instead of filing a 10-K, on February 29, 2024, Defendants stated (without accurately disclosing why) that the Company's 2023 annual report would be delayed for an unspecified amount of time.  ¶86.  Defendants then failed to meet all subsequent SEC filing deadlines and incurred repeated warnings of delisting from NASDAQ.

With still no 2023 annual 10-K or 2024 quarterly reports filed, two months later, on April 23, 2024, Defendants instead announced the need for yet another, even more massive "restatement"—covering all financial reports issued *for the past two years*—revealing that those financials were "*false*" and "*should no longer be relied upon*."  ¶92.  Defendants also revealed massive layoffs of approximately 1,000 employees and cost-cutting restructuring.  The April disclosure only mentioned "misstatements," which Defendants claimed the Company would "describe[] in more detail in" those forthcoming amended financials.  ¶93.  Defendants never issued any more Company financials, restated or otherwise.

**C. SunPower's Auditor, Ernst & Young, "Noisily" Resigns, Alleging Misconduct In Defendants' Financial Reporting, And SunPower Files For Bankruptcy.**

Secretly, after Defendants exhausted the second tranche of the Sol Holding credit in June 2024, the Company was out of financing options.  The need to restate financials for the past two years (as well as its many breaches of its financial and reporting covenants) cut off access to additional credit.  ¶147-51, 187-97.  Then, in what one analyst report referred to as a "horror show"

8-K filing (filed strategically after-market hours on July 3, 2024), Defendants revealed that the Company's auditor resigned, with EY stating it "believes that allegations of misconduct by senior members of management, who had significant roles in internal control over financial reporting and upon whose representations EY relied, were within the scope of EY's audit" but had been withheld, and that "information has come to its attention that has made [EY] unwilling to be associated with the financial statements prepared by management." ¶102. Defendants falsely assured that this resignation would have "no material impact' on the Company's "cash position or continued focus to deliver for its customers." But only two weeks later, on July 17, 2024, the Company notified its customers and partners it was ceasing operations. ¶109. On August 5, 2024, SunPower filed for bankruptcy. ¶114. That same day, a federal grand jury subpoena issued, seeking "documents similar to those sought by the SEC" to "investigat[e] . . . SunPower's accounting." ¶116.

## ARGUMENT

**A. The TAC Pleads Actionable False Statements and Omissions.**

      **1.    Defendants Misled Investors About SunPower's Financial Health in 2023.**

          a.    The Same Cash Concerns in August 2023 Were Apparent to Defendant Faricy in May 2023 (Statement 1).

This Court held Plaintiffs sufficiently alleged a Section 10(b) claim based on Defendants' "going concern" statement in its August 2023 Q2 that ***[w]e currently anticipate that our cash and cash equivalents will be sufficient to meet our obligations over the next 12 months***." Op. 11-12. "The Complaint plausibly alleges that by August 2023, SunPower was in a dire cash crunch that went far beyond 'spot episodes of illiquidity,'" and "both Eby and Faricy were well aware of the situation and could not have believed SunPower could continue to meet its cash obligations over the next year" (Op. 11), relying on FE allegations showing that dire liquidity position (including missed payments to key supplier, Maxeon) and Defendants' awareness (Op. 12).[1]

---

[1] This Court's conclusions in its prior order are the law of the case and may not be revisited. *Vanleeuwen v. Keyuan Petrochemicals, Inc.*, 2013 WL 2247394, at *7 (C.D. Cal. May 9, 2013); *Kipling v. Flex Ltd.*, 2020 WL 7261314, at *9 (N.D. Cal. Dec. 10, 2020) (issues decided in the previous MTD Order were law of the case). Under the law of the case doctrine, "the decision on a legal issue by the same or a superior court must be followed in all subsequent proceedings in the same case" unless one of the following narrow exceptions apply: "(1) the first decision was clearly

However, this Court concluded that "Plaintiffs fail[ed] to sufficiently allege a claim as to [the same] . . . May 2023 [going concern] statement." The Court reasoned that the AC alleged FE statements "that from around 2019 to 2024, SunPower was tight on cash and regularly failed to pay suppliers on time," so "[t]he fact that SunPower was alleged to have operated in this cash-strapped state for multiple years without a major liquidation event undercuts both . . . falsity and scienter." Op. 11. The TAC clarifies that by the May 3, 2023 Q1 report, the Company was in an **unprecedented, acute** liquidity crisis such that Defendants would have "already anticipated that SunPower would not be able to meet its cash obligations over the next 12 months." Op. 11. NEM 3.0—effective in in Q1—created an unprecedented "crisis" for residential solar companies. ¶¶43-45, 51. According to FE1 (a finance manager), for instance, the Company was "performing 'OK'" when FE1 joined in January 2022, but was "hit hard" by NEM 3.0" in early 2023. As demand significantly dropped, the Company had "not performed well for a couple of quarters leading into the middle of 2023." ¶120. Multiple FEs clarify that severe liquidity challenges became "apparent" at the start of 2023. *E.g.*, ¶128 (FE4: SunPower's lack of cash became "apparent" in Q1 2023); ¶126 (FE3: years-long cash problems became a "big" issue in 2023); ¶120 (FE1: same).

Those FEs also recount how this new liquidity crisis caused SunPower to default on its critical obligations in Q1 2023. During Q1, as FE1 explained, there "was a lack of cash on hand at the Company," forcing continual cost cutting and "liquidat[ion] . . . of our material and inventory," and that the Company was delinquent on payments to key supplier, Maxeon. ¶121. The Company had been delinquent on these payments for "months" *before* Maxeon suspended SunPower's contract in July 2023, raising an inference that those payments ceased prior to May 2023. ¶122; *see* Op. 11-12 (crediting Maxeon nonpayment as evidence of a cash crisis).[2] FE2,

---

erroneous; (2) there has been an intervening change in law; (3) the evidence before the court when reconsidering the issue is substantially different; (4) there are other changed circumstances; or (5) a manifest injustice would result from applying the doctrine." 2013 WL 2247394, at *7. "Failure to apply the doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion." *Id.* (citation omitted). Defendants do not argue any condition is met here.

[2] Defendants' attempt to discredit FE1 as too "low level" fails as a matter of fact and law. MTD 11. FE1 was a finance manager on the supply chain team who was responsible for understanding and assessing the company's profits, losses, and expenses related to suppliers like Maxeon, and

responsible for facilitating payments to insurance, conveyed that, leading up to May 2023, the Company was "crunched constantly" for cash, "[n]othing just flowed," such that critical insurance providers (including property, workers' compensation, casualty, and "D&O," or directors and officers) repeatedly threatened "to cut [us] off." ¶124. FE3, responsible for executing payments to logistics services, had the same experience in Q1, receiving both threats and cancellations from service providers, including one "major supplier," due to nonpayment. ¶126. FE4, the VP of supply chain, said in Q1 2023 that there was no longer "enough cash in the business to continue to pay some of the suppliers" "across the entire Company" and that almost "every aspect was overdue." ¶130. FE4 also conveyed that, in Q1, management had hired a consulting firm to "literally manage cash flow," but that this did not stem the Company's bleeding of cash. ¶129.

This case is similar to *In re MF Global Holdings Ltd. Securities Litigation*, 982 F.Supp.2d 277, 299 (S.D.N.Y. 2013), where defendants claimed to "have sufficient liquidity to satisfy all of [its] expected cash needs for at least one year." *Id.* In truth, MF Global had a "lack of sufficient internal controls to manage . . . liquidity" and was "me[eting] . . . capital requirements only through intra-company transfers," which created a liquidity shortfall that led to bankruptcy. *Id.* at 290, 299, 318. The same applies here. The May 2023 "statement[] [was] inconsistent with [SunPower's] real-time financial information and . . . materially false or misleading." *In re Quality Sys.*, 865 F.3d 1130, 1144 (9th Cir. 2017); *Brown v. Papa Murphy's Holdings*, 2021 WL 235865, at \*5 (W.D. Wash. Jan. 12, 2021) ("rosier view" of "financial prospects"); *Hammer v. Frontier Fin. Corp.*, 2011 WL 13229260, at \*5 (W.D. Wash. Sept. 7, 2011) (weak capitalization).

Defendants contend that the May 2023 statement cannot be false because "SunPower . . . survived as a going concern for" 12 months before bankruptcy. MTD 9. But the Company's

---

thus was squarely positioned to know about the missed Maxeon payments and the implications of that default. ¶119. Courts regularly credit such accounts in any event. *E.g.*, *Brendon v. Allegiant Travel Co.*, 412 F.Supp.3d 1244, 1260-61 (D. Nev. 2019) ("[m]ost of the FEs occupied front-line maintenance positions, but the FEs allege that senior management . . . knew of the maintenance issues" through "monthly reliability meetings"). That is particularly so given other FE allegations of missed payments to "major" suppliers corroborate its falsity. *E.g.*, ¶126. Moreover, it is immaterial whether Maxeon "canceled" the contract in July (MTD 11-12); what matters is the allegations confirm SunPower did not have the cash to pay Maxeon (and many other suppliers and service providers) months before that time, contrary to the going concern assurance.

continuation *was artificially prolonged by fraud*. As this Court noted in finding the August 2023 going concern statement misleading, "[t]he existence of a severe liquidity crisis is . . . bolstered" by the fact that in "December 2023, [7 months after the May 2023 statement] SunPower disclosed 'substantial doubt exists about [its] ability to continue as a going concern'" and "by February 2024 [9 months post-May], had obtained a cash infusion from Sol Holdings [the TAC alleges through questionable means, *infra* A.2.] that SunPower later admitted was a lifeline to stave off 'imminent insolvency.'" Op. 12. These events undermine Defendants' attempt to obscure the means by which SunPower was able to remain in business just weeks beyond the twelve-month timeline.

The TAC also makes clear that, in May 2023, Faricy was "aware of the situation and [thus] could not have believed SunPower could continue to meet its cash obligations over the next year." *Cf.* Op. 12. During that time, FE4 raised these cash issues directly with Faricy. ¶130. As FE1 explained, Faricy started tracking expenses closely in Q1, and "[w]e had almost monthly meetings from [Faricy] trying to emphasize the importance of getting cash on hand." ¶121. FE2 also communicated insurers' threats of cancellation verbally to the then-CFO Dundas, who was working with Faricy to manage the cash crisis. ¶124. Moreover, that management hired an outside firm to address the cash issues, ¶129, confirms this awareness. Such facts show Faricy "w[as] aware of the adverse facts that cut against the positive information conveyed" rendering the going concern assurance "misleading." *In re Splunk Inc.*, 592 F.Supp.3d 919, 948 (N.D. Cal. 2022); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000). The FEs also provide insight into a motive for Faricy to misrepresent SunPower's financial strength. As FE1 conveyed, the swift impact of NEM 3.0 and the Company's poor performance in early 2023 put "[CEO] [Faricy] . . . under a lot of heat." ¶120. Indeed, according to FE4, SunPower's lack of cash (which became "apparent" in Q1 2023) was "caused" by Faricy's decision to "pay down a bunch of debt" in 2022 to "make sure we could get more favorable equity to fund" the "financial services business." ¶128. But this strategy, if it backfired (and it did), carried many risks: "***If you don't have enough cash to sustain operations for several months, which we didn't, you get into dire straits really, really quickly***." ¶128. Faricy's prior, bad decision does not exonerate him (MTD 15 n.12); rather, it

provides his motive during the Class Period to bolster the Company's financial health once his gamble did not pay off starting in early 2023. *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F.Supp.2d 1165, 1195 (D.N.M. 2010) (prolonging the "survival" of an enterprise supplies motive). CFO Dundas resigning shortly after these misleading assurances adds to an inference of scienter. *Cullen v. RYVYL Inc.*, WL 4536471, at *11 (S.D. Cal. Oct. 21, 2024) (suspicious CFO resignation).

The PSLRA safer harbor does not shield this May 2023 statement. As an initial matter, Defendants do not challenge this Court's prior holding that the August 2023 risk warnings were inadequate (Op. 13). The same analysis renders the same risk disclosures in May 2023 insufficient. Instead, Defendants claim that "[f]or forward-looking guidance to be actionable, the Ninth Circuit requires . . . specific facts showing Defendants had 'little or no chance' of achieving their predictions" (MTD 1, 5, 9) or "rendering nearly impossible the underlying business plan and assumptions." MTD 8.[3] That is not the test—it is enough that Plaintiffs show Faricy was "'aware of a significant likelihood that the risk [of insolvency] would materialize.'" *See* Op. 14. That is alleged. *Supra* A.1.a. As this Court held regarding the August 2023 statement, allegations that "Faricy w[as] allegedly aware that SunPower was in a severe liquidity crisis that resulted in SunPower already defaulting on its payment obligations to Maxeon," Op. 14, equally apply to Faricy's going concern assurance a few months earlier, in May 2023. *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F.Supp.2d 1132, 1178 n.62 (C.D. Cal. 2008); *MF Global*, 982 F.Supp.2d at 318. "Defendants attempt to raise the standard for scienter far beyond what is required" as "the

---

[3] *In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005) (MTD 1, 9, 18) did not create such a test. There, the complaint was upheld, but as to one claim (that Daou had "little or no chance" of obtaining certain future contracts), plaintiffs pled nothing to indicate that this was true. That is not the case here. In *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001) (MTD 1, 8, 18) the complaint "d[id] not explain what the 'serious operational problems' were, what kind of 'substantial difficulties' were being experienced, and why these 'difficult problems' decreased revenues." 253 F.3d at 434. Here, the TAC details how NEM 3.0 and the Company's cash crisis (bolstered by allegations the Company could not meet its current obligations) hurt liquidity. The same distinguishes *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (finding "no facts alleged to show that the defendants knew their forecasts were false when made"). And, in *In re Pac. Gateway Exch., Inc., Sec. Litig.*, 2002 WL 851066, at *16 (N.D. Cal. Apr. 30, 2002), "the company plainly stated that it could not satisfy its capital requirements unless it obtained additional funding," and "plaintiffs d[id] not allege that defendants made an inaccurate, incomplete, or misleading prior disclosure regarding" the company's financials; neither is true here.

PSLRA does not require that Plaintiffs show that Defendants were capable of predicting the future." *Todd v. STARR Surgical Co.,* 2016 WL 6699284, at *14 (C.D. Cal. Apr. 12, 2016). Were it otherwise, "then it would be virtually impossible to establish scienter at the pleading stage" in cases where (like here) deeply flawed financial issues undercut defendants' upbeat public commentary.[4] Even if the alleged misstatements here were forward-looking, it is well settled that the safe harbor does not protect material omissions of "present fact" that undermine them. *Id.* at *10; *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *9 (C.D. Cal. Feb. 27, 2015); *In re Celera Corp. Sec. Litig.*, 2013 WL 4726097, at *2 (N.D. Cal. Sept. 3, 2013) ("an omission of a historical fact"). Here, the TAC alleges that Defendants omitted, *i.e.*, failed to disclose, material information about the present, undisclosed problems (*supra* A.1.a) plaguing the Company's liquidity.

Defendants try to change the plain import of a "going concern" warning, contending (through extraneous documents) that such warnings are not relevant to "financial health" but are instead a "specific accounting analysis." MTD 7-8.[5] But Plaintiffs need not "alleg[e] . . . how the analyses" were created (MTD 8-10)—representing that the Company has "cash and cash equivalents" sufficient to carry it through 12 months is a representation of financial health and liquidity, which the TAC's allegations about the ongoing dire cash crisis (*supra* A.1.a) plainly undermine. Indeed, this Court (like *MF Global* assessing a similar "going concern" statement) endorsed this interpretation.[6] If Defendants wish to submit "specific" internal analyses, they can

---

[4] *Schueneman v. Arena Pharms*, 840 F.3d 698, 709 (9th Cir. 2016); *Emergent*, 2023 WL 5671608, at *21 (plaintiff's theory is not that facility was "doomed to fail" but that "ongoing, serious" flaws . . . made defendants' public assessments more risky than they led investors to believe"); *In re Illumina, Inc. Sec. Litig.*, 2018 WL 500990, at *5 (S.D. Cal. Jan. 22, 2018) ("[i]t is possible that Defendants believed they could hit their earnings forecast notwithstanding lower [] sales. However, to survive this Fed. R. Civ. P. 12(b)6 motion, Plaintiff need not prove anything").

[5] *Seagate* (cited at MTD 8) is not to the contrary. There, plaintiff mistakenly alleged a certain customer-related disclosure was a GAAP requirement—it was not.

[6] *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130 (9th Cir. 2017) cited with approval *Stone & Webster*, where the company claimed to "ha[ve] on hand and ha[ve] access to sufficient sources of funds to meet its anticipated operating, dividend and capital expenditure needs," and "the alleged falsehood was in the fact that the statement claimed that the Company had access to ample cash at a time when the Company was suffering a dire cash shortage." *Id.* at 1142; *Cont'l Gen. Ins. Co. v. Olafsson*, 2024 WL 4263211, at *2 (D.N.J. Sept. 23, 2024) (examining "going concern" as one misrepresenting whether "the Company had sufficient liquidity to remain solvent").

do that at a later stage of the litigation. Defendants also ignore the larger problem: Defendants later admitted (twice, through two separate notices of restatements) that the May 2023 going-concern statement, and all the financial information underpinning it, were ***inaccurate and should "no longer be relied upon," and Defendants never issued any restated financials***. ¶56, 92. Defendants' repeated insistence that "the only reasonable inference is that SunPower had the ability to pay Maxeon all along," MTD 12-13, or that the going concern analysis was otherwise accurate, e.g., MTD 8, cannot be credited in light of definitive allegations that, behind the scenes, the Company was in a cash crisis. *See In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005) ("admission that its financial reports . . . should not be relied upon and would be 'restated' meant that the as-issued reports were materially inaccurate").[7]  Such conjectures are also belied by allegations Defendants shifted obligations, delaying receipts—robbing Peter to pay Paul—to artificially keep the Company above water. *E.g.*, ¶131.  In these circumstances, "Although Plaintiffs do not identify precisely when or where these facts were concealed, they do not need to." *SBC Berlin 2012-2014, Ltd. v. Babywatch, Inc.*, 2019 WL 13203776, at *10 (N.D. Cal. Oct. 10, 2019), *Herremans v. BMW of N. Am., LLC*, 2014 WL 5017843, at *9 (C.D. Cal. Oct. 3, 2014) (Rule 9(b) "somewhat relaxed [for concealment claims]"). The particularity rule is "relaxed as to matters peculiarly within the opposing party's knowledge." *Boba Inc. v. Blue Box OPCO,* 2019 WL 3082021, at *4 (S.D. Cal. July 15, 2019).

Defendants journey well beyond the TAC by improperly asking this Court to take judicial notice of the never-alleged "GAAP analyses" and then accept them for the truth of the matters asserted on the ground that "EY audited them" and "[i]f any questions remain (they should not), the going concern analyses themselves supply answers." MTD 10.  Once again, Defendants' factual argument ignores that Defendants ***conceded*** that the May financial results (including as to

---

[7] Such a restatement "[b]y definition . . . corrects financial data that was false when made." *Hemmer Grp. v. SW Water Co.*, 527 Fed. App'x 623, 626 (9th Cir. 2013). *M&M Hart Living Tr. v. Glob. Eagle Entm't, Inc.*, WL 5635424, at *10 (C.D. Cal. Aug. 20, 2017) (cited at MTD 7) is not to the contrary; there, "Defendants had disclosed internal control problems to investors," whereas here, SunPower affirmative reassured it had effective controls in its February 2023 10-K.

"going concern" matters) were *false* and can "no longer be relied on."[8]  The argument also ignores how EY *resigned* due to management's lack of candor and cooperation.[9]  *Empl's Ret. Sys. v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015).  That the SEC and the AUSA are investigating this conduct is "circumstantial evidence" of managerial misconduct. *In re Cyclink Sec. Litig.*, 178 F.Supp.2d 1077, 1083 (N.D. Cal. 2001).  Thus, while Defendants fault the TAC for failing to address specific aspects of the analysis, there could not be a clearer case where dismissal "prior to discovery [would] . . . permit sophisticated defrauders to successfully conceal the details of their fraud.'" *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992).

> b.    Investors Were Misled About Full-Year 2023 Guidance (Statement 2).

On the Q1 May 3, 2023 earnings call, Defendant Faricy falsely doubled down on the full-year guidance originally projected in early 2023 to secure a line of credit from BOA.  He told investors: "***Importantly, we remain confident in our plans to achieve our full year 2023 guidance*** of between $125 million and $155 million of adjusted EBITDA based on 90,000 to 110,000 new customers and adjusted EBITDA per customer before platform investment of between $2,450 and $2,900."[10]  By May 2023, the Company was experiencing an acute liquidity crisis.  Former employees confirm that the "NEM 3.0 Headwinds" had already devastated customer demand (including from "new customers"), which exacerbated the Company's cash crisis and triggered widespread defaults on the Company's obligations in Q1 2023.  *Supra* A.1.a.  Just two months

[8] Even if this reality did not govern, such extraneous evidence at most raises premature factual disputes.  In *Signet*, for instance, the court declined to consider Defendants' "additional arguments that they claim[ed] exonerate[d] Signet's reserve calculations and compel[led] dismissal of the FAC," including arguments that testimony from former employees was unreliable, that "Signet ha[d] not restated its financials or dramatically increased its reserves, and "that Signet received unqualified audit opinions during the Class Period."  *In re Signet Jewelers Ltd. Sec. Litig.*, WL 6167889, at *14 (S.D.N.Y. Nov. 26, 2018).  The Court reasoned that "[t]hese arguments . . . are improper on a motion to dismiss, as they either raise issues of fact that go beyond the pleadings or misconstrue Plaintiff's pleading obligations under the PSLRA and Rule 9(b)."  *Id*.

[9] The EY resignation letter plainly included the May statement.  *Contra* MTD 10; ¶102 (including Q1 2023 report as those "affected" financial statements).

[10] This is not a new claim.  *Contra* MTD 4.  It is a reiteration of the projection made in February 2023 and thus merely reflects supplemental public facts showing that the assertion was re-endorsed.  *Cf. Bowles v. Reade*, 198 F.3d 752, 762-63 (9th Cir. 1999); *see also, Lama v. Fred Meyer, Inc.*, 2006 WL 581084, at *4 (W.D. Wash. Mar. 8, 2006) ("claim arises out of the same nucleus of facts and period of conduct").

later, the Company *withdrew* this guidance, dramatically reducing projected EBITDA by **more than 50%**. *See Hacker v. Elec. Last Mile Sols. Inc.*, 687 F.Supp.3d 582, 600 n.38 (D.N.J. 2023) ("size of . . . errors" supports falsity); *Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at *16 (C.D. Cal. 2013) (temporal proximity, four to eleven weeks, supported falsity). Plaintiffs need not allege that "internal projections" "to which Faricy had access, the process by which those projections were prepared, or the underlying assumptions, business plans, or strategies" were false. MTD 5. Defendants ignore that they *admitted* all such underpinnings were false, and that Defendants never issued accurate information necessary to assess such internal projections. The TAC need only allege facts undermining Faricy's statements.[11] That is the case here because metrics underlying the guidance (like EBIDTA, i.e., earnings cash flow, reflecting new customers and robust sales) undoubtedly are linked to the Company's liquidity crisis. *Supra* A.1.a.

Regarding scienter, Defendants are wrong to contend "[t]he TAC contains no facts suggesting Faricy knew" in May "that the reduction should have been greater, or that preliminary NEM 3.0 sales were lower than expected." MTD 5-6. They ignore the allegations of Faricy's real-time knowledge of the dire financial strain on the Company starting in 2023. *Supra* A.1.a. As the TAC alleges, the reiteration of the projection in May 2023, after NEM 3.0 was already producing devastating effects, thus creating a situation in which such bullish projections at the very least lacked a basis in material fact. Indeed, CEO Faricy would have had real time access to filed reports as to the devastation being wreaked by NEM 3.0—an impact never seen before in the history of solar sales. Faricy admitted, as to the reduced July guidance, "we've been expecting a decline in new bookings under NEM 3.0," (Aug. 2023 conference call, Defs. Ex. 13), and the TAC alleges that this decline was already apparent in Q1 2023. Faricy's admission shows that he had no reasonable basis to double-down on the full year guidance. Indeed, both "the magnitude" and the "timing of the [July] decline" (just two months later) "bolsters the inference that [Faricy] knew that his statement[] w[as] misleading." *In re Apple Sec. Litig.*, 2020 WL 6482014, at *11 (N.D.

[11] None of Defendants cases (cited in MTD 4-6) involve allegations of an undisclosed liquidity crisis with contemporaneous accounts from CWs.

Cal. Nov. 4, 2020) ("With the magnitude of the decline that large, defendants plausibly had data and information to suggest the decline was taking place."); *In re eHealth Sec. Litig.*, 2021 WL 5855864, at *11 (N.D. Cal. Aug. 12, 2021) ("the magnitude of the operational expenses . . . raises the inference that the . . . Defendants, who allegedly participated in eHealth's management and operations at the highest level by virtue of being the company's CEO, CFO, and COO, were aware of them and the importance of disclosing them."); *In re Grand Casinos, Sec. Litig.*, 988 F.Supp.1273, 1283 (D. Minn. 1997) ("given the short time frame" (three months) "it is reasonable to infer that management was on notice of these problems"). Defendants also do not address Faricy's motive to obscure the dire crisis he had a large hand in exacerbating. *See In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at *10 (S.D.N.Y. Sept. 19, 2017) ("steps to obscure" facts indicated scienter). As FEs revealed, in 2022, Faricy had taken a gamble pre-NEM 3.0 to pay down debt, but by early 2023, the Company was burning cash at an alarming rate, and the original, bullish February projection was formulated for the sole purpose of raising badly needed capital. ¶¶49-50. Faricy, who was under a "lot of heat" for the NEM impact, reduced demand, and overall poor performance in Q1 2023, had a motive to double down, rather than retract, this guidance. ¶121; *In re Williams Sec. Litig.*, 339 F.Supp.2d 1206, 1234 (N.D. Okla. 2003) (that "continued viability was dependent upon certain measures of WCG's financial performance" is a "strong motive" to misstate financials); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 527 F.Supp.3d 1151, 1185 (N.D. Cal. 2021) (motive to buy time). Faricy managed to convey enough empty optimism to keep his job a few months longer. *Splunk Inc. Sec. Litig.*, 592 F.Supp.3d 919, 949 & n.9 (N.D. Cal. 2022). ("incentive" to deceive investors to help career supports scienter).

Statement 2 is not protected by the safe harbor. Faricy's assurance that he "***remain[ed] confident***" was not a forward-looking statement, but rather a statement about the Company's current financial status. *See In re Eros Int'l PLC Sec. Litig.*, 2021 WL 1560728, at *7 (D.N.J. Apr. 20, 2021) ("[R]emains" clearly refers to a current, not future, state."). Even if the statement were forward-looking (it is not), once again, Defendants misrepresent that the standard requires a "showing Defendants had 'little or no chance' of achieving their predictions." MTD 5. That is

not the test: "[a] projection or statement of belief contains at least three implicit factual assertions: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement" and "[a] projection or statement of belief may be actionable to the extent that one of these implied factual assertions is inaccurate." *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989). That is alleged here.

Moreover, "[t]he Ninth Circuit has applied this doctrine narrowly: '[a] motion to dismiss for failure to state a claim [on the basis of the doctrine] will succeed only when the documents containing defendants' challenged statements include 'enough cautionary language or risk disclosure' . . . that 'reasonable minds' could not disagree that the challenged statements were not misleading.'" *In re Mullen Auto. SEC Litig.*, 2023 WL 8125447, at *12 (C.D. Cal. Sep. 28, 2023). Defendants cite only to various disclaimers stating NEM 3.0 "*could* cause our revenue to decline and harm our financial results" or that the Company was still assessing the "full impact" of NEM 3.0. MTD 4, 6. They do not suffice; Faricy could not employ speculative language when he knew such effects would happen and were already happening.

### 2.    Defendants Misled Investors About SunPower's Financial Health in 2024 and The Impact of the Sol Holding Transaction (Statements 4-9).

After issuing the first, unaudited "restatement" in December 2023 with a "going concern" insolvency warning, Defendants negotiated a $125 million credit line from majority shareholder, Sol Holding. When announcing it on February 15, 2024, Defendants portrayed this as a long-term solution to the Company's liquidity problems: in response to an analyst question—whether "[the transaction] . . . definitively remove[s] the going concern language in your financials"—Eby assured: "[W]hile we are still in discussions with auditors and reviewing financial plans, *we do not expect at the moment to have a going concern provision in our 10-K [annual report] that's coming out*" in 14 days. ¶166. That is, Eby assured investors that the Company had sufficient cash and cash equivalents to remain solvent for the next twelve months. *Id*.

On the same conference call, Faricy similarly assured the inquiring analysts that the infusion "*puts us in a position to have the liquidity we need to execute against our business plan*

*this year*." ¶165.  Defendants also repeatedly assured investors that, following this capital raise, "*we expect to be cash flow positive in the second half of 2024 and beyond*," ¶¶165, 168, and Eby specifically conveyed that significant "restructuring" and other "*cost reductions have been implemented*" to make this a reality.  ¶168; ¶165 (Eby: "we put in a conservative 2024 plan, and …*with the cost reductions that we put in place…we're going to be consistently free cash flow positive in the second half and beyond that*.").  These statements falsely reassured stockholders that sufficient funds had been obtained to put the Company on a steady, long-term financial footing and that serious financial problems were in the rearview mirror.

This Court acknowledged that these statements "go beyond puffery" but concluded that the prior complaint lacked enough "allegations supporting the inference that the $125 million cash infusion would not have mitigated SunPower's" cash issues.  Op. 17.  The TAC adds allegations to show that the cash infusion did *not* in any material way "mitigate" SunPower's existing cash crisis.  In a sworn declaration, the CTO confirmed this infusion was but a short-term respite of "*incremental financing* [which] allowed the Company to weather near-term challenges" but not enough to provide long-term liquidity or cash flow positive in the second half of 2024 and beyond. ¶170.  Rather, "[t]his new money infusion provided the Company with critical liquidity support amid *ongoing discussions* with stakeholders regarding a *potential comprehensive solution*." ¶170 (Sol Holding provided "additional runway to find a more comprehensive solution").  Nor (contrary to Eby's assurances) had the needed "cost reductions" already "been implemented." ¶168.  Two months later, on April 24, 2024, Defendants announced massive layoffs and a major reorientation that "mov[ed] to a low fixed-cost model" and "w[ound] down" major aspects of the Company's residential program and "closed" "direct sales." ¶174.  And, by June 2024, the Company already was drawing on the second (and final) loan tranche of $50 million. ¶101; *see* Op. 17 (finding draw relevant to cash issues).  Thus, the Company still struggled with liquidity following this short-term lifeline and had found no "solution" to this immediate crisis.

This Court also reasoned that because "[n]one of the FEs [in the prior complaint] were tenured at the company at the time of this alleged misstatement," "none commented on the effect of the capital infusion" on the cash crisis and longevity of the Company.  Op. 17.  The TAC adds

new FEs to confirm it did not provide a long-term solution. FE5, a regional manager, described how behind the scenes, after securing this funding, there remained "definite uncertainty within the Company at the time about SunPower's future." ¶140. FE5 recalls that SunPower had an "all-hands" meeting led by Faricy to discuss the credit agreement with Sol Holding; while the message to employees was that the deal "bolstered" SunPower, FE5 "knew we were still in trouble" financially. *See, e.g.*, *Cornwell*, 689 F.Supp.2d at 637-38 (considering allegations of "widespread knowledge" of problems at company); *In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433, 505 (S.D.N.Y. 2005) (allegation that "everyone knew" of the problems). FE5 revealed how during this timeframe (February 2023 until bankruptcy in August 2024), the Company was still not paying, and was many months behind, its obligations including rent for offices and warehouses, cleaning services, and subcontractors—forcing further notices of cancellation and service termination, ¶¶132-41, and that Company credit cards suffered a nationwide outage from too much unpaid debt, stranding hundreds of employees, ¶137. FE10, a senior sales director from August 2006 to August 2024, corroborated that these cash issues persisted after the February 2023 infusion with the Company continuing to fail to pay vendors, suppliers, and manufacturers. ¶150. FE6 (a finance manager) confirmed that, from December 2023 until SunPower's bankruptcy in August 2024, "[t]here was the need and the desire for more cash" to meet the Company's outstanding obligations. ¶¶143-45. These new FE allegations reveal that, far from "expect[ing]" this influx of cash to render the Company solvent for the next 12 months, the Company still was in a dire liquidity crisis that this influx of capital did not (and could not) solve.

The TAC need not allege that the Company's so-called "internal projections" "in fact indicated a contrary result." MTD 18. Courts (including this Court) assessing such statements about financial health do not require it. *See, e.g.*, *Cont'l Gen. Ins. Co. v. Olafsson*, 2024 WL 4263211, at *8 (D.N.J. Sept. 23, 2024) (representation that company could continue as "going concern" misleading given allegations company "lacked financial resources" and overstated financial health); *MF Global.*, 982 F.Supp.2d at 317-18 ("sufficient liquidity to satisfy all of [its] expected cash needs for at least one year" misleading from allegations of "substantial strain on its

capital and liquidity and met its requirements only through daily intra-company transfers").

Regarding scienter, other allegations "indicate that insolvency" and serious "cash flow issues" within 12 months "was apparent to Defendants in February." Op. 17. The CTO confirmed Defendants were aware of the short-term nature of the Sol Holding fix. ¶170. Former employees confirm the same. For instance, FE6, a finance manager who "helped work on" the Sol Holding transaction, made clear that Faricy and Eby were "definitely in conversations with Sol Holding on the need for capital" after the initial infusion. ¶145. FE6 reported directly to Eby and discussed the cash crisis with Eby in "regular meetings" "every week or two." ¶¶143-45. FE5 conveyed how the serious cash issues were relayed up the reporting chain to Faricy and, after Faricy was fired, Werner. ¶¶138-39. FE4 worked at SunPower until February 2024, and conveyed at that time, "every aspect" of SunPower's obligations were "overdue" "[t]here's no way that [Faricy] . . . wasn't aware of the gravity of the payment situation that [Eby] . . . and [the COO] . . . on his behalf were trying to navigate." ¶130. Such awareness (at least, recklessness) is pled because Defendants touted the long-term strength of SunPower's business, *see Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at *21 (C.D. Cal. May 8, 2013) (executive could "recklessly misrepresent the inability to deliver on those promises"), and in response to direct analyst questions, *Allegiant Travel*, 412 F.Supp.3d at 1261; *EnSource*, 2017 WL 10648061, at *5; *see De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *8 (D.N.J. Dec. 31, 2018) (defendants hid "the truth about [the company]'s questionable status as a going concern").

The TAC also makes clear that Defendants were aware this was a lifeline of last resort. At the time, Defendants knew that SunPower had breached its reporting and financial covenants and thus could not get access to other forms of credit or cash. ¶170. As the CTO divulged, "[w]hile this incremental financing allowed the Company to weather near-term challenges, the Company was also affected by delays in filing certain of its financial reports," which blocked access to any capital that could provide "a comprehensive long-term liquidity and business solution." ¶83. In addition, finance manager, FE6, who worked on the Sol Holding deal said that even after securing funding in February 2024, "the big worry then is will we get the next tranche of lease financing?

And if we get the next one, will we get the one after that?" ¶145. Defendants claim that "the need for lease financing . . . says nothing about Defendants' expectations in February with respect to operational financing the Company used to run its business." MTD 19. But as the TAC relates, access to lease financing is dependent on the ability to raise capital, *e.g.*, ¶149, which was impossible given the ongoing, known breaches of the Company's financial and reporting requirements. Moreover, in February 2024, Defendants also knew that the SEC was investigating the Company's "accounting practices" (a fact not revealed to investors until five months later, in July), which would also render further capital raises dead in the water. *See Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F.Supp.3d 381, 397 (S.D.N.Y. 2022) ("investigations . . . provided red flags"); *In re Bear Stearns Comp., Inc.*, 763 F.Supp.2d 423 (S.D.N.Y. 2011) (same).[12]

The TAC also alleges that Defendants had a motive to misstate their financials to secure short-term credit solutions to buttress the failing business amid a liquidity crisis and to obscure that crisis by not paying creditors. *See Nguyen v. Radient Pharm. Corp.*, 2011 WL 5041959, at *8 (C.D. Cal. Oct. 20, 2011) (scienter demonstrated where "ability to continue operating was dependent upon raising additional capital"); *In re LDK Solar*, 584 F.Supp.2d 1230, 1247 (N.D. Cal. 2008) (motive to misstate financials to attract investors). As Forbes wrote, the circumstances around the Sol Holding infusion raise an inference that "***Sol Holdings [was] induced to throw good money after bad based on fractured financials***." *See EnSource Invs. LLC v. Tatham*, 2017 WL 10648061, at *5 (S.D. Cal. Mar. 9, 2017) ("failed to disclose that Hopewell was on the verge of bankruptcy when soliciting . . . investment"). Indeed, while Defendants were "meeting on a near daily basis during January and February 2024 to close the financing transaction with Sol Holding," Defendants "simultaneously" were working directly with its later-resigned auditor, EY, to prepare its 10-K annual report—due to be filed a mere ***two weeks*** (February 29, 2024) after the transaction was announced—where (unknown to investors) Defendants had "identified

---

[12] The Ninth Circuit recently held that an issuer had a duty under the securities laws to disclose an SEC letter that affected its ability to make aggressive financial forecasts. *Pino v. Cardone Capital, LLC*, 2025 U.S. App. LEXIS 14214, at **13-16, 139 F.4th 1102 (9th Cir. June 10, 2025). So, too, the subpoena (given its adverse impact) should have been earlier disclosed.

Opposition To Motion To Dismiss                19                3:23-cv-05544-RFL

misstatements and material deficiencies in the Company's disclosure controls and internal controls over financial reporting" that could not pass its auditor's scrutiny, and would delay the 10-K forever, and force yet *another* restatement shortly after, in April 2024, and eventually a noisy resignation from the Company's auditor, citing management's repeated failure to accurately provide financials to audit. *See Empl's Ret. Sys. v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015) (concealed information from auditor). "[G]iven the short time frame" (two weeks before Eby said the 10-K would be filed) "it is reasonable to infer that management was on notice of these problems." *See Grand Casinos*, 988 F.Supp. at 1283.

These statements are not protected by the safe harbor. Many are not forward-looking but address the *present* status of the Company's financial health. *E.g.*, ¶166 (Eby: "we do not expect **at the moment** to have a going concern provision in our 10-K" to be filed **two weeks later**); ¶165 (Faricy: capital infusion "**puts us in a position** to have the liquidity we need" for the next year); ¶168 (Eby: "cost reductions **have been implemented**"). Nor are these statements "surrounded by meaningful cautionary language." MTD 17-18. The boilerplate, hypothetical language cited by Defendants (that "actual results *may* differ'" MTD 17) does not suffice given "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired," including the undisclosed liquidity crisis and inadequate financials. Op. 13; *In re Alphabet Sec. Litig.*, 1 F.4th 687, 704 (9th Cir. 2021); *MF Global*, 982 F.Supp.2d at 318 (no safe harbor for going concern that company "might not hold sufficient capital or liquidity to meet market demands"); *In re American Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F.Supp.2d 511, 532 (S.D.N.Y.2010) (language insufficient "in light of the undisclosed hard facts critical to appreciating the magnitude of the risks"). And such language cannot overcome Eby's much more specific assurances that the Company would not have a going concern warning in the Company's annual report (due two weeks later). *See In re QuantumScape Sec. Class Action Litig.*, 580 F.Supp.3d 714, 734 (N.D. Cal. 2022) (disclosures do not render "more categorical statements [. . .] non-misleading").

**3.    Defendants Misled Investors About the Impact of Their Auditor's "Noisy" Resignation (Statement 10).**

After Defendants exhausted the second tranche of the Sol Holding credit in June 2024, the

Company was out of financing options—the need to restate its financials for the past two years (and the breaches of its financial and reporting covenants) cut off access to any additional credit. Yet on July 3, 2024, when the Company announced EY's "noisy" resignation and an ongoing SEC investigation, a press release stated that the Company was "***working to secure a new independent registered public accounting firm***" and that the "***development has no material impact on SunPower's current cash position or continued focus on delivering for its customers***. *Additional information is available in the Company's latest disclosure*." But this resignation had a material and devastating impact on the Company's cash position and business. This Court already held that "Plaintiffs have sufficiently alleged a [Section 10b] claim" (Op. 18-19) but "dismissed [it] because Plaintiffs fail to plead attribution." The TAC adequately pleads such attribution.

        a.      <u>New Allegations Bolster This Court's Ruling</u>.

As this Court held, "[t]he [prior] Complaint sufficiently alleges that Defendants knew that the resignation of EY—and the resulting inability to file audited financials—would block SunPower from obtaining additional cash and/or credit to remain solvent, thereby 'impact[ing] SunPower's current cash position.'" Op. 19. This Court also reasoned that, shortly after, "because SunPower allegedly informed suppliers that it could not fulfill its preexisting obligations two weeks later [on July 17] and filed for bankruptcy a month later with just $32.6 million in cash left in the bank despite having drawn the $50 million secondary [and final] tranche from Sol Holdings, one could reasonably infer that SunPower's cash position *had* been impacted." Op. 19.

The CTO confirmed that "the Company was . . . affected by delays in filing certain of its financial reports," which blocked access to capital to provide "a comprehensive long-term liquidity and business solution." ¶172. As FE8, a structured financial analyst, noted, "we did not raise any new capital because we hadn't issued financial statements." ¶149. FE10 confirmed "it was clear that the Company was still having cash problems"; the Company "was not paying our vendors," was "probably just barely making payroll," and "without having audited financials, our ongoing liquidity was pretty suspect." ¶150-51. As FE7 conveyed, this resignation would make it "very difficult to raise money" in enough time to stop the cash crisis given a new auditor would have to

reassess several years of financials, and "[t]hat's six to twelve months with no financials, which makes it very difficult to raise additional debt just to get through until the ship is righted." ¶147.

This Court also credited that "the speculation of various news outlets about the gravity of SunPower's troubles after EY's resignation" including "[a]n article on Forbes.com opin[ing] that EY's resignation signaled that *'[t]he troubles at SunPower must be beyond the average accounting questions facing these companies'*" and "that Sol Holdings *'might perhaps feel like a victim of securities fraud'* because it 'put fresh capital into a company on the promise that its accounting issues were being ironed out,' and yet "six months later the auditor quits because management wouldn't cooperate.'" Op. 19.  "[I]t is reasonable to infer that Defendants knew it was unlikely SunPower would be able to find another willing auditor soon to stave off its increasingly severe cash flow issues, and at the very least, was reckless in stating otherwise." *Id*.

Defendants contend that the "allegation [denying a "material impact on SunPower's current cash position"] fails because 'cash position' and 'cash flow' are distinct and well-understood terms." MTD 22-23.  Here, the "distinction" is one without a difference.  When cash cannot flow in from financing or otherwise, the cash position is impacted and imperiled.  *See In re Arlan's Dep't Stores, Inc*., 615 F.2d 925, 929 (2d Cir. 1979) ("Cash flow was clearly inadequate, and its cash position became critical.").  Defendants erroneously overfocus on the words "cash position" while ignoring their crucial precursor, "impact."  Of course, the dire developments would *impact* the current cash position—it would cause present cash to evaporate.  How a cash position will be "impacted" is understood to involve anticipated negative effects from future outflows.  *See In re City of Vallejo*, 2008 WL 4180008, at *9 (Bankr. E.D. Cal. Sep. 5, 2008) ("Fund's cash position also is negatively impacted by the approximate $2 million in excess insurance premiums that are due at the start of the fiscal year").  As this Court held, "a reasonable investor would not construe the statement so narrowly; indeed, such a statement would have little meaning if it were read as such"; "[r]ather, seeking a new auditor—and in the interim, lacking an auditor and restated financials—is an ongoing situation, and the most natural reading of the statement is as a comment on *the impact to SunPower's cash position in the near future*." Op. 19-20 (emphasis added).

b.    New Allegations Permit This Statement to be Attributed to Defendants.

The July 2024 press release was issued simultaneously with an 8-K discussing related matters signed by Defendant Eby. ¶¶108, 187. These two documents should be considered as one, integrated announcement. *See* ¶¶20(c), 102, 191. Defendants Eby and Werner may be held liable for the false press release both *directly* as "makers" under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) ("*Janus*") and *secondarily* as control persons. Primary and second liability are not "mutually exclusive." *Hessefort v. Super Micro Comput., Inc.*, 2021 WL 1169906, at *15 (N.D. Cal. Mar. 29, 2021).

***Defendants are Directly Liable as "Makers."*** The *Janus* "maker" test does not turn on who actually wrote a statement in question, but rather on who had the "ultimate authority" over its contents and dissemination. *Id.* Here, the TAC pleads numerous "surrounding circumstances" (*Janus*, 564 U.S. at 142) that permit an inference that Eby and Werner had ultimate authority over this crucial financial statement. As to Eby, she was part of a very small control group, led by Werner (MTD 21), she was the subject-matter expert and spokesperson regarding SunPower's finances and cash, she specifically opined repeatedly on the same issues raised in the press release, and she signed an 8-K on July 3, 2024 that was linked to the press release and part and parcel of the same crucial set of disclosures. ¶¶20(a-c); 108, 191. Press releases "were heavily controlled by the executive team," which included Eby as CFO. ¶195. It was also Eby's "habit and custom to review and approve the dissemination of financial information." ¶20(c); ¶192. As to PEO and Executive Chairman, Werner "led" the executive team (Defs. Ex. 30); FE9 confirmed that "either the CFO or the CEO would personally review and approve all such press releases related to the Company's financial condition" (¶192); that Werner was typically "on the chain of emails [that] conveyed these [press] releases to CEO Werner for approval and [FE9] would ensure that CEO Werner approved them in a timely manner for release" (*Id.*); FE7 confirmed that there was a press release approval process that would have required Werner's assent (¶194); while FE5 averred that approval by Werner would have been likely, as observed on similar occasions (¶195).

*Janus* "maker" liability has been adequately pled. *E.g.*, *Sneed v. AcelRx Pharm., Inc.*, 2023

WL 4412164, at *6-9 (N.D. Cal. July 7, 2023) (CEO and Chief Health Officer had "some degree of control over false statements" although their precise role was unclear); *In re Rocket Fuel, Inc. Sec. Litig.,* 2015 WL 9311921, at *10 (N.D. Cal. Dec. 23, 2015) (defendants "possessed the power and authority to control the contents of the Company's press releases [and] . . . presentations"). In *Bar Mandalevy v. Bofi Hldg.*, 2021 WL 794275, at *7 (S.D. Cal. Mar. 2, 2021), "maker" claims were upheld as to three executives, the CEO, CFO, and the Chief Legal Officer where plaintiffs alleged officers were "very involved in the oversight of the Company's finances" and, "according to confidential witnesses, actively discussed" the substance of alleged fraud, creating a "reasonable inference that [the] high-level officers . . . involved . . . would play a part in ensuring the accuracy of [the Company's] public statements regarding" it.[13]   The same is true here.

**_Defendants are Secondarily Liable as Control Persons_**. The analysis set forth below in Section B, *infra,* provides an independent basis for liability, and should not be confused with direct liability under *Janus.  See Oaktree Principal Fund V, LP v. Warburg Pincus* LLC, 2017 U.S. Dist. LEXIS 122725, at *22-23 (C.D. Cal. Jan. 17, 2017) (defendants need not be "primary" violators: "the 'control' inquiry . . . is more forgiving than the 'maker' inquiry under *Janus* and Rule 10b-5," so "under section 20(a), Plaintiffs . . . may state a claim based on the statements, even though [business purchaser] and [top executive] did not "make" the statements under *Janus*").   If violations are found to have been committed in SunPower's name, SunPower is a primary violator. *Costa Brava P'ship III LP v. ChinaCast Educ. Corp.,* 809 F.3d 471, 476 (9th Cir. 2015).  Plaintiffs allege that the Defendants knew that false statements had been issued "in the name of the Company, or in their own name," and that these were "primary violations." ¶238.  There is no requirement that the primary violator be named as a defendant—control person liability may be

---

[13] Defendants' authorities are inapposite.  *Bartelt v. Affymax, Inc*., 2014 WL 231551, at *13-14 (N.D. Cal. Jan. 21, 2014) and *In re InterMune, Inc. Sec. Litig.*, 2004 WL 1737264, at *6-7 (N.D. Cal. July 30, 2004) do not cite or discuss *Janus.*  In *In re Celgene Corp.*, 741 F.Supp.3d 217, 226-27 (D.N.J. 2024), *a post-discovery, summary judgment decision,* the alleged maker was a COO found to have lacked control and authority, only the power to "review and comment."  There was "no proof that the [COO] directed anyone about what to say or how to say it."  *Id.* at 224.  In *In re Banco Bradesco S.A. Sec. Litig.*, 277 F.Supp.3d 600, 640-41 (S.D.N.Y. 2017), the sole issue was whether *Janus* was satisfied by "group pleading."  Plaintiffs have not engaged in group pleading.

found regardless. *See, e.g.*, *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 285 (3d Cir. 2006) (control persons cannot escape liability due to primary violator's bankruptcy and failure therefore to be named as a defendant); *Abdo v. Fitzsimmons,* 2018 U.S. Dist. LEXIS 241075, at *64-68 (N.D. Cal. May 22, 2018). SunPower is identified as the controlled party, ¶¶270-71, and its role as a primary violator is alleged. *See* ¶3. Eby and Werner are liable as control persons for the release, as they controlled SunPower and had responsibility to ensure that the public utterances were accurate. Where a press release addresses a crucial matter, is material, and is within the controllers' sphere of expertise, a Section 20(a) claim is stated. *Alger Dynamic Opportunities Fund v. Acadia Pharm. Inc.*, 756 F.Supp.3d 852, 863, 879 (S.D. Cal. 2024) (false press releases); *Costas v. Ormat Techs., Inc.,* 2019 WL 6700199, at *8 (D. Nev. Dec. 6, 2019) (same).

**B. The TAC Adequately Pleads Section 20(a) Claims.**

Defendants present no cogent defense against Plaintiffs' Section 20(a) claims but insist that "Section 20(a) requires that 'the defendant exercised actual power or control over the primary violator.'" This is what must be demonstrated at trial; the *pleading standard* was established in *Howard*, 228 F.3d at 1065 ("it is not necessary to show actual participation or the exercise of actual power").[14] Defendants confuse Section 20(a) claims, which are liberally upheld, with direct Section 10(b) "maker" claims, which require more particularized pleading under *Janus*. *See* MTD 21 (arguing erroneously that control claims require statements be signed or attributed). Section 20(a) has no "signature," "maker" or "attribution" requirement. *See Oaktree Principal Fund V, LP v. Warburg Pincus LLC*, 2017 WL 3187688, at *6-7 (C.D. Cal. Jan. 17, 2017). Allegations about each Defendants' "titles and responsibilities" are "sufficient to establish control." *Ohio Pub. Empls. Ret. Sys. v. Meta Platforms, Inc.*, 2024 WL 4353049, at *19-20 (N.D. Cal. Sept. 30, 2024).

<u>**CONCLUSION**</u>

The Court should deny Defendants' motion to dismiss or grant further leave to amend.

---

[14] *E.g.*, *Biao Wang v. Zymergen,,* 744 F.Supp.3d 995, 1011 (N.D. Cal. 2024) ("It is enough … that the defendant possessed actual power, even if the plaintiff cannot show that the defendant used that power."); *Apple*, 2020 WL 6482014, at *14 (CFO liable for passively listening to false statements as he "could have corrected the record" and "disclosed omitted facts"). Even if required to allege the actual exercise of power or control, plaintiffs have readily done so. ¶¶18-20, 270.

Dated: July 14, 2025                    Respectfully submitted,

                                        POMERANTZ LLP

                                        /s/ Austin P. Van

                                        Jeremy A. Lieberman
                                        (*pro hac vice* application forthcoming)
                                        Austin P. Van
                                        (*pro hac vice*)
                                        Samantha Daniels
                                        (*pro hac vice*)
                                        600 Third Avenue, 20th Floor
                                        New York, New York 10016
                                        Telephone: (212) 661-1100
                                        Facsimile: (917) 463-1044
                                        jalieberman@pomlaw.com
                                        avan@pomlaw.com
                                        sdaniels@pomlaw.com

                                        Jennifer Pafiti (SBN 282790)
                                        1100 Glendon Avenue, 15th Floor
                                        Los Angeles, California 90024
                                        Telephone: (310) 405-7190
                                        jpafiti@pomlaw.com

                                        *Counsel for Plaintiffs*

                                        PORTNOY LAW FIRM
                                        Lesley F. Portnoy, Esq.
                                        1800 Century Park East, Suite 600
                                        Los Angeles, California 90067
                                        Telephone: (310) 692-8883
                                        lesley@portnoylaw.com

                                        *Additional Counsel for Bezeyem Lemou*

                                        David N. Lake
                                        LAW OFFICES OF DAVID N. LAKE, APC
                                        16130 Ventura Boulevard, Suite 650
                                        Encino, California 91436
                                        Tel: (818) 788-5100
                                        Fax: (818) 479-9990
                                        Email: david@lakelawpc.com

                                        PASKOWITZ LAW FIRM PC

Opposition To Motion To Dismiss            26                    3:23-cv-05544-RFL

Laurence D. Paskowitz
(*pro hac vice*)
97-45 Queens Blvd., Ste. 1202
Rego Park, New York 11374
Telephone: (212) 685-0969
Facsimile: (718) 275-1338
lpaskowitz@pasklaw.com

*Additional Counsel for Gabriel Rodrigues and Charles Orr*