**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice application forthcoming*)
Austin Van
(*pro hac vice*)
Samantha Daniels
(*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
avan@pomlaw.com
sdaniels@pomlaw.com

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE SUNPOWER CORPORATION SECURITIES LITIGATION<br><br>This Document Relates to:<br><br>*ALL ACTIONS* | No. 3:23-cv-05544-RFL<br><br>CLASS ACTION<br><br>**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**<br>Date:   Feb. 24, 2026<br>Time:   10:00AM<br>Judge:  Hon. Rita F. Lin<br>Courtroom:  15, 18th Floor |

Lead Plaintiff Bezeyem Lemou and Plaintiffs Daniel Suarez and Charles Orr (collectively "Plaintiffs") respectfully submit this Supplemental Memorandum In Support Of Unopposed Motion For Preliminary Approval Of Settlement ("Supplemental Memorandum") pursuant to the Court's Order for Supplemental Filings for Motion for Preliminary Approval of Class Action Settlement ("Order") dated January 26, 2026 (Dkt. No. 135).

In connection with this Supplemental Memorandum, Plaintiffs also submit an Amended Stipulation of Settlement and exhibits thereto, in both clean and redline, reflecting the changes and additions required by the Court's Order.

1.      **"Plaintiffs estimate likely aggregate damages of $48 million for two claims, one claim that 'was worth at most $10 million in damages' and another claim for which 'estimated damages . . . fall into a range with a midpoint of approximately $38 million.' (*See id.* at 18.) Please explain how these $10 million and $38 million figures were calculated."**

*$10 Million Estimated Damages for the Period 8/2/2023 to 11/15/2023:*  At the time of the settlement negotiations, the $10 million figure represented Plaintiffs' best understanding of the maximum damages Defendants ascribed to the damages period 8/2/2023 to 11/15/2023, but Defendants have since informed Plaintiffs that this was not their damages figure for this period.  Plaintiffs' expert estimated maximum damages for the period 8/2/2023 to 11/15/2023 at $4 million.  Plaintiffs used the $10 million figure instead of their own because it results in the more conservative (higher) total maximum damages for the Court to use in assessing this settlement, and both parties agreed that the theoretical damages for this period could not exceed $10 million.

Plaintiffs' experts' calculation of their $4 million damages figure for this period can be explained as follows.  Damages for this period were primarily analyzed under The Institutional Trading Model, a version of the "Multi-Sector, Multi-Trader Model of Investor Behavior," which has been advocated by NERA Economic Consulting, an economic consulting firm frequently

engaged by plaintiffs and defendants in class action securities litigation.[1] Unlike proportional trading models, which estimate the trading behavior of various assumed investor types using observed daily trading volume, the Institutional Trading Model, "in contrast, essentially counts damaged volume for a substantial subset of the outstanding shares [i.e., for institutional investors]."[2] Specifically, the Institutional Trading Model estimates aggregate damages from the reported quarterly shareholdings of institutions, which filed an SEC Form 13-F during the Class Period, under the assumption that increases in institutional holdings represent share purchases and that decreases represent share sales. Non-institutional damages are estimated by analyzing the quarterly changes in shares held by non-institutions (i.e., shares outstanding + short interest - insider holdings - institutional holdings) during the Class Period. For both institutions and non-institutions, daily shareholdings, purchases and sales are estimated by interpolation using the observed exchange trading volume in SunPower stock between the reported quarterly positions. Under FIFO, the first-in-first-out accounting method is used for matching sales with prior purchases.

For the period August 2, 2023 through November 15, 2023, damages were calculated using November 16, 2023 as the relevant alleged corrective disclosure impact date. As shown in Table 1, the Company-specific stock price decline on that date was conservatively associated with per-share inflation of $0.17.[3]

Applying the per-share inflation described above to the daily trading behavior predicted by the Institutional Trading Model, aggregate Class-wide damages for shares purchased during the

---

[1] *See* Mayer, Marcia Kramer, "Best-Fit Estimation Of Damaged Volume in Shareholder Class Actions: The Multi-Sector, Multi-Trader Model of Investor Behavior," NERA Economic Consulting working paper, 2000 ("Mayer (2000)").

[2] Mayer (2000), pp. 6, 7. (Emphasis in original.)

[3] The Institutional Trading Model was not applied to the period July 5, 2024 through July 18, 2024 because that period contains no quarter-end dates. As a result, there are insufficient Form 13-F data to reliably estimate institutional purchases and sales during this interval, making proportional trading models more appropriate for estimating damages over this period.

period August 2, 2023 through November 15, 2023 were estimated as follows, prior to the adjustments reference above (which reflected a judgment that additional damages could be proven as the litigation progressed):

| Summary of Damages for Period: 8/2/2023–11/15/2023 Institutional Trading Model (FIFO) | |
| --- | --- |
| Number of Damaged Shares | 25.4 million |
| Damages | $4.0 million |

\*\*\*

***$38 Million Estimated Midpoint of Damages for the Period 7/5/2024 to 7/18/2024***: Thirty-eight million is the approximate midpoint between Defendants' and Plaintiffs' different expert damages calculations for the period July 5, 2024 through July 18, 2024.

Defendants presented Plaintiffs with their experts' damages model projecting damages of $16 million.

As explained further below, Plaintiffs' experts provided two different damages calculations based on two different damages models. Under the One-Trader Model, damages are estimated to be $76.8 million, and under the 80/20 Multi-Trader Model, damages are estimated to be $46.5 million. The midpoint damages figure between these two Models is approximately $60 million.

Thus, taking the midpoint between Defendants' figure ($16 million) and Plaintiffs' figure ($60 million), the approximate midpoint between those calculations is $38 million.

To estimate aggregate Class-wide damages for the period July 5, 2024 through July 18, 2024, Plaintiffs' experts estimated the timing and quantity of investor transactions in SunPower common stock during the Settlement Class Period using both (i) the proportional "One-Trader Model," and (ii) the proportional "80/20 Multi-Trader Model," which are two versions of the

General Trading Model ("GTM"),[4] which has been advocated by representative authors from Cornerstone Research, an economic consulting firm frequently engaged by defendants in class action securities litigation.[5] "Virtually every securities litigation case in which aggregate damages are estimated relies on a version of the GTM for the number of shares damaged and the damage theory for the amount of artificial inflation."[6]

Specifically, the One-Trader Model posits that each share purchased during the Class Period has the same chance of being sold on a subsequent day as any other share in the float, and that shares purchased on day $t$ of the Class Period have, on average, a probability of being sold on day $t+1$ equal to the adjusted volume-to-float ratio on day $t+1$. The 80/20 Multi-Trader Model, on the other hand, posits two active traders (*e.g.*, institutions and individuals) with different shareholdings and propensities to trade. The so-called "80/20" split between the two sets of traders specifies a large set of "slow" traders (*i.e.*, they hold 80% of shares available, but trade 20% of the volume) and a small set of "fast" traders (*i.e.*, they hold 20% of shares available, but trade 80% of the volume).

For the period July 5, 2024 through July 18, 2024, damages were calculated using July 18 and July 19, 2024 as the relevant alleged corrective disclosure impact dates. As shown in the table below, the Company-specific stock price declines on July 18 and July 19, 2024 are associated with per-share inflation of $0.95 and $0.78, respectively, for a total of $1.73 per share.

---

[4] Barclay, Michael, and Frank C. Torchio. "A Comparison of Trading Models Used for Calculating Aggregate Damages in Securities Litigation." *Law and Contemporary Problems*, vol. 64, no. 2/3, 2001, pp. 105–136 ("Barclay and Torchio (2001)") at 117.

[5] William H. Beaver, James K. Malernee and Michael C. Keeley, "Stock Trading Behavior and Damage Estimation in Securities Cases," Cornerstone Research working paper, 1993.

[6] Barclay and Torchio (2001) at p. 105.

Applying the per-share inflation described above to the daily trading behavior predicted by the One-Trader Model and 80/20 Multi-Trader Model, aggregate Class-wide damages for shares purchased during the period July 5, 2024–July 18, 2024 are estimated to be as follows:[7, 8]

| Summary of Damages for Period: 7/5/2024 – 7/18/2024 | | |
|---|---|---|
| | **One-Trader Model** | **80/20 Multi-Trader Model** |
| Number of Damaged Shares | 55.3 million | 31.1 million |
| Damages | $76.8 million | $46.5 million |

**2.    "The Recognized Loss calculation accounts for share price inflation using an estimated inflation figure 'based on certain misrepresentations alleged by Plaintiffs and on stock price declines, net of market- and industry-wide factors, that occurred in reaction to the public announcements that allegedly corrected those misrepresentations.' (*See* Dkt. No. 132-2 at 39 ¶ 58; *see also id.* at 40 (chart of 'Per-Share Price Inflation' by date ranges).) Please explain how the Per-Share Price Inflation figures were calculated."**

For the purpose of estimating price inflation present in SunPower stock during the Settlement Class Period for the Plan of Allocation, a standard event study was performed.  As part of the event study, the Company-specific return on each day of the Settlement Class Period was estimated using a regression analysis, which measures the relationship between SunPower's stock returns and 1) changes in market-wide factors that would be expected to impact all stocks; and 2) changes in industry-wide factors that would be expected to impact stocks in SunPower's particular industry.  By measuring how SunPower's stock returns move in relation to an overall market index and an industry index, one can also measure how it responds to Company-specific news on a given day.

---

[7] Trading volume has been reduced by 31% for to correct for the typical level of dealer-intermediated trading.  (*See* Barclay and Torchio (2001) at p. 110.)  The midpoint of the two models is approximately $61.65 million.

[8] Additional data input and sources include: shares outstanding, closing price, trading volume and short interest as reported by Bloomberg; and institutional and insider holdings as reported by Thomson Reuters Eikon.

According to Plaintiffs, "Defendants' materially false, misleading, and incomplete statements were revealed through disclosure events occurring between July 26, 2023, and July 19, 2024, the price of SunPower's securities materially fell, as the prior inflation came out of the Company's share price."[9]  The Company-specific returns (*i.e.*, net of market and industry effects) on each of the alleged impact dates, as estimated by the regression analysis, are shown in Table 1 below.[10]

| Alleged Impact Date[11] | Previous Closing Price | Actual Return | Company-Specific Return | Contribution to Price Inflation |
|---|---|---|---|---|
| 7/26/2023 | $11.22 | -15.78% | -15.82% | $1.78 |

[9] Consolidated Third Amended Class Action Complaint for Violation of the Federal Securities Laws (the "TAC"), ¶202.

[10] *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016) (internal citations omitted, emphasis in original):

> Performing an event study can thus help an expert to determine at least two things. First, assuming that the defendant company fraudulently concealed information, the event study shows how much money the fraud caused shareholders to lose. Identifying residual returns on days when allegedly concealed information reached the market indicates that the supposedly withheld information caused the company's stock price to change.  If the release of allegedly withheld information causes a stock price decrease, shareholders who purchased the defendant company's stock after the alleged fraud but before the revelation may have paid a higher price than they would have but for the defendant's fraudulent conduct — known as an "artificial[ly] inflat[ed]" price.

> Second, the event study helps the expert "calculat[e] what the price of [the defendant company's] security would have been had the alleged wrongful conduct not occurred," by estimating the amount of artificial inflation in the company's stock price over time.  Just as the existence of a residual return on a day when the market discovers allegedly concealed information shows that the company's stock price was artificially inflated, the *size* of the residual return on such a day provides evidence of the *amount* by which concealing that particular information inflated the defendant company's stock.  As a result, if concealed information reached the market through multiple corrective disclosures, the sum of the residual returns associated with those disclosures provides evidence about the amount of artificial inflation in the company's stock after the fraud but before those corrections.  Thus, an expert using an event study can estimate the amount of artificial inflation in the defendant company's stock price when shareholders purchased their shares, which is equivalent to estimating the difference between what those investors should have paid for the shares but-for the alleged fraud, and what they actually paid.

[11] TAC, ¶¶203–233.

| 7/27/2023 | $9.45 | -2.33% | 0.41% | -$0.04 |
|---|---|---|---|---|
| 11/16/2023 | $4.67 | -7.28% | -3.67% | $0.17 |
| 12/12/2023 | $4.80 | -7.61% | -4.22% | $0.20 |
| 12/18/2023 | $6.14 | -31.27% | -29.71% | $1.82 |
| 2/15/2024 | $4.27 | 0.35% | -1.96% | $0.08 |
| 2/16/2024 | $4.28 | -15.42% | -13.64% | $0.58 |
| 2/20/2024 | $3.62 | -4.14% | -0.65% | $0.02 |
| 2/21/2024 | $3.47 | -1.15% | 0.70% | -$0.02 |
| 2/22/2024 | $3.43 | -7.87% | -1.61% | $0.06 |
| 2/23/2024 | $3.16 | 0.63% | 4.32% | -$0.14 |
| 4/23/2024 | $2.14 | -8.41% | -10.95% | $0.23 |
| 7/5/2024 | $2.43 | -22.39% | -21.36% | $0.57 |
| 7/18/2024 | $2.52 | -40.08% | -37.73% | $0.95 |
| 7/19/2024 | $1.51 | -55.01% | -51.82% | $0.78 |
| **TOTAL** | | | | **$7.06** |

Consistent with Plaintiffs' allegations, the artificial inflation in the price of SunPower stock used in the Plan of Allocation begins on May 3, 2023 (*i.e.*, the start of the Settlement Class Period). [12]   The following table summarizes the evolution of price inflation throughout the Settlement Class Period:

| Table 2 Plan of Allocation Per-Share Artificial Inflation in SunPower Stock | | |
|---|---|---|
| **From** | **To** | **Per-Share Price Inflation*** |
| May 3, 2023 | July 25, 2023 | $7.06 |
| July 26, 2023 | July 26, 2023 | $5.28 |
| July 27, 2023 | November 15, 2023 | $5.32 |
| November 16, 2023 | December 11, 2023 | $5.15 |
| December 12, 2023 | December 17, 2023 | $4.95 |
| December 18, 2023 | February 14, 2024 | $3.13 |
| February 15, 2024 | February 15, 2024 | $3.04 |
| February 16, 2024 | February 19, 2024 | $2.46 |
| February 20, 2024 | February 20, 2024 | $2.43 |
| February 21, 2024 | February 21, 2024 | $2.46 |
| February 22, 2024 | February 22, 2024 | $2.40 |
| February 23, 2024 | April 22, 2024 | $2.54 |

---

[12] TAC, ¶48.

| April 23, 2024 | July 4, 2024 | $2.31 |
|---|---|---|
| July 5, 2024 | July 17, 2024 | $1.73 |
| July 18, 2024 | July 18, 2024 | $0.78 |
| July 19, 2024 | Thereafter | $0.00 |

\* For each day listed in Table 1, the per-share price inflation in SunPower stock is limited to that day's closing price for the stock.

**3.      The Recognized Loss calculation is complex. At the end of the section in the Long Notice discussing the calculation, please include a note that the claimant may contact the administrator with questions about the calculation and how it applies to them, along with the administrator's contact information.**

The Long Notice has been revised to include a note that the claimant may contact the administrator with questions about the calculation and how it applies to them, along with the administrator's contact information.  The revised Long Notice and its redline is filed herewith as Exhibit I-A-1, with this addition at paragraph 68.

**4.      Please confirm that the operative complaint and all supplemental filings provided in response to this Order will be available on the settlement website.**

The operative complaint and all supplemental filings provided in response to this Order will be available on the settlement website, as confirmed in the Declaration of Cody, filed herewith.

**5.      Please confirm that an electronic form to request exclusion will be available on the settlement website.**

An electronic form to request exclusion will be available on the settlement website, as confirmed in the Declaration of Cody, filed herewith.  The electronic exclusion form is filed herewith as Exhibit II-A.

**6.      Please edit each notice to set the time of the final approval hearing for 1:30 p.m., both in person and via Zoom, and to include the following link for those who wish to attend via Zoom: https://cand.uscourts.gov/judges/rfl/lin-rita-f. A proposed schedule, including a final**

**approval hearing date, will be provided to the parties shortly before the preliminary approval hearing, if appropriate.**

The Long Notice, Summary Notice, Postcard Notice, and Email Notice have been revised to include the time of the final approval hearing for 1:30 p.m., note that the hearing is to take place both in person and via Zoom, and include the following link for those who wish to attend via Zoom: https://cand.uscourts.gov/judges/rfl/lin-rita-f.  The revised Notices and their redlines are filed herewith as Exhibits A-1, A-2, A-3, and A-4.

**7.    The definition of Settlement Class (*see* Dkt. No. 132-1 at 13) should also exclude the presiding judge and their staff and the immediate family members of the judge and their staff.**

In the documents containing this definition (the Stipulation of Settlement, Preliminary Approval Order, Long Notice, Summary Notice, Postcard Notice, Email Notice, and the Declaration of Wilmot) the definition of "Settlement Class" now excludes the presiding Judge, their staff, and the immediate family members of the Judge and their staff.  Exhibits I, A-5, A-1, A-2, A-3, A-4 and A-6.

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Austin Van*
Austin Van (pro hac vice)
Jeremy A. Lieberman (pro hac vice)
Samantha Daniels (pro hac vice)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: bszydlo@pomlaw.com
jalieberman@pomlaw.com
dferrogari@pomlaw.com

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Telephone: (310) 2405-7190
Email: jpafiti@pomlaw.com

*Attorneys for Lead Plaintiff and the proposed Classes*